UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:16CR006(MPS) |
| vs. | : | |
| JOHN EASTMAN | : | January 22, 2016 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS

In the early evening hours of Saturday, November 10, 2012, Waterbury police detectives Peter Morgan and David Terni (the "Waterbury detectives") entered the home of John and Linda Eastman and conducted a search of the home as well as a search and a seizure of an HP Pavilion desktop computer. The Waterbury detectives then detained Mr. Eastman, transported him to the Waterbury police station, and subjected him to custodial interrogation. The Waterbury detectives did all of this without a warrant of any kind. According to the Waterbury detectives, their searches, seizures, and interrogation were justified because Mr. Eastman signed a "Consent to Search" form, an "Advisement of Rights" form, and a "Voluntary Statement Rights" form. According to John Reznikoff, an expert on handwriting analysis, "to a strong degree of professional certainty," Mr. Eastman did not sign any of those documents. See Exhibit A (Expert Report).[1] Likewise, both Mr. and Mrs. Eastman deny giving consent. See Exhibits B (John Eastman Affidavit) and C (Linda Eastman Affidavit). Because the Waterbury detectives failed to obtain a warrant and no exception to the warrant requirement applies, the government cannot meet its burden to demonstrate that the Waterbury detectives complied with the Fourth and Fifth Amendments, and therefore, the Court should suppress the computer and its contents, along with the results of the forensic examination conducted on the computer, in addition to all statements purportedly made by Mr. Eastman.

---

[1] Note that all of the questioned consent forms are attached to Exhibit A.

**I. There are two different versions of the relevant factual background.**

In many cases arising from home searches, the facts of what happened are not in dispute except for a key detail or two. In the usual case, the facts are largely agreed upon but the import of those facts is disputed by the parties. This is not a usual case. In this case, there are two profoundly different versions of what happened.

    A. <u>The Waterbury detectives' story does not make sense.</u>

The Waterbury detectives' version of events, taken entirely from the report of Detective Morgan, is simple. <u>See</u> Exhibit D (Morgan report). On October 25, 2012, the Waterbury Police Department received a complaint from the Vermont State Police regarding some allegedly suspect Skype activity. On November 1, 2012, Detective Morgan applied for and was granted an ex parte order requesting the Comcast cable account information for the individual using the IP address associated with the suspect Skype activity. On Thursday, November 8, 2012, Detective Morgan received a response from Comcast, indicating that the IP address was associated with John Eastman of 157 Congress Avenue, Waterbury, Connecticut. <u>See</u> Exhibit D at Disc-0029. One would expect that the next logical step would have been for Detective Morgan to apply for a search warrant, based upon the combination of information received from Comcast and the Vermont State Police. It is at this point, however, that the Waterbury detectives' story begins to diverge from what one would expect. The Waterbury detectives apparently did not apply for a warrant.

Instead, Detectives Morgan and Terni visited the Eastman home without a warrant. The Waterbury detectives had no sooner entered the home when, according to the Waterbury detectives' version of events, Mr. Eastman stated that he wished to "fully cooperate" in the investigation and told the Waterbury detectives that he was willing to voluntarily give the computer to the detectives for further investigation. Detective Morgan's report states that "Once inside, I advised Mr. Eastman of the ongoing investigation. Mr. Eastman stated that he wished to fully cooperate in the investigation. Mr. Eastman stated that he had a desktop computer in his bedroom that he uses, and that he was willing to voluntarily give the computer to the detectives for further investigation. On November 10, 2012, Mr. Eastman signed a Consent to Search form allowing detectives to take his HP Pavilion

2

model p2 desktop computer S/N 3CR22116SQ and perform a complete computer forensic examination on it." See Exhibit D at Disc-0029-30.  According to Detective Morgan, Mr. Eastman then voluntarily agreed to go to the police station with the detectives.  Detective Morgan asserts that Mr. Eastman was advised of his Miranda rights and then waived them.  According to Detective Morgan, Mr. Eastman then gave a fairly lengthy and detailed incriminating statement that, if true, amounted to a confession for production of child pornography.

Curiously, however, notwithstanding this supposed tell-all confession, the Waterbury detectives allowed Mr. Eastman to leave the police station.  See Exhibit D at Disc-0030.  In fact, according to his report, Detective Morgan did not apply for an arrest warrant until May 2013, approximately six months later.  See Exhibit D at Disc-0035.  Meanwhile, Mr. Eastman had gone to Virginia to help out his cousin who was very sick and died in March, 2013.  In May 2013, Mr. Eastman was arrested in Virginia, extradited to Connecticut and was detained in state custody.

