UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-cr-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | March 28, 2016 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

The Government respectfully submits this memorandum in opposition to the defendant John Eastman's motion to suppress physical evidence and statements ("Def.'s Mot.") and his accompanying memorandum of law ("Def.'s Mem.").  Docs. 30 and 31.  On November 10, 2012, two detectives from the Waterbury Police Department went to the defendant's apartment to investigate a complaint that a Skype user, utilizing an internet account associated with the defendant's residence, had engaged in sexually explicit webcam conversations with a minor in Vermont. The defendant invited the detectives into the apartment, showed them the computer in his bedroom, and verbally consented to let the detectives take the computer to be forensically examined.  At no point did the detectives search the apartment, take any other items from the apartment, or place the defendant in handcuffs.  The defendant also agreed to go with the detectives to the police station to discuss the investigation.  At the police station, the defendant was advised of his rights, signed a waiver of his rights, provided a signed sworn statement, and signed a consent to search form memorializing his prior verbal consent to search his computer. A government forensic document examiner has confirmed that the defendant's signature on those forms match other documents with his signature.  Again, at no point was he in handcuffs.

Accordingly, there have been no Constitutional violations, and the Court should deny the defendant's motion to suppress.

Even if the Court finds that the Waterbury detectives somehow violated the defendant's Constitutional rights, the computer evidence should not be suppressed because federal law enforcement agents separately obtained a federal warrant to search the defendant's computer, and acted in good faith when they executed the warrant and forensically examined his computer.

Therefore, the defendant's motion should be denied.

## I.     FACTUAL BACKGROUND

### A.     The Nature of the Investigation and Charges

On January 7, 2016, a federal grand jury returned a two-count indictment charging the defendant with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  Doc. 28 (Indictment).  The indictment alleges that between June and November 2012, the defendant engaged in video chats with minors over the internet using online video chatting services such as Skype.  Indictment ¶¶ 2, 5.  During these video chats, he enticed the minors to engage in sexually explicit conduct, which he then recorded and/or photographed and then saved on his computer.  *Id*.  In order to deceive and entice the minors, the defendant posed as famous singers and musicians that are popular to teenagers.  *Id*.

The charges stem from an investigation that originally began in Vermont in September 2012 when Trooper Eric Jollymore of the Vermont State Police received a complaint from the mother of an eleven year old girl about an incident that occurred when her daughter and her daughter's friends were using Skype during a sleepover.  Decl. of Detective Peter Morgan, dated March 25, 2016, ¶ 3, attached hereto as Ex. A ("Morgan Decl."); Doc. 1-1 (Criminal Complaint Affidavit ("Compl. Aff.")) ¶ 12.  Trooper Jollymore then spoke with the eleven year old girl,

who indicated that she and her friends were using the Skype program to speak with people over the internet, including an individual on Skype using the username "Harry.Styles888." Morgan Decl. ¶ 3; Compl. Aff. ¶ 13. Harry Styles is a member of the musical group "One Direction" that is popular with teenagers.  Morgan Decl. ¶ 3; Compl. Aff. ¶ 13. During the Skype conversation, "Harry.Styles888" asked the girls to activate the web cam so that he could see them. Morgan Decl. ¶ 3; Compl. Aff. ¶ 13.  The girl told "Harry.Styles888" that the girls were thirteen years old.  Morgan Decl. ¶ 3; Compl. Aff. ¶ 13. After the girl activated the web cam on her computer, "Harry.Styles888" asked the girls if they could pose in the sexual position called "Doggy Style" in front of the web cam for him. Morgan Decl. ¶ 3; Compl. Aff. ¶ 13.  The girl stated that they did not perform the act, and the conversation ended shortly thereafter. Morgan Decl. ¶ 3; Compl. Aff. ¶ 13.

Through a court order, Skype disclosed that the "Harry.Styles888" account was activated on July 27, 2012 from a specific internet protocol address, which Trooper Jollymore subsequently determined was assigned to Comcast Cable to a subscriber in Waterbury, Connecticut.  Morgan Decl. ¶ 4; Compl. Aff. ¶ 14.  Trooper Jollymore then referred the matter to the Waterbury Police Department for further investigation.  Morgan Decl. ¶ 4; Compl. Aff. ¶ 15.

The case was assigned to Detective Peter Morgan of the Waterbury Police Department's Computer Crimes Unit.  Morgan Decl. ¶¶ 2, 4; Compl. Aff. ¶ 16.  Detective Morgan has been a member of the Waterbury Police Department since 1995. Morgan Decl. ¶ 2.  He started as a police officer and then became a detective in 2004.  *Id*.  He is also a computer forensic examiner. *Id*.

Detective Morgan reviewed the Vermont complaint and then obtained an order from Connecticut Superior Court requiring Comcast to disclose the subscriber information associated

with the internet protocol address disclosed by Skype. Morgan Decl. ¶¶ 3, 5; Compl. Aff. ¶ 16. On November 8, 2012, Comcast reported that the internet protocol address provided by Skype was assigned to the account of John Eastman with an address in Waterbury, Connecticut. Morgan Decl. ¶ 6; Compl. Aff. ¶ 16.

