UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| vs. : | CRIMINAL NO. 3:16CR006(MPS) |
| JOHN EASTMAN : | May 17, 2016 |

**MR. EASTMAN'S REPLY TO GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

Mr. Eastman limits his brief reply memorandum to three main points in light of the fact that the bulk of the disputed issues are factual in nature and will be more effectively addressed at the evidentiary hearing and/or in connection with post-hearing briefing. In doing so, he does not waive or abandon any of the arguments previously raised in the principal memorandum. First, the government errs as a matter of law in arguing that the Waterbury detectives' entrance into the Eastman home does not constitute a search. It is black letter law that it is a search for which either a warrant or a valid exception is required. Second, if the Court finds that the government has not met its burden of proof regarding the validity of the search and seizure at issue, and therefore the Waterbury detectives' version of events does not apply, the "good faith exception" does not apply. Third, the government handwriting expert's opinion demonstrates the variability of handwriting analysis and the problems of relying upon different universes of samples covering expansive periods of time.

1. **The Waterbury detectives' entrance into the Eastman home constitutes a "search" in and of itself for which a warrant or a valid exception to the warrant requirement is needed.**

Much attention has been paid by both parties to the question whether the Waterbury detectives had valid consent to search the computer seized from the Eastman home. There is, however, another

1

issue regarding whether the Waterbury detectives had the authority to enter the Eastman home in the first instance. In its memorandum, at page 14, the government states that "law enforcement did not conduct a search of [the Eastman] residence." This statement is an incorrect statement of the law. At the moment the Waterbury detectives entered the Eastman home, they were conducting a search. See, e.g., Miller v. United States, 357 U.S. 301 (1958) (police entry into home began when they broke down the door of apartment in multi-unit building); Johnson v. United States, 333 U.S. 10 (1948) (search began when police entered "living quarters – hotel room of defendant). The question becomes whether they had the authority to do so. This question is the key to Mr. Eastman's motion to suppress. It is more important than the handwriting issue on the consent forms, which even according to the Waterbury detectives' version of events, were not signed until almost two hours after they initially entered the Eastman home, because even assuming for the sake of argument that Mr. Eastman signed the consent form for the computer, there is no consent form for the home. Putting aside for the moment the question whether the Waterbury detectives had authority to seize and search the computer, before they seized the computer, they entered the Eastman home without a warrant. And, if their entry into the home was illegal, so is everything that followed.

It is a clear violation of the Fourth Amendment for police to enter a home without a warrant or one of the narrow exceptions to the warrant requirement. Not only is the entry into the home considered a search, but in addition, it is considered to be presumptively unreasonable. It is "a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal citations and quotation marks omitted); see also Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971) ("a search

or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions").

It is not correct for the government to claim that the Waterbury detectives did not conduct a search of the Eastman home. By entering the Eastman home without a warrant, they conducted a search. The only question here is whether the search was legally justified with a valid exception to the warrant requirement.

Adequate consent would, theoretically, be an acceptable exception to the warrant requirement if the Waterbury detectives had obtained it, however, they did not do so in this case. It is undisputed that there is no written consent, so the only arguable form of consent is oral consent. Mr. Eastman denies giving consent. Such refusal is consistent with his history and characteristics. Mr. Eastman has a history of refusing to deal with law enforcement. For example, in 2007, he was charged with refusing to be fingerprinted because he refused to be fingerprinted in connection with another pending charge. See Exhibit E (refusal to be fingerprinted documents). The question of consent will no doubt be explored further at the evidentiary hearing scheduled for May 31, 2016.

The government argues that the Eastman version of events is not credible. Mrs. Eastman is both the lease-holder of the apartment and the owner of the seized computer. She was present at the time of the search and seizure. Notwithstanding differences in the factual depictions between the Eastman version of events and the Waterbury detectives' version of events, it is undisputed that Mrs. Eastman was at home and present at the time of the search. It is hard to imagine why the Waterbury detectives would exclude altogether the lease-holder of the searched apartment and owner of the seized computer from the police report. On the other hand, it is entirely reasonable and expected that Mrs. Eastman did not file a complaint with the Waterbury Police until August 2013. This is because Mr. Eastman was not even arrested until May of 2013. It was not until he went to court and was given

3

a lawyer in July 2013 that the issue of a consent to search form was even raised. Prior to that, neither Mr. nor Mrs. Eastman would have known anything about a consent form. Mrs. Eastman then complained as soon as practicable thereafter, asserting that neither she nor her son had consented.