Even more curiously, it was not until February 2015, more than two years after the computer was seized, that Mr. Eastman was presented in federal court before the Hon. Joan G. Margolis. Criminal Complaint at Disc-01.  He has been detained in state custody the entire time.

> B. The version of events supported by expert John Reznikoff's opinion and Mr. and Mrs. Eastman's affidavits makes more sense.

The Waterbury detectives' story is materially incorrect in several significant ways.  Most importantly, Mr. Eastman never consented to the search of the Eastman home or the seizure and subsequent search of his computer, either in writing or verbally.  Nor did he write, sign, or even read the alleged statement and corresponding Voluntary Statement Rights form that the police have provided.  See Exhibit B at ¶ 19.

On the evening of November 10, 2012, at approximately 6:00 p.m., Mr. Eastman was in his home, which he shares with his mother, Linda Eastman.  Two men knocked on the door and said they wanted to ask Mr. Eastman some questions.  Although they verbally identified themselves as police officers, they did not display identification nor give their names.  When Mr. Eastman opened the door,

the two men stepped inside, forcing Mr. Eastman to stumble backwards. Mr. Eastman did not invite them in, nor did they ask if they could enter. The man who Mr. Eastman later learned was Detective Morgan began asking him about his Skype habits. Detective Morgan asked Mr. Eastman to go with him to the police station. Initially, Mr. Eastman voluntarily agreed. The officers then handcuffed Mr. Eastman, and Detective Terni pushed Mr. Eastman's shoulder down and told him to sit on the couch and not to move. Meanwhile, Detective Morgan began to search the apartment. Detective Morgan looked inside packed boxes and desk drawers in the living room, entered the kitchen without permission and began looking through counter drawers and into the pantry area, and entered Mrs. Eastman's bedroom, where she had been asleep, without asking permission, waking and surprising Mrs. Eastman.

   Mr. Eastman protested the Waterbury detectives' search of the home. Mrs. Linda Eastman, Mr. Eastman's mother, who had been asleep in her own bedroom, came out and demanded that the officers show some authority for the search they were conducting. See Exhibit C at ¶ 2. Mrs. Eastman also protested the search. The officers ignored both Mr. and Mrs. Eastman. At one point, Mr. Eastman stated that he needed to use the bathroom, and rose to go do so, but was told to stop by Detective Terni, who then took the handcuffs off and allowed him to use the bathroom, but insisted that he keep the door open. He also told Mr. Eastman to not touch anything in the cabinets and to keep his hands free. Mr. Eastman asked for some privacy, and Detective Terni turned his head away, but left the bathroom door open. When Mr. Eastman emerged from the bathroom, he saw Detective Morgan in his bedroom, looking inside dresser drawers. Mr. Eastman again protested that he had no right to conduct any such search. Detective Morgan again ignored Mr. Eastman, and disconnected the computer tower in his bedroom from its screen and picked it up. He shook it and inquired whether there was a hard drive. Mr. Eastman replied that he was not supposed to be touching it. Mr. Eastman

4

was then put in handcuffs again and driven to the Waterbury police station by Detectives Morgan and Terni.

After they arrived at the police station, Detective Morgan asked Mr. Eastman his age, which he told him. Detective Morgan then explained that he was investigating a complaint from some young women in Vermont about an interaction they had had on Skype. He read Mr. Eastman a statement from a Vermont State trooper about the incident and asked Mr. Eastman if he knew anything about the incident. Mr. Eastman denied it, and demanded the return of the computer. Detective Morgan jumped up from his chair and put his face very close to Mr. Eastman's face. He said that if Mr. Eastman did not cooperate with him he would lock him up and make his bond $250,000, adding that it was a holiday weekend (Veterans Day). Mr. Eastman asked what the charges were and requested a lawyer. Detective Morgan then began to type up a statement. Detective Morgan printed the statement, which to the best of Mr. Eastman's knowledge is the one provided by the government. Mr. Eastman read it but refused to sign it, nor did he acknowledge any of the facts in it as true. It is, in fact, not Mr. Eastman's statement.