### B.      The Events of November 10, 2012

During the evening of Saturday, November 10, 2012, Detective Morgan and another member of the Waterbury Police Department, Detective David Terni,[1] drove to the defendant's apartment to try and speak with him about the complaint from Vermont. Morgan Decl. ¶ 7; Compl. Aff. ¶ 17. Detective Terni has been a member of the Waterbury Police Department for several years.  Morgan Decl. ¶ 7.  Detective Morgan did not obtain a search warrant at the time because he felt he needed additional information first.  *Id*. ¶ 8.  The detectives arrived at the defendant's residence sometime between 6:00 and 6:30pm. *Id*. ¶ 9. Upon arrival, the detectives knocked on the door. *Id*. ¶ 10. The defendant answered the door, and Detective Morgan identified himself and Detective Terni to the defendant.  *Id*.  Although they were dressed in plain clothes, Detective Morgan showed Eastman his police shield and stated he was with the Computer Crimes Unit of the Waterbury Police Department.  *Id*.  Detective Terni was wearing his police shield around his neck and was visible.  *Id*.

The defendant invited the two detectives into the apartment.  *Id*. ¶ 11. Detective Morgan informed the defendant that he was not under arrest and that he was conducting an investigation regarding his internet activity.  *Id*. The defendant stated he wished to cooperate. *Id*.  The defendant sat down on the couch in the living room. *Id*. The defendant was never placed in handcuffs during the time the detectives were at the residence.  *Id*.

---

[1] The government expects to call Detective Terni to testify at the suppression hearing.  Detective Morgan is unavailable due to a prior family obligation in Atlanta, Georgia on the days the hearing is scheduled.

At one point, the defendant's mother came out from a bedroom and asked what was happening. *Id*. ¶ 12. Detective Morgan explained they were from the police department and were investigating the defendant's internet activity. *Id*.   The defendant told his mother to go back inside her room and that everything was okay. *Id*.   His mother then went inside her room and closed the door. *Id*.

Detective Morgan asked the defendant about a laptop computer he could see in plain view.  *Id*. ¶ 13. The defendant stated he did not use that laptop. *Id*. He then stated he had a desktop computer in his bedroom that he uses, and he led the detectives into his bedroom. *Id*. The detectives followed the defendant into the bedroom where they observed the desktop computer and a webcam. *Id*. Detective Morgan asked the defendant if they could take the desktop computer to the police station to be examined.  *Id*.  The defendant verbally agreed. *Id*. The detectives did not ask to take the other laptop computer because the defendant indicated he did not use that computer.  *Id*.

The detectives also asked the defendant if he would be willing to come to the Waterbury Police Department to speak about the case, and the defendant agreed to do so.  *Id*. ¶ 14.  Prior to leaving, the defendant used the bathroom, and he closed the door as he was using the bathroom. *Id*. ¶ 15.  Also, before leaving, the defendant knocked on the door to his mother's bedroom to let her know where he was going. *Id*.  Eastman's mother inquired as to whether her son was under arrest and Detective Morgan responded no. *Id.*

The total time the detectives spent in the defendant's apartment was less than half an hour. *Id*. ¶ 17. The detectives did not enter any other room, other than the living room and the defendant's bedroom, which the defendant invited them into.  *Id.*  They did not enter the kitchen or the mother's bedroom, they did not search the apartment, and they did not take any items

except for the desktop computer that the defendant verbally agreed to let them take. *Id.* The defendant was calm and cooperative throughout the period the detectives were at his residence, and neither the defendant nor his mother ever asked the detectives to leave the apartment. *Id.*

The detectives then drove the defendant to the police station.  *Id.* ¶ 16. He sat in the back seat of the car and was not in handcuffs during the drive.  *Id.*  At the police station, Detective Morgan sat at a desk in an open area next to a computer, and the defendant sat next to him. *Id.* ¶ 18.  Detective Terni was across from them.  *Id.* The defendant was not in handcuffs during the interview.[2]  *Id.*

Before interviewing the defendant, Detective Morgan provided the defendant with an "Advisement of Rights" form and read out loud each of the Constitutional rights contained on the form. *Id.* ¶ 19; *id.* Ex. A-1. The defendant initialed each of the rights contained on the form and agreed to waive those rights. *Id.* ¶ 19; *id.* Ex. A-1. The defendant signed the form, and Detective Morgan also signed the form and noted the date and time, which was November 10, 2012 at 6:55 p.m.  *Id.* ¶ 19; *id.* Ex. A-1. Detective Terni was also present at the time and observed. *Id.* ¶ 25.

Detective Morgan then interviewed the defendant, and the defendant described his use of Skype to interact with minors. *Id.* ¶ 20. After the interview, Detective Morgan started a computer program on the computer at the desk in order to type the defendant's statement into a "Voluntary Statement" form. *Id.*  Upon starting the program, the program generates a "Voluntary Statement Rights Form" which, like the Advisement of Rights, lists an individual's Constitutional rights. *Id.*  Detective Morgan provided the form to the defendant.  *Id.*  The defendant placed his initials next to each right and then signed the form agreeing that he understood and wished to waive

---

[2] There is no video recording of the interview because prior to 2014, the Waterbury Police Department was not equipped with video recording devices to record interviews.  Morgan Decl. ¶ 18.

those rights.  *Id*. ¶ 20; *id.* Ex. A-2.  Detective Morgan also signed the form and noted the date

and time, which was November 10, 2012 at 7:32 p.m.  *Id*. ¶ 20; *id.* Ex. A-2.  Again, Detective

Terni was also present at the time and observed. *Id.* ¶ 25.