The Waterbury detectives' illegal entry into the Eastman home did not dissipate enough to avoid tainting the resulting seizure of the computer and supposed statements of Mr. Eastman. In United States v. Snype, the Second Circuit stated:

> When a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that "the taint of the initial entry has been dissipated" in order to admit evidence seized following the illegal entry. United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (internal quotation marks omitted). Oguns's identification of taint and voluntariness as distinct inquiries in evaluating the validity of certain consents derives from two Supreme Court decisions: Wong Sun v. United States, which held that evidence seized after an illegal search must be suppressed unless the government shows that it, in fact, resulted from "an intervening independent act of free will" sufficient "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963); and Brown v. Illinois, which held that, where an inculpatory statement follows an unlawful arrest, a finding of voluntariness under the Fifth Amendment (based on Miranda warnings) does not obviate the need to make a separate Fourth Amendment determination as to whether the statement was "'sufficiently an act of free will to purge the primary taint.'" 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting Wong Sun, id.).

441 F.3d 119, 132 (2d Cir. 2006).

The Supreme Court has prescribed three factors for determining whether the taint from a Fourth Amendment violation has dissipated: (1) the time between the Fourth Amendment violation and the acquisition of evidence, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603–04 (1975). Here, all three factors point to the need to apply the Exclusionary Rule. The time between the illegal entry into the home and the seizure of the computer was quite brief – "less than half an hour," according to the

4

government's response at page 5. There were essentially no intervening circumstances – no change of venue, no substantive conversation between police and Mr. Eastman, and no opportunity for Mr. Eastman to speak to counsel or communicate with anyone outside the apartment – much less use the bathroom unsupervised. Finally, the egregiousness of the violation cannot be overstated. According to Mr. Eastman's affidavit, police simply barged into his home, disregarded his rights and his invocation of those rights, handcuffed him, humiliated him by forcing him to use a bathroom with an open door, and then hauled him off to the police station.

**2. The "good faith" doctrine does not apply here.**

The government argues that even if the Waterbury detectives unlawfully searched the Eastman home and unlawfully searched and seized their computer, the error was harmless, because a different, federal law enforcement officer later submitted a search warrant affidavit based on the illegally obtained evidence without knowing of the illegality. This cannot be correct, because if it was, it would allow a government body to, in effect, "launder" its bad searches through an alternative government body.

The government cites three cases for the proposition that the use of tainted information can be excused under the Good Faith exception. None are on point, because all three cases stand for the proposition that reliance on evidence later judged to have been obtained illegally, *but the illegality of which had not been obvious to the officer who violated the law in the first place*, should not fatally taint any downstream use of that evidence whatsoever. Here, there *is no inadvertence*. If this Court rules that the government has not met its burden, the evidence thereby obtained is tainted in a manner that cannot be explained by mere inadvertence.

5

In United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985), the Circuit did indeed find that the Leon good faith rule was applicable where an affidavit supporting a warrant contained evidence obtained in violation of the Fourth Amendment.  Subsequent to the Thomas decision, however, the Second Circuit later decided United States v. Reilly, 76 F.3d 1271, 1281 (2d Cir. 1996), on reh'g, 91 F.3d 331 (2d Cir. 1996), in which it held that "it is one thing to admit evidence innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error.  It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant."

Key to the distinction between the two cases was that in Thomas "[t]he officer who presented the canine sniff evidence to the magistrate was clearly acting in good faith in doing so.  He did not have any significant reason to believe that what he had done was unconstitutional."  In Reilly, by contrast, the officers deliberately excluded relevant information from their affidavit.  Here, the officer presenting the facts to the magistrate knew (or should have known) that the evidence had not been obtained legally.  Reilly contains an excellent survey of cases where the original evidence was obtained illegally, including one that noted Leon "does not hold that a subsequent warrant validates an earlier illegal search.  Police officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate."  State v. Hicks, 707 P.2d 331, 333 (Ariz.Ct.App. 1985) (aff'd on other grounds sub nom. Arizona v. Hicks, 480 U.S. 321 (1987).  That is exactly what the government is trying to do here – launder the unconstitutional behavior of the Waterbury Police through an unwitting cutout.