Detective Morgan told Officer Terni to drive Mr. Eastman home. Mr. Eastman asked for the return of the computer and inquired whether anything else had been taken from the home. Detective Morgan ignored Mr. Eastman, and Mr. Eastman left with Officer Terni. In the car with Officer Terni, Mr. Eastman again requested the return of the computer and was told he would get it soon or within three days. Even Detective Morgan's own report suggests that Mr. Eastman had not previously been free to leave. Detective Morgan's report describes the end of the interview with Eastman this way: "Mr. Eastman was allowed to leave the police department without any further incident pending the completion of the computer forensic examination of his desktop computer." See Exhibit D at Disc-0030. The suggestion that he was "allowed" to leave suggests that he had not previously been allowed

5

to do so.  When Officer Terni dropped Mr. Eastman off at his home he gave back several cell phones he had taken from Mr. Eastman's house.

Mr. Eastman neither signed, nor initialed, nor verbally agreed to the following documents -- "Consent to Search form," (Disc-0038); Voluntary Statement Rights form (Disc-0039); "Advisement of Rights" (Disc-0040); and "Voluntary Statement" (Disc-0036-37).

**II.   The Government Bears the Burden of Proof.**

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. . . . Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence . . . that the search or seizure did not violate the Fourth Amendment." United States v. Herron, 18 F. Supp.3d 214, 221 (E.D.N.Y. 2014) (citations omitted).  There is no dispute that the police seized a computer from Mr. Eastman's home and subjected it to a search.  Nor is there any dispute that no warrant was issued for the seizure or the search.  The government therefore has the burden of proving that its actions were legal.  United States v. Vasquez, 638 F.2d 507, 524 (2d Cir. 1980) (citing cases).

**III.   The Waterbury detectives conducted an illegal search of the Eastman home.**

   A. The search of the Eastman home is presumptively unreasonable, because it was conducted without a warrant.

The Fourth Amendment to the United States Constitution provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV.  The Supreme Court has "time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy." Jones v. United States, 357 U.S. 493, 498 (1958).  "[I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and

6

well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal citations and quotation marks omitted); see also Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions").

"[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013); see also United States v. United States District Court, 407 U.S. 297, 313 (1972) ("The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). That is because the home serves as "the center of the private lives of our people." Minnesota v. Carter, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). "We have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's house is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown.'" Georgia v. Randolph, 547 U.S. 103, 115 (2006) (quoting Miller v. United States, 357 U.S. 301, 307 (1958) (internal quotation marks omitted)). It is therefore "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (quoting Coolidge, 403 U.S. at 477).

There is no dispute that the Waterbury detectives did not have a search warrant to search the Eastman home.

B. <u>No exception to the warrant requirement applies.</u>

"The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn[.]" <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958). "A warrantless search" like the one in this case "is per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." <u>United States v. Perea</u>, 986 F.2d 633, 639 (2d Cir. 1993). "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." <u>United States v. Isiofia</u>, 370 F.3d 226, 230 (2d Cir. 2004).

In seeking to admit evidence obtained during a warrantless search on the basis of consent, the Government must demonstrate by a preponderance that such consent was (1) provided (2) voluntary (3) by someone with actual or apparent authority over the premises. The Government must further demonstrate (4) that the consent remained effective (i.e., was not retracted) at the time the evidence was seized, and (5) was not countermanded by a co-inhabitant's express refusal to consent. In holding the Government to its burden, it should be remembered that the right to be free from warrantless searches is "fundamental" and "cannot be eroded simply because the government seeks to take the path of least resistance by obtaining consent from an individual whose interest in the premises searched is obviously vague and attenuated." <u>United States v. Gonzalez Athehorta</u>, 729 F. Supp. 248, 258 (E.D.N.Y. 1990).

> **1. There is no record evidence that the Eastmans consented to the search of the home.**

There is no evidence at all to suggest that the Eastmans consented to the search of the *<u>home</u>*. There is a consent to search form in evidence, however, the consent to search form references only an "<u>HP desktop computer</u>," *not* the Eastman home. Accordingly, the Waterbury detectives had no

authority to enter the Eastman home and search it, and everything that follows is fruit of the poisonous tree.

### 2. The government cannot prove by a preponderance of the evidence that Mr. Eastman signed the Consent to Search form.