Detective Morgan then finished typing the defendant's statements into the Voluntary

Statement form, printed the form, and then handed it to the defendant.  *Id*. ¶ 21. Detective

Morgan asked the defendant to read portions of the statement out loud to make sure he could

read the form. *Id.*  After reviewing the statements on the form, the defendant asked for a change

to one of his statements.  *Id*.   Detective Morgan made the change, reprinted the form, and

provided it to the defendant.  *Id*.   The statement provides, in part, as follows:

> I use the Internet to chat with girls on different web sites. I use the program Skype
> to chat with girls because you can use the web cam to video chat and see them
> while chatting. I am sexually attracted to very petite girls. I like girls that are like
> 14 years old and have started to develop. Because of this, I made a couple of
> screen names on Skype that were the names of members of the singing group One
> Direction. I used their names because I know the names would attract teenage
> girls to contact me. One of the screen names I used is "harry.styles888." I also
> have an email address "stylesharry446@gmail.com." I log on to Skype with the
> screen name and just wait for girls to contact me. When a girl contacts me, I start
> chatting with them. If they want to see me on the web cam, I will have a You
> Tube video of the singer from some old video footage ready to play and then
> point my web cam at the computer screen so the girl thinks that she is talking to
> the real singer. I will then try talking to the girl in a sexual manner to see if she
> will talk back. I will ask if the girl will pose in the sexual position doggy style
> with their ass facing the camera. I ask them to do this because I think it is the best
> pose to see a girl. My hope is that the girl will show me herself on camera and
> then pose in a sexual manner, or perform some kind of sex act for me to see. I
> know that I have chatted with some girls that were between like 12 and 15 years
> old, we chatted about sex and they posed in a sexual manner or performed a sex
> act so I could watch on the web cam.  Anytime that I can get the girls to perform
> any sex acts, I will masturbate until I ejaculate. . . . I also go to other porn sites
> called Motherless.com and Jailbait.

*Id.* Ex. A-3.

Before asking the defendant to sign the statement, internal procedures require the

detectives to call a supervisor to observe and notarize the defendant's signature.  *Id*. ¶ 22.  In

accordance with those procedures, the detectives called Lieutenant William Fox to observe and notarize while the defendant initialed and signed the Voluntary Sworn Statement.[3]  *Id*. ¶ 23.  In the presence of Lieutenant Fox, Detective Morgan, and Detective Terni, the defendant initialed and signed the Voluntary Statement on each page.  *Id*.  Lieutenant Fox then signed the form on each page.  *Id*.  Finally, Detective Terni signed the form on each page as a witness.  *Id*.

Detective Morgan also asked the defendant to sign a Consent to Search form to memorialize the verbal consent he previously gave the detectives to search his desktop computer. *Id*. ¶ 24; *id.* Ex. A-4.  The defendant signed the form. *Id*. ¶ 24; *id.* Ex. A-4. Detective Morgan also signed the form and noted the date and time, which was November 10, 2012 at 7:40 p.m. *Id*. ¶ 24; *id.* Ex. A-4.  Like before, Detective Terni was present at the time and observed.  *Id*. ¶ 25.

The detectives did not arrest the defendant following the interview, as Detective Morgan wanted to perform a forensic examination of the defendant's computer to see if evidence from the computer corroborated his statements.  *Id*. ¶ 26.  The two detectives drove the defendant back to his residence. *Id*. ¶ 27.  The defendant sat in the back seat of the car and he was not placed in handcuffs during the drive.  *Id*.  Upon arrival at his residence, the defendant got out of the car, and the detectives drove away.  *Id*.

### C.     The Forensic Examination of the Defendant's Computer

After the interview, Detective Morgan began forensically examining the defendant's computer. Def.'s Mot. Ex. D at DISC-000030. Through his forensic examination he found the Skype program on the computer, along with several Skype usernames that were used to communicate with other people.  *Id*. at DISC-000031. The names of some of the Skype accounts were:  bieber.believe,  harry.styles888,  harry.styles962,  john.eastman.15,  justin.bieber727,

---

[3] Lieutenant Fox has since been promoted and is currently a Captain at the Waterbury Police Department.  The government expects Captain Fox to testify at the suppression hearing.

justin.bieber6444, justin.swag6, louis.tomlinson85, niall.horan520, and sam.albert624.  *Id*.  Justin Bieber is a singer who is popular with teenagers. *Id*.  Harry Styles, Niall Horan, and Louis Tomlinson are members of the singing group "One Direction" that is popular with teenagers.  *Id*. Sam Albert is a popular teen figure on the website YouTube. *Id*.  Detective Morgan also found several videos that were saved to the hard drive that depicted webcam videos of the individual singers and band members listed above, which was consistent with the defendant's signed statement when he admitted "I will have a You Tube video of the singer from some old video footage ready to play and then point my web cam at the computer screen so the girl thinks that she is talking to the real singer." *Id.* at DISC-000032.

In addition, Detective Morgan located photos that were taken using Skype's "Video Snapshot" function, which allows a Skype user to take still photos of the person they are communicating with during a Skype video call. *Id.* Photos taken with the "Video Snapshot" function depict a still image of whatever the other person is doing on the video call when the snapshot is taken. *Id.* Several of them depict child pornography in that they depict minor females in various stages of undress and posing in a lascivious manner, with their exposed buttocks facing the camera allowing a clear view of their genitalia, consistent with the defendant's signed statement in which he stated "I will ask if the girl will pose in the sexual position doggy style with their ass facing the camera. I ask them to do this because I think it is the best pose to see a girl." *Id*.

Detective Morgan also recovered hundreds of images of child pornography from unallocated space from the defendant's computer, meaning the defendant had deleted the images prior to his computer being examined.  *Id.* at DISC-000033. His web browsing history showed he repeatedly accessed websites with names indicative of child pornography.  *Id*.  Finally, there was

also evidence on the computer that the Skype account "harry.styles888" had been used to communicate with the minor girls from Vermont.   *Id.* at DISC-000031.