The government also cited to United States v. McClain, 444 F.3d 556, 564–66 (6th Cir. 2005) for the proposition that "the Leon good faith exception should apply despite an earlier Fourth

6

Amendment violation." Again, however, a critical part of the court's analysis was that the violation in question was a tenuous one that might not have been apparent to the officers:

> The court in [United States v. White, 890 F.2d 1413 (8th Cir. 1989)] refused to apply the exclusionary rule because the facts surrounding the initial Fourth Amendment violation were 'close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable.'…The same is true here. The facts surrounding these officers' warrantless entry into the house at 123 Imperial Point were not sufficient to establish probable cause to believe a burglary was in progress, but we do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home.

McClain, 444 F.3d at 566. Here, there can be no argument that a violation of Mr. Eastman's rights was an objectively reasonable mistake by officers in a hurry.

Finally, in United States v. Fletcher, 91 F.3d 48, 51–52 (8th Cir. 1996), the court found that the Leon good faith exception was applicable to a subsequent warrant authorizing search of luggage when the initial detention of the luggage was a Fourth Amendment violation, but again only because "an objectively reasonable officer could have believed the search was valid." Id. Indeed, the Fletcher Court stated that "[t]he relevant inquiry is whether the facts surrounding reasonable suspicion are 'close enough to the line of validity' that the police officers were entitled to a belief in the validity of the warrant and the existence of reasonable suspicion." Id.

Moreover, the government is overlooking a critical fact from Leon – that case was about objectively reasonable reliance on a search warrant that was legally insufficient to establish probable cause because "the information included was fatally stale. The affidavit, moreover, failed to establish the informant's credibility." United States v. Leon, 468 U.S. 897, 904 (1984). Here, by contrast, the affidavit contained illegally obtained information.

As Chief Justice Roberts noted in a relatively recent case further developing the good faith exception, "If the police have been shown to be reckless in maintaining a warrant system, or *to have*

7

*knowingly made false entries to lay the groundwork for future false arrests*, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation." Herring v. United States, 555 U.S. 135 (2009) (emphasis added).

Contained within Leon is an analysis of why suppression is or is not an appropriate remedy for invalid warrants, and Justice White's opinion makes clear there is a distinction between inadvertent failure to establish probable cause, which should not necessarily trigger suppression, and the use of false or misleading information, which should be treated under Franks v. Delaware, 438 U.S. 154, 171 (1978). Franks makes it clear that the proper way to deal with a search warrant affidavit containing false information is to excise the false information and see if what remains still supports a finding of probable cause.

If that were done there, there would be nothing left of the affidavit in question. When reading the affidavit of Agent Haimila, it is clear that Detective Morgan and his report was her sole source for her information, and that she had no personal knowledge whatsoever of the "facts" in the affidavit. The only information in the affidavit related to the seizure and search of the computer – the nature of the visit to the Eastman home, the details of police interaction with Mr. Eastman, and the contents of the purported statement given by him – are all the same as, and no doubt directly derived from, Detective Morgan's version of events. If that cannot stand, then the Haimila affidavit, and thus the federal warrant, also cannot stand.

**3.     The government's handwriting expert opinion demonstrates the variability of the science of handwriting analysis.**

The government's handwriting expert does not squarely address the defense handwriting expert opinion, but instead considers an entirely new universe of documents. This is not responsive, and does not illuminate where the real differences of opinion between the two experts lie.

8

Nonetheless, the issue of the government expert's handwriting analysis is expected to be the subject of testimony at the hearing scheduled for May 31, 2016, at which time the quality of the analysis and evidence behind the expert's opinion can be assessed.

In conclusion, Mr. Eastman respectfully asserts that the moment the Waterbury detectives entered his home on November 10, 2012, a search of the home occurred. The critical question is whether the Waterbury detectives had valid consent to do so. A separate question exists regarding whether the Waterbury detectives had valid consent to search the computer. Although the government conflates the two (the search of the home and the computer), they are actually two separate inquiries. If the Waterbury detectives searched the Eastman home and/or computer without valid consent in the manner alleged, the "good faith" doctrine does not apply.

Respectfully Submitted,

THE DEFENDANT,
JOHN EASTMAN

FEDERAL DEFENDER OFFICE

Date: May 17, 2016          /s/ Kelly Barrett
                            Assistant Federal Defender
                            265 Church Street, 7th FL
                            New Haven, CT 06510
                            Phone: (860) 498-4200
                            Bar No.: ct27410
                            Email: kelly_barrett@fd.org

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on May 17, 2016, a copy of the foregoing MR. EASTMAN'S REPLY TO GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDAN'TS MOTION TO SUPPRESS was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                        /s/ Kelly Barrett
                        Kelly Barrett