The Waterbury detectives assert that Mr. Eastman signed a Consent to Search form. Handwriting expert, John Reznikoff, has analyzed the signature and initials on the Consent to Search form and has compared them to known samples of Mr. Eastman's signatures. He has concluded to a "strong degree of professional certainty" that the signature/initials on the Consent to Search form is not that of John Eastman. See Exhibit A. Mr. Reznikoff's expert opinion, alone, is sufficient to prevent the government from meeting its burden of proof. There is, however, additional record evidence bolstering Mr. Reznikoff's opinion. According to Mr. Eastman's affidavit, he never signed the Consent to Search form. See Exhibit B at ¶¶ 9, 11 and 15. Moreover, according to Mrs. Eastman's affidavit, she neither saw nor heard any evidence that Mr. Eastman consented to the search. See Exhibit C at ¶¶ 8 and 9.

The circumstances surrounding Mr. Eastman and the interaction with the Waterbury detectives also suggests that he did not consent to the search and seizure of the home and computer.

First, it does not make sense that Mr. Eastman would consent to a search. Mr. Eastman has a history of past interactions with law enforcement and is an inherently distrustful man. It would, in fact, be very surprising if Mr. Eastman had consented to the search.

Second, it does not make sense that the Waterbury detectives failed to obtain a warrant prior to visiting the Eastman home. They had the time and ability to do so, yet failed to do so. Their failing is suggestive of – at a minimum – poor judgment and failure to adhere to best practices. The Court should approach the Waterbury detectives' version of events with scrutiny.

Third, the Waterbury detectives excluded Mrs. Eastman from the report altogether. Certainly the presence of a co-habitant and her reaction to the Waterbury detectives is relevant to the question of consent and should have been addressed.

<u>Fourth</u>, the handling of the seized cell phones and the failure to provide a property receipt also suggests lack of consent. When Mr. Eastman was finally told he could go, he was handed several cell phones that the police had taken from his home without his consent or knowledge and was told that the police would be in touch. It should be noted that the police had neither asked for his permission to seize the cell phones, told him they were doing so, nor offered any kind of receipt or invoice for the seized items, including the computer. That fact alone casts doubt on Detective Morgan's version of events – if he was so scrupulous about getting consent for seizures, why did he fail to do so for the cell phones?

It is likewise suspicious that the Eastmans were not given a property receipt for the seized property.

<u>Fifth</u>, the time and location written on the Consent to Search form are suspicious. The time listed is 7:40 p.m., which is approximately one hour and 40 minutes after the Waterbury detectives entered the Eastman home. This suggests that the consent form was not drafted contemporaneously to the search but rather was drafted later, after the fact. The time is even more suspicious when compared to the Voluntary Statement Rights form, which has a time entry of 1932 hours (or 7:32) which is actually earlier than the time on the Consent to Search form. Yet, the Voluntary Statement Rights form supposedly was signed at the police station <u>after</u> the search. In addition, the location listed on the Consent to Search form is 255 East Main Street, Waterbury, Connecticut, which is not the Eastman residence. It is the Waterbury police station. This again suggests an after-the-fact attempt to justify earlier actions.

<u>Finally</u>, as discussed above, nowhere does the form even purport to give consent to search the *home*, which would have been a pre-requisite to searching the computer.

### 3. The government cannot prove by a preponderance of the evidence that Mr. or Mrs. Eastman gave any other form of consent, verbal or otherwise.

Neither Mr. Eastman nor his mother verbally consented to the search and seizure of the computer. In fact, their affidavits make clear that they protested the illegal search. <u>See</u> Exhibits B and C.

Moreover, even if Mr. Eastman had consented to the search, which he did not, Mrs. Eastman's refusal to give consent would have negated any prior consent given by Mr. Eastman. An individual who possesses actual or apparent authority may withdraw his or her consent at any time prior to or during the search. See Walter v. United States, 447 U.S. 649, 656 (1980) ("When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of its authorization."); United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004) (noting that an individual has a "constitutional right to revoke or limit the scope of a search to which he has consented").

Likewise, any co-inhabitant's refusal to submit to a premises search negates whatever consent has been given by an authorizing party. See Georgia v. Randolph, 547 U.S. at 103, 120 (2006) ("[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

Here, according to her affidavit, Mrs. Eastman – as soon as she awoke and was aware of what was happening – refused consent, thereby negating any consent previously given. See Exhibit C at ¶ 2.