### D.      The Defendant's State Charges

Based on the evidence he gathered to date, Detective Morgan obtained an arrest warrant charging the defendant in Connecticut Superior Court with Employing a Minor in an Obscene Performance, Promoting a Minor in an Obscene Performance, and Use of a Computer to Entice a Minor to Engage in Sexual Activity, Misrepresentation of Age to Entice a Minor, Possession of Child Pornography, and Risk of Injury to a Minor.   *Id.* at DISC-000035. The defendant, however, was no longer living in Connecticut.  Def.'s Mem. at 3. He had taken off to live with a relative in Virginia.  *Id.*

The defendant was eventually apprehended in Virginia.  Ex. D (Waiver of Extradition). On May 15, 2013, he waived extradition, and on May 29, 2013, he was transported to Connecticut, where he was formally arrested on the Connecticut state charges listed above.  Ex. D (Waiver of Extradition); Ex. E (Uniform Arrest Report).

### E.      The Federal Investigation

In approximately February 2014, the state authorities contacted federal law enforcement to see if the case could be charged federally.  Decl. of Special Agent Allison M. Haimila, dated March 28, 2016, ¶ 2, attached hereto as Ex. B ("Haimila Decl.").  Special Agent Allison Haimila with the Department of Homeland Security, Homeland Security Investigations ("HSI") was the lead federal case agent assigned to the case.[4] *Id.* ¶¶ 1, 2.  She obtained and reviewed copies of Detective Morgan's reports and the results of his forensic examination.  *Id.* ¶ 2; Compl. Aff. ¶ 20.   She also applied for, obtained, and executed search warrants for several of the email

---

[4] The government expects Special Agent Haimila to testify at the suppression hearing.

accounts associated with the Skype accounts found on the defendant's computer.  Haimila Decl. ¶ 3.  Based on her investigation, Agent Haimila determined that the photos and videos saved from the Skype calls were of approximately five different minor victims and depicted child pornography.  *Id.* ¶ 4; Compl. Aff. ¶ 20. On February 20, 2015, the defendant was arrested pursuant to a federal criminal complaint charging him with coercion and enticement of a minor and possession of child pornography.  Docs. 1, 6.

Subsequently, on July 28, 2015, Agent Haimila applied for and obtained a search warrant to forensically examine a mirror image of the defendant's computer.  Haimila Decl. ¶ 6; *United States v. Mirror image of 500 gigabyte Hitachi computer hard drive, bearing serial number JP1572FL0375ZK*, No. 3:15-mj-152 (JGM) (D. Conn.). The basis for the warrant was that computer forensic examiners at HSI had access to additional computer forensic analysis tools that Detective Morgan did not have access to.   Haimila Decl. ¶ 6.   Based on the warrant, computer forensic examiners at HSI performed additional computer forensics on the computer image and recovered the evidence that Detective Morgan recovered, as well as Skype chat messages between the Skype accounts on the defendant's computer and dozens of minor victims. Haimila Decl. ¶ 6.  Several of the chats correspond to the date and time some of the still images depicting child pornography were taken using the Skype Video Snapshot function.  *Id.* Through Facebook and other social media applications, law enforcement was able to identity two of the minors: one resides in Seattle and was 16 years old at the time of the offense, and the other resides in Florida and was approximately 12 years old at the time of the offense.  *Id*. ¶ 7.

Based on the evidence, on January 7, 2016, a federal grand jury returned the indictment in this case charging the defendant with coercion and enticement of a minor and possession of child pornography.

### F.      The Defendant's Motion to Suppress

On January 22, 2016—nearly three years after the defendant was apprehended in Virginia and arrested in Connecticut Superior Court—the defendant filed the instant motion to suppress. Although Agent Haimila utilized the results of Detective Morgan's forensic examination and the defendant's statements to the Waterbury detectives in her application for a federal search warrant to forensically examine a mirror image of his computer, Agent Haimila was not aware that the defendant was contesting the validity of the Consent to Search form, the Advisement of Rights form, the Voluntary Statement Rights form, or the Voluntary Statement form.  Agent Haimila had no reason to believe that he had not provided consent to search his computer or that he had not voluntarily made the statements contained in the Voluntary Statement.  *Id.* ¶ 8.  In addition, according to Agent Haimila and Detective Morgan, the defendant never made a request to have his computer returned to him. *Id.*; Morgan Decl. ¶ 28.

### G.      The Government's Handwriting Analysis

After the defendant filed his motion to suppress in which he claims the signatures on the forms discussed above are not his, the government utilized the services of a forensic document examiner, Joan DiMartino, who is employed by HSI.[5]  Ex. C (Report and CV of Joan DiMartino). She compared the signature on the original disputed forms (Consent to Search, Advisement of Rights, Voluntary Statement Rights, and Voluntary Statement) to other original documents that the government asserts bear Eastman's signature, including his Waiver of Extradition, which he signed before a judge in Norfolk, Virginia on May 15, 2013, and his Uniform Arrest Report in Connecticut, his Booking Card, and a Waterbury questionnaire, all of which he signed on May 29, 2013 after he was brought back to Waterbury and which are signed

---

[5] The government expects HSI forensic document examiner to testify at the suppression hearing.

by officers other than Detectives Morgan and Terni.  *Id.*; Exs. D, E, F, G. After performing a comparative and microscopic handwriting examination, she determined that the writer of John Eastman's signature on the Consent to Search form is the same as the writer of John Eastman's signature on the other documents.  Ex. C.