> **4. Even if the Court accepts the Consent form as legitimate, it was not executed at the time of the search and therefore is not valid.**

Even if the Court were to find that the Consent to Search form (which applies only to the computer, not to the home) is valid, it still would not justify the search of the Eastman home or the seizure of the computer. The form states on its face that it was prepared at the Waterbury police station, not at the Eastman home and was prepared after the search had been completed. Thus, there is no evidence of consent given contemporaneously with the search of the home and seizure of the computer. The government cannot meet its burden of showing that consent was given at the relevant time.

11

**5. No other exception to the warrant requirement applies.**

No other exception to the warrant requirement even arguably applies.

**6. The physical evidence must be suppressed as fruit of an unreasonable search.**

"[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention.'" United States v. Crews, 445 U.S. 463, 470 (1980) (internal citations omitted).  Here, the Court should suppress the HP Pavillion computer, all of its contents, and the forensic analysis thereof.

**IV.    The verbal statements sought to be attributed to Mr. Eastman must be suppressed.**

The written, typed statement that the Waterbury detectives attribute to Mr. Eastman was actually written and typed by the Waterbury detectives.  Mr. Eastman did not write the statement, did not agree to the statement, and did not sign the statement.  As such, it cannot be said to be his statement at all.  Moreover, to the extent that the Waterbury detectives were trying to illicit a statement from Mr. Eastman, their attempts to do so violated the Fifth Amendment.

A.    Mr. Eastman did not sign the "Voluntary Statement Rights" form, the "Advisement of Rights" form, or the "Voluntary Statement" form.

The Waterbury detectives assert that Mr. Eastman signed a "Voluntary Statement Rights" form, an "Advisement of Rights" form, and a "Voluntary Statement" form.  Handwriting expert, John Reznikoff, has analyzed the signature and initials on the three forms associated with Mr. Eastman's purported confession and has compared them to known samples of Mr. Eastman's signatures.  He has concluded to a "strong degree of professional certainty" that the signature/initials on the three relevant forms are not that of John Eastman.  See Exhibit A.  Moreover, Mr. Eastman denies signing the relevant forms and denies having made any incriminating statements to the Waterbury detectives.

12

      B.      <u>Even if Mr. Eastman had made a statement, such statement would need to be suppressed, because it was the product of custodial interrogation, and the government cannot meet its burden of proof to show that Mr. Eastman was advised of his Miranda rights.</u>

When the government seeks to admit statements made by a suspect, the government must show by a preponderance of the evidence that the statement was voluntary and not "coerced, by explicit or implicit means, by implied threat or covert force." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 228 (1973). Whether a statement is voluntary is determined on the basis of the totality of the circumstances. "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." <u>Green v. Scully</u>, 850 F.2d 894, 901 (2d Cir. 1988). <u>See also</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 433, 120 S. Ct. 2326, 147 L.Ed.2d 405 (2000) ("a confession be voluntary to be admitted into evidence"). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." <u>United States v. Taylor</u>, 745 F.3d 15, 23 (2d Cir.2014).

The Supreme Court has long held that:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966). To introduce an incriminating

13

> statement made in response to custodial interrogation in its case-in-chief, the government bears the burden of proving by a preponderance of the evidence that the accused waived his Miranda rights voluntarily, knowingly, and intelligently. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Howes v. Fields, 132 S. Ct. 1181, 1189-90, 182 L. Ed. 2d 17 (2012) (internal quotation marks and citations omitted). The term "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. In order to determine the freedom of one's movement, "courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Id.

"In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary centered around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Green, 850 F.2d at 901-02. A threat to arrest a suspect is not per se coercion, see, e.g., United States v. Tutino, 883 F.2d 1125, 1138 (2d Cir.1989) (citing United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir.)), but must be considered on a case specific basis. Specifically, a threat that is "false or baseless" can be impermissibly coercive. United States v. Graham, 480 F. App'x 453, 456 (9th Cir. 2012) (unpublished summary order). The test of voluntariness of a confession is whether all the relevant circumstances show that the conduct of law enforcement officials "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." United States v. Ferrara, 377 F.2d 16, 17 (2d Cir.), (quoting Rogers v. Richmond, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L.Ed.2d 760 [1961]).

The question whether a person is under arrest or in custody depends on "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." United States v. Newton, 369 F.3d 659, 671 (2d Cir. 2004) (quoting United States v. Ali, 68 F.3d 1468, 1472 (2d Cir.1995)).  Moreover, "a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. at 672.