### H.      The Defendant's Criminal History

The defendant has an extensive criminal history.  Def.'s Mot. Ex. D. at DISC-000034 to DISC-000035.  In 1998, he was convicted in Connecticut state court in 1998 for fourth degree sexual assault and risk of injury to a minor.  *Id.*  In that case, the defendant had pulled down the underwear of a nine-year old girl while she was sleeping. *Id.* The defendant was placed on the Connecticut Sex Offender Registry for ten years, and was removed from the registry in 2009. *Id.*

In 1999, the defendant was convicted of first degree harassment for making obscene telephone calls and giving obscene notes to an adult woman who worked at his bank. *Id.*  In 2008, the defendant was again convicted of risk of injury to a minor for grabbing the arm of a 15 year old female as she walked past him.  *Id.*  The defendant also has three convictions in Connecticut for violating probation.  *Id.*

Prior to 1998, the defendant had several convictions in Florida including making obscene telephone calls.  *Id.*  In addition, the defendant's sister states that the defendant repeatedly sexually harassed her and her sister, that he often exposed himself and masturbated in public, and that he would call up girls in his sisters' classes and talk in a sexually explicit manner to them and sexually grab them when they visited the house.  *Id.* at Disc-000033 to DISC-000034.  The sister stated that at one point their father put the defendant into a sex rehab program, but their mother signed him out a short time later.  *Id.*  According to the sister, the defendant also shot a cat with a BB gun, and stuffed their dog's head into a gas oven with the gas on.  *Id.*

## II.     ARGUMENT

### A.     The Court Should Deny the Motion to Suppress the Physical Evidence

#### 1.     The defendant consented to the search of his computer.

A warrantless search or seizure without probable cause does not violate the Fourth Amendment if, like here, "the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995). Voluntary consent "need not be expressed in any particular form[.]" *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). "[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).

In determining whether consent is voluntary, courts look to the totality of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993). A number of factors are relevant to the voluntariness of a consent to search, including age, education, background, physical and mental condition, the setting in which the consent is obtained, and the defendant's prior interactions with law enforcement. *See Schneckloth*, 412 U.S. at 226; *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (consent voluntary where 40-year-old defendant was calm, conversation with police was conversational in tone, and defendant had prior convictions and was "thus no newcomer to the law"). Significantly, a defendant's knowledge of the right to refuse consent is not a requirement to a finding of voluntariness. *See Schneckloth*, 412 U.S. at 231-33.

Here, the Court should deny the defendant's motion to suppress the computer evidence because, contrary to the defendant's contentions, law enforcement did not conduct a search of his residence. Rather, the defendant invited the detectives into his apartment, showed the detectives

to his bedroom, and verbally gave them permission to take his computer from his bedroom.  The detectives did not search any of the rooms or take any other items.

Looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. *See United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (noting that interrogation in the familiar surroundings of one's own home is generally not deemed custodial).  In fact, the defendant admits that the request to go to the police station for an interview "was phrased as a request, not an order."  The defendant also has prior dealings with law enforcement and is no newcomer to the law. *See Calvente*, 722 F.2d at 1023 (consent voluntary where 40-year-old defendant was calm, conversation with police was conversational in tone, and defendant had prior convictions and was "thus no newcomer to the law").

Finally, when the defendant was taken back to the police station, he initialed and signed a "Consent to Search" form, memorializing his prior consent to have the detectives examine his computer.  Morgan Decl. Ex. A-4. The form expressly disclosed that he had the right to refuse consent, and he initialed the form indicating he read and understood that right.  He also initialed the form to indicate his consent was being given freely and voluntarily without coercion.  Accordingly, his motion to suppress the computer evidence should be denied.

## 2.  The defendant's version of events is not credible.

The defendant and his mother provide different version of events.  The defendant argues that the Waterbury detectives' version of events should be discredited, claiming their version does not make sense.  *See* Def.'s Mem. at 9-12.  To the contrary, the detectives' version of events makes complete sense.

For example, the defendant argues that it does not make sense that Mr. Eastman would consent to a search given his past history with law enforcement. *See* Def.'s Mem. at 9. However, as the Second Circuit and other courts in this circuit have repeatedly observed, "[d]espite the obvious irony, it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979); *see United States v. Villegas*, 928 F.2d 512, 518 (2d Cir. 1991) (quoting the same); *United States v. Moreno*, No. 08-CR-605, 2009 WL 454548, at *7 (E.D.N.Y. Feb. 24, 2009) (same); *United States v. Yepes-Quintero*, No. 86 CR 672, 1987 WL 8114, at *2 (E.D.N.Y. Mar. 6, 1987) (same).  Although an individual's consent to a search primarily benefits law enforcement, it "may result in considerably less inconvenience for the subject of the search." *Schneckloth*, 412 U.S. at 228. Granting consent in such circumstances is not necessarily self-defeating, because a defendant may still disclaim ownership of what is uncovered in the search. *See Price*, 599 F.2d at 497.  Thus, it is entirely reasonable for the defendant to have provided his consent to take and search his computer.

The defendant also suggests that it does not make sense that the Waterbury detectives did not get a warrant first, reflecting poor judgment. *See* Def.'s Mem. at 9. However, Detective Morgan believed the better course of action was to try and speak with Eastman first because he felt he needed additional information to support an application for a search warrant.  It is entirely reasonable for law enforcement to try and obtain a defendant's consent to search without having a warrant in hand.  In fact, courts have repeatedly recognized that this procedure, often called a "knock and talk" strategy, is a legitimate law enforcement option. *See United States v. Chambers*, 395 F.3d 563, 568 n. 2 (6th Cir. 2005) ("Courts generally have upheld [the 'knock and talk'] investigative procedure as a legitimate effort to obtain a suspect's consent to search.");

*United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (noting that the "knock and talk" is "generally upheld as a legitimate method of investigation, designed to obtain a suspect's consent to search").