> Courts have looked at various factors in making this determination. These include:  whether a suspect is or is not told that she is free to leave, see Campaneria v. Reid, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989); the location and atmosphere of the interrogation, see Oregon v. Mathiason, 429 U.S. 492, 494–95, 97 S. Ct. 711, 713–14, 50 L.Ed.2d 714 (1977); the language and tone used by the police, see United States v. Guarno, 819 F.2d 28, 31–32 (2d Cir. 1987); whether the suspect is searched, frisked, or patted down, see United States v. Wilson, 901 F. Supp. 172, 175 (S.D.N.Y.1995); and the length of the interrogation, see Berkemer, 468 U.S. at 437–38, 104 S. Ct. at 3148–49.

Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998).

Mr. Eastman denies he made any inculpatory statements to the Waterbury detectives, as noted above.  Nonetheless, in addition and in the alternative, he also argues that any statements he did make, no matter what the content, cannot be used against him because they were the product of a custodial interrogation.  See Exhibit B at ¶ 15.

**1.     Mr. Eastman was "in custody" in his home and at the police station.**

The entire series of events the evening of November 10, 2012 demonstrates that Mr. Eastman was in custody.

Once inside the Eastman home, the detectives placed Mr. Eastman in handcuffs and ordered him to sit down.  They did more than that.  One of the officers placed a hand on his shoulder and directed him to sit.  It was an unequivocal physical direction to sit, one that, had it been resisted, would certainly have been treated as resisting an officer.  While that officer remained standing over Mr. Eastman, another officer began searching the home.  See Exhibit B at ¶¶ 8 and 11.  When Mr. Eastman needed to use the bathroom, he had to ask permission to do so and was ordered to leave the door open so the police could observe him.  See Exhibit B at ¶ 10.

15

When Mrs. Eastman awoke she demanded to know why police were searching her home, and asked to see a warrant. <u>See</u> Exhibit B at ¶ 9.  The police ignored her, and Detective Morgan subsequently omitted her presence – and her objections to his actions – from his version of events.  As the intrusion was ending, Detective Morgan unhooked and seized a computer, again without the permission of either Eastman, or the display of a warrant, and without providing a receipt for the confiscated property.  <u>See</u> Exhibit B at ¶ 11.

Mr. Eastman was transported to the police station in handcuffs in the back of the detectives' vehicle.  At the police station, Mr. Eastman was threatened with being thrown in jail for the duration of a long holiday weekend.[2]  <u>See</u> Exhibit B at ¶ 14.

### 2. Mr. Eastman was subjected to interrogation.

By the Waterbury detectives' own admissions, they questioned Mr. Eastman in his home and at the police station about the matter they were investigating.  <u>See</u> Exhibit D at Disc-0029.

### 3. The government cannot meet is burden of proof to show that Mr. Eastman was advised of his <u>Miranda</u> rights.

As discussed above, according to handwriting expert John Reznikoff, the signatures on the Advisement of Rights form and Voluntary Statement Rights form do not match Mr. Eastman's signature.  There is no other evidence that Mr. Eastman was advised of his rights.  Even in Detective Morgan's report, he does not state that the Waterbury detectives verbally advised Mr. Eastman of his rights.  It would have been very helpful if the Waterbury detectives had recorded the interview, but apparently they did not.  The absence of a recording in this era is also indicative of – at a minimum – poor police practices.

Accordingly, even if Mr. Eastman had made the incriminating statements attributed to him, those statements would need to be suppressed.

---

[2] The interview occurred November 10, 2012, the Saturday of the three-day Veterans Day holiday.

16

**V.     Conclusion**

The government cannot meet its burden of proof to show that the search and seizure and resulting custodial interrogation in this case was lawful. Accordingly, all physical evidence and all purported statements attributed to Mr. Eastman must be suppressed, because they were obtained in violation of the Fourth and Fifth Amendments.

In the alternative, Mr. Eastman respectfully requests that the Court hold a hearing in this matter.

                                           Respectfully Submitted,

                                           THE DEFENDANT,
                                           JOHN EASTMAN

                                           FEDERAL DEFENDER OFFICE

Date: January 22, 2016          /s/ Kelly Barrett
                                           Assistant Federal Defender
                                           265 Church Street, 7th FL
                                           New Haven, CT 06510
                                           Phone: (860) 498-4200
                                           Bar No.: ct27410
                                           Email: kelly_barrett@fd.org

CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on January 22, 2016, a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                                 /s/ Kelly Barrett
                                               Kelly Barrett