The defendant further suggests that there must be something wrong with the detective's version of events because Detective Morgan did not include Mrs. Eastman's presence and reaction in his report. *See* Def.'s Mem. at 9. Again, this argument is unconvincing. As Detective Morgan's declaration makes clear, Mrs. Eastman's presence was almost non-existent. She came out for a brief moment when the defendant told her to go back into her room. Later, the defendant spoke to her again when he informed her that he was going with the officers to the police station. The detectives never entered her room and she never told the detectives to leave. Since the only item the detectives took from the home was the defendant's computer from his own bedroom with his consent, there was no need to mention her in the report.

Finally, the defendant suggests that the time and location written on the Consent to Search form are suspicious because it was signed at the Waterbury police station and was not signed at the home. *See* Def.'s Mem. at 10, 11. There is nothing suspicious about the form. As Detective Morgan explains in his declaration, the defendant gave a verbal consent at his residence, which was later memorialized in the written consent at the station. There is no requirement that consent must be in written form. *See Buettner-Janusch*, 646 F.2d at 764 ("[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct.").

If any version of events should be discredited, it is the version offered by the defendant and his mother.  If the detectives had performed a warrantless search of the home, then it makes no sense that they would have left the other laptop computer behind.  It also makes no sense they would take the defendant's cell phones, only to return them to him after his interview without examining them.  This alone casts doubt on the defendant's version of events.

The fact is the detectives did not take the laptop because the defendant was being cooperative and stated the laptop was not his.  He stated his computer was in the bedroom.  The defendant was calm and cooperative.  If the events at the home were as contentious as the defendant contends, then it would only make sense for the detectives to take the other laptop and keep the cell phones for further examination, which they did not.  The only plausible explanation is that the defendant voluntary agreed to turn over his computer.

The defendant next argues that even if he did give consent, his mother's refusal to consent to a search negates whatever consent the defendant gave. *See* Def.'s Mem. at 10-11. Again, the defendant's argument presumes there was a search of the residence in the first place, which the detectives flatly deny, and as just discussed, does not even make sense.  In addition, at no time did Mrs. Eastman tell the detectives to leave.   And the detectives were under no obligation to ask for her consent. *See United States v. Lopez*, 547 F.3d 397, 400 (2d Cir. 2008) (holding that if one co-tenant consents to a search, officers have "no duty to ask [the other co-tenant] if he consented to the search, no matter how easy or convenient it might have been to do so.").

Moreover, Mrs. Eastman's authority to consent or refuse consent to a search only relates to property or area she had common authority over, a substantial interest in, or permission to access. *See United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992) ("[A] third-party consent to a

search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access").  With respect to a container, a co-inhabitant's consent (and implicitly a refusal to consent) "may not be effective consent to a search of a closed object inside the home." *United States v. Karo*, 468 U.S. 705, 725 (1984); *see United States v. Block*, 590 F.2d 535 (4th Cir. 1978) (mother had no authority to consent to search of footlocker in son's room); *United States v. Robinson*, 999 F. Supp. 155, 162–63 (D. Mass. 1998) (mother had authority to consent to search of adult son's bedroom for items open to view but not a closed vinyl bag in the room or the pockets of a pair of pants in the room).

In this case, the computer belonged to the defendant, not his mother, and it was in his bedroom, not the common area.  She does not claim that she had access to it or otherwise used it. Accordingly, even if she could refuse consent to search the common areas of the home, she did not have the authority to consent, and therefore refuse consent, to a search the defendant's bedroom or his computer.  *See United States v. Griswold*, No. 09-CR-6174, 2011 WL 7473466, at *4 (W.D.N.Y. June 2, 2011) (holding that while defendant's mother had the right to retrieve the laptop from the defendant's bedroom and deliver it to the officers, the mother did not have authority to consent to search the laptop itself, which "is akin to a closed container").

Finally, it bears noting that although the defendant's mother states she filed a complaint with the Waterbury Police Department, she did so in August 2013—over nine months after the supposed warrantless search of her residence and the seizure of the defendant's computer.  If the events of that day occurred as they now contend, they offer no explanation why they waited so long to file a complaint.  This delay further undermines their version of events.

3. **Handwriting analysis confirms the defendant signed the consent to search form.**

In his motion to suppress, the defendant claims that the initials and signature on the Consent to Search form are not his, suggesting they were forged. However, the government's forensic document examiner, Ms. DiMartino, compared the signature and initials on the original Consent to Search form (as opposed to a photocopy) to several other original documents that the government asserts bear the defendant's signature and initials, including a Waiver of Extradition, which he signed before a judge in Norfolk, Virginia on May 15, 2013, and his Uniform Arrest Report, his booking card, and a questionnaire, all of which he signed on May 29, 2013 after he was brought back to Waterbury. Ex. C. After performing a comparative and microscopic handwriting examination, she determined that the writer of John Eastman's signature on the Consent to Search form is the same as the writer of John Eastman's signature on the other original documents she examined. Ex. C.

Although the defendant's handwriting expert, John Reznikoff, reaches a different conclusion, his report should be given little weight, if any. First, unlike Ms. DiMartino, the defense expert has not examined any original documents, only photocopies. As he readily admits, "photocopies provide a sub-par example of handwriting . . . . Lost for examination are pen speed, pressure, rhythm, as well as a number of other factors." Def.'s Mot. Ex. A at 4.

In addition, the majority of documents that Mr. Reznikoff uses as the defendant's known signatures are documents the defendant signed in 2015, after he was arrested and had a motive to manipulate or alter his signature. Significantly, of the four known signatures he examined that pre-date the disputed documents, none of them remotely resemble the defendant's 2015 signatures, further supporting the government's belief that the defendant altered his signature after his arrest. The defense expert offers no explanation for this discrepancy. In addition, the

defense fails to describe the conditions under which the defendant provided his handwriting exemplars, whether he was supervised and given instructions, or whether he was simply left alone and allowed to take all the time in the world to carefully manipulate his signature.

Finally, the defense expert has not examined many of the other documents the government's witness has examined.  For example, as discussed, Ms. DiMartino examined an original Waiver of Extradition form, which the government submits the defendant signed before a judge in Norfolk, Virginia, an original Uniform Arrest Report, an original booking card, and an original questionnaire, all of which were signed in May 2013.  *See* Exs. D, E, F, G.

In addition, there are numerous other non-original documents containing the defendant's signatures and initials, including various forms the defendant signed in 2011 with the State Probation Office (*see* Ex. H), a fingerprint card the defendant signed in 1997 (*see* Ex. I), and other forms he signed and initialed while he was being held in Virginia in May 2013 (*see* Ex. J). Although the government's forensic examiner was unable to perform an electrostatic analysis on these non-original documents due to the poor quality, the Court can view the defendant's signature and initials on these documents for itself and see that they are strikingly similar to the initials and signatures on the disputed Consent to Search form. *See, e.g.*, *United States v. Marshall*, No. 3:10-CR-14-JCH, 2011 WL 2842497, at *6 (D. Conn. July 14, 2011) ("The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents" (quoting *United States v. Alvarez–Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003)).

Below is a comparison of the signatures and initials on the various documents:

| **Signature and Initials** | **Source** |
|---|---|
| | Consent to Search<br>(Morgan. Decl. Ex. A-4) |
| iuthority designated to transport me to the<br><br>ACCUSED<br>John Eastman | Waiver of Extradition<br>(Ex. D) |
| IATURE OF ACCUSED<br> | Uniform Arrest Report<br>(Ex. E) |
| ict family or counsel.<br> | Booking Card<br>(Ex. F) |
| | Questionnaire<br>(Ex. G) |
| understand and agree to the above terms<br> | 2011 Probation Forms<br>(Ex. H) |

| | |
|---|---|
| | 1997 Fingerprint Card (Ex. I) |
| | Norfolk Sheriff's Office forms (Ex. J) |

The government submits that the initials and signatures are all remarkably similar. Thus, to believe the defendant's signature on the Consent to Search form is forged would require this Court to also believe that the defendant's signature on the waiver of extradition form witnessed by a judge in Virginia was also forged, his signature on other forms from the Norfolk Sherriff's office were forged, the signature on the 2011 probation forms was forged, his signature on a 1997 fingerprint card was also forged, and his signature on the Uniform Arrest Report, Booking Card, and Questionnaire in 2013 were forged. Such a vast conspiracy to forge his signature on multiple documents witnessed by multiple people in multiple jurisdictions over a span of 20 years defies credulity.

4.     **Suppression is not warranted because the Federal law enforcement who forensically examined a mirror image of the defendant's computer acted in good faith reliance on a federal search warrant.**

Even if the Court finds that the Waterbury detectives did not have consent to take and search the defendant's computer, or that they otherwise violated the defendant's Fourth Amendment rights, suppression of the computer evidence is not warranted here because federal

law enforcement agents obtained a separate warrant to forensically examine a mirror image of the defendant's computer and acted in good faith reliance on that warrant.

In *United States v. Leon*, 468 U.S. 897, 920 (1984), the Supreme Court held that the exclusionary rule does not require the suppression of evidence seized by law enforcement officers in good faith pursuant to a warrant. *See also United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Leon*, 468 U.S. at 922) ("The exclusionary rule barring illegally obtained evidence from the courtroom does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid."). The good faith exception applies even when the affidavit in support of a warrant includes information obtained from prior unconstitutional conduct. *See United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (finding *Leon* good faith rule applicable where affidavit supporting the warrant contained evidence obtained in violation of the Fourth Amendment); *United States v. McClain*, 444 F.3d 556, 564–566 (6th Cir. 2005) (finding that "the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation"); *United States v. Fletcher*, 91 F.3d 48, 51–52 (8th Cir. 1996) (finding that the *Leon* good faith exception was applicable to a subsequent warrant authorizing search of luggage when the initial detention of the luggage was a Fourth Amendment violation).

There are four circumstances in which the good-faith exception does not apply: (1) the issuing judge relied on an affidavit that the affiant knew was false or would have known was false had he or she not acted in "reckless disregard of the truth"; (2) the "magistrate wholly abandoned his judicial role"; (3) the "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468

U.S. at 923.  None of these circumstances are present here: there is no evidence that the Agent Haimila, who signed the federal warrant application, deliberately misled the magistrate, that the magistrate abdicated her duty, that the warrant application lacked probable cause, or that the warrant was facially deficient.

Although Agent Hamilia's affidavit in support of the warrant does describe evidence that the Waterbury police obtained from the forensic examination of the defendant's computer and his statements, she makes clear in her attached declaration that when she applied for the federal warrant to search the defendant's computer, she had no knowledge that the defendant was contesting the validity of his consent to search, his waiver of rights, or his voluntary statement. Ex. B.  The agent read through all of the documents she received from Waterbury and talked to Detective Morgan on numerous occasions, and there was nothing to suggest anything improper. Therefore, the Court should find that the federal agents acted in good faith when they obtained the federal warrant and forensically examined a mirror image of the defendant's computer. *See United States v. DeProspero*, 472 F. App'x 42, 43-44 (2d Cir. 2012) (finding agents acted in good faith because "[e]ven if we assume that the review of the electronic media by the state law enforcement officers was improper, the evidence was nonetheless admissible because the federal law enforcement agents relied in good faith on a facially valid federal search warrant").

**B.      The Court Should Deny the Motion to Suppress Eastman's Statements**

The Court should also deny the defendant's motion to suppress the statements in the Voluntary Statement form.  First, any discussion that took place in the defendant's home, during which he told the Waterbury detectives about his computer in his bedroom, was not the subject of a custodial interrogation.  *See Mitchell*, 966 F.2d at 99 (noting that interrogation in one's own home is generally not deemed custodial).  The defendant invited the detectives into the home, he was not in handcuffs, and he was calm and cooperative throughout the short time period the

detectives were in the home.  Indeed, the defendant concedes he was told he was not under arrest and the detectives' request for him to go to the station "was phrased as a request, not an order."

Second, at the station, the defendant was still not in handcuffs.[6]  Nonetheless, the defendant was advised of and waived his rights two times, once when he signed the Advisement of Rights form and then again when he signed the Voluntary Statement Rights form.  Morgan Decl. Exs. A-1 and A-2.  In his Voluntary Statement, the defendant again acknowledged that he was advised of his rights and agreed to waive them.  Morgan Decl. Ex. A-3.  All three forms were signed by both the defendant in the presence of Detectives Morgan and Terni.  In addition, a supervisor, Lieutenant Fox observed and notarized the defendant's signature on the Voluntary Statement.

Although the defendant claims that he did not sign the forms, the government's forensic document examiner, Ms. DiMartino, examined the originals of these three forms and compared the signatures and initials on the forms to the other original documents mentioned previously, and she determined that the writer of John Eastman's signature and initials on these forms is the same as the writer of John Eastman's signature and initials on the other documents.  Although the defense expert reaches a different conclusion, his report should be given little to no weight for the same reasons discussed above, primarily that he has not examined original documents, he relies primarily on known signatures that post-date the defendant's arrest (except for a couple of documents where the pre-arrest signatures do not resemble his post-arrest signatures), and he has not examined a variety of other documents containing initials and signatures that are remarkably

---

[6] In his memorandum, the defendant argues that because Detective Morgan's report states that the defendant "was allowed to leave" after the interview, the suggestion is he must not have been allowed to leave earlier.  *See* Def.'s Mem. at 5.  However, as Detective Morgan explains, his choice of words, "was not meant to indicate that Eastman was not allowed to leave at any point before then.  Rather, I simply meant that I was not placing him under arrest following the interview." Morgan Decl. ¶ 26.

similar to the disputed signatures on the three forms.   Below is a comparison of the various

signatures:

| Signature and Initials | Source |
|---|---|
| | Advisement of Rights (Morgan. Decl. Ex. A-1) |
| | Voluntary Statement Rights (Morgan. Decl. Ex. A-2) |
| | Voluntary Statement (Morgan. Decl. Ex. A-3) |

| | |
|---|---|
| Signature of Person giving voluntary st | |
| gnature of Person giving voluntary statement | |
| Authority designated to transport me to the | Waiver of Extradition (Ex. D) |
| ACCUSED<br>John Eastman | |
| ATURE OF ACCUSED | Uniform Arrest Report (Ex. E) |
| ...ct family or counsel. | Booking Card (Ex. F) |
| | Questionnaire (Ex. G) |
| understand and agree to the above terms. | 2011 Probation Forms (Ex. H) |

| | 1997 Fingerprint Card (Ex. I) |
|---|---|
| | Norfolk Sheriff's Office forms (Ex. J) |

Finally, it is not plausible that the detectives manufactured the facts in the Voluntary Statement out of thin air, especially in light of the fact that the forensic examination corroborated most of the statements, and Detective Morgan would not have known of those facts until he completed the examination. In his affidavit, the defendant states that he read (but did not sign) the typed statement that Detective Morgan gave him and believes it is the same one that is in dispute. At that time, Detective Morgan had not yet begun to forensically examine the defendant's computer. The only Skype account he was aware of at that point was "harry.styles888" which was mentioned in the Vermont complaint. Detective Morgan had not yet discovered the other Skype accounts on the computer or the videos of the individual singers and band members, which the defendant played so the minors he was talking to would think they are talking to the real singers. In addition, Detective Morgan had no way of knowing which websites the defendant frequented. He found this evidence on the computer after the interview. Yet the typed statement included statements that the defendant used multiple screen names on Skype that were names of One Direction band members and that the defendant would play You Tube videos of the singers to trick the minors he was chatting with. The statement also indicated

the defendant visited pornography websites such as Motherless.com, which is one of the websites Agent Haimila noticed in her review of the defendant's web browsing history.  Haimila Decl. ¶ 6.  Detective Morgan could not have determined these facts until he performed the forensic examination.  Thus, the only plausible explanation for these statements being in the Voluntary Statement form is that the defendant did, in fact, provide these statements to the detectives.

Accordingly, the defendant's motion to suppress his statements should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion to suppress.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/   Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:    (203) 821-3700
Fax:    (203) 773-5376
Email: neeraj.patel@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2016, a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/   Neeraj N. Patel*
Neeraj N. Patel
Assistant United States Attorney
