1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT

3
    UNITED STATES OF AMERICA,    )
4               Plaintiff,   )         NO: 3:16CR6(MPS)
                             )
5   vs.                      )
                             )         May 31, 2016
6   JOHN EASTMAN,            )
                Defendant.   )         Suppression Hearing
7   _____

8
                            450 Main Street
9                       Hartford, Connecticut

10  B E F O R E:
            THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
11

12  A P P E A R A N C E S:

13  For the Plaintiff :        NEERAJ N. PATEL, AUSA
                               ANASTASIA KING, AUSA
14                             United States Attorney's Office
                               157 Church Street, 25th Floor
15                             New Haven, CT 06510

16  For the Defendant:         KELLY M. BARRETT, ESQUIRE
                               DAVID SMITH KEENAN, ESQUIRE
17                             Federal Public Defender's Office
                               265 Church Street, Suite 702
18                             New Haven, CT 06510

19

20

21

22

23
    Court Reporter:            Martha C. Marshall, RMR, CRR
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

1          THE COURT:  Good morning.  Please be seated.

2          We have a hearing today in United States versus

3     Eastman.  The case is 16CR6.

4          Let's begin with appearances of counsel, starting

5     with the Government, please.

6          MR. PATEL:  Thank you, Your Honor.  Assistant United

7     States Attorney Neeraj Patel on behalf of the United States,

8     and seated next to me is Assistant United States Attorney

9     Anastasia King who would be conducting the Government's

10    portion of the hearing with me.  And seated next to her is

11    Special Agent Allison Haimila with Homeland Security.

12         THE COURT:  Good morning.

13         MS. BARRETT:  Good morning, Your Honor.  Kelly

14    Barrett and David Keenan from the Federal Defender's Office

15    on behalf of John Eastman who is with us at counsel table.

16         THE COURT:  Good morning.

17         Okay. Before we begin, my law clerk and I received

18    communication from counsel last week indicating that there

19    has been, I guess, a change in plans with regard to proposed

20    handwriting experts.  Can you maybe put that on the record

21    for me and tell me a little bit more about that.

22         MR. PATEL:  Yes, Your Honor.

23         Last week we learned, the parties learned that a

24    conflict of interest with the defendant's handwriting expert.

25    I don't want to get into too much details about the conflict

1   unless we seal that portion of the record, but it's a

2   conflict with Homeland Security.  And so I discussed it with

3   defense counsel, and defense counsel proposed, and the

4   Government agreed, that the parties would just submit the

5   expert reports that have been prepared to date as evidence,

6   which I believe they're attached to the prehearing briefing

7   as well.  It appears that the defendant's expert didn't

8   realize -- wasn't aware of the conflict when he prepared his

9   initial report and only became aware of it himself the Friday

10  before this past Friday.

11          And so the Government agreed to that proposal.  I

12  understand from defense counsel that she has discussed the

13  agreement with her client, and that he would be in agreement

14  that the expert reports would come in without any further

15  testimony.  The parties reserve their rights to argue to the

16  Court how much weight should be given to those expert

17  reports, and that the defendant does not wish to continue the

18  hearing to have time to retain another expert on his behalf.

19          THE COURT:  Thank you.

20          Attorney Barrett, do you want to comment on that?

21          MS. BARRETT:  Yes, Your Honor.  I agree with what

22  Attorney Patel said.  And under the circumstances,

23  unfortunate although they were, given that Mr. Eastman has

24  been held in pretrial detention for three years, we thought

25  that this was an appropriate solution rather than seeking a

1  further continuance.  So the proposed solution is that the

2  Court can consider both parties expert reports, but that

3  neither side will present live expert testimony.  And that's

4  acceptable to Mr. Eastman as well.

5       THE COURT:  Would it be acceptable with you if I

6  just inquired briefly yes or no answers of Mr. Eastman if

7  that's his understanding and is acceptable to him?

8       MS. BARRETT:  Yes, Your Honor.

9       THE COURT:  Mr. Eastman, did you hear what the

10  prosecutor and your lawyer had to say about an agreement they

11  reached with regard to the two proposed handwriting experts?

12       THE DEFENDANT:  Yes, Your Honor.

13       THE COURT:  And my understanding of the agreement is

14  that the parties have agreed that the Court may consider the

15  written submissions made by the experts which include, I

16  guess, reports.  I have reviewed them briefly just to

17  understand what they were.  And that the parties -- but that

18  the experts will not testify.  Is that your understanding?

19       THE DEFENDANT:  Yes, Your Honor.

20       THE COURT:  And further, that the parties reserve

21  the right to contest the weight that the Court should

22  attribute to either of these reports.  In other words, how

23  much importance I should give them in arriving at a decision.

24  Is that your understanding, too?

25       THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:   And is that arrangement acceptable to

2    you, even though it means that your handwriting expert is not

3    going to testify?

4          THE DEFENDANT:   Yes.  Yes, Your Honor.

5          THE COURT:  Would anybody have me inquire further?

6          MR. PATEL:  Further, Your Honor, that he would not

7    be able to cross-examine our expert.

8          THE COURT:  Right.  Good point.  Also, of course,

9    that means the Government's handwriting expert won't testify

10   either which means that your lawyer won't have an opportunity

11   to cross-examine that expert.  Do you understand that?

12         THE DEFENDANT:   Yes.

13         THE COURT:   And that arrangement is acceptable to

14   you?

15         THE DEFENDANT:   Yes.  Yes, Your Honor.

16         THE COURT:   And you would like to proceed today?

17         THE DEFENDANT:   Yes.

18         THE COURT:  Fair enough.  Is there any other -- are

19   there any other preliminary matters we should take up?  I do

20   think this hearing calls for sequestration of fact witnesses.

21   I do want to understand who is in the courtroom, whether

22   there are any witnesses here and how we should deal with

23   that.

24         Attorney Patel?

25         MR. PATEL:  Yes, Your Honor.  We would move that the

1    witnesses be sequestered except for the case agent and the

2    defendant, of course.

3              And just so the Court is aware, we only intend to

4    call three witnesses today, all three of them from the

5    Waterbury Police Department.  I do not intend to call the

6    case agent any longer, although I reserve my right to in case

7    something comes up and I need her for rebuttal.

8              THE COURT:  Attorney Barrett.

9              MS. BARRETT:  We agree, Your Honor.

10             THE COURT:  I take it that the only two potential

11   fact witnesses in the courtroom right now are the case agent

12   and Mr. Eastman, am I correct in understanding that?

13             MR. PATEL:  Yes, Your Honor.

14             THE COURT:  Very well.

15             So I'm ready to proceed then.

16             MR. PATEL:  One more preliminary matter, Your Honor.

17   The parties conferred this morning, and I believe Your Honor

18   has a copy of the Government's exhibits, a binder.

19             THE COURT:  I do.  I haven't looked at them yet, but

20   yes.  And I also have defense exhibits as well.

21             MR. PATEL:  And we agreed that they can all come in

22   as full exhibits.

23             THE COURT:  Let's go through that just so I'm clear

24   that we all have the same package.

25             MS. BARRETT:  Your Honor, before you do that, I have

1    three additional exhibits that I'd like to add.  I've already

2    provided them to the Government.

3              THE COURT:  And that's acceptable to the Government?

4              MR. PATEL:  Yes, Your Honor.

5              THE COURT:  Fine.  So we'll go through the exhibits.

6    Before we do that, I think that in light of the issues

7    raised -- I take it it's everyone's expectation this is going

8    to take more than a day, is that fair?

9              MR. PATEL:  We only have three witnesses, Your

10   Honor.  I believe we can possibly finish today.

11             THE COURT:  Oh, okay.  I go nine to three.  Does

12   that change your view?

13             MR. PATEL:  It does not.

14             THE COURT:  Attorney Barrett, do you think that's

15   realistic?

16             MS. BARRETT:  I think it's possible we can go into

17   tomorrow.

18             THE COURT:  In any event, I've reserved the time.

19   It's not a problem.  I actually reserved three days for this

20   so that's fine.

21             In terms of procedure, though, I think what would

22   make sense -- I reserve the right to revisit this at the end

23   of the hearing, depending on where my thinking is -- I think

24   what the parties should plan on is ordering transcripts and

25   doing post-hearing proposed findings because of the nature of

1    the issues raised.  Let's have that understanding now and

2    then we'll discuss it again at the end of the hearing.

3            Let's just go through the exhibits so that I

4    understand what the parties would propose the Court consider.

5    I'll start with the Government's binder.

6            On the witnesses for a moment, Mr. Patel, I take it

7    that the three witnesses you intend to call are those listed

8    as first Morgan, Terni, and Fox?

9            MR. PATEL:  That's correct, Your Honor.

10           THE COURT:  The exhibit list I have for the

11   Government lists a total of 19 exhibits.  I'm not going to

12   read them all.  They're listed 1 through 19.  As I understand

13   it, that is what the parties would have the Court consider

14   and all those should be admitted as full exhibits for the

15   hearing, is that right?

16           MR. PATEL:  Yes, Your Honor.

17           MS. BARRETT:  Yes, Your Honor.

18           THE COURT:  That's Exhibits 1 through 19 for the

19   Government will all be full exhibits.

20           (Whereupon, Government's Exhibits Number 1 through

21   19 were marked in full.)

22           THE COURT:  Let's go to the defense's binder.  Then

23   looking at the exhibits, I have a total of 39 -- there's

24   more.  I have a total of -- well, there's 39 and then there's

25   39-1 and 39-2 and 40.  So a total of, I guess, 42 exhibits by

1    the defense proposes to have me consider.  And my

2    understanding is that the parties agreed that all of these

3    should be admitted as full exhibits and considered by the

4    Court, is that right?

5            MR. PATEL:  Yes, Your Honor.

6            MS. BARRETT:  Yes, Your Honor.

7            THE COURT:  Okay.  So that's what will happen.

8            Mr. Patel.

9            MR. PATEL:  Your Honor, the Government calls

10   Detective Peter Morgan from the Waterbury Police Department.

11           THE COURT:  Good morning, sir.  If you could please

12   come up here and stand in front of the witness box and raise

13   your right hand and face our courtroom deputy, please.

14                    P E T E R   M O R G A N,

15   called as a witness by the Government, having been duly sworn

16   by the Clerk, was examined and testified on his oath as

17   follows:

18           THE CLERK:  State your name, city and state, spell

19   your last name.

20           THE WITNESS:  My name is Peter Morgan, M O R G A N,

21   255 East Main Street, Waterbury, Connecticut.

22           THE COURT:  You may proceed.

23           MR. PATEL:  Thank you, Your Honor.

24                    DIRECT EXAMINATION

25   BY MR. PATEL:

1       Q.      Good morning.

2       A.      Good morning.

3       Q.      Can you tell the Court where you currently work?

4       A.      I work for the City of Waterbury Police

5   Department.

6       Q.      And can you briefly describe your educational

7   background for the Court?

8       A.      High school graduate.  Currently enrolled at

9   Champlain College to obtain a bachelor of science degree in

10   digital forensics and computer investigations.

11               I don't know how much more you want.

12       Q.      That's fine.  When did you graduate from high

13   school?

14       A.      1990.

15       Q.      '90?

16       A.      '90, yes.

17       Q.      When did you begin working for the Waterbury Police

18   Department?

19       A.      1995.

20       Q.      And what's your current rank or position there?

21       A.      Detective.

22       Q.      And how long have you been a detective?

23       A.      Since 2004.

24       Q.      Can you walk us through the various positions

25   you've held with the Waterbury Police Department?

1       A.      In 1995, I started as a patrolman and worked as a

2    patrolman until I successfully passed the written and oral

3    examination to be promoted to the rank of detective.   And

4    since 2004, I've been a detective with the Police

5    Department.

6       Q.      As a detective, what types of cases do you

7    investigate?

8       A.      Prior to what I do now, I was just a general

9    detective investigating any cases that came in that needed to

10   be investigated through either property damage or personal

11   assaults.   At one point I was assigned to a group that

12   handled all of the major crimes.   So I was part of a group

13   that investigated all homicides, serious assaults, robberies,

14   serious sexual assaults.

15      Q.      And what kind of cases do you investigate now?

16      A.      I currently am assigned to the Computer Crimes Unit

17   where my duties are to investigate all crimes that involve

18   any kind of computers or digital media evidence in their

19   cases.

20      Q.      Do you also investigate crimes involving

21   children?

22      A.      The majority of what I do -- the majority of the

23   cases revolve around possessing and sharing of child

24   pornography and the online enticement of minors to engage in

25   sexual activity.

1    Q.    Did you receive any training to investigate those

2    types of cases?

3    A.    Yes.  Since 2009, I've received hundreds of hours

4    of training in both digital forensics examinations and

5    computer investigations.  During that time I obtained

6    certification, EnCase certified examiner certification after

7    passing both the written and practical examination.  And I

8    still maintain that certification.

9         Some of the training I obtained was through the U.S.

10   Department of Justice, National White-Collar Crime Center,

11   and various other organizations throughout the years.

12   Q.    You mentioned EnCase certification.  Just so the

13   Court understands, is that a certification for a computer

14   forensics?

15   A.    It is.  They're digital forensics.  It's a widely

16   recognized software used to complete digital forensic

17   examinations.

18   Q.    Detective Morgan, I want to direct your attention

19   to the fall of 2012.  At the time, were you investigating a

20   person by the name of John Eastman?

21   A.    Yes.

22   Q.    How did Mr. Eastman come to your attention?

23   A.    In October of 2012, I received a call from Trooper

24   Jollymore of the Vermont State Police who had for several

25   weeks been investigating a complaint that he received in his

1    jurisdiction.  That complaint centered around a mother who

2    had complained that her 11 year old daughter had recently had

3    a sleepover at their redense with three of her friends, and

4    during the time of that sleepover the daughter and the

5    friends were using the daughter's laptop computer to

6    communicate with others using the Skype video and instant

7    messaging software.  And that during the time that they were

8    communicating using that software, they began speaking to an

9    individual with the user name Harry.Styles888, and that the

10   girls at the time felt that they were speaking to Harry

11   Styles who was a well-known performer with the singing group

12   One Direction.  And that during the conversation at some

13   point the individual that they were speaking to had requested

14   that they turn on their web cam so that a video conference

15   could take place.  That they did activate their web cam and

16   requested the same from the other individual.  The girl

17   stated that the view they saw appeared to be only of a still

18   photo of the individual Harry Styles, and that during the

19   instant messaging conversation the individual requested that

20   the girls pose in front of the camera in the sexual position

21   doggie style.  And that the girls did not pose in this manner

22   and that the conversation terminated shortly thereafter.

23        Q.    And so that's when they told their mother?

24        A.    I believe their mother found out somehow.

25        Q.    And so I think you -- just to backtrack.  The

1    mother of one of the girls had made a complaint with this

2    Trooper Jollymore?

3         A.    The mother, yes.

4         Q.    And so what happened next?

5         A.    So Trooper Jollymore faxed me his reports that he

6    had compiled during his investigation, and the reports showed

7    that after he received this information he had applied for

8    and was granted a court order for Skype to provide the

9    account activation information for the user name

10   Harry.Styles888.  And that subsequent to supplying Skype with

11   that order, they responded with the IP address from which the

12   account was created from, and the date and time that the

13   account was created.

14        Q.    So just to be clear, Trooper Jollymore got a court

15   order for Skype to disclose the IP address which was used to

16   create this Harry.Styles888 user account on Skype?

17        A.    Yes.

18        Q.    And what did he find out?

19        A.    He then used some online tools to identify the

20   Internet service provider that the IP address was assigned

21   to.  And he got results that the IP address belonged to

22   Comcast Cable and issued to a subscriber in Waterbury,

23   Connecticut.

24        Q.    And then what happened after he figured that out?

25        A.    That's when he contacted my office.

1    Q.    So once you were contacted, what did you do?

2    A.    I gathered the information that Trooper Jollymore

3    had provided and I then applied for my own ex parte order to

4    Comcast to obtain the subscriber information for date and

5    time and the IP address from when the Harry.Styles888 account

6    had been created.

7    Q.    And what did you learn?

8    A.    I got a response back from Comcast Cable that the

9    subscriber that that IP address was issued to at that time

10   was John Eastman, 157 Congress Avenue, 3rd floor, Waterbury,

11   Connecticut.

12   Q.    I'm going to show you what's been admitted as

13   Government Exhibit 17.  And if, Your Honor, if I could just

14   provide the witness with a binder of all the exhibits?

15        THE COURT:  That's fine.

16   Q.    Turn to tab 17.  And I'll also put it on the screen

17   in front of you.  What is this document?

18   A.    This is the response that I received from Comcast

19   Cable in response to the ex parte order.

20   Q.    What information does it provide?

21   A.    It provides the subscriber name, their address,

22   their telephone number, the date that the service started,

23   their account number, whether it's active or not.  Whether

24   the IP address dynamic or static.

25   Q.    And on this page do you see where it says

1   subscriber name?

2        A.    I do.

3        Q.    And what's listed after that?

4        A.    John Eastman.

5        Q.    And below that is an address?

6        A.    It is.

7        Q.    And what's the address?

8        A.    157 Congress Avenue, Floor 3, Waterbury,

9   Connecticut 06708.

10       Q.    After you received this information, what did you

11   do?

12       A.    A couple of days after I received this information

13   I was scheduled to work a short-staffed weekend shift with

14   Detective Terni, and I made it a point that I would be

15   stopping up to that address to further investigate the

16   information that I had received from Trooper Jollymore.

17       Q.    Why did you want to go to that address?

18       A.    Because that was the information that I had

19   obtained from the court order from Comcast Cable and needed

20   to just further my investigation.

21       Q.    What day did you decide to go?

22       A.    November 10th, 2012.

23       Q.    And you said you were going to go with somebody?

24       A.    Yes.

25       Q.    And who was that?

1      A.      That was Detective Terni.

2      Q.      What's his first name?

3      A.      David.

4      Q.      And why did you ask him to go?

5      A.      He was the only one working with me.  It was just

6    the tow of us working that evening.

7      Q.      Is he also a detective?

8      A.      He is.

9      Q.      Did you, in fact, go to the residence that day?

10     A.      Yes.

11     Q.      Do you remember approximately when it was?

12     A.      Somewhere between 6, 6:15, p.m. on that evening.

13     Q.      Was that light outside or was it dark outside?

14     A.      It was dark at that time.

15     Q.      Did you obtain a search warrant before you went?

16     A.      No.

17     Q.      Why didn't you get a search warrant?

18     A.      The information that I had obtained from Trooper

19   Jollymore was light with probable cause I felt, and I felt

20   that a judge may question not doing my own investigative

21   research prior to obtaining a search warrant.  Plus, although

22   the information said John Eastman, it doesn't necessarily

23   mean that a John Eastman was living in that residence at the

24   time.  Could have been multiple people living in the

25   residence at the time.  Could have been an open wireless

1   network in which somebody else was using their account.

2   Could have been somebody visiting that they provided the

3   password to use that account.  And, quite frankly, I found in

4   my years of doing these investigations that just showing up

5   with a search warrant and going in and taking things doesn't

6   yield as much cooperation as just going and talking to people

7   and having an honest and a direct conversation about the

8   investigation.  And I feel that that garners much more

9   cooperation with people.

10       Q.    Have you done that on other occasions, go and try

11  to visit a residence without a warrant?

12       A.    Quite often.

13       Q.    And in those circumstances, have you asked whoever

14  you're talking to for permission to search anything?

15       A.    Yes.

16       Q.    And in your experience, do suspects in the prior

17  occasions where you've done this, have suspects voluntarily

18  agreed, for example, to let you examine their computers?

19       A.    On numerous occasions.

20       Q.    How many occasions?

21       A.    Probably 50 at least.

22       Q.    So you said you went to this residence, 157

23  Congress Avenue, is that right?

24       A.    Yes.

25       Q.    Did you and Detective Terni -- how did you get

```
 1   there?

 2        A.    In an unmarked white Tahoe police vehicle.

 3              THE COURT:  Unmarked white?

 4        A.    Tahoe.  Chevy Tahoe.

 5        Q.    Who drove?

 6        A.    I drove.

 7        Q.    And you said it was an unmarked car?

 8        A.    Yes.

 9        Q.    Were you and Detective Terni in uniform?

10        A.    No.

11        Q.    How were you dressed?

12        A.    In jeans and sweatshirt, jacket of some kind.

13        Q.    Were you armed?

14        A.    Yes.

15        Q.    Why?

16        A.    It's part of your uniform that we have to be armed

17   while on duty.

18        Q.    You have to be armed while on duty?

19        A.    Yes.

20        Q.    How far away is 157 Congress Avenue from the police

21   station?

22        A.    I would say driving, without traffic, about five

23   minutes.

24        Q.    So what happened when you arrived at that

25   location?
```

1        A.      We walked up to the third floor and I knocked on

2    the door, and a gentleman answered the door and I asked if he

3    was John Eastman and he said yes.  I identified myself.  I

4    keep my badge clipped on my belt.  So I usually take it off.

5    In this case I took it off and showed him that I was a

6    detective and identified myself as Detective Morgan and

7    Detective Terni and that we were investigating a case that

8    involved his residence and wanted to know if we could come in

9    and speak to him further.

10       Q.      Just to be clear, did you -- you said you

11   identified yourself and Detective Terni.  Did you identify

12   Detective Terni?

13       A.      Yes.

14       Q.      Did Detective Terni display his badge?

15       A.      I believe Detective Terni usually carries his on a

16   chain around his neck.

17       Q.      Do you -- so a person answered the door and

18   identified themselves as Mr. John Eastman?

19       A.      Yes.

20       Q.      Do you see Mr. Eastman in the courtroom today?

21       A.      I do.

22       Q.      Can you point him out and describe an article of

23   clothing he's wearing?

24       A.      Sure.  He's seated at the table with a what appears

25   to be a whiter light gray sweatshirt.

1    Q.    So what happened after Mr. Eastman answered the

2  door and you identified yourself and Detective Terni to

3  him?

4    A.    Once I requested if we could come in and speak to

5  us, he allowed us in to a living room area.  I requested that

6  he sit so that we could converse and I could explain to him

7  why it is I was there and the focus of my investigation.

8    Q.    And you said that he invited you in, is that

9  right?

10   A.    I asked and he said yes.

11   Q.    Do you remember what he said?

12   A.    Okay.

13   Q.    Did -- at that time did you believe Mr. Eastman had

14  the authority to let you into the apartment?

15   A.    Yes.

16   Q.    At that moment, did you know if anyone else was in

17  the apartment?

18   A.    No.

19   Q.    Do you know whose name was on the lease for that

20  apartment?

21   A.    No.

22   Q.    And going back to that response we saw from

23  Comcast, Government Exhibit 17, whose name was listed as a

24  subscriber?

25   A.    John Eastman.

1    Q.    Now, once inside, you testified a moment ago, that

2    he was sitting on a couch?

3    A.    Yes.

4    Q.    What part of the apartment was that?

5    A.    The living room area in from the entrance door.

6    Q.    And how were you and Detective Terni positioned in

7    relation to Mr. Eastman?

8    A.    He was seated in front of me, I was standing in

9    front of him speaking to him, and Detective Terni was off to

10   my side behind me.

11   Q.    Did you or Detective Terni place Mr. Eastman in

12   handcuffs?

13   A.    No.

14   Q.    Why not?

15   A.    He wasn't under arrest.

16   Q.    Did you tell him he was not under arrest?

17   A.    At some point during the conversation, yes.

18   Q.    What was Mr. Eastman's demeanor at this time?

19   A.    Calm, cooperative.

20   Q.    So you began speaking to him, is that right?

21   A.    Yes.

22   Q.    And what did you talk about?

23   A.    I informed him of the information that I had

24   received from Vermont, and that the incident had occurred on

25   the Skype program and that the user had been using the name

1    Harry Styles, and that through the investigation the

2    information led us to the address we were at as being where

3    that account was created and that did he have any information

4    about that, did he know anything about that.

5        Q.    At some point during this conversation, did you

6    learn if anyone else was in the apartment?

7        A.    While speaking to Mr. Eastman, a woman who I

8    believe was his mother had come into the room to question

9    what was going on, and I identified myself, identified myself

10   as being involved in an investigation, and I really didn't

11   get much else out of my mouth.

12       Q.    Why is that?

13       A.    Because Mr. Eastman chimed in and told his mother

14   everything's all right and to go back in the room.

15       Q.    So you were trying to identify yourself?

16       A.    Oh, I believe I got that out.

17       Q.    But you couldn't get much more out, is that what

18   you're testifying?

19       A.    I told her we were investigating a case and he cut

20   me off to tell her everything's all right, to go back in the

21   room.

22       Q.    And by he, you're referring to Mr. Eastman?

23       A.    Mr. Eastman, yes.

24       Q.    And he told what you believe is his mother to go

25   back into her room?

```
1      A.    Yes.

2      Q.    What did this other woman do?

3      A.    She walked away.

4      Q.    Did you ever enter the room that this woman came

5   out of?

6      A.    No.

7      Q.    No?

8      A.    No.

9      Q.    Now, you said you were conversing with Mr. Eastman,

10  what else happened during the course of your conversation

11  with him?

12     A.    While speaking to him about the case he alluded to

13  the fact that he understood what the case was about and that

14  he had knowledge of the Skype conversations that I was

15  referring to.  At that time I questioned if he would be

16  willing to come to the station and provide a written

17  statement about this fact and if he had any computers in the

18  home that he was using for these conversations.

19     Q.    Let's just break that down.  You said first you

20  asked him if he was willing to come down to the police

21  station to provide a statement?

22     A.    Yes.

23     Q.    What did Mr. Eastman say in response?

24     A.    Yeah, okay.

25     Q.    He agreed to come?
```

1    A.    He did.

2    Q.    And second, you also asked him about a computer?

3    A.    I did.

4    Q.    And what was Mr. Eastman's response?

5    A.    That he had a computer in his bedroom that he

6    utilized that he would be willing to allow us to bring to the

7    station.

8    Q.    And so what happened when he provided this

9    information to you?

10   A.    While we were talking -- I just got to back up a

11   little bit.  While we were talking, I noticed there was a

12   laptop computer near where he was seated and I questioned him

13   about that laptop computer, was that something that he

14   utilized, and he indicated, no, that that wasn't a computer

15   that he utilized.  That the computer that he would use is in

16   his bedroom.  And I asked if we could see that and then bring

17   that to the station and he agreed.  And I asked if he could

18   show us where that was and he led us into his bedroom.

19   Q.    Just so I'm clear.  He led you into the bedroom?

20   A.    Yes.

21   Q.    You were following him?

22   A.    Yes.

23   Q.    What happened when you got to the bedroom?

24   A.    When we got to the bedroom I noticed the lap -- the

25   desktop computer on what would amount to a small computer

1   desk table, and he identified that as the computer that he

2   had been using.  So I asked him if I could take it.  Okay.

3   So I disconnected the computer from the monitor and the

4   keyboard and Internet and picked it up.

5        Q.    At this time where was Mr. Eastman?

6        A.    He was standing behind me.

7        Q.    In the bedroom as well?

8        A.    In the bedroom.

9        Q.    And where was Detective Terni?

10       A.    Outside of the hallway, just outside of the

11   bedroom.

12       Q.    So kind of --

13       A.    Behind Mr. Eastman I guess.

14       Q.    And did you -- what happened after you disconnected

15   the computer?

16       A.    Mr. Eastman asked to use the bathroom before we

17   left.  So the bathroom was right next to his bedroom.  So we

18   let him go in the bathroom and go to the bathroom.

19       Q.    Was he in handcuffs at the time?

20       A.    No.

21       Q.    Did you -- did he keep the door open or closed?

22       A.    Closed.

23       Q.    Did you have any issue with him closing the door?

24       A.    No.

25       Q.    And why's that?

 1     A.     It was a very casual conversation.  I didn't have
 2  any fear that there was going to be any issues.
 3     Q.     What was Mr. Eastman's -- earlier you said he was
 4  very calm and cooperative.  What was his demeanor at this
 5  point?
 6     A.     Continued to be calm and cooperative.
 7     Q.     After he went to the bathroom, what happened?
 8     A.     We left.
 9     Q.     Did you at any point see his or speak to his -- the
10  other woman that was in the apartment?
11     A.     I don't believe so.  She was what I believe in a
12  bedroom that was on the other side of the bathroom door, and
13  the door was almost all the way closed.
14     Q.     Did you or Detective Terni or Mr. Eastman tell her
15  you were leaving the apartment?
16     A.     I believe one of us did.  I believe she was told.
17  I don't remember exactly who.  I might have said to her we're
18  going to take him and we're going to bring him back, he's not
19  under arrest.
20     Q.     Do you recall whether or not the woman had a
21  response?
22     A.     I didn't hear one.
23     Q.     At any point -- at that point you proceeded to
24  leave the apartment?
25     A.     Yes.

```
 1        Q.    At any point did you enter any other rooms in the

 2    apartment, other than a hallway and bedroom to get to those

 3    rooms?

 4        A.    No.   The living room and bedroom, his bedroom, are

 5    the two places.

 6        Q.    How about Detective Terni, did you observe him

 7    going into any other rooms?

 8        A.    No.

 9        Q.    Did you open any drawers or cabinets?

10        A.    No.

11        Q.    Did you observe Detective Terni opening any drawers

12    or cabinets?

13        A.    No.

14        Q.    At any point, did Mr. Eastman or his mother ask you

15    to leave?

16        A.    No.

17        Q.    At any point, did either of them ask you to provide

18    them with a search warrant?

19        A.    No.

20        Q.    Did you take anything other than that computer you

21    talked about from Mr. Eastman's bedroom?

22        A.    No.

23        Q.    How about that laptop that you observed?

24        A.    No.

25        Q.    Now, you testified that Mr. Eastman said it was
```

1   okay for you to take that computer, is that right?

2        A.    Yes.

3        Q.    Did you have him sign any written consent forms

4   while you were at the apartment?

5        A.    No.

6        Q.    Why not?

7        A.    I didn't have one with me, to be honest.

8        Q.    And who did you believe that computer in that

9   bedroom belonged to?

10        A.    Mr. Eastman.

11        Q.    And what was your basis for that belief?

12        A.    He identified the bedroom as his and identified the

13   computer as one that he had purchased.

14        Q.    Did you testify earlier that when you were in the

15   living room he indicated that he uses the desktop computer?

16        A.    Yes.

17        Q.    Now, before you left the apartment, did Mr. Eastman

18   indicate to you that he had changed his mind and you couldn't

19   take the computer?

20        A.    No.

21        Q.    Did at any time the other woman that was in the

22   residence tell you that you could not take the computer?

23        A.    No.

24        Q.    If Mr. Eastman had not given you permission to take

25   that computer, what would you have done?

1    A.    At that point, if I felt it necessary, I would have

2    secured the apartment and obtained a search warrant to then

3    search and seize that computer.

4    Q.    Earlier you testified that you didn't feel you had

5    enough probable cause to go to a judge and get a warrant.

6    How are the circumstances different now that you felt you

7    would get a search warrant?

8    A.    Because when speaking to Mr. Eastman, he admitted

9    that he had been using the Skype program and that he had been

10   using the Harry Styles user name to speak to people on the

11   Skype program.

12   Q.    How long were you in this apartment?

13   A.    15 minutes, 20 minutes.

14   Q.    And as you were exiting the apartment, what was

15   Mr. Eastman's demeanor?

16   A.    Calm, cooperative.

17   Q.    And when you were leaving, was he under arrest?

18   A.    No.

19   Q.    Did you inform him that he was not under arrest?

20   A.    Yes.

21   Q.    And was he in handcuffs at any point when you left

22   the apartment?

23   A.    No.

24   Q.    After you exited the apartment, what did you do?

25   A.    We went down to the Tahoe that we had driven there

1   in, and at that point Detective Terni then drove because I

2   was carrying the desktop computer.  I sat in the front

3   passenger and Mr. Eastman sat in the back seat.

4        Q.   Was he in handcuffs during this ride?

5        A.   No.

6        Q.   Did you do anything to ensure that he didn't have

7   any weapons or anything before he got in the car?

8        A.   It's standard procedure for us to just check

9   individuals clothing to ensure that they don't have any

10  weapons prior to them getting into our police vehicles.  So

11  we did a cursory pat down to make sure he didn't have any

12  weapons before he got into the vehicle.

13       Q.   And who did that?

14       A.   Detective Terni.  I was holding the computer.

15       Q.   Do you recall whether or not Mr. Eastman had a

16  reaction to that pat down?

17       A.   I don't remember a negative reaction, no.

18       Q.   Did the three of you, you, Detective Terni, and

19  Mr. Eastman have any conversations in the car?

20       A.   We may have.  I don't remember anything specific.

21       Q.   Anything substantive about the investigation?

22       A.   No.

23       Q.   What happened when you arrived at the

24  Waterbury -- what was your destination?

25       A.   The Waterbury Police Department Detective Bureau.

1    Q.    What happened when you arrived at the Waterbury

2    Police Department?

3    A.    We went into the Detective Bureau room which is

4    where all the detectives have desks.

5    Q.    If you could just describe how many floors is the

6    Waterbury police station?

7    A.    The department's three floors.

8    Q.    And where is the Detective Bureau?

9    A.    On the third floor.

10   Q.    Do you remember how you got up to the third

11   floor?

12   A.    Yeah.  We have a ramp garage attached to the

13   building, and there's an entrance to the third floor from the

14   top of the ramp garage.  And that's where we entered the

15   Detective Bureau, from that top ramp.

16   Q.    Can you describe the layout of the Detective

17   Bureau?

18   A.    The Detective Bureau is a large room, at least the

19   size of this room, with numerous desks throughout the room

20   for detectives to sit, two supervisor rooms, one holding cell

21   area, and three interview rooms.

22   Q.    And where did you and Mr. Eastman and Detective

23   Terni go to within the area called the Detective Bureau?

24   A.    We went to one desk, myself and Mr. Eastman, went

25   to one desk in that area.  And Detective Terni went to his

1    own desk.  At that time I don't have a desk in that -- I have

2    my own office.  So I just use one of the other detective's

3    desks.

4         Q.    Why did you decide to sit at a desk?

5         A.    Because I needed to use a computer to type a

6    statement.

7         Q.    So there was a computer at the desk you were

8    sitting at?

9         A.    Yes.

10         Q.    Can you describe how you were seated and

11   Mr. Eastman was seated?

12         A.    Sure.  If I'm sitting the way I am now with the

13   computer in front of me, Mr. Eastman was seated to my left on

14   the side of the desk in a chair.  So we could converse face

15   to face.

16         Q.    And where was Detective Terni?

17         A.    He was seated at his desk which is behind me facing

18   kind of the way Your Honor's facing, but behind me.

19         Q.    So he would have been facing across from the front

20   of Mr. Eastman?

21         A.    Yes.

22         Q.    And would he also be able to kind of be across from

23   your computer screen?

24         A.    He would be able to see the computer.  Maybe not be

25   able to read the words, but he could see the computer.

1      Q.     And once you're at the Detective Bureau, was

2    Mr. Eastman ever placed in handcuffs?

3      A.     No.

4      Q.     You sat at the desk.  You described where

5    Mr. Eastman was.  What happened next?

6      A.     At this point, because this is going to be a formal

7    interrogation, we have cards that we use to issue Miranda

8    warnings to individuals that we're going to interrogate about

9    a specific crime.  So I obtained one of those and then read

10   the rights to Mr. Eastman, and then provided him with the

11   card to then read himself, to then initial the rights that he

12   understood them.  At one point I had him read them out loud

13   so that I knew that he could actually read and understand

14   English.  And he went through and initialed the rights as he

15   went through.

16     Q.     I'm going to show you, if you look in that binder,

17   what was admitted as Government's Exhibit 1.   You can also

18   see it on the screen in front of you.

19            What is this document?

20     A.     This is a copy of the card that I read to

21   Mr. Eastman and that he initialed.

22     Q.     At the bottom, do you see where it says officer's

23   signature?

24     A.     Yes.

25     Q.     Do you know whose signature that is?

```
 1      A.      That's mine.

 2      Q.      Above that, do you see a date and time?

 3      A.      I do.

 4      Q.      What is the date?

 5      A.      November 10, 2012.

 6      Q.      What is the time?

 7      A.      1855 hours.

 8      Q.      And is that the date and time that you signed it?

 9      A.      That's the date and time that he signed it, yes.

10      Q.      Whose handwriting is that date and time?

11      A.      That's mine.

12      Q.      And I believe you said you read these out loud to

13  him?

14      A.      I did.

15      Q.      And that you also -- you testified you also had him

16  read out loud a couple of the rights?

17      A.      The first one out loud.

18      Q.      Why did you do that again?

19      A.      Because I wanted to ensure that he could read

20  English and understand English.

21      Q.      Was he able to read that out loud to you?

22      A.      He was.

23      Q.      Did you observe any difficulty with him reading

24  that right out loud to you?

25      A.      No.  As a matter of fact, another reason that I
```

1   have them do this is to try and see if they're impaired in

2   any way, smell of any alcoholic beverage, or any kind of

3   imparity at all, and he showed none.

4       Q.   And you see initials next to each right?  Each of

5   the rights you see an initial there?

6       A.   I do.

7       Q.   Do you know whose initials they are?

8       A.   I do.

9       Q.   Whose are they?

10      A.   Those are John Eastman's.

11      Q.   Did you observe him initial each of those rights?

12      A.   I did.

13      Q.   And at the bottom above your signature, do you see

14  another signature?

15      A.   I do.

16      Q.   Do you know whose signature that?

17      A.   I do.

18      Q.   Whose is that?

19      A.   John Eastman.

20      Q.   And did you witness Mr. Eastman sign that

21  document?

22      A.   I did.

23      Q.   Who signed it first, did he sign it and then you

24  signed it or the other way around?

25      A.   He signed it first.

1      Q.    After signing --

2            THE COURT:  Before you leave that, can I ask him two

3      questions?

4            MR. PATEL:  Certainly.

5            THE COURT:  The number in the upper right-hand

6      corner that's handwritten, is that the case number?

7            THE WITNESS:   That is.

8            THE COURT:   And then who wrote that?

9            THE WITNESS:   I did.

10           THE COURT:   And then the number in the lower

11     right-hand corner, is that your badge number?

12           THE WITNESS:   It's my I.D. number.

13           THE COURT:   Within the force, within the Police

14     Department?

15           THE WITNESS:  Yes.

16           THE COURT:  Thank you.

17           MR. PATEL:  Thank you, Your Honor.

18     BY MR. PATEL:

19     Q.    After signing -- after having Mr. Eastman sign and

20     you signed this Advisement of Rights, what happened next?

21     A.    I then began questioning him more indepth about his

22     use of the Skype program and his individuals that he would

23     attempt to speak with using the Skype program.  And that at

24     some point -- it wasn't very long conversation -- I said to

25     him I'd like to get a written statement from you about this.

1  Would you be willing to do that.  And he complied.  He agreed

2  that he would.

3      Q.    And so what steps did you take after that, after he

4  agreed to do that?

5      A.    I initialized the program that we use to take

6  written statements.  And when that program is started, you

7  have the option to print the rights again for the individual.

8  So I printed them a second time.

9      Q.    Let me show you what's admitted as Government

10  Exhibit 2.  It's tab 2 in your binder.  Do you recognize this

11  document?

12      A.    I do.

13      Q.    What is this document?

14      A.    This is the rights form that is printed, that you

15  have the option of printing when you start to take a written

16  statement.

17      Q.    And what information is contained on this form?

18      A.    The same information that's contained on the rights

19  card that I described earlier.

20      Q.    And do you see -- is the top half in English and

21  the bottom half in Spanish there?

22      A.    I believe that's Spanish.  I don't read it well.

23      Q.    Just focus on the top half there.  Do you see a

24  signature towards the bottom where it says officer signature

25  and ID number?

```
 1        A.     I do.

 2        Q.     Whose signature is that?

 3        A.     Mine.

 4        Q.     And to the right of that, do you see another

 5   signature?

 6        A.     I do.

 7        Q.     And whose is that?

 8        A.     John Eastman.

 9        Q.     Did you observe him sign this form?

10        A.     I did.

11        Q.     And to the right of that, do you see a date and

12   time?

13        A.     I do.

14        Q.     Whose handwriting is that?

15        A.     That's mine.

16        Q.     What is the date?

17        A.     November 10, 2012.

18        Q.     And what is the time?

19        A.     1932 hours.

20        Q.     And is that the time that you and Mr. Eastman

21   signed this form?

22        A.     Yes.

23        Q.     Now, how did you -- did you read these rights out

24   loud as well?

25        A.     I did not.
```

1    Q.    So what did you do when this form was printed?

2    A.    I gave it to Mr. Eastman to read and I explained to

3  him that it was the same information in the card, and for him

4  to read it to ensure that it was the same information, and to

5  initial as he went through that he understood.

6    Q.    And do you see some initials next to some of those

7  rights there?

8    A.    I do.

9    Q.    And whose initials are those?

10    A.    John Eastman.

11    Q.    Did you observe him initial that document?

12    A.    I did.

13    Q.    Now, you testified on here that the time is 1932.

14  Is that 7:32 p.m.?/

15    A.    7:32, p.m., correct.

16    Q.    The prior form we looked at, Exhibit 1, was signed

17  at 1855 or 6:55 p.m., is that right?

18    A.    Correct.

19    Q.    What occurred in that time span of 37 minutes?

20    A.    As I explained later, that's when I was speaking to

21  Mr. Eastman more indepth about his activities in using the

22  Skype program and how he utilized it and who he would attempt

23  to speak to.

24    Q.    So after you and Mr. Eastman signed this voluntary

25  statement --

1          MR. PATEL:  Let me first ask if the Court has any

2     other questions on this document?

3          THE COURT:  No, thank you.

4     Q.    What happened after this document was signed?

5     A.    I began typing the information into the statement

6     form, the name, address, and date of birth that he had given

7     to me for himself, and then started typing the information

8     about what we had been referring to regarding the Skype

9     conversations.

10    Q.    You mean you were typing up the statements he had

11    made?

12    A.    Correct.

13    Q.    And as you were typing them up, would you have to

14    ask him additional questions?

15    A.    Yes.  While I was typing it we had already

16    discussed his computer usage and, although I had the verbal

17    consent from him to bring the computer to the station, I felt

18    it better to get a formal signed written consent to perform

19    the digital forensic examination on the computer.  So while I

20    was taking the statement from him, I asked him if he would be

21    willing to sign a consent form for me to search the data on

22    the computer and he agreed.

23    Q.    Let's break this down a little bit.  First you

24    started to type up the statements he was making, is that

25    right?

```
 1        A.     Correct.
 2        Q.     Let me show you, it's behind tab 4 there, what's
 3   admitted as Government's Exhibit 4.  Do you see that document
 4   in front of you?  It's a two-page document.  Heading at the
 5   top says Voluntary Statement.
 6        A.     Yes.
 7        Q.     Do you recognize this document?
 8        A.     I do.
 9        Q.     What is this document?
10        A.     This is the typed statement that I had obtained
11   from Mr. Eastman.
12        Q.     The statements on here was what you were typing
13   into this program?
14        A.     Correct.
15        Q.     And at the top there, do you see a date and time?
16        A.     I do.
17        Q.     What is the time listed there?
18        A.     The time is 7:34, p.m.
19        Q.     What does that indicate?
20        A.     That's the time that I started to enter the
21   information into the statement.
22        Q.     And that's two minutes after the time listed on the
23   statement rights form that we just looked at?
24        A.     Correct.
25        Q.     And if you turn to the second page, at the very,
```

1   very bottom, you see a finished date there with the time of

2   8:43, p.m.?

3        A.    Yes.

4        Q.    What is that time?

5        A.    That's the time that the statement was completed

6   typing.

7        Q.    I'm going to come back to this document in a

8   second, but you had just testified that while you were typing

9   this statement you asked Mr. Eastman to sign another form?

10       A.    I did.

11       Q.    And what was that form again?

12       A.    That was a Consent to Search form.

13       Q.    Showing you what's -- let me show you what's been

14  admitted as Government's Exhibit 3, tab 3 in that binder.

15  What is this document?

16       A.    This is Waterbury Police Department Consent to

17  Search form that we use.

18       Q.    Is this the form that you were just referring to?

19       A.    Yes.

20       Q.    And what item or property were you getting consent

21  to search?

22       A.    The HP desktop computer.

23       Q.    Do you see a signature at the very bottom there, it

24  says witnesses or officers?

25       A.    I do.

1    Q.    Whose signature is that?

2    A.    Mine.

3    Q.    And above that, a couple of lines above that, do

4    you see another signature?

5    A.    I do.

6    Q.    And whose is that?

7    A.    John Eastman's.

8    Q.    And did you see him, observe him sign this form?

9    A.    I did.

10    Q.    In between your two signatures, yours and his, do

11    you see a date and time?

12    A.    I do.

13    Q.    And what is the date?

14    A.    November 10th, 2012.

15    Q.    And what's the time?

16    A.    7:40, p.m.

17    Q.    And that's after the 7:34 time that's listed at the

18    top of the Voluntary Statement that you were typing?

19    A.    Correct.

20    Q.    Before it was completed?

21    A.    Correct.

22    Q.    Do you see next to it that time, there's a

23    location?

24    A.    Yes.

25    Q.    What does it say next to that?

1      A.     255 East Main Street, Waterbury.

2      Q.     What is that address?  What's at that address?

3      A.     That's the Waterbury Police Department.

4      Q.     So this document was signed at the Waterbury Police

5  Department, right?

6      A.     Yes.

7      Q.     And you see at the top there it says the Waterbury

8  Police Department requests your permission to search/obtain

9  HP desktop computer which is located at 157 Congress Avenue,

10  3rd floor?

11      A.     Yes.

12      Q.     Do you see that?

13      A.     I do.

14      Q.     Where was the computer physically located at this

15  time?

16      A.     At the time that this was signed, at the Police

17  Department.

18      Q.     Whose handwriting is that that says 157 Congress

19  Avenue?

20      A.     Mine.

21      Q.     Why did you put that address there?

22      A.     Because that's the address where the computer was

23  located when we brought it to the station.

24      Q.     Were you trying to mislead anybody by putting that

25  address there?

1    A.    No.  I wanted it known where it was when we

2    started.

3    Q.    If you see in the middle of the page there's a

4    paragraph in italics, do you see that?

5    A.    Yes.

6    Q.    I'm not going to have you read it, but you can read

7    it to yourself.  Below that, do you see a statement that says

8    I have read it and understood the above disclosure with what

9    appears to be initials next to it?

10    A.    I do.

11    Q.    Do you know whose initials those are?

12    A.    I do.

13    Q.    Whose are they?

14    A.    John Eastman.

15    Q.    Did you observe him put his initials on this

16    document?

17    A.    I did.

18    Q.    And below that, do you see a sentence that reads,

19    do you freely and voluntarily give permission to the

20    Waterbury Police Department to search and obtain the HP

21    desktop computer which is located at 157 Congress Avenue,

22    Third floor, Waterbury, Connecticut, do you see that?

23    A.    I do.

24    Q.    Do you see a box that's checked yes?

25    A.    I do.

1    Q.    Are there initials next to that box?

2    A.    Yes.

3    Q.    Whose initials are those?

4    A.    John Eastman.

5    Q.    Did you observe him initial this document?

6    A.    Yes.

7    Q.    And below that, do you see another statement with

8    initials below that?

9    A.    Yes.

10   Q.    Do you recognize those initials?

11   A.    Yes.

12   Q.    Whose are they?

13   A.    John Eastman's.

14   Q.    Do you observe him place his initials there?

15   A.    Yes.  Along with, and I'd just like to say, he

16   actually put those checkmarks in those boxes too.

17   Q.    And did you observe him doing that?

18   A.    I did.

19   Q.    I want to go back to the -- I think you testified

20   about this.  But why did you have him sign this form if you

21   already obtained his verbal consent at the apartment?

22   A.    Because I wanted a more formal consent from him, a

23   signed consent, that he was willing to allow the computer to

24   be examined forensically.

25   Q.    Going back to Government's Exhibit 4 which is a

1   Voluntary Statement, at some point you finished typing up the

2   statement, is that right?

3        A.    Yes.

4        Q.    And what happened after you finished typing it

5   up?

6        A.    I printed the statement and then gave it to

7   Mr. Eastman for him to read it and review it to ensure that

8   it was the statement that he wanted to provide in this

9   case.

10       Q.    And did Mr. Eastman review it?

11       A.    He did.

12       Q.    Did he make any comments?

13       A.    He did.  He wanted some wording changed in the

14   original printed statement, which I did make those changes,

15   and then reprinted the statement for him to review again.

16       Q.    Sitting here today, do you remember specifically

17   what he wanted changed?

18       A.    I do not.

19       Q.    But you made the change?

20       A.    Yes.

21       Q.    And then you reprinted the document?

22       A.    Yes.

23       Q.    So you typed up the words that are on this page, is

24   that right?

25       A.    Yes.

1      Q.     Can you just look at the first paragraph there.   In

2   the middle, do you see where it reads -- it states:

3   Detective Morgan has advised me of my constitutional rights

4   and I signed and initialed a card and form agreeing to waive

5   those rights.   Do you see that?

6      A.     I do.

7      Q.     What are you referring to there when you say signed

8   and initialed a card and form?

9      A.     The rights form that we spoke of earlier that was

10  initialed and signed at 1855 hours.

11     Q.     Is the card and the form supposed to be two

12  different things?

13     A.     Yeah.   The card is one thing and the form is the

14  other.   So it's two different things.   The card is the one

15  that was initialed and signed at 1855 hours.   The form is

16  what gets printed when you have that option when you

17  initialize the statement program which was initialed and

18  signed, I believe, at 1932.

19     Q.     So if you just look in your binder at what's

20  Government's Exhibits 1 and 2, is that what you're referring

21  to in this paragraph?

22     A.     Yeah.   Exhibit 1 would be the rights card, and

23  Exhibit 2 would be the rights form.

24     Q.     And if you look at page two, I want you to look at

25  the last paragraph there.   Second to last sentence it says, I

1    also signed a Consent to Search form allowing Detective

2    Morgan to take the desktop computer from my bedroom and do a

3    forensic examination on it to look for the information from

4    my Skype chats.  Do you see that?

5         A.    I do.

6         Q.    What is the Consent to Search form you're referring

7    to in your sentence?

8         A.    That's the form we referred to, Exhibit 4 -- 3, I'm

9    sorry.  Exhibit 3 that was initialed and signed by

10   Mr. Eastman.

11        Q.    What's Government's Exhibit 3 in your binder

12   there?

13        A.    Correct.

14        Q.    After you printed out the form and made the change

15   that Mr. Eastman requested and reprinted the form, what did

16   you do?

17        A.    Well, because Detective Terni and I were the only

18   two working, we needed a supervisor to notarize the

19   statement.  So I had to call the front desk to locate a

20   supervisor that could come up and notarize the statement.

21        Q.    And did a supervisor come up?

22        A.    Yes.

23        Q.    And who was that?

24        A.    Lieutenant Fox.

25        Q.    Lieutenant William Fox?

1      A.    Yes.

2      Q.    Is he currently a Lieutenant?

3      A.    No.

4      Q.    What is his title now?

5      A.    Captain.

6      Q.    But at the time he was a Lieutenant?

7      A.    Yes.

8      Q.    And what happened when Lieutenant Fox or now

9   Captain Fox came up?

10      A.    I provided him with the statement, the written

11   statement that had been printed, and advised him that

12   Mr. Eastman was the individual who had provided that

13   statement, and Lieutenant Fox then administered an oath to

14   Mr. Eastman affirming that it was a true and accurate

15   statement, that he agreed with the items that were listed in

16   the statement, and then he proceeded to have Mr. Eastman

17   initial the statement at the beginning and end of the typed

18   portions of both pages and then had him sign the -- both

19   pages.

20      Q.    Just to break that down.  Lieutenant Fox comes up

21   and he administers an oath to Mr. Eastman?

22      A.    Correct.

23      Q.    And he also, I believe you testified, asks him if

24   he agreed with the statements that are on this form?

25      A.    Correct.

1      Q.     Did Mr. Eastman have a response?

2      A.     He agreed.

3      Q.     And then at that point Lieutenant Fox asks

4   Mr. Eastman to did you say initial the document?

5      A.     Initial the typed portion at the beginning and the

6   end of each page.

7      Q.     If you look at Government Exhibit 4 there, do you

8   see where my finger's pointing, do you see initials at the

9   beginning and then at the end of the typed portions of the

10   first page?

11      A.     I do.

12      Q.     Do you know whose initials those are?

13      A.     I do.

14      Q.     Whose are they?

15      A.     John Eastman's.

16      Q.     Did you observe him place those initials?

17      A.     I did.

18      Q.     Was that after Lieutenant Fox asked him to do

19   that?

20      A.     That was -- yes.

21      Q.     In other words, those initials were not on there

22   before Lieutenant Fox came up, is that right?

23      A.     Right.

24      Q.     If you look at the second page, do you see a

25   similar set of initials at the beginning and end of the typed

1   portion?

2       A.    Yes.

3       Q.    And whose are those?

4       A.    John Eastman's.

5       Q.    And, again, is that -- were those placed on there

6   after Lieutenant Fox asked him to initial the document?

7       A.    Yes.

8       Q.    And after that, what did Lieutenant Fox do or what

9   took place after Mr. Eastman initialed the document?

10      A.    Lieutenant Fox then requested that he sign both

11  documents, Mr. Eastman.

12      Q.    And if you look at the bottom of each page, do you

13  see several signatures?

14      A.    I do.

15      Q.    And whose signatures do you see?

16      A.    I see John Eastman's, Lieutenant Fox, and Detective

17  Terni.

18      Q.    Where my finger is, where it has the word signed,

19  do you see a signature?

20      A.    I do.

21      Q.    Who is that?

22      A.    John Eastman.

23      Q.    Did you observe him sign this form?

24      A.    I did.

25      Q.    Below that, do you see a line that says

```
 1   supervisor?

 2        A.    Yes.

 3        Q.    Whose signature is that?

 4        A.    Lieutenant Fox.

 5        Q.    Did you observe him sign this form?

 6        A.    I did.

 7        Q.    On the right side, do you see a signature next to

 8   witness?

 9        A.    Left side?

10        Q.    Left side.

11        A.    Yes.

12        Q.    Whose signature is that?

13        A.    Detective Terni.

14        Q.    Did you sign this document?

15        A.    I did not.

16              THE COURT:  Did you see Detective Terni sign the

17   document?

18              THE WITNESS:  I did.

19        Q.    And that was done on both pages, is that right?

20        A.    Yes.

21        Q.    What happened after this document was signed?

22        A.    Once this was signed, I had completed my interview

23   with Mr. Eastman and proceeded to bring him back home.

24        Q.    Did you -- after you received this statement, did

25   you place Mr. Eastman under arrest?
```

1    A.    No.

2    Q.    Why not?

3    A.    Because I needed to do the forensic examination on

4  the computer to obtain evidence related to any crimes.

5    Q.    And so you said you drove him or you took him home,

6  is that right?

7    A.    Correct.

8    Q.    Who took him home?

9    A.    Myself and Detective Terni.

10   Q.    And did you place Mr. Eastman in handcuffs?

11   A.    No.

12   Q.    Again, what was Mr. Eastman's demeanor the whole

13  time you were at the Detective Bureau?

14   A.    Calm and cooperative.

15   Q.    How about when you were driving him back?

16   A.    I think happy to be going home.

17   Q.    Did he say anything?

18   A.    The only question I think he asked is what was

19  going to happen next.

20   Q.    And what was your response?

21   A.    I advised him I wouldn't have an answer until after

22  I had completed the forensic examinations and that I would

23  get in touch with him once I was done with that.

24   Q.    And so you drove him, you and Detective Terni,

25  drove back to -- is it 157 Congress Avenue?

1      A.     Yes.

2      Q.     What happened when you got there?

3      A.     Mr. Eastman got out of the back seat and went home

4    I assume.

5      Q.     Did you escort him upstairs?

6      A.     No.

7      Q.     At some point -- let me rephrase that.  To your

8    knowledge, has anyone filed a complaint against you regarding

9    the events that took place on November 10, 2012 at

10   the -- Mr. Eastman's apartment or at the Detective Bureau?

11     A.     Yes.

12     Q.     Who filed a complaint?

13     A.     I believe Mr. Eastman's mother.

14     Q.     How did you become aware of that?

15     A.     The Internal Affairs Division contacted me and

16   advised me.

17     Q.     And did you read the complaint itself?

18     A.     I did.

19     Q.     And when did you do that?

20     A.     After it came in.  I don't remember exactly.

21     Q.     And you said Internal Affairs.  Did they speak to

22   you about it?

23     A.     They did.

24     Q.     Do you know if they came to any sort of

25   conclusion?

1      A.    I do.

2      Q.    And how did you learn about that?

3      A.    They advised me.

4      Q.    Do you remember when they advised you?

5      A.    I don't.

6      Q.    Do you know what that conclusion was?

7      A.    I believe one portion of it was unfounded, and the

8   second portion was -- I don't know what they use, but they

9   couldn't make a determination for the second portion.

10           MR. PATEL:  One moment, Your Honor.

11           No further questions at this time, Your Honor.

12           THE COURT:  Cross-examination.

13           Actually, we'll take a break in five minutes.  I

14   usually break at 10:30.  Do you want to get started, though?

15           MS. BARRETT:  Sure.

16                  CROSS-EXAMINATION

17   BY MS. BARRETT:

18      Q.    Good morning, Detective Morgan.

19      A.    Good morning.

20      Q.    You're the lead detective in this case, right?

21      A.    I am.

22      Q.    In 2012, waterbury Police Department was contacted

23   by Vermont State Police, correct?

24      A.    Yes.

25      Q.    That was Trooper Jollymore?

1    A.    It was.

2    Q.    He is investigating Internet activity?

3    A.    He was.

4    Q.    Sexually explicit Internet activity?

5    A.    An attempt at that.

6    Q.    It involved minor girls, correct?

7    A.    Yes.

8    Q.    11, 12 years old?

9    A.    Yes.

10    Q.    The activity occurred over Skype, correct?

11    A.    Correct.

12    Q.    And Trooper Jollymore was able to trace Skype

13    activity to an IP address in Waterbury, correct?

14    A.    Correct.

15    Q.    You then applied for a court order for Comcast for

16    the IP address, correct?

17    A.    Yes.

18    Q.    You applied for that Court order on November 1st,

19    2012, correct?

20    A.    Yes.

21    Q.    You were granted that Court order, correct?

22    A.    Yes.

23    Q.    You requested user account information from

24    Comcast, right?

25    A.    Yes.

1        Q.     And Comcast provided that information to you?

2        A.     Yes.

3        Q.     The response indicated that the IP address belonged

4    to John Eastman, right?

5        A.     The subscriber, yes.

6        Q.     And that that was at 157 Congress Avenue, 3rd

7    floor, Waterbury, Connecticut, right?

8        A.     Yes.

9        Q.     You received that response from Comcast on November

10   8, 2012, right?

11       A.     Yes.

12       Q.     And you went to 157 Congress Avenue on November 10,

13   2012, correct?

14       A.     Yes.

15       Q.     You didn't feel that time was of the essence?

16       A.     No.

17       Q.     Once you had John Eastman's name, you ran his rap

18   sheet, correct?

19       A.     Not then, no.

20       Q.     It's not standard police practice to run rap sheets

21   on suspects?

22       A.     I didn't have a suspect at that time.

23       Q.     You decided to go to the home of a person

24   associated with Internet activity without first running his

25   rap sheet?

```
1      A.    Again, there was no suspect.

2      Q.    You did run the rap sheet at some point, correct?

3      A.    I did.

4      Q.    Fair to say it's a lengthy rap sheet, correct?

5      A.    It is definitely fair to say that.

6      Q.    About 37 pages long, right?

7      A.    It's extensive.

8      Q.    Mr. Eastman has a former conviction for assault on

9  a police officer, correct?

10     A.    Oh, that I didn't know.

11     Q.    He has convictions for interfering with arrests,

12  correct?

13           THE COURT:   Interfering with?

14     Q.    Interfering with arrest?

15     A.    I didn't know that.

16     Q.    He has convictions for violating probation,

17  correct?

18     A.    That I believe I knew.

19     Q.    Actually, three convictions for that, correct?

20     A.    I don't know how many convictions he has for

21  that.

22     Q.    He's a former registered sex offender, correct?

23     A.    That I know.

24     Q.    He was on the sex offender registry for ten years,

25  correct?
```

1      A.      That I know.

2      Q.      The list goes on and on, correct?

3      A.      It does.

4      Q.      Prior to this case, you had never met Mr. Eastman

5  before?

6      A.      No.

7      Q.      But you did know he had a reputation for being

8  difficult, correct?

9      A.      Again, no.

10      Q.      You hadn't heard that from other Waterbury police

11  officers?

12      A.      No.

13      Q.      I want to ask you some questions now about your

14  purpose in going to the Eastman home.   In the two days

15  between November 8th and November 10th, 2012, you did not

16  apply for a search warrant, correct?

17      A.      No.

18      Q.      In the two days between November 8th and November

19  10th, you did not apply for an arrest warrant, correct?

20      A.      Correct.

21      Q.      In the two days between November 8th and November

22  10th, you made inquiries into who lived at the residence at

23  157 Congress?

24      A.      I did not.

25      Q.      In the two days between November 8th and November

1    10th, you learned that Linda Eastman is the lease holder at

2    157 Congress?

3         A.    I did not.

4         Q.    In the two days between November 8th and November

5    10th, did you check the property records?

6         A.    I did not.

7         Q.    You now know that Linda Eastman is the lease holder

8    at 157 Congress, correct?

9         A.    No.

10        Q.    You now know that Linda Eastman purchased the

11   computer that you seized on November 10th, correct?

12        A.    No.

13        Q.    Linda Eastman is John Eastman's mother, correct?

14        A.    I guess.  I don't know.

15        Q.    You guess or you don't know?

16        A.    I don't know.

17        Q.    You have testified that you did not obtain a search

18   warrant because you felt you needed additional information?

19        A.    Yes.

20        Q.    Incidentally, you didn't state that in your police

21   report, did you?

22        A.    No.

23        Q.    You felt you needed more information than an IP

24   address linking the sex chats in Vermont to John Eastman's

25   name and address?

1    A.    Yes.

2    Q.    You felt you needed more information, even though

3  John Eastman was a registered sex offender for 10 years?

4    A.    I didn't know that prior to going there.

5    Q.    Because you didn't run the rap, correct?  In the

6  two days between November 8th and November 10th, you didn't

7  take the time to run his rap sheet?

8    A.    Correct.

9    Q.    A warrant requires probable cause, correct?

10   A.    Yes.

11   Q.    To believe a crime was committed, right?  Probable

12  cause requires probable cause to believe that a crime was

13  committed, correct?

14   A.    And some other stuff, but yes.

15   Q.    The other stuff being that a particular person

16  committed it, correct?

17   A.    Correct.

18   Q.    Probable cause does not require proof beyond all

19  reasonable doubt, does it?

20   A.    No.

21   Q.    In fact, probable cause is a relatively, relatively

22  low standard, correct?

23   A.    I wouldn't say low standard, no.

24   Q.    I'm sorry, I didn't hear you.

25   A.    I would not say a low standard, no.

1    Q.    In this case, you knew a crime had been committed

2    based on the evidence from Vermont, correct?

3    A.    I did not feel that at the time that there was a

4    definite crime, no.

5    Q.    You didn't believe that the crime of harassment had

6    been committed?

7    A.    No.

8    Q.    You didn't feel that the crime of risk of injury to

9    a minor had been committed?

10   A.    No.  Because the person in the home using the

11   computer could have been 13 years old themselves.  It would

12   have been age appropriate conversation.

13   Q.    Meaning, if John Eastman had been 13 years old, it

14   would have been age appropriate, is that what you mean?

15   A.    Right.

16   Q.    Did you run John Eastman's date of birth before you

17   went to his house on November 10, 2012?

18   A.    No.

19         THE COURT:  All right, Attorney Barrett, why don't

20   we take our break.

21         We'll take a 15 minute recess.

22         Thank you.

23         (Recess.)

24         THE COURT:  Whenever you're ready.

25   BY MS. BARRETT:

1      Q.     Detective Morgan, it's fair to say that reasonable

2    minds can differ about whether probable cause exists in any

3    given case?

4      A.     The standard is reasonable person.  So I can't

5    answer that.

6      Q.     You can't answer that?

7      A.     No.

8      Q.     You would at least agree with me that you had

9    enough information on November 8, 2012 to make a good faith

10   attempt to get a search warrant, correct?

11     A.     No.

12     Q.     Well, after all, the worse that could happen is

13   that you would be denied, correct?

14     A.     Correct.

15     Q.     And then you'd be in no worse position than you

16   already were, right?

17     A.     I didn't feel there was a need to apply for a

18   search warrant.

19     Q.     You didn't feel there was a need or you felt you

20   needed more information?

21     A.     Needed more information, need, either way.

22     Q.     You didn't feel you needed a search warrant?

23     A.     No.

24     Q.     Now, a conviction requires proof beyond reasonable

25   doubt, correct?

1      A.    Yes.

2      Q.    And you certainly wanted to get sufficient evidence

3   for a conviction in this case, correct?

4      A.    After establishing a crime, yes.

5      Q.    But you did want to establish proof beyond a

6   reasonable doubt, correct?

7      A.    If a crime was committed, yes.

8      Q.    Some examples of such evidence would include a

9   confession, correct?

10     A.    Yes.

11     Q.    Physical evidence?

12     A.    Yes.

13     Q.    You didn't think you had enough information for a

14  warrant so you decided to go to 157 Congress anyway without a

15  warrant, right?

16     A.    Yes.

17     Q.    You testified that you believed that the better

18  course of action was to try to speak with Mr. Eastman first,

19  right?

20     A.    Speak with Mr. Eastman, yes, because he was listed

21  as the subscriber.

22     Q.    So that would be speaking with Mr. Eastman,

23  right?

24     A.    Yes.

25     Q.    So you thought that even though you felt you didn't

1    have enough information to get a warrant to go to the home,

2    the better course of action was to go to the home anyway

3    without a warrant?

4         A.    Yes.

5         Q.    That's what you felt was a better course of

6    action?

7         A.    I was the lead investigator.  That's what I felt,

8    yes.

9         Q.    You've received training on the Fourth Amendment,

10   right?

11        A.    I have.

12        Q.    You knew before going to 157 Congress that you

13   could not enter the home without either a warrant or an

14   exception to the warrant requirement, right?

15        A.    That's not true.

16        Q.    That's not true?

17        A.    That's not true.

18        Q.    What's your understanding of the Fourth

19   Amendment?

20        A.    If they let me in, then I can go in.

21        Q.    Well, that would be called consent, right?

22        A.    That would be.

23        Q.    And that would be an exception to the warrant

24   requirement, correct?

25        A.    It would be.

1    Q.    So my statement that you either needed a warrant or

2    an exception to the warrant requirement was accurate,

3    correct?

4    A.    Correct.  My mistake.

5    Q.    And you know that you could not seize any items

6    within the home without the owner's consent, correct?

7    A.    Correct.

8    Q.    Now, you didn't know at the time whether there was

9    a computer at 157 Congress, correct?

10    A.    I did not.

11    Q.    If there was a computer, you did not know where it

12    was located?

13    A.    I did not.

14    Q.    If there was a computer, you did not know who was

15    operating it?

16    A.    I did not.

17    Q.    You didn't even know if the persona Skyping with

18    the underaged girls in Vermont was using a computer or a cell

19    phone, correct?

20    A.    All the reasons why I didn't get a search

21    warrant.

22    Q.    So that's correct?

23    A.    Correct.

24    Q.    Fair to say in approaching 157 Congress, you were

25    hoping that Mr. Eastman would be cooperative?

1    A.    I was hoping that anybody in the residence that

2    answered the door would be cooperative.

3    Q.    And that was Mr. Eastman, correct?

4    A.    It was.

5    Q.    You wanted to convince him to talk to you?

6    A.    I wanted to speak to whoever resided at the home.

7    Q.    And that was Mr. Eastman, correct?

8    A.    It was.

9    Q.    And you wanted to speak to him without a lawyer

10   present, correct?

11   A.    That was the effect of what the conversation was

12   going to be, yes, without a warrant -- I'm sorry, without a

13   lawyer present, yes.

14   Q.    You were hoping that he would incriminate

15   himself?

16   A.    I had no idea what the conversation would consist

17   of.

18   Q.    My question, though, Detective Morgan, is that you

19   were hoping that he would incriminate himself?

20   A.    No, that wasn't my hope at all.

21   Q.    So that you could get the information you wanted

22   without having to obtain a warrant, correct?

23   A.    I just wanted to investigate the case and see what

24   action I needed to take going further.

25   Q.    Is it fair to say that in approaching 157 Congress,

1    you were hoping to get inside of it, inside of the

2    apartment?

3        A.    I was hoping to gain information to see what steps

4    I would need to take going further.

5        Q.    You were interested to note there was a computer

6    there, correct?

7        A.    That would be important to know, yes.

8        Q.    And when you were approaching 157 Congress, you

9    knew you couldn't arrest John Eastman in his home without a

10   warrant, correct?

11       A.    Correct.

12       Q.    Now, I want to ask you some questions about your

13   entry into 157 Congress.  You had received information from

14   Comcast on November 8, 2012 identifying John Eastman's name

15   and address, right?

16       A.    Correct.

17       Q.    That was a Thursday, correct?

18       A.    Correct.

19       Q.    You did not go to 157 Congress that day, right?

20       A.    Correct.

21       Q.    You went on November 10th, 2012, correct?

22       A.    Correct.

23       Q.    Now, November 10, 2012, was a Saturday, correct?

24       A.    Yes.

25       Q.    It was the Saturday of the Veterans holiday

1    weekend, correct?

2        A.    That, I don't know.

3        Q.    But you did testify you were short-staffed that

4    weekend because it was a holiday weekend, correct?

5        A.    That's not what I said.

6        Q.    You didn't say it was short-staffed?

7        A.    I said short-staffed, but I didn't give a reason.

8        Q.    And you don't recall if it was the Veterans holiday

9    weekend?

10       A.    No.

11       Q.    You testified that you went to 157 Congress between

12   6 and 6:15, p.m., right?

13       A.    Correct.

14       Q.    It was dark?

15       A.    It was dark.

16       Q.    It was cold?

17       A.    That, I don't remember.

18       Q.    Fair to say 157 Congress is not located in the best

19   of neighborhoods?

20       A.    That's all relative to who you are.

21       Q.    Well, relative to who you are, Detective Morgan, is

22   it fair to say that 157 Congress is not located in the best

23   of Neighborhoods?

24       A.    It's okay.  It's not horrible.

25       Q.    You asked Detective Terni to go with you to 157

1   Congress, right?

2       A.    Yes.

3       Q.    And that was for officer safety?

4       A.    Yes.

5       Q.    Going into a suspect's home can be dangerous,

6   right?

7       A.    I didn't know if it was the suspect located there

8   or not.  So we were going there not knowing who we were going

9   to deal with.

10      Q.    Well, John Eastman was your only suspect at the

11  time, correct?

12      A.    I didn't have any suspects.

13      Q.    But you did have John Eastman's name?

14      A.    I had his name, yes.

15      Q.    And you had his address?

16      A.    Yes.

17      Q.    And you had his name and address associated with

18  sex chats in Vermont, right?

19      A.    I did.

20      Q.    Going into anyone's home that you don't know can be

21  dangerous, correct?

22      A.    Correct.

23      Q.    And it's important to have a backup, right?

24      A.    It's good to have.

25      Q.    You were also hoping that showing up with two

1    detectives would make Mr. Eastman more cooperative, right?

2        A.    No.

3        Q.    By the way, Detective Morgan, Detective Terni, is

4    he junior to you?

5        A.    He is.

6        Q.    And you testified that you were wearing plain

7    clothes, right?

8        A.    Yes.

9        Q.    You were armed?

10       A.    Yes.

11       Q.    Detective Terni was armed?

12       A.    Yes.

13       Q.    Your firearms were visible?

14       A.    Yes.

15       Q.    You had your handcuffs on you?

16       A.    No.

17       Q.    You didn't carry handcuffs with you on your belt?

18       A.    No.

19       Q.    Detective Terni had handcuffs on him?

20       A.    No.

21       Q.    It's not standard police practice to carry

22    handcuffs?

23       A.    Not as a detective, no.

24       Q.    That's not part of your uniform?

25       A.    No.

1    Q.    You both had police badges?

2    A.    Yes.

3    Q.    You knocked on the door?

4    A.    Yes.

5    Q.    And a man answered, right?

6    A.    Yes.

7    Q.    Now, you testified you had not run John Eastman's

8    rap sheet at this point, right?

9    A.    No.

10   Q.    Had you run any of his prior mug shots?

11   A.    At this point, no.

12   Q.    So you didn't recognize the man as John Eastman?

13   A.    No.

14   Q.    You had never met Mr. Eastman prior to November

15   10th?

16   A.    No.

17   Q.    As far as you know, Detective Terni never met

18   Mr. Eastman prior to November 10th?

19   A.    No.

20   Q.    When you showed up at the front door, Mr. Eastman

21   did not appear to recognize you, right?

22   A.    No.

23   Q.    When you -- when Mr. Eastman answered the door, you

24   told him that you were with the Waterbury police, right?

25   A.    Yes.

1    Q.    You testified that Mr. Eastman allowed you in,

2    right?

3    A.    Yes.

4    Q.    Now, prior to entering the apartment, you did not

5    ask Mr. Eastman if he was the owner of the premises, did

6    you?

7    A.    No.

8    Q.    Prior to entering, you did not ask Mr. Eastman if

9    he was the lease holder, did you?

10   A.    No.

11   Q.    Prior to entering the apartment, you did not ask

12   Mr. Eastman if anyone else was present in the home, did

13   you?

14   A.    No.

15   Q.    Prior to entering the home at 157 Congress, you did

16   not have a discussion with Mr. Eastman about the concept of

17   informed consent, did you?

18   A.    No.

19   Q.    Prior to entering the home at 157 Congress, the

20   word consent was not uttered by you or Mr. Eastman, was it?

21   A.    No.

22   Q.    You never explicitly asked Mr. Eastman for consent

23   to enter the home, did you?

24   A.    I asked him if we come in and talk to him and he

25   said, yes, okay.

1    Q.    In fact, a fair characterization of what happened

2   is you knocked, Mr. Eastman opened the door, and you entered,

3   correct?

4    A.    No.

5    Q.    Well, Mr. Eastman didn't physically block your way

6   into the apartment, did he?

7    A.    He could have.

8    Q.    Did he?

9    A.    No.

10    Q.    That would have been a crime, right?

11    A.    No.

12    Q.    That wouldn't have been assault on a police

13   officer?

14    A.    No.

15    Q.    But you actually did make physical contact with

16   Mr. Eastman as you entered, right?

17    A.    No.

18    Q.    Mr. Eastman stumbled backward as you entered the

19   apartment?

20    A.    No.

21    Q.    You testified that you've received training on the

22   Fourth Amendment, right?

23    A.    I have.

24    Q.    So you understand that the home receives the

25   strongest protection under the Fourth Amendment, right?

 1      A.     It does.

 2      Q.     It is your understanding, is it not, that merely

 3   entering a home without a warrant is considered to be an

 4   illegal search unless there's valid consent, correct?

 5      A.     Sure.

 6      Q.     Now, I want to ask you some questions about what

 7   you did once you were inside 157 Congress.  Once inside the

 8   Eastman home, you testified that Detective Terni did not

 9   handcuff Mr. Eastman, is that correct?

10      A.     That's correct.

11      Q.     We'll come back to that in a moment.  You did

12   testify that you placed Mr. Eastman on the couch?

13      A.     I didn't place him.  I asked him if he could sit

14   down.

15      Q.     And he sat down on the couch, correct?

16      A.     He did.

17      Q.     Now, you told Mr. Eastman you suspected him of

18   soliciting minors?

19      A.     That's definitely not what I said.

20      Q.     You did tell him you were investigating sex chats

21   from Vermont, correct?

22      A.     I did.

23      Q.     And you suspected him in connection with those sex

24   chats, correct?

25      A.     No, that's not what I said.

1    Q.    You told him you wanted to talk to him about the

2  sex chats in Vermont, correct?

3    A.    I did.

4    Q.    You told him you wanted to see his computer,

5  correct?

6    A.    I did not.

7    Q.    You asked him about his computer, correct?

8    A.    I did.

9    Q.    But meanwhile, while Mr. Eastman was sitting on the

10  couch, you conducted a protective sweep of the home,

11  correct?

12    A.    No.

13    Q.    Conducting protective sweep of a suspect's

14  residence is standard police practice, isn't it?

15    A.    Not necessarily.

16    Q.    Well, it's essential to protect officer safety,

17  isn't it?

18    A.    If the officer feels it's needed.

19    Q.    Well, you would agree with me that officer safety

20  is paramount, correct?

21    A.    It is.

22    Q.    And after all, you didn't know who or what else was

23  in that apartment, right?

24    A.    I did not.

25    Q.    So you did conduct a protective sweep in the living

1   room, correct?

2        A.    I did not.

3        Q.    Your testimony is you did not look in drawers in

4   the living room?

5        A.    That is my testimony.

6        Q.    You at least checked the house for other occupants,

7   correct?

8        A.    No.

9        Q.    You knocked on a closed bedroom door?

10       A.    No.

11       Q.    Mrs. Eastman emerged from the door?

12       A.    No.

13       Q.    She had been sleeping, correct?

14       A.    I don't know what she was doing.

15       Q.    She is the lease holder of 157 Congress, right?

16       A.    I have no idea.

17       Q.    When she came to the door, you conducted a

18   protective sweep of her room, correct?

19       A.    That's totally incorrect.

20       Q.    Mrs. Eastman did not consent to you searching her

21   home, did she?

22       A.    We didn't search the home.

23       Q.    Mrs. Eastman did not consent to you searching her

24   home, did she?

25       A.    No.

1      Q.    Mrs. Eastman did not consent to you entering the

2  home, did she?

3      A.    No.

4      Q.    In fact, Mrs. Eastman questioned you on what you

5  were doing in her home, correct?

6      A.    Yes.

7      Q.    She asked to see some paperwork, correct?

8      A.    No.

9      Q.    Paperwork like a warrant, correct?

10     A.    No.

11     Q.    You told her to sit at the kitchen table,

12  correct?

13     A.    No.

14     Q.    Let me be very clear.  Your testimony today is that

15  you never entered the kitchen at 157 Congress?

16     A.    I don't ever remember entering the kitchen.

17     Q.    You don't ever remember or you didn't enter it?

18     A.    I don't remember entering the kitchen.

19     Q.    While you were in the apartment, John Eastman asked

20  permission to use the bathroom, correct?

21     A.    Yes.

22     Q.    And he actually had to ask permission, correct?

23     A.    He didn't have to ask permission.  Can I use the

24  bathroom.

25     Q.    But he did ask permission?

1    A.    He did.

2    Q.    And you granted permission for him to use the

3    bathroom, correct?

4    A.    I said it's your home, you can use the bathroom.

5    Q.    When he was using the bathroom, you told him to

6    keep the door open, correct?

7    A.    No.

8    Q.    You also entered John Eastman's bedroom, correct?

9    A.    I did, yes.

10    Q.    And before doing so, you conducted a protective

11    sweep of the room, correct?

12    A.    No.

13    Q.    You seized a desktop computer from the room?

14    A.    I wouldn't say seized, but I obtained.

15    Q.    You testified that you and Detective Terni walked

16    with Mr. Eastman to his bedroom, correct?

17    A.    Yes.

18    Q.    You allowed a suspect to lead you around his own

19    home?

20    A.    Yes.  Back up.  He wasn't a suspect so.

21    Q.    Now, at this point he had admitted to you that he

22    had used the Harry Styles user name, correct?

23    A.    Yes.

24    Q.    And he had admitted to you that he had engaged in

25    sex chats over Skype, correct?

1       A.      Yes.

2       Q.      And your testimony is that at that time he was not

3   a suspect?

4       A.      I misspoke.  At that time, yes, he was.

5       Q.      So you allowed a suspect to lead you around his own

6   home?

7       A.      Yes.

8       Q.      Without conducting a protective sweep?

9       A.      Yes.

10      Q.      Your testimony is that at no time while at 157

11  Congress did you conduct a protective sweep?

12      A.      That is my testimony.

13      Q.      I want to ask you some questions about the use of

14  handcuffs.  You do receive training on officer safety,

15  correct?

16      A.      Yes.

17      Q.      You are taught that officer safety is key,

18  correct?

19      A.      It is very important, yes.

20      Q.      And when a suspect is unrestrained, it is a

21  potential threat to officer safety, correct?

22      A.      Potentially.

23      Q.      And that's because you don't have control over the

24  situation at that time, correct?

25      A.      They don't need to be handcuffed to be under

1   control.

2       Q.    But handcuffing is one way to control the

3   situation, correct?

4       A.    That is a way.

5       Q.    Another way is to conduct a protective sweep of the

6   area to ensure the suspect cannot reach any weapons,

7   correct?

8       A.    That is a way.

9       Q.    Now, when you're in a suspect's home or any home

10  that you've never been to before, that's a potentially

11  dangerous situation, correct?

12      A.    Potentially.

13      Q.    Because you're on that person's home turf, so to

14  speak?

15      A.    Correct.

16      Q.    And you know, since you're the lead detective on

17  this case, that Mr. Eastman has many prior convictions,

18  correct?

19      A.    I already testified I didn't know that before I

20  went there.

21      Q.    Be that as it may, it was pretty dangerous, wasn't

22  it, Detective Morgan, to go into the house and not restrain

23  the suspect?

24      A.    I felt no danger.

25      Q.    Well, it's not in keeping with your training on

1   officer safety, is it?

2       A.      Each situation is different.  As an officer, you

3   judge each situation independently and, in this situation, I

4   did not feel in danger.

5       Q.      Looking back on the situation, would you agree it's

6   fair to say -- your decision-making was not in keeping with

7   your training on officer safety?

8       A.      I would not say that.

9       Q.      Now, you and Detective Terni transported

10  Mr. Eastman to the Waterbury Police Station, correct?

11      A.      Yes.

12      Q.      Prior to transporting him, you testified that

13  Detective Terni searched his person, correct?

14      A.      He did a cursory pat down of his clothing.

15      Q.      I'm sorry, is that a --

16      A.      Cursory.

17      Q.      Cursory pat down.  What's a difference between a

18  cursory pat down and a search of the person?

19      A.      Patting the outer clothing to see if an individual

20  may be secreting a weapon of some kind instead of going into

21  the person's clothing, pockets, or underneath clothing to

22  actually search.

23      Q.      So a full search was not conducted?

24      A.      It was not conducted.

25      Q.      Now, at the time did you tell Mr. Eastman he had a

1    right to refuse the cursory pat down?

2         A.    I did not.

3         Q.    At the time did you explain to Mr. Eastman that you

4    had no authority to do a cursory pat down unless he agreed?

5         A.    I did not.

6         Q.    Prior to transporting Mr. Eastman, did you place

7    him in handcuffs?

8         A.    I did not.

9         Q.    You transported him in an unmarked police cruiser,

10   correct?

11        A.    Yes.

12        Q.    You and Detective Terni both sat in the front

13   seat?

14        A.    Yes.

15        Q.    Mr. Eastman was in the back seat?

16        A.    Yes.

17        Q.    In this particular vehicle there was no screen

18   dividing the front and back, correct?

19        A.    Correct.

20        Q.    It was an open vehicle?

21        A.    Yes.

22        Q.    You're aware that the Waterbury Police Department

23   has a duty manual, correct?

24        A.    I do.

25        Q.    Policy and procedures manual?

 1      A.      Yes.

 2      Q.      There is a policy regarding transport in unmarked

 3  cruisers, correct?

 4      A.      I'm sure there is.

 5      Q.      The policy states that prisoners being transported

 6  in unmarked vehicles must be searched, handcuffed, and

 7  accompanied by two officers, does it not?

 8      A.      Prisoners, yes.

 9      Q.      And the second officer is supposed to sit in the

10  back seat behind the driver next to the suspect, correct?

11      A.      No, you said prisoners.  He wasn't a prisoner.

12      Q.      You're distinguishing between prisoners and

13  suspects?

14      A.      Definitely distinguishing between the two of

15  them.

16      Q.      So if it's a prisoner, the policy must be

17  followed?

18      A.      Yes?

19      Q.      If it's a suspect, the policy does not have to be

20  followed?

21      A.      No.

22      Q.      What's the distinction that you make between a

23  prisoner and a suspect?

24      A.      Prisoner's under arrest, a suspect is not.

25      Q.      So you and Detective Terni both sat with your backs

1   to Mr. Eastman?

2        A.      Yes.

3        Q.      With no screen separating you?

4        A.      Yes.

5        Q.      He was not handcuffed?

6        A.      He was not handcuffed.

7        Q.      And, again, you did not conduct a full search on

8   him?

9        A.      Correct.

10       Q.      And this is the same Mr. Eastman with a conviction

11  for assaulting a police officer, correct?

12       A.      Again, I didn't know that prior.  It wouldn't have

13  changed the decision anyways.

14       Q.      Really, that would not have changed your

15  decision?

16       A.      No.

17       Q.      I want to ask you some questions now about your

18  field notes, Detective Morgan.  You're familiar with the term

19  field notes, correct?

20       A.      I am.

21       Q.      You would agree that field notes are important in a

22  criminal investigation?

23       A.      No.

24       Q.      Well, they do provide a written record of events,

25  right?

1      A.    They could.

2      Q.    Such as times?

3      A.    That's up to the officer's discretion on what he

4  would like to put in his field notes.

5      Q.    Places?

6      A.    It could.

7      Q.    Witnesses?

8      A.    It could.

9      Q.    Suspects?

10     A.    It could.

11     Q.    Police officers rely on field notes, right?

12     A.    Not necessarily.

13     Q.    They can rely on them, right?

14     A.    They can.

15     Q.    In drafting police reports?

16     A.    They can.

17     Q.    In making search warrant applications?

18     A.    I guess.

19     Q.    You guess?

20     A.    I guess.

21     Q.    I'm not asking you to guess.  Can police officers

22  rely on field notes in making search warrant applications?

23     A.    They can.

24     Q.    Field notes can contain sensitive information,

25  correct?

1    A.    They can contain any information.

2    Q.    Particularly in this case could contain the names

3  and addresses of minor victims, correct?

4    A.    They could, I guess.

5    Q.    So you know it's very important to keep close

6  control over your notes, right?

7    A.    If you have notes, yes.

8    Q.    Now, you've been a detective for ten years, right,

9  over ten years actually?

10    A.    Over ten years.

11    Q.    And as a detective, you received training on how to

12  investigate crimes?

13    A.    I have.

14    Q.    One of the things you are taught is to keep

15  accurate field notes during the course of an investigation,

16  correct?

17    A.    No.

18    Q.    You're not taught that?

19    A.    It's discretionary.

20    Q.    One of the purposes of taking field notes is to

21  ensure you remember important details of an investigation,

22  isn't it?

23    A.    If you need to take notes for that, yes.

24    Q.    For example, to ensure your police report is

25  accurate, right?

```
 1      A.      If you need that help, yes.

 2      Q.      Or if you're called to testify, to ensure that your

 3   recollection is accurate, right?

 4      A.      If you need them, yes.

 5      Q.      You prepared the police report in this case,

 6   right?

 7      A.      Yes.

 8      Q.      And you've had an opportunity to review your report

 9   recently, right?

10      A.      I've reviewed it.

11      Q.      And you agree your police report accurately

12   reflects what occurred on November 10, 2012?

13      A.      Yes.

14      Q.      Is there anything not accurately reflected in your

15   police report?

16      A.      I don't believe so.

17      Q.      Report is dated May 7, 2013, correct?

18      A.      Yes.

19      Q.      You were first contacted by Trooper Jollymore in

20   October of 2012, correct?

21      A.      Yes.

22      Q.      The investigation took about seven months?

23      A.      Yes.

24      Q.      You visited the Eastman home in November of 2012?

25      A.      Yes.
```

1    Q.    So approximately six months elapsed between your

2    visit to the Eastman home and when the report was finalized,

3    correct?

4    A.    Yes.

5    Q.    You wouldn't just rely on your memory in typing up

6    the police report, would you?

7    A.    Some portions.

8    Q.    Some portions of the report you would rely on your

9    memory?

10   A.    Yes.

11   Q.    What about the other portions?

12   A.    I have documents to support what had occurred

13   during the investigation.

14   Q.    Did you have any documents from the Eastman home on

15   November 10, 2012?

16   A.    No.

17   Q.    You do keep handwritten notes during your

18   investigation, do you?

19   A.    No.

20   Q.    You don't ever keep handwritten notes?

21   A.    Ever.

22   Q.    And you didn't keep any notes on this case?

23   A.    No.

24   Q.    The prosecutor asked you to turn any notes you had

25   over to him, right?

1    A.    Yes.

2    Q.    You checked to see if you have any notes?

3    A.    I didn't have to.  I knew I didn't have any.

4    Q.    And your testimony is that not keeping notes is in

5    keeping with best police practices?

6    A.    It's in keeping with my police practices.

7    Q.    With your police practices?

8    A.    Yes.

9    Q.    Not necessarily best police practices?

10   A.    That's open to opinion I guess.

11   Q.    So in recalling in what happened on November 12,

12   2012, you are relying primarily on your memory?

13   A.    And the documents that I have, statement, and the

14   information from Trooper Jollymore.

15   Q.    But, again, you don't have any -- you just

16   testified you don't have any documents from the period of

17   time that you were in the Eastman home, correct?

18   A.    No.

19   Q.    Do you know if Detective Terni kept any handwritten

20   notes?

21   A.    I do not.

22   Q.    Did you ask Detective Terni to review the police

23   report before you submitted it for final review?

24   A.    I did not.

25   Q.    Between November 2012 and today, how many other

1   cases did you investigate?

2       A.     I'm sorry, repeat that.

3       Q.     Between November 2012 and today, approximately how

4   many other cases did you investigate?

5       A.     Over 50.

6       Q.     Is it difficult to remember the precise number?

7       A.     It is.

8       Q.     But your testimony today is that your memory of

9   what happened on November 10, 2012 is clear?

10      A.     It is.

11      Q.     I want to ask you some questions specifically about

12   your police report.  Detective Morgan, as a police officer,

13   you consider yourself to be a professional, correct?

14      A.     I do.

15      Q.     You've received training on how to apply the law as

16   a police officer, right?

17      A.     I have.

18      Q.     And, in fact, your job has certain educational

19   requirements that have to be met, right?

20      A.     That's not true.  Oh, I'm sorry.  Yes, there is.

21   I'm sorry, yes.

22      Q.     And you do have on-the-job training?

23      A.     Yes.

24      Q.     One of your jobs as a police officer is to write

25   police reports, right?

1      A.    Yes.

2      Q.    Basically that involves describing the facts of

3  your investigation of a crime in the form of a written

4  report, right?

5      A.    It doesn't necessarily have to be a crime.  Not

6  every report we write is about a particular crime.

7      Q.    You could write reports about other incidents that

8  aren't crimes as well, correct?

9      A.    Yes.

10     Q.    In either case, whether a crime or not a crime, the

11  police report is very important, correct?

12     A.    It is.

13     Q.    Because it's kept as a permanent record of what

14  happened?

15     A.    It is.

16     Q.    It contains information about what witnesses told

17  you, right?

18     A.    It could.

19     Q.    And it could provide information about what other

20  officers may have told you, right?

21     A.    It could.

22     Q.    And as part of your training, you're actually

23  taught how to write police reports, correct?

24     A.    I'm sure at some point I took a report writing

25  class, yes.

1    Q.    Well, you know from your experience that the

2  prosecutor relies on the police report in deciding what

3  charges to bring, right?

4    A.    No.  That usually relies on an arrest warrant

5  affidavit that's supplied to the prosecutor.

6    Q.    And the arrest warrant affidavit relies on what is

7  contained in the police report, correct?

8    A.    Usually.

9    Q.    And you know that a prosecutor can rely on a police

10  report in responding to pretrial motions such as a motion to

11  suppress, right?

12    A.    I don't know all the rules about that.

13    Q.    Can we agree that a big part of your job is

14  investigating cases and arresting people?

15    A.    Was that a question?  I'm sorry.

16    Q.    Can we agree that investigating cases and arresting

17  people is a big part of your job?

18    A.    It's a part.

19    Q.    And if you have to testify in a case where you make

20  an arrest, you can use the police report to refresh your

21  recollection if you're called to testify, correct?

22    A.    Again, I don't know the rules, but I have had that

23  occur in the past, yes.

24    Q.    So it's important that the report be accurate,

25  right?

1    A.    Yes.

2    Q.    And it's important to have the report give a clear

3  picture of what happened, right?

4    A.    As best as possible, yes.

5    Q.    And you consider your police report in this case to

6  be accurate, correct?

7    A.    I do.

8    Q.    You put all the important facts that you developed

9  into the police report, right?

10    A.    I believe all the pertinent information is in

11  there.

12    Q.    And if there's something that you find that you

13  left out, you can always write a supplemental report,

14  right?

15    A.    Yes.

16    Q.    Now, in this case, you did not write a supplemental

17  report, right?

18    A.    I don't believe, no, I don't believe so.

19    Q.    And because this case involved the seizure of a

20  computer, you know that the circumstances surrounding the

21  seizure of that computer are important, right?

22    A.    Yes.

23    Q.    You know the issue of whether Mr. Eastman consented

24  to you entering the home is important, correct?

25    A.    Yes.

1    Q.    You know the issue of whether Mr. Eastman consented

2    to the seizure of the computer is important, correct?

3    A.    Yes.

4    Q.    Now, you also know that the issue of whether

5    Mrs. Eastman consented to a search of the home or the

6    computer is important, right?

7    A.    No.

8    Q.    You know that the issue of whether Mrs. Eastman was

9    present in the home is important, correct?

10   A.    No.

11   Q.    You know that third parties present in the home can

12   invalidate consent, don't you?

13   A.    They could.

14   Q.    So the presence of a third party in the home is an

15   important factor?

16   A.    In this case, I didn't feel it was.

17   Q.    You didn't feel it was important in this case?

18   A.    No.

19   Q.    Now, I want to direct your attention to the police

20   report that you wrote in this case.  And I can provide you

21   with a copy if you would like.

22   A.    Could I use the binder, do you mind?

23   Q.    I actually don't believe it's in that binder.  I'll

24   hand you the Defense Exhibit binder and direct your attention

25   to Defendant's Exhibit 1.

1      A.      Thank you.

2      Q.      Now, Defense Exhibit 1 is a copy of your police

3    report, correct?

4      A.      With several redacted portions, yes.

5      Q.      For the record, the redacted portions are

6    information pertaining to the minor victims, which is why

7    they've been redacted.

8              Now, you signed this police report, correct, Defense

9    Exhibit 1?

10      A.      Yes.

11      Q.      And you signed that report under oath?

12      A.      Yes.

13      Q.      Take a moment to look over your report and please

14    let us know where in the report there's any mention

15    whatsoever about Mrs. Eastman.

16      A.      I don't think there's any mention in here at all

17    about Mrs. Eastman.

18      Q.      No mention at all.  Now, can you show us in the

19    report where it states what time you went to 157 Congress on

20    November 10?

21      A.      That I don't believe is in here.

22      Q.      Can you show us in the report, I think you already

23    testified to this, that where it says that you did not feel

24    you had enough information to apply for a search warrant on

25    November 8th?

1      A.     That's not in here.

2      Q.     Tell us where in the report there's any mention of

3   Mr. Eastman using the bathroom at 157 Congress?

4      A.     That's not in here.

5      Q.     Can you tell us where in the report it states that

6   Mr. Eastman signed the consent to search form at the police

7   station as opposed to in his home?

8      A.     That's not in here.

9      Q.     Can you tell us where it states that Mr. Eastman

10  signed the consent form at approximately 7:40, p.m.?

11     A.     The time isn't in here.

12     Q.     Can you tell us where in the report that it states

13  that where Mr. or Mrs. Eastman explicitly gave consent to

14  search the apartment?

15     A.     I didn't search the apartment.

16     Q.     I think we're disagreeing over terminology.  Let me

17  phrase it a different way.  Can you tell us where in the

18  report it states that Mr. or Mrs. Eastman explicitly gave you

19  permission to enter the apartment?

20     A.     The bottom of I guess would be page two, the last

21  paragraph on page two.  We were met by Mr. John Eastman, with

22  his date of birth redacted, who allowed us inside.

23     Q.     And what part of that are you interpreting as John

24  Eastman explicitting giving you consent to enter the home?

25     A.     He allowed us inside.

1    Q.    Meaning that he didn't physically stop you?

2    A.    He didn't physically or orally say we could not

3    enter.

4    Q.    Tell us where in the report it states that

5    Detective Terni searched Mr. Eastman prior to transporting

6    him?

7    A.    He didn't search him.

8    Q.    Tell us where in the report it states that he

9    conducted a cursory pat down?

10   A.    That's not in here.

11   Q.    Tell us where in the report it states that you gave

12   Mr. Eastman a receipt, a property receipt for his computer?

13   A.    That was not done.

14   Q.    It wasn't put in the report?

15   A.    No, there was no receipt that was done.

16   Q.    No receipt was given to Mr. Eastman for the

17   computer?

18   A.    No.

19   Q.    Now, I want to ask you some questions about the

20   timing of the consent to search form.  You testified on

21   direct that the consent to search the computer form was

22   signed at the police station, correct?

23   A.    Yes.

24   Q.    I want to direct your attention to Defense Exhibit

25   1, which is your police report, to the top of page 3.  Could

1   you please read the first paragraph out loud?

2        A.    11-10-2012.  Mr. Eastman signed a consent to search

3   form allowing detectives to take his HP Pavilion Model P2

4   desktop computer, serial number 3CR22116SQ, and perform a

5   complete computer forensic examination on it.

6        Q.    But that's not an accurate statement, is it?

7        A.    He signed the consent form, yes.

8        Q.    Detective Morgan, directing your attention to

9   Defense Exhibit 3 in the binder, that's the Consent to Search

10  form, correct?

11       A.    Yes.

12       Q.    And the form states that it was signed at 7:40,

13  p.m., correct?

14       A.    Yes.

15       Q.    And it states that it was signed at 255 East Main

16  Street, correct?

17       A.    Yes.

18       Q.    And I'd like you to take a look at the top of the

19  form and read out loud in the beginning the Waterbury Police

20  Department requests?

21       A.    The Waterbury Police Department requests your

22  permission to search/obtain HP desktop computer which is

23  located at 157 Congress Avenue, Third Floor, Waterbury,

24  Connecticut.

25       Q.    Thank you.  Now, in fact, at this time that this

1    form was signed, the computer was not located at 157 Congress

2    Avenue, correct?

3        A.    Correct.

4        Q.    In fact, it was located at 255 East Main Street,

5    correct?

6        A.    Correct.

7        Q.    The Police Department?

8        A.    Correct.

9        Q.    The computer had already been taken, correct?

10       A.    Yes.

11       Q.    So the statement in the police report that

12   Mr. Eastman signed a consent form allowing detectives to take

13   his computer was not entirely accurate, correct?

14       A.    When he signed it he was still allowing us to take

15   it.  So it is correct.

16       Q.    But, in fact, it had already been taken?

17       A.    He had already verbally consented.

18       Q.    And it had been taken?

19       A.    He had verbally consented to us taking it, yes.

20   Which he could have withdrawn at any point.

21       Q.    I understand that, but my question was the computer

22   had already been taken, correct?

23       A.    It had been taken.

24       Q.    The consent to search form advises a person of his

25   or her right to refuse consent, correct?

1    A.    It does.

2    Q.    The primary purpose of the form is to document when

3    someone has given voluntary consent, correct?

4    A.    Written voluntary consent, yes.

5    Q.    And to be effective, the form has to be signed

6    before you seize an item, correct?

7    A.    No.  Because somebody can verbally consent to

8    something and then written consent can follow that.

9    Q.    But you testified that you did not advise

10   Mr. Eastman orally that he could refuse consent?

11   A.    I did not.

12   Q.    The written form is what advises Mr. Eastman that

13   he could refuse consent?

14   A.    That's true.

15   Q.    And the written form was signed at the police

16   station, correct?

17   A.    Yes.

18   Q.    After the computer had been taken, correct?

19   A.    Yes.

20   Q.    I want to ask you some questions now about Miranda

21   warnings.  The police report indicates that you advised

22   Mr. Eastman of the investigation once you were in the

23   apartment, correct?

24   A.    Yes.

25   Q.    You did not advise Mr. Eastman of his Miranda

1    rights at that time, correct?

2       A.    No.

3       Q.    You didn't tell Mr. Eastman he had a right to a

4    lawyer?

5       A.    No.

6       Q.    You didn't tell him he had the right to remain

7    silent?

8       A.    No.

9       Q.    You didn't tell him anything he said could be used

10   against him?

11      A.    No.

12      Q.    You didn't have him read an advice of rights card

13   at that time, correct?

14      A.    Correct.

15      Q.    Now, you testified that Mr. Eastman admitted to

16   using the Harry Styles user name while you were at the 157

17   Congress address, correct?

18      A.    Yes.

19      Q.    Now, after he admitted to using the Harry Styles

20   user name, at that point did you advise him of his rights?

21      A.    No.

22      Q.    You already testified that Mr. Eastman gave verbal

23   consent to seize the computer, correct?

24      A.    Yes.

25      Q.    And you already testified that at that time you did

1    not advise Mr. Eastman that he could refuse consent,

2    correct?

3        A.    Correct.

4        Q.    At that time you didn't advise Mr. Eastman that you

5    would need to obtain a warrant if he didn't consent to your

6    taking the computer, correct?

7        A.    I don't believe I did.

8        Q.    And you didn't present Mr. Eastman with a consent

9    to search form, correct?

10        A.    At his home, no.

11        Q.    That was done about an hour and a half later at the

12    police station, correct?

13        A.    About an hour later.

14        Q.    And you don't have any contemporaneous notes

15    indicating that Mr. Eastman gave you consent orally at the

16    home, correct?

17        A.    No.

18        Q.    And did you not videotape the seizure of the

19    computer?

20        A.    No.

21        Q.    I want to ask you some questions now about the

22    content of the Consent to Search form which is Defense

23    Exhibit 3.

24              Looking at Defense Exhibit 3, Detective Morgan,

25    this is the Consent to Search form that you claim that

1   Mr. Eastman signed, correct?

2      A.    Right.

3      Q.    This is a Consent to Search form for the HP desktop

4   computer, correct?

5      A.    Correct.

6      Q.    This is not a consent to search the home at 157

7   Congress?

8      A.    Correct.

9      Q.    There is no written consent form for the home at

10   157 Congress, correct?

11      A.    Correct.

12      Q.    Now, this consent to search form, Defense Exhibit

13   3, was signed at the police station, correct?

14      A.    Yes.

15      Q.    At which time Mr. Eastman was seated in the police

16   station, correct?

17      A.    Yes.

18      Q.    He had been subject to what you call cursory pat

19   down, correct?

20      A.    Prior to leaving the home, yes.

21      Q.    Multiple law enforcement officers were present at

22   the time?

23      A.    Two.  Me and Detective Terni.

24      Q.    And they were armed?

25      A.    Yes.

1    Q.    Now, at this time Mr. Eastman was handcuffed,

2  correct?

3    A.    No.

4    Q.    You did threaten to throw him in jail over the

5  weekend if he didn't cooperate, correct?

6    A.    No.

7    Q.    Over the long weekend?

8    A.    No.

9    Q.    You telephoned his former probation officer,

10  correct?

11    A.    I did speak to his former probation officer, yes.

12    Q.    And what did you talk to the probation officer

13  about?

14    A.    His prior history, criminal history.

15    Q.    His prior criminal history, meaning his prior sex

16  offense conviction?

17    A.    Yes.

18    Q.    And you did telephone a second probation officer as

19  well, correct?

20    A.    I only remember talking to one.

21    Q.    You telephoned the probation officer, whether it

22  was one or two, in the presence of Mr. Eastman, correct?

23    A.    Yes.

24    Q.    And did you learn whether Mr. Eastman was still on

25  probation or not?

1     A.     I did.

2     Q.     And what did you learn?

3     A.     He was not.

4     Q.     Did you learn when he had finished with

5  probation?

6     A.     I'm sure I did, but I don't remember what that

7  was that was -- I'm sorry -- when that was.

8     Q.     Now, you testified that you witnessed Mr. Eastman

9  sign the consent form, correct?

10     A.     Yes.

11     Q.     Turning your attention to Defense Exhibit 3, toward

12  the bottom of the page.  You see the line that says witnesses

13  or officers?

14     A.     Yes.

15     Q.     And does that appear to be your signature on that

16  line?

17     A.     That is my signature.

18     Q.     There is an on additional space for an officer

19  signature directly below yours, correct?

20     A.     Yes.

21     Q.     And that signature line is blank, correct?

22     A.     Yes.

23     Q.     Now, with respect to the text located on the form,

24  you filled out the text located on the form, correct?  For

25  example, the case number.

1     A.     The handwritten portions or the text?   Those are

2   two different things.

3     Q.     The handwritten portions.

4     A.     I filled out the majority of that.

5     Q.     And your testimony -- so, in other words, you

6   filled in the time space, correct?

7     A.     No.

8     Q.     You filled in the location space, correct?

9     A.     The location, yes.

10     Q.     You filled in the top part which stated where

11   the -- that the property was located at 157 Congress,

12   correct?

13     A.     I did.

14     Q.     Now, at the time you presented this form to

15   Mr. Eastman, you did not advise him that he could refuse to

16   sign it, did you?

17     A.     Yeah, I absolutely did.

18     Q.     You advised him orally?

19     A.     Yes.

20     Q.     And that was at the police station?

21     A.     Yes.

22     Q.     Do you recall if Mr. Eastman is left-handed or

23   right-handed?

24     A.     I do not recall.

25     Q.     I want to ask you some questions now about the

1    voluntary statement rights form which is Defendant's Exhibit

2    4.

3              You testified that you witnessed Mr. Eastman

4    initial and sign this form, correct?

5         A.   Yes.

6         Q.   And that took place at about 7:32, p.m., correct?

7         A.   Yes.

8         Q.   And that was approximately an hour and a half after

9    you had first entered the Eastman home, correct?

10        A.   Approximately.

11        Q.   You filled in the date and time on this form,

12   correct?

13        A.   I did.

14        Q.   You did not read the voluntary statement rights

15   form out loud to Mr. Eastman, did you?

16        A.   This one, no.

17        Q.   Your signature appears as a witness on this form,

18   correct, on the officer signature line?

19        A.   That is my signature, yes.

20        Q.   And no other witness's signature appears on this

21   form, correct?

22        A.   Correct.

23        Q.   You did not videotape Mr. Eastman's interrogation,

24   did you?

25        A.   No.

1    Q.    You did not keep handwritten contemporaneous notes

2    of your interrogation of Mr. Eastman, did you?

3    A.    No.

4    Q.    I want to ask you some questions now about

5    Mr. Eastman's purported statement which is located as

6    Defendant's Exhibit 5.

7          The voluntary statement start time is listed as

8    7:34, p.m., correct?

9    A.    Correct.

10   Q.    So to be clear, this form was started prior to

11   executing the Consent to Search the computer form, correct?

12   A.    Yes.

13   Q.    Because that was signed at 7:40, correct?

14   A.    Correct.

15   Q.    So you began the voluntary statement for six

16   minutes, and then stopped to get the consent form signed and

17   then resumed the voluntary statement?

18   A.    Yes.

19   Q.    Isn't it the case that when you got to the part of

20   the voluntary statement referencing the consent, you realized

21   that you had failed to get an actual consent form?

22   A.    No.  That's why it's so early in this conversation.

23   I had him sign it early into taking the written statement.

24   Q.    And the end time on the statement was 8:43, p.m.,

25   correct?

1     A.     Correct.

2     Q.     You took the statement, right?

3     A.     I did.

4     Q.     Meaning you typed it up?

5     A.     I did.

6     Q.     Is it your testimony Mr. Eastman signed the

7   statement?

8     A.     It is.

9     Q.     Is it your testimony that the words contained in

10   the statement are Mr. Eastman's?

11    A.     They are his words, yes.

12    Q.     Let's take a look at the first line of paragraph

13   two, if you would.  The sentence reads:  I, John Eastman, of

14   157 Congress Avenue, third floor, date of birth, which has

15   been I think redacted here, am giving this statement under my

16   own free will.  Your testimony is that Mr. Eastman made that

17   statement?

18    A.     My testimony is that I typed the statement and that

19   Mr. Eastman reviewed the contents afterwards.

20    Q.     So your testimony is that you wrote those words?

21    A.     Yeah, I was typing the words, yes.

22    Q.     Your testimony is that Mr. Eastman spoke those

23   words to you and you wrote them down?

24    A.     He did not speak those words out loud, no.

25    Q.     So you generated those words and then showed them

1  to Mr. Eastman?

2      A.    Correct.

3      Q.    Let's look at the next sentence.  It reads:  I can

4  read and write English and have completed 10 years of

5  schooling and have a GED.  Is it your testimony that

6  Mr. Eastman uttered that statement?

7      A.    He uttered the information that's in that

8  statement, yes.

9      Q.    Mr. Eastman said those words to you?

10      A.    He said that he could read and write English, that

11  he finished ten years of school and has a GED.

12      Q.    The next line reads:  Detective Morgan has advised

13  me of my constitutional rights, and I signed and initialed a

14  card and form agreeing to waive those rights and speak to him

15  and to give this statement.

16          Again, it's your testimony that Mr. Eastman made

17  that statement?

18      A.    Word for word, no.  But, again, I'm typing a

19  statement for him to review and then sign afterwards.  He

20  could make changes to anything on this form if he wanted

21  to.

22      Q.    So it's fair to say that you typed up the statement

23  and then had Mr. Eastman read the statement, correct?

24      A.    That's what I said from the beginning, yes.

25      Q.    Why don't you explain in more detail how it went,

1    how the mechanics of the statement process went.

2        A.    Sure.   So I'm seated at the computer and I'm

3    questioning Mr. Eastman about the case, and as I'm

4    questioning him and gathering information I'm typing

5    information into the statement form which is on the computer.

6    Once I've completed typing all that information, the form is

7    then printed, given to Mr. Eastman for him to review, and

8    then to either make any changes that he wishes or to maintain

9    it in the fashion that it was printed under in the first

10   place.

11       Q.    So that it's fair to say that the words contained

12   in the statement are your words that you then showed

13   Mr. Eastman to verify?

14       A.    Correct.   I'm typing the statement.

15       Q.    Now, Mr. Eastman goes on to give what amounts to a

16   full confession, right?

17       A.    Not necessarily, no.

18       Q.    Well, he told you I know that I have chatted with

19   some girls who were like between 12 and 15 years old.   We

20   chatted about sex and they posed in a sexual manner or

21   performed a sex act so I could watch them on the web cam.   He

22   told you that, right?

23       A.    Yes.

24       Q.    Now, again, those were his words or those were your

25   words?

1      A.    Those were -- well, my typing of the information

2    that he's giving me.

3      Q.    Now, since November 10, 2012, you've had the

4    opportunity to investigate John Eastman at some length,

5    correct?

6      A.    I'm not sure I understand the question.

7      Q.    Since November 10, 2012, you continued your

8    investigation into John Eastman, correct?

9      A.    Into his computer that was provided.

10     Q.    Well, and into John Eastman himself, correct?

11     A.    A little bit I guess, just to get his history.

12     Q.    Well, at a minimum, you ran his rap sheet?

13     A.    Correct.

14     Q.    And you learned that he had three probation

15   violations?

16     A.    I don't recall the number of probation

17   violations.

18     Q.    And you learned that he was charged with failing to

19   be fingerprinted?

20     A.    I don't recall that.

21     Q.    You did learn that he had numerous convictions for

22   interfering with arrests and disorderly conduct?

23     A.    I don't recall that.

24     Q.    You're aware, are you not, that in his underlying

25   state case, in the same case that we're here today on, that

1    he has fired three of his attorneys?

2       A.   Oh, that I didn't know either.

3       Q.   So aside from the seemingly extraordinary

4    cooperation he exhibited to you and Detective Terni, as far

5    as you've been able to tell, Mr. Eastman has never cooperated

6    with law enforcement a day before in his life, has he?

7       A.   Again, I know nothing of what you're saying to

8    me.

9       Q.   But he did tell you that he had been chatting with

10   underage girls?

11      A.   He did.

12      Q.   And your response, after obtaining this confession,

13   was to let Mr. Eastman leave the building?

14      A.   I had no evidence of what he was saying was

15   accurate.

16      Q.   A confession isn't evidence?

17      A.   A confession is a piece of evidence.

18      Q.   So you had some evidence.

19      A.   I had some evidence.

20      Q.   And you had the evidence from Vermont, correct?

21      A.   I had some evidence.

22      Q.   And you had a computer in your possession,

23   correct?

24      A.   That I needed to go through, correct.

25      Q.   And a computer is evidence, correct?

1    A.    A computer itself is one piece of evidence.  The

2    data contained within it is another.

3    Q.    But you didn't arrest Mr. Eastman, did you?

4    A.    No, I had no -- even in his confession, there was

5    nothing that linked him to the conversations with the girls

6    in Vermont.

7    Q.    And you didn't seek an arrest warrant, correct?

8    A.    At that point, no.

9    Q.    You had Detective Terni drive him home, correct?

10   A.    The two of us went and drove him home.

11   Q.    You waited more than five months before arresting

12   Mr. Eastman?

13   A.    I didn't wait.  I was continuously working on the

14   case.

15   Q.    Five months passed by before Mr. Eastman was

16   arrested, correct?

17   A.    I don't know the date he was arrested.

18   Q.    Well, you know he was arrested in May of 2013,

19   don't you?

20   A.    I didn't know the date he was arrested, no.

21   Q.    You didn't know it was in the month of May in the

22   year 2013?

23   A.    No.

24   Q.    But you know that now, correct?

25   A.    Since you just told me, yes.

1        Q.      Well, your report is dated May 7, 2013?

2        A.      Correct.

3        Q.      And your report ends with your seeking an arrest

4    warrant, correct?

5        A.      Correct.

6        Q.      And you know Mr. Eastman was thereafter arrested,

7    correct?

8        A.      You're going a little fast.   What?

9        Q.      You know Mr. Eastman was thereafter arrested,

10   correct?

11       A.      He was arrested, yes.

12       Q.      And you did believe he had been engaging in sex

13   chats with underage girls, correct?

14       A.      I was unsure for certain.   People can say whatever

15   they want.

16       Q.      I want to ask you some questions about the computer

17   you seized.   You seized a computer from the Eastman home on

18   November 10, 2012, correct?

19       A.      It was allowed for me to take.   I didn't seize

20   it.

21       Q.      And you testified that you did not provide the

22   Eastmans with a receipt for the computer?

23       A.      I did not.

24       Q.      Well, the computer was considered evidence, wasn't

25   it?

1        A.      Yes.

2        Q.      And the Waterbury Police Department has policies on

3    handling evidence, correct?

4        A.      It does.

5        Q.      And the policy provides that with respect to

6    property not seized pursuant to a warrant, which we all agree

7    this was not, a signed receipt must be generated, correct?

8        A.      If that's the policy, then that's correct.

9        Q.      And you didn't follow the policy in this case?

10       A.      If that's what the policy says, then no.

11       Q.      Is there a reason you didn't provide a property

12    receipt?

13       A.      No.

14       Q.      When you seized the computer, you transported it to

15    the Waterbury Police Station, correct?

16       A.      I didn't seize it.

17       Q.      I understand you don't agree with that terminology.

18       A.      So I'll just keep saying I didn't seize it.

19       Q.      You transported the computer to the Waterbury

20    Police Department, didn't you?

21       A.      Yes.

22       Q.      And you transported it in your unmarked police

23    cruiser, correct?

24       A.      Yes.

25       Q.      You placed the computer in the back seat?

1    A.    No.

2    Q.    You kept the computer with you?

3    A.    Yes.

4    Q.    In the front seat?

5    A.    Yes.

6    Q.    Now, once you reached the Waterbury police station,

7    what did you do with the computer, did you turn it on?

8    A.    No.  It wasn't connected to anything.

9    Q.    So what did you do with it?

10   A.    I just left it until I was done with him to bring

11   it to my office.

12   Q.    You left it where?

13   A.    In the Detective Bureau.

14   Q.    Where in the Detective Bureau?

15   A.    On one of the desks.

16   Q.    On whose desk?

17   A.    I have idea.

18   Q.    Your report states you began your forensic analysis

19   that very same evening, correct?

20   A.    Correct.

21   Q.    When you began the analysis, did you turn the

22   computer on?

23   A.    No.

24   Q.    What did you do when you began your analysis?

25   A.    I had to remove the hard drive from the computer.

1   And then to start the analysis, connected the hard drive to a

2   hardware write blocking device to then make a mirror forensic

3   image of the data contained on the hard drive on to a

4   Waterbury Police Department computer.  The hardware write

5   blocking device would allow no information to be altered or

6   changed on the hard drive while the transfer of data is

7   taking place.

8       Q.    Did you enter the computer into evidence?

9       A.    I did.

10      Q.    Did you log your handling of the computer in the

11  evidence log book?

12      A.    There's no log book.

13      Q.    There's no evidence log book at the Waterbury

14  police station?

15      A.    Not that I keep or have access to.  We just enter

16  it into the Property and Evidence Division.  We give it to

17  them.

18      Q.    So you didn't fill out any paperwork in connection

19  with logging in the computer into evidence?

20      A.    That's not what I said.  We fill out a property

21  sheet, and the property sheet goes with the evidence to the

22  Property and Evidence Division.

23      Q.    And have you provided that property sheet to the

24  prosecutor in this case?

25      A.    I don't know.

1    Q.    Were you asked to provide it?

2    A.    No.

3    Q.    You're the lead detective in this case, correct?

4    A.    I am.

5    Q.    You also conducted the initial forensic examination

6    of the computer, correct?

7    A.    Yes.

8    Q.    Isn't that considered a conflict of interest?

9    A.    No.

10   Q.    Shouldn't an expert forensic analysis be based on

11   an unbiased analysis?

12   A.    In a perfect world maybe.

13   Q.    In addition to the computer, you also seized

14   several cell phones from the Eastman residence, correct?

15   A.    No.

16   Q.    I have just a few more questions for you Detective

17   Morgan.

18         You're aware, are you not, that the Waterbury

19   Police Department was being criminally investigated by the

20   FBI for civil rights violations?

21   A.    I don't know any specifics about that.

22   Q.    Were you questioned by the FBI in connection with

23   their investigation into the Waterbury Police Department?

24   A.    No.

25   Q.    Were you asked to provide any documentation to the

1   FBI in connection with their investigation?

2   A.    No.

3        MS. BARRETT:  Could I have one moment, Your Honor?

4        THE COURT:  Yes.

5        MS. BARRETT:  Thank you, Detective Morgan.  No

6   further questions.

7        THE COURT:  I have a couple of questions and you can

8   follow-up if you want.

9        Going back to the speaking with the probation

10  officer regarding his history.  When did that occur?

11       THE WITNESS:  While we were at the Police Department

12  and I was taking his statement.

13       THE COURT:  So you're actually taking his statement

14  and you interrupted what you were doing to call the probation

15  officer?

16       THE WITNESS:  Yeah.  It was part of the question

17  and the answer.  The statement goes on, I think, for an hour

18  and a half time frame maybe.  And during that question and

19  answer, the conversation went to his prior history, criminal

20  history.  And that's where I learned that he had a previous

21  arrest where he was an arrested sex offender and I called the

22  probation officer to see if he -- to confirm what Mr. Eastman

23  had said, to see if he was or was not still on probation and

24  his status of being a registered sex offender.

25       THE COURT:  Did you run his rap sheet at that time?

1              THE WITNESS:   I don't believe I did, no.

2              THE COURT:   Am I right, I'm just looking at it

3    quickly, is there any mention in his statement of his prior

4    record?

5              THE WITNESS:   I don't believe there is, no.

6              THE COURT:   So this came about -- the picture I

7    have in my mind from what you said is you're taking his

8    statement at the station, it comes up somehow that he's a

9    registered sex offender or was.  How did that come up, if you

10   recall?

11             THE WITNESS:   I don't recall exactly, but during my

12   questioning of him and we started talking about his actual

13   predilection to juveniles, I questioned him had he ever been

14   arrested in the past for this type of behavior, and he did

15   relay that he had an arrest not for this, but something else

16   that involved a minor.  And that he was on a registered sex

17   offender for a time period.

18             THE COURT:   And then you asked whether he was on

19   probation?

20             THE WITNESS:   I did.

21             THE COURT:   And he gave you the name of the officer

22   and you called the officer?

23             THE WITNESS:   I called an officer that I knew that

24   was -- I have a working relationship with the sex offender

25   probation officers.  So I called one of the ones I knew and

1    spoke with him about Mr. Eastman's status.

2          THE COURT:    Someone in Waterbury?

3          THE WITNESS:    Correct.

4          THE COURT:  You can follow-up if you wish.

5          MS. BARRETT:  No further questions.

6          THE COURT:  Thank you, sir.

7          Is there any redirect?

8          MR. PATEL:  Briefly, Your Honor.  I think I can

9    finish before noon.

10          THE COURT:  We go to 12:30.

11                  REDIRECT EXAMINATION

12   BY MR. PATEL:

13     Q.    Mr. Morgan, how long have you been a detective with

14   the Waterbury Police Department?

15     A.    I was promoted in 2004.

16     Q.    So 12 years?

17     A.    12 years this year, yes.

18     Q.    And in your experience, in this case you felt you

19   needed more information before getting a search warrant and

20   that's why you proceeded to try and interview him?

21     A.    Yes.

22     Q.    I think you testified on direct, but just to be

23   clear.  Do you often try to see if a suspect will voluntarily

24   talk to you?

25     A.    Yes.

1      Q.      And turn over a computer for you to examine?

2      A.      Yes.

3      Q.      I think you testified about this on direct, but in

4    your 12 years of experience that proves more successful in

5    investigations because the defendant or suspect is more

6    cooperative?

7      A.      Especially in the cases that I currently

8    investigate.

9      Q.      Has anyone ever told you that that practice of

10   trying to have a person, a witness, talk to you voluntarily

11   or consent to a search is unlawful in any way?

12     A.      No.  As a matter of fact, I believe it's a widely

13   used tactic, and it's referred to as a knock and talk

14   throughout the community.

15     Q.      And you've used that practice before?

16     A.      Yes.

17     Q.      And you know other officers that do that as well?

18     A.      Yes.

19     Q.      Earlier on cross-examination counsel asked you

20   about the use of handcuffs.  Do you recall that?

21     A.      I do.

22     Q.      And she also asked you about doing a protective

23   sweep, do you recall that?

24     A.      I do.

25     Q.      At the time you were at Mr. Eastman's residence, at

 1    any point did you feel you were in any danger?

 2         A.    No.

 3         Q.    Remind us again, what was Mr. Eastman's demeanor?

 4         A.    Calm and cooperative.

 5         Q.    And did you feel that handcuffs or a protective

 6    sweep could make it difficult to get his cooperation?

 7         A.    I didn't know so at that point.  Well, first of

 8    all, I didn't need to handcuff him.  There was absolutely no

 9    reason for that.  I didn't feel a protective sweep was

10    necessary in any way.

11         Q.    And in other cases, when you've tried to go to a

12    person's apartment to talk to them, have you felt you didn't

13    need handcuffs or a protective sweep?

14         A.    Numerous times.

15         Q.    Now, counsel was asking you about the report you

16    generated, Defense Exhibit 1.  Do you recall that?

17         A.    I do.

18         Q.    And you testified that that was prepared in May

19    2013?

20         A.    Correct.

21         Q.    A few months after the interview of Mr. Eastman?

22         A.    Correct.

23         Q.    Now, when you prepared that report, you had other

24    documents that you could refer to, is that right?

25         A.    Yes.

1    Q.    For example, the reports you got from Trooper

2  Jollymore in Vermont?

3    A.    Correct.

4    Q.    Did you have the application for an order that you

5  got for Comcast?

6    A.    Yes.

7    Q.    And the information in that application you had,

8  right?

9    A.    Yes.

10    Q.    Did you have the results that Comcast provided when

11  you prepared that report in May?

12    A.    Yes.

13    Q.    And did you have the forms we've been looking at,

14  the consent forms, the Miranda forms, and the voluntary

15  statement of Mr. Eastman when you prepared that report?

16    A.    Yes.

17    Q.    Did you have the voluntary statements of other

18  people?

19    A.    Yes.

20    Q.    For example, did you at any point obtain a

21  voluntary statement from Mr. Eastman's sister?

22    A.    Yes.

23    Q.    And you had that, correct?

24    A.    Yes.

25    Q.    And you had the EnCase software which you used to

1    do the forensic examination, right?

2        A.    Yes.

3        Q.    And you had that result that you could put into

4    your report, right?

5        A.    Yes.

6        Q.    Now, counsel asked you about stuff that was in and

7    not in the report.  Do you recall that?

8        A.    I do.

9        Q.    And she asked you that and you testified that

10   information about third parties being in the home was not

11   included in your report, is that right?

12       A.    Correct.

13       Q.    I think you testified about this on direct.  The

14   person, the woman that was in the home, did she ever ask you

15   to leave the apartment?

16       A.    No.

17       Q.    So did you feel that information was necessary for

18   you to include in the report?

19       A.    No.

20       Q.    Now, your recollection is that Mr. Eastman let you

21   into the apartment, is that right?

22       A.    Yes.

23       Q.    And he actually verbally said okay, is that

24   right?

25       A.    Yes.

1      Q.    He made numerous statements to you while in the

2   home, is that right?

3      A.    Yes.

4      Q.    And, again, at the time was he under arrest?

5      A.    No.

6      Q.    And was he informed he wasn't under arrest?

7      A.    Yes.

8      Q.    And was he in handcuffs?

9      A.    No.

10      Q.    And did you -- was he in custody?

11      A.    No.

12      Q.    And you asked him if he could -- if he would agree

13   to come back to the police station, right?

14      A.    I did ask.

15      Q.    You didn't order him, did you?

16      A.    No.

17      Q.    And, again, he was calm and cooperative?

18      A.    Yes.

19           MS. BARRETT:  I'm going to object to the leading

20   nature here.

21           THE COURT:  Overruled.

22      Q.    Just a couple more questions, Detective Morgan.

23           The consent form that -- for the computer,

24   Government's Exhibit 3, if you could look at it.  Do you

25   recall during your cross-examination defense counsel asking

1   you if there was a line underneath your signature and that's

2   blank?

3        A.    Yes.

4        Q.    Turning to Exhibit 4, which is the voluntary

5   statement, Government Exhibit 4, page 2.  Just to be clear,

6   that consent to search form is referenced in the voluntary

7   statement, is that right?

8        A.    Yes.

9        Q.    It says, I also signed a consent to search form

10   allowing Detective Morgan to take the desktop computer and do

11   a forensic examination?

12        A.    Yes.

13        Q.    And how many people signed this form?

14        A.    Three.

15        Q.    Who was that again?

16        A.    Mr. Eastman, Lieutenant Fox, and Detective Terni.

17        Q.    Now, this voluntary statement, just to be clear,

18   you described the process on cross-examination, but you were

19   typing up information -- typing up this statement based on

20   information Mr. Eastman provided to you?

21        A.    Yes.

22        Q.    Did you transcribe verbatim what he was saying to

23   you?

24        A.    Not word for word, no.

25        Q.    Were you sort of summarizing what he was saying?

1        A.      Correct.

2        Q.      Did you make any of this up out of thin air?

3        A.      No.

4        Q.      It all came from Mr. Eastman?

5        A.      Yes.

6        Q.      In your cases where you're investigating computer

7    crimes or crimes against children, do you often wait to do

8    forensics before you obtain an arrest warrant?

9        A.      Almost always.

10       Q.      Even if you have a confession?

11       A.      Yes.

12               MR. PATEL:  One moment, Your Honor.

13               MR. PATEL:  No further questions, your Honor.

14               THE COURT:  All right.  You may step down.

15               Attorney King.

16               MS. KING:  The Government calls Detective David

17   Terni.

18               THE COURT:  Sir, if you could step forward to the

19   witness box, please.  If you could face our courtroom deputy,

20   raise your right hand.

21                   D A V I D   T E R N I,

22   called as a witness by the Government, having been duly sworn

23   by the Clerk, was examined and testified on his oath as

24   follows:

25               THE CLERK:  State your name, city and state, spell

1    your last name.

2              THE WITNESS:  My name is Detective Dave Terni.  I

3    work for the City of Waterbury in Connecticut.  And my last

4    name is spelled T, as in Tom, E R N I.

5              THE COURT:  Go ahead.

6                        DIRECT EXAMINATION

7    BY MS. KING:

8         Q.    Good afternoon, Detective Terni.

9         A.    Good afternoon.

10        Q.    Could you please tell us where in Waterbury it is

11   that you work?

12        A.    Police Department.

13        Q.    And what do you do for the Waterbury police

14   department?

15        A.    I'm a detective there.

16        Q.    How long have you been with the Waterbury Police

17   Department?

18        A.    I'm in my 19th year.

19        Q.    And have you -- how long have you been a

20   detective?

21        A.    Nine years.

22        Q.    And before that, could you tell us briefly what

23   else you did at the Waterbury Police Department?

24        A.    I started on patrol.  I was on the SWAT team for a

25   while, Parking Authority, extra duty, and detective.  That's

1   it.

2       Q.    As a detective, could you describe briefly what it

3   is that your duties involve?

4       A.    I investigate crimes anywhere, from just basic

5   assault all the way up to and including homicide.

6       Q.    Are you familiar with an investigation of an

7   individual by the name of John Eastman?

8       A.    Yes.

9       Q.    And if I could turn your attention to November the

10  10th, 2012.  Do you recall that day?

11      A.    Uh-huh.

12            THE COURT:  You have to say yes or no.

13      A.    Yes.  Sorry.

14      Q.    Was that a Saturday?

15      A.    Yes, I believe so.

16      Q.    And as a detective, do you ordinarily work on

17  Saturday?

18      A.    No, not ordinarily.  I work one weekend every nine

19  weeks.

20      Q.    And was that your weekend?

21      A.    Yes.

22      Q.    How many detectives work on a weekend?

23      A.    Two in the morning, two in the evening, and one

24  supervisor.

25      Q.    And what was your shift that weekend?

1    A.    Four to midnight.

2    Q.    And who else was a detective at that time?

3    A.    Detective Peter Morgan.

4    Q.    Did you and Detective pETER Morgan do any work

5    together that day?

6    A.    Yes.

7    Q.    And what is it that you did?

8    A.    Detective Morgan asked me to assist him with a case

9    that he was working on.

10   Q.    And did you and Detective Morgan take any steps in

11   the course of working on that case?

12   A.    Yes.

13   Q.    What did you do?

14   A.    We left the department, went to an address on

15   Congress Avenue, and met with Mr. Eastman.

16   Q.    And why were you going there?

17   A.    I'm sorry?

18   Q.    Why were you going there?

19   A.    I was going to assist Detective Morgan.  I didn't

20   know a lot of the details in the case.  He gave me a brief

21   synopsis and then I just went to help assist him.

22   Q.    Did Detective Morgan tell you what the purpose of

23   going to Congress Avenue was?

24   A.    Yes.

25   Q.    What's that?

1    A.    To make contact with Mr. Eastman.

2    Q.    And were you going for the purpose of doing an

3    interview?

4    A.    Initially, yeah.  Initial contact to speak with

5    Mr. Eastman about the case.

6    Q.    And so what did you and Detective Morgan do that

7    evening?

8    A.    We drove to the house.  I think it was 157 Congress

9    Avenue which is a three-family building, house.  Detective

10   Morgan knocked on the door.

11   Q.    You indicated it said three-family.  Which

12   apartment did you go to?

13   A.    I'm sorry, third floor apartment.

14         Detective Morgan knocked on the door.  Mr. Eastman

15   answered the door.  Detective Morgan identified himself and

16   myself as police detectives.

17   Q.    Did you have any other -- what were you wearing?

18   A.    Plain clothes, jeans, and a t-shirt.  Probably a

19   jacket.

20   Q.    And did you have anything outwardly visible to

21   indicate that you were a police officer?

22   A.    I always hang my badge around my neck on the

23   outside of my clothing when I work.

24   Q.    And what was Detective Morgan wearing?

25   A.    I don't know.  Same thing, t-shirt, jeans.

1      Q.     Not police uniforms?

2      A.     No, not police uniforms.  Plain clothes.

3      Q.     And you indicated that Detective Morgan knocked on

4   the door?

5      A.     Yes, ma'am.

6      Q.     And what happened?

7      A.     Mr. Eastman answered the door.  Like I said, we

8   identified ourselves, and then he invited us in.  After

9   Detective Morgan explained why we were there briefly, he

10   asked if we could speak to him about a case he was working on

11   that his name came up in and then he said, yeah, sure, come

12   on in.  So he invited us in.

13      Q.     Did Mr. Eastman take any action at that time?

14      A.     No.

15      Q.     Did anyone else come to the door when you

16   knocked?

17      A.     No.

18      Q.     When you or Detective Morgan knocked on the door?

19      A.     No.

20      Q.     Once you were inside, could you please tell us what

21   happened?

22      A.     We went into the apartment.  We went into a living

23   room, I guess, living room area.  I didn't say anything.  I

24   just stood by.  But Detective Morgan was speaking with

25   Mr. Eastman.

1    Q.    And when Detective Morgan was speaking with him,

2    what was the subject matter of the conversation?

3    A.    He gave him a brief description of why we were

4    there.  He didn't give too many details of the case, but he

5    just let him know why we were there.

6    Q.    And where were you during that conversation?

7    A.    I just stood off to the side.

8    Q.    Was anyone sitting down?

9    A.    Yeah.  I believe Mr. Eastman was sitting on the

10   couch, a chair, something in that room.

11   Q.    And do you recall where Detective Morgan was?

12   A.    Standing up right in front of him talking to him.

13   Q.    At any point when you were at 157 Congress, was

14   Mr. Eastman in handcuffs?

15   A.    No.

16   Q.    Did you become aware of anyone else in the

17   apartment while you were there?

18   A.    Yes.  His mother actually came into the room and

19   asked what was going on.  Detective Morgan started to explain

20   why we were there and Mr. Eastman actually injected himself

21   and interrupted Detective Morgan and said it's okay,

22   everything's fine, go back in your room.

23   Q.    And what happened?

24   A.    She did.  She left.  She went back in her room.

25   Q.    Did you or Detective Morgan say anything to her?

1     A.     I didn't say anything to her but, like I said,

2     Detective Morgan started to explain why we were there, but he

3     didn't get to finish because we got interrupted.

4     Q.     As a result of the interruption what ended up

5     happening?

6     A.     I don't understand the question.

7     Q.     I think you covered this already.  You indicated

8     that Mr. Eastman interrupted and as a result of his

9     interruption what did the woman do?

10    A.     Oh, she went back in the room.

11    Q.     Can you tell us what happened next?

12    A.     Just basic interview continued.  He was very

13    cooperative.  Very cordial, polite.  Detective Morgan

14    explained that it was a computer issue and asked if he would

15    mind showing us his computer.  And he said no.  He walked us

16    into his bedroom.  I followed.  He showed us the computer.

17    And then Detective Morgan asked him if he would be willing to

18    accompany us to the Police Department, Detective Bureau, and

19    talk more about the case.  And he was very willing.

20    Q.     And what happened in terms of the computer?

21    A.     Detective Morgan asked Mr. Eastman if he would be

22    willing to submit his computer for a forensic examine at some

23    point, what was on the hard drive, on the tower, and he said

24    no problem, and actually helped Detective Morgan take it

25    apart, unplug stuff.  And then we left.  We went to the

1    Department.

2         Q.    Did anything happen before you left the

3    apartment?

4         A.    I think he asked to go to the bathroom and his

5    mother -- right when we were leaving, his mother came back in

6    the room again and asked if everything was okay, if he was

7    under arrest, if he'd be coming home.  And we allowed him to

8    go to the bathroom.

9         Q.    Was the door open or closed when he went to the

10   bathroom?

11        A.    The bathroom?  It was closed.

12        Q.    Going back to -- you were explaining that his

13   mother asked if he's going to be arrested?

14        A.    Yes.

15        Q.    And what happened?

16        A.    Well, we said, no, he's not under arrest.  We're

17   just talking to him.  He's just going to come and talk to us,

18   that's it.

19        Q.    Was there any further contact with that woman?

20        A.    No.

21        Q.    And when you left, how did you get to the police

22   station?

23        A.    We went back -- we were driving a white Chevy

24   Tahoe.

25        Q.    Unmarked?

1    A.    Unmarked.  And I drove back, Detective Morgan was

2  in the passenger seat with the computer in his lap, and

3  Mr. Eastman was in the back seat.

4    Q.    Before Mr. Eastman sat in the back seat, did you

5  take any steps prior to leaving Congress Avenue?

6    A.    Honestly, I don't -- usually I would check somebody

7  for weapons, but I don't remember.  It was four years ago.  I

8  don't recall.

9    Q.    But you remember that Mr. Eastman was sitting in

10  the back seat?

11    A.    Yes.

12    Q.    Who was driving?

13    A.    I was driving.

14    Q.    And where was Detective Morgan?

15    A.    Passenger seat in the front.

16    Q.    Where was the computer?

17    A.    He was holding onto it.

18         MS. KING:  If I may approach the witness, Your

19  Honor?

20         THE COURT:  You may.

21    Q.    Detective Terni, do you have a book of Government

22  exhibits in front of you?

23    A.    Yes.

24    Q.    If you would, please, keep that available so that

25  you can refer to it when I direct you to a certain numbered

1   exhibit.

2           You indicated that you got into a white Tahoe and

3   when you got into the white Tahoe you were driving.  What

4   happened next?

5       A.    We drove to the Detective Bureau.

6       Q.    Straight?

7       A.    Yes.

8       Q.    And where did you go when you reached -- the

9   Detective Bureau is in the police station, correct?

10      A.    Yes.

11      Q.    Where did you go when you reached the police

12  station?

13      A.    Third floor parking ramp.

14      Q.    And why is that?

15      A.    That's where all the detectives/vice vehicles are

16  parked.  That's where we park.

17      Q.    When you parked there, what happened?

18      A.    We exited the car, the vehicle, went into the

19  Detective Bureau.

20      Q.    When you got to the Detective Bureau, where did you

21  go?  Where did Mr. Eastman go and where did Detective Morgan

22  go?

23      A.    Just went right into the Detective Bureau.  The

24  main area is a big open area.

25      Q.    And what's in that main big open area?

1      A.     Desk, computers.

2      Q.     Did you have an assigned desk?

3      A.     Yes.

4      Q.     And what about Detective Morgan, did he have a

5   specific assigned desk out in the open area?

6      A.     He has his own specific desk area that he works in

7   a different part of the building that has all of his computer

8   stuff.  But he didn't have an assigned desk, no, he just sat

9   wherever he felt like.

10      Q.     And do you recall where that was approximately?

11      A.     I sit -- I was sitting this way facing the wall,

12   and he was right next to me facing that way, and Mr. Eastman

13   was on the other side of him.

14      Q.     And at the desk where Detective Morgan was sitting,

15   was there a computer?

16      A.     Yep.

17      Q.     Were you able to see the computer screen?

18      A.     Yes.

19      Q.     Could you read what was on it?

20      A.     No, I wasn't that close.

21      Q.     And could you see Mr. Eastman?

22      A.     Yes.

23      Q.     And so you got out of the Tahoe, went into the

24   Detective Bureau and sat in this main area, correct?

25      A.     Yes.

1    Q.    And what happened after you sat down in this main

2   area?

3    A.    Detective Morgan advised Mr. Eastman of his rights.

4   They have a little rights card that we fill out.  Read and

5   explained each one, and Mr. Eastman initialed each one.

6   Stated that he understood his rights and was willing to waive

7   his rights to speak to us, and then he signed it.

8    Q.    Were you able to see Detective Morgan having this

9   conversation with John Eastman?

10   A.    Yes.

11   Q.    And were you able to see John Eastman during the

12   conversation?

13   A.    Yes.

14   Q.    And were you able to hear what was going on?

15   A.    Yes.

16   Q.    I'd like you now to turn to what's marked in that

17   book in front of you as Government Exhibit 1.

18   A.    Okay.

19   Q.    Do you see what is on Exhibit 1?

20   A.    This is a copy of our advisement of rights card.

21   Q.    Do you see signatures on that card?

22   A.    Yes.

23   Q.    Is yours one of them?

24   A.    No.

25   Q.    You indicated that you could see Detective Morgan

 1   providing an advice of rights card to Mr. Eastman, is that

 2   right?

 3        A.    Yes.

 4        Q.    Did you hear Mr. Eastman acknowledge what Detective

 5   Morgan was telling him on the advice of rights card?

 6        A.    Yes.

 7        Q.    And as a result of what he was told, what did

 8   Mr. Eastman do?

 9              Let me rephrase that.  What did you observe

10   Mr. Eastman do?

11        A.    He signed the rights card, initialed it, signed it.

12   Is that what you're asking?

13        Q.    Yes.  That was my question.

14              At any time did you hear Mr. Eastman reflect on the

15   contents of what was in this card?

16        A.    Not really.

17        Q.    Did Detective Morgan ask Mr. Eastman to read

18   anything?

19        A.    Yes, he did.  Yeah.  He explained all the rights to

20   him.  Mr. Eastman read them, initialed each one, and then

21   signed it.

22        Q.    After Mr. Eastman signed this card, what

23   happened?

24        A.    Detective Morgan asked if he was willing to speak

25   about the case indepth.  Mr. Eastman said he was.  So they

1    spoke for a while, discussed everything.  And then after that

2    he asked if Mr. Eastman would be willing to give a written

3    statement.

4        Q.    And did you hear Mr. Eastman's reply?

5        A.    He said yes.

6        Q.    Then what did you see?

7        A.    Then Detective Morgan logged on to his computer to

8    generate a statement and printed out a rights form, a larger

9    form on the card, and advised Mr. Eastman of his rights a

10   second time.

11       Q.    Did you hear Detective Morgan verbally advise him

12   of the rights again?

13       A.    Yes.

14       Q.    And did you see Detective Morgan do anything?

15       A.    The same exact thing.  He did the same thing.  He

16   read it to him, explained you have a right to remain silent,

17   the usual Miranda rights.  Mr. Eastman read along, signed,

18   initialed.  And then he initialed and then signed the form.

19       Q.    If you would turn to Exhibit 2 in the book in front

20   of you.  Do you recognize that form?

21       A.    Yeah.  This is our long form Voluntary Statement of

22   Rights form.

23       Q.    Does your signature appear on this form anywhere?

24       A.    No.

25       Q.    Did you observe Mr. Eastman sign this form?

1      A.    Yes.

2      Q.    After Mr. Eastman signed this form, did he and

3  Detective Morgan continue speaking?

4      A.    Yes.

5      Q.    Mr. Eastman after signing that form was willing to

6  continue speaking with Detective Morgan?

7      A.    Yes.

8      Q.    And what happened next in the conversation?

9      A.    Then he gave Detective Morgan a statement, a

10 written statement.

11     Q.    In the course of that discussion, do you recall

12 whether or not you heard anything about a consent to search

13 computer form?

14     A.    Yes.

15     Q.    And if you could tell us generally what you

16 heard?

17     A.    Detective Morgan asked Mr. Eastman if he could have

18 his consent to forensically access the hard drive of his

19 computer and he consented.

20     Q.    Who did?

21     A.    Mr. Eastman.  I'm sorry.

22     Q.    And if you could turn to what's marked as

23 Government's Exhibit 3.

24     A.    That's our consent form.

25     Q.    And could you see Mr. Eastman throughout this

1   process?

2        A.    Yes.

3        Q.    Did you see whether or not he signed the Consent to

4   Search form?

5        A.    Yes.

6        Q.    To be clear, you indicated you weren't able to read

7   the computer screen from where you were sitting, correct?

8        A.    Correct.

9        Q.    Were you able to read the words on these forms?

10       A.    From where I was sitting?

11       Q.    Yes.

12       A.    No.

13       Q.    Based on what you heard and what you observed, is

14   it your understanding that this was the form that was signed

15   by Mr. Eastman?

16       A.    Yes.

17       Q.    And looking at Government Exhibit 3, do you see

18   your signature anywhere on this form?

19       A.    No.

20       Q.    Could you tell us, please, what you recall about the

21   process that Detective Morgan utilized in obtaining a

22   voluntary statement from Mr. Eastman?

23       A.    Everything that they had discussed prior to the

24   second form, being the consent form, he just would ask, you

25   know, okay, and then this happened, and then he just types

1    exactly the way Mr. Eastman was talking in his words,

2    transposes it on to the computer screen, makes any

3    corrections.  Either prints it or allows Mr. Eastman to read

4    it.

5         Q.    Do you recall which happened in this case?

6         A.    I don't remember.  I'm pretty sure he printed it

7    and handed it to him and he read it.  Asked him if there was

8    any mistakes or anything he wanted him to change, any

9    corrections.  I don't remember if there were any corrections

10   made.  And then after that he signs it, initials it,

11   beginning and end, and then signs it.

12        Q.    Is there -- is it just Mr. Eastman who signs that

13   form?

14        A.    No.

15        Q.    What do you recall happening with regard to the

16   signing of this form?

17        A.    Well, Detective Morgan called for a supervisor,

18   because all forms have to be notarized by a supervisor.  So

19   he contacted the front desk, Lieutenant Fox came upstairs.

20   Mr. Eastman, while in his presence, initialed it, signed it.

21   And Lieutenant Fox signed it and then I witnessed it.

22        Q.    If you could turn to what's marked as Government

23   Exhibit 4.

24        A.    Statement.  Voluntary statement.

25        Q.    Have you seen this before?

1     A.    Yes.

2     Q.    You indicated it's a voluntary Statement form?

3     A.    Yes.

4     Q.    Does this bear your signature?

5     A.    Yep.

6     Q.    And where is your signature appearing on this

7   form?

8     A.    Lower left corner.  That's my badge number, 570.

9     Q.    On the line that says witness?

10    A.    Yes, ma'am.

11    Q.    Just to be clear, we're talking about Government

12  Exhibit 4, right?  Do you see that on the screen in front of

13  you?

14    A.    Yes.

15    Q.    And that's the form that you're looking at,

16  correct?

17    A.    Yes.

18    Q.    And you've indicated on the lower left, number 570.

19  That's your identification number?

20    A.    Yes, ma'am.

21    Q.    Is that your badge number?

22    A.    Yes.

23    Q.    And then there's space here that says witness.

24  Next to witness, is that your signature?

25    A.    Yes.

1    Q.    Do you recognize the signature of anyone else on

2    this form?

3    A.    Yes.

4    Q.    Who?

5    A.    Where it says signed, as Mr. Eastman's signature.

6    And it says supervisor is Lieutenant Fox.

7    Q.    Are you familiar with Lieutenant Fox's signature?

8    A.    Yes.

9    Q.    And do you recognize his signature?

10   A.    Yes.

11   Q.    Did you see other people sign this form?

12   A.    Just the ones that were here, yeah.  Me -- I'm

13   sorry.  Myself, Lieutenant Fox, and Mr. Eastman.  That's it.

14   Nobody else.

15   Q.    And do you recall whether you observed anyone make

16   the initials that appear at the lower right corner, in that

17   upper left corner?

18   A.    Yes.  Mr. Eastman.

19   Q.    Mr. Eastman made those initials?

20   A.    Yes.

21         THE COURT:  To be clear, you observed him doing so,

22   correct?

23         THE WITNESS:   Yes.  Yes, sir.

24   Q.    And going to page two of this Voluntary Statement

25   form, it also has signature lines at the bottom, correct?

1      A.      Yes.

2      Q.      And do you recognize any signature on page two?

3      A.      Yes.

4      Q.      Could you tell us please, which ones you

5   recognize?

6      A.      Lower left, witness is my signature.  Signed is

7   Mr. Eastman's.  And supervisor is Lieutenant Fox.

8      Q.      And did you observe each of these signatures be put

9   on to this paper?

10     A.      Yes, ma'am.

11     Q.      And the number 570, do you know who wrote that?

12     A.      I did.

13     Q.      And the date 11-10-12, do you know who wrote

14   that?

15     A.      Lieutenant Fox wrote that.

16     Q.      How do you know?

17     A.      Because I watched him sign it.

18     Q.      And, again, there are initials that appear in the

19   upper left corner and at the bottom right of the last piece

20   of text in the middle of the statement.  Do you see those?

21     A.      Yes.

22     Q.      And did you observe those initials being put on the

23   paper?

24     A.      Yes.

25     Q.      Who wrote those initials that you observed?

1    A.    John Eastman.

2    Q.    At any time did Mr. Eastman say he did not want to

3    sign any of these forms?

4    A.    No.

5    Q.    What happened after that form was completed?

6    A.    After the form was completed, we took him home.

7    Q.    Who?

8    A.    Mr. Eastman.

9    Q.    Who took him home?

10   A.    Detective Morgan and myself.

11   Q.    In what?

12   A.    The same car, the white Tahoe.

13   Q.    Did you take him back to 157 Congress?

14   A.    Yes.

15   Q.    And when you got there, what happened?

16   A.    He got out of the car and went in the house.  We

17   didn't escort him up or take him up.

18   Q.    Was he able to get out of the back of the car

19   without you letting him out?

20   A.    Yes.

21   Q.    Why?

22   A.    It's not a patrol car.  There's no secured lock on

23   the back doors.  The doors lock when you put the car in

24   drive, but you can pop the thing and get out if you want.

25           MS. KING:  If I may have a moment, Your Honor?

1          THE COURT:  Yes.

2     Q.    When you were in the apartment, turning your

3  attention back to being in the apartment at 157 Congress

4  Avenue, third floor, you indicated that you entered and went

5  into the living room area, correct?

6     A.    Yes.

7     Q.    And you indicated that you were standing off to the

8  side, was that your testimony?

9     A.    Yes.

10    Q.    When you were in the apartment, did you open any

11 cabinets?

12    A.    No.

13    Q.    Open any drawers?

14    A.    No.

15    Q.    Look in any -- look under anything that was on a

16 table?

17    A.    No.

18    Q.    Go in the kitchen?

19    A.    Maybe at some point.  I don't remember.  I don't

20 remember all that.

21    Q.    Did you open -- do you have a recollection of

22 opening any cabinet or any drawer when you were in the

23 apartment?

24    A.    No, I did not.

25    Q.    Was Mr. Eastman handcuffed at any time during the

1    apartment?

2       A.    He wasn't handcuff at any time ever, from the start

3    to the end.

4             MS. KING:  Nothing further, your Honor.

5             THE COURT:  All right.  Why don't we take lunch and

6    then do cross-examination after lunch.

7             We'll be back on the record at 1:15.

8             We'll be in recess.

9             (Luncheon Recess.)

10            THE COURT:  All right.  Are we ready for

11   cross-examination?

12            MR. KEENAN:  Yes, Your Honor.

13                 CROSS-EXAMINATION

14   BY MR. KEENAN:

15      Q.    Good afternoon, Detective Terni.  My name is David

16   Keenan and I represent Mr. Eastman.

17            November 12, 2012, was almost four years ago,

18   correct?

19      A.    Yes.

20      Q.    So it's fair to say a lot of time has elapsed since

21   then.  I imagine you've had a lot of investigations since

22   2012?

23      A.    Yes.

24      Q.    Do you know approximately how many?

25      A.    No.

1    Q.    Would it be more than 50?

2    A.    Oh, yeah, definitely.

3    Q.    More than a hundred?

4    A.    In four years?  Possible.

5    Q.    So you don't recall the details of exactly how many

6    investigations you've conducted since 2012, correct?

7    A.    I'm sorry.  Say that again.

8    Q.    You don't recall each of the details of all the

9    investigations you've conducted since 2012, correct?

10   A.    Not off the top of my head.

11   Q.    And it's fair to say you don't remember all of the

12   details of what transpired on November 10, 2012 because that

13   was more than four years?

14   A.    No, I remember.

15   Q.    You remember all of the details of what happened

16   that day?

17   A.    What I was involved with.

18   Q.    You don't recall whether or not you searched

19   Mr. Eastman or not prior to putting him in the patrol car?

20   A.    No.

21   Q.    So it's fair to say you don't recall the details of

22   what happened on November 10?

23   A.    Well, when you put it that way, yes, I guess.

24   Q.    And I imagine you didn't keep any notes that day of

25   what occurred?

1     A.    I did not.

2     Q.    So in testifying today, you're relying primarily on

3   your memory of what transpired nearly four years ago?

4     A.    And the paperwork, the facts, the statements.

5     Q.    The police report, for instance, you reviewed that

6   prior to testifying today?

7     A.    Say that again.

8     Q.    You reviewed the police report prior to testifying

9   today?

10    A.    I read the statements.  Not today.

11    Q.    You read Mr. Eastman's voluntary statement?

12    A.    Yes.

13    Q.    But you did not review the police report prior to

14   testifying today?

15    A.    The police report, yes, the whole case.

16    Q.    You reviewed the police report.  Approximately when

17   did you review the police report?

18    A.    A while ago.  Couple weeks ago.

19    Q.    You weren't asked to sign off on the police report

20   at the time it was prepared in 2013, correct?

21    A.    No, sir.  I'm sorry.  You're talking about the

22   initial police report?

23    Q.    I'm talking about the May 7, 2013 police report.

24    A.    I'm sorry.  I misunderstood you.  I'm just talking

25   about the voluntary statement, the rights card, everything we

1    went over.

2         Q.    Have you ever reviewed the May 7, 2013 police

3    statement?  And it's Exhibit 1 in your Defense Exhibit binder

4    which I think you have up there.

5         A.    This one here?

6         Q.    Yes.  You can just review that and tell me if

7    you've ever reviewed it.

8         A.    The wars (ph) report, no.

9         Q.    Word for word no?

10        A.    No, it's called the wars report and I did not

11   review it.

12        Q.    You never reviewed it.  Thank you.

13             In addition to your memory, we're relying on your

14   review of the voluntary statement form, the consent to search

15   form, and the two advisement of rights form, correct?

16        A.    Yes, sir.

17        Q.    In addition to that, prior to testifying today, did

18   you talk to Detective Morgan about this case?

19        A.    No.

20        Q.    So since your involvement -- by the way, did your

21   involvement in the investigation end effectively November 10,

22   2012?

23        A.    Yes.

24        Q.    So between November 10, 2012 and today, you've

25   never talked to Detective Morgan about this case?

1     A.     No.

2     Q.     Did you meet with the prosecutors in this case?

3     A.     Yes.

4     Q.     How many times?

5     A.     Once.

6     Q.     And when, approximately, did that take place?

7     A.     What's today?  31st.  I believe it was on the 23rd,

8   24th.

9     Q.     And do you recall who was present at that

10   meeting?

11     A.     The prosecuting attorneys.

12     Q.     Anyone else?

13     A.     Allison.  I don't know her last name, I'm sorry,

14   from Homeland Security.

15     Q.     And did anyone take notes during that meeting?

16     A.     I think so.

17     Q.     Do you recall who took notes?

18     A.     No.

19     Q.     And did the prosecutor review with you the

20   questions that she would ask you here today?

21     A.     Yes.

22     Q.     You were not the lead detective in this case, is

23   that right?

24     A.     No, sir.

25     Q.     And you didn't speak with the Vermont State

1    Police?

2       A.    No.

3       Q.    You didn't talk with Trooper Jollymore?

4       A.    No.

5       Q.    I take it you don't even know who Trooper Jollymore

6    is?

7       A.    No idea.

8       Q.    You didn't apply for the subpoena from Comcast?

9       A.    No.

10      Q.    Did you know that a subpoena had been obtained?

11      A.    No.

12      Q.    And you didn't perform a search on -- you didn't

13   perform the search on Mr. Eastman's computer either?

14      A.    No.

15      Q.    Detective Morgan was the lead detective?

16      A.    Yes.

17      Q.    And your involvement, I think you said, the purpose

18   was to make contact with Mr. Eastman, the purpose of your

19   visit?

20      A.    Yeah.  Initiate the investigation.  I was just

21   there as a backup.

22      Q.    So Detective Morgan basically asked you to come

23   along for officer safety reasons?

24      A.    Among other things.

25      Q.    And at the time you became involved, Mr. Eastman

1   essentially had already become a suspect?

2       A.     Say that again.

3       Q.     At the time you became involved, Mr. Eastman was

4   already a suspect?

5       A.     Yes.

6       Q.     But aside from what Detective Morgan had told you,

7   you didn't know anything about Mr. Eastman, correct?

8       A.     Correct.

9       Q.     You had never met Mr. Eastman before?

10      A.     No.

11      Q.     And he didn't know who you were?

12      A.     No.

13      Q.     Now, when you went to the apartment, you were

14   armed, correct?

15      A.     Yes.

16      Q.     And your firearm was visible on the outside of your

17   clothing?

18      A.     I don't recall.  If I was wearing a jacket, no.

19   But if I wasn't, yes.

20      Q.     But you don't remember whether you were wearing a

21   jacket or not?

22      A.     No.

23      Q.     So your firearm might have been visible?

24      A.     Yes.

25      Q.     And you had you handcuffs with you?

1     A.    Yes.

2     Q.    And that's standard police practice to be armed and

3     have your handcuffs with you at all times?

4     A.    Yes.

5     Q.    Detective Morgan, to your knowledge, didn't apply

6     for a search warrant prior to going to Mr. Eastman's home,

7     correct?

8     A.    I don't believe so.

9     Q.    And he didn't apply for an arrest warrant either?

10    A.    No.

11    Q.    Had Detective Morgan run John Eastman's rap sheet,

12    to your knowledge?

13    A.    I have no idea.

14    Q.    So you didn't know what you were dealing with?

15    A.    No.  Just a basic understanding of what the case

16    initially was about.

17    Q.    The individual you went to talk to could have been

18    violent?

19    A.    Could have been.

20    Q.    And he could have had an extensive criminal

21    record?

22    A.    Yes.

23    Q.    And, in fact, Mr. Eastman does have an extensive

24    criminal record.  You know that now.

25    A.    Yes.  Never mind, I'm sorry.

1    Q.    You knew that before going to 157 Congress that you

2    couldn't enter the apartment without Mr. Eastman's consent,

3    correct?

4    A.    Correct.

5    Q.    And you couldn't -- you knew that you couldn't

6    seize any items without the owner's lawful consent,

7    correct?

8    A.    Correct.

9    Q.    So did you bring a consent to search form with

10   you?

11   A.    I don't remember if Detective Morgan had brought

12   one with us.

13   Q.    And you don't remember if he ever showed a consent

14   to search form to Mr. Eastman at the apartment?

15   A.    No, I don't remember.

16   Q.    You're aware that Mr. Eastman eventually signed a

17   consent to search form at 7:40, p.m., correct?

18   A.    Yes.

19   Q.    And that took place at the police station, right?

20   A.    Yes, sir.  Yes.

21   Q.    So there's no consent to search form signed by

22   Mr. Eastman at his home allowing you to enter the home or

23   seize the computer?

24   A.    There was no consent form at the apartment.

25   Q.    Your testimony, though, is that Mr. Eastman gave

1    you verbal consent to enter the home?

2    A.    Yes.

3    Q.    And do you recall what exactly were his words?

4    A.    I don't recall.  Come in.

5    Q.    You don't recall his exact words?

6    A.    Come on in.

7    Q.    And he gave you --

8         THE COURT:  First you said I don't recall his exact

9    words, and then you said come on in.  Which is it?  Is it

10   that you don't recall or that you recall that he said come on

11   in?

12        THE WITNESS:  His exact words, I don't remember.

13        THE COURT:  Sorry.

14        MR. KEENAN:  No, thank you, your Honor.

15   Q.    You testified that he gave you verbal consent or

16   gave Detective Morgan verbal consent to take the computer?

17   A.    Yes.

18   Q.    What exactly were his words, if you recall?

19   A.    I don't recall.

20   Q.    And whatever he said is not documented anywhere in

21   the police report or any notes that you have or any notes

22   that you reviewed of Detective Morgan's?

23   A.    I didn't take any notes at all.  I wasn't involved

24   in that regard to this case.

25   Q.    So with regard to the issue of Mr. Eastman's verbal

1    consent, there's no verbatim record of what he actually said,

2    correct?

3         A.    I don't know.

4         Q.    To your knowledge?

5         A.    Right.

6         Q.    Were you aware that 157 Congress Avenue was leased

7    to Linda Eastman?

8         A.    His mother, yes.

9         Q.    Were you aware of that prior to going to the

10   apartment?

11        A.    No.

12        Q.    You became aware that there was another occupant in

13   the apartment once you were inside, correct?

14        A.    Yes.

15        Q.    Did you ask her if she consented to you entering

16   into her apartment?

17        A.    I didn't interact with her at all.  Detective

18   Morgan did all the talking.

19        Q.    Did Detective Morgan ask Ms. Eastman if she

20   consented to you being in her apartment?

21        A.    I don't remember.  Well, actually, I'm sorry.  Let

22   me back up.  When she first made contact with us she asked

23   what was going on.  Detective Morgan started to explain it to

24   her and he was interrupted by Mr. Eastman.  So that topic

25   never came up.

1    Q.    So he never asked Ms. Eastman if she consented to

2    you being in the apartment?

3    A.    Not at that point, no, no.

4    Q.    And she was never provided with a written consent

5    to search form or consent to seize evidence form, correct?

6    A.    Correct.

7    Q.    Are you aware that Ms. Eastman is the one who

8    purchased the computer?

9    A.    I did not know that.

10   Q.    So your testimony here is that you had handcuffs on

11   you, correct?

12   A.    Yes.

13   Q.    Do you know if Detective Morgan also had

14   handcuffs?

15   A.    I believe so.

16   Q.    But at no time did you use those handcuffs?

17   A.    No.

18   Q.    And you're aware that Mr. Eastman provided a sworn

19   affidavit that he was handcuffed while in the apartment?

20   A.    No.

21   Q.    Are you aware that Mr. Eastman's mother, Linda

22   Eastman, similarly provided a sworn affidavit that

23   Mr. Eastman was handcuffed while inside the apartment?

24   A.    No.

25   Q.    That doesn't change your testimony that, in fact,

1    he was not handcuffed?

2        A.    No, he was never handcuffed at any point.

3        Q.    And when you transported him to the station, you

4    didn't handcuff him at that time?

5        A.    No, sir.

6        Q.    And you don't recall, correct, whether you searched

7    him or not?

8        A.    No.

9        Q.    Would it be standard practice to not search a

10   suspect and not handcuff a suspect prior to transporting them

11   to the station for questioning?

12       A.    The only way for tactical reasons, for officer

13   safety reasons, we always check somebody for weapons when we

14   transport them.  Whether they're under arrest or not, we just

15   do a quick pat down and have them show us, but if they're

16   under arrest they're handcuffed.  If he wasn't under arrest,

17   he was never handcuffed.

18       Q.    And let's talk about officer safety.  When you

19   entered into the apartment, did you perform a protective

20   sweep of the apartment to make sure there were no other

21   individuals in the apartment or no weapons in the

22   apartment?

23       A.    No.

24       Q.    But you didn't know whether Mr. Eastman was

25   dangerous or not because he hadn't run his criminal record

1   yet, correct?

2       A.      We were just making initial contact with

3   Mr. Eastman, and his demeanor was very pleasant and

4   cooperative and he gave us no indication that he was going to

5   be violent in any way.  We weren't there for a violent crime.

6   So we weren't concerned with doing a protective sweep of the

7   house.  If things changed quickly, if something happened, you

8   know --

9       Q.      You had no knowledge whether he was a firearm

10  owner?

11      A.      No.

12      Q.      And you had no knowledge when you initially entered

13  the apartment whether there was anybody else there,

14  correct?

15      A.      Initially, no, we had no idea.

16      Q.      Detective Terni, are you familiar with the term

17  field notes?

18      A.      Yes.

19      Q.      And you would agree that field notes play an

20  important role in criminal investigations?

21      A.      Sure.

22      Q.      You keep them as a detective in your cases when

23  you're the primary detective I take it?

24      A.      Sometimes.  Depends.

25      Q.      Field notes provide a written record of events?

1      A.    Yes.

2      Q.    Times?

3      A.    Yes.

4      Q.    Places, suspects?

5      A.    Yes.

6      Q.    Witnesses?

7      A.    Yes.

8      Q.    Statements that a suspect might make?

9      A.    Yes.

10      Q.    And other important information that's relevant to

11  a criminal investigation, correct?

12      A.    Yes.

13      Q.    And you rely in your own practice on field notes

14  sometimes, correct?

15      A.    Yes.

16      Q.    In drafting police reports?

17      A.    Yes.

18      Q.    Search warrant applications?

19      A.    Yes.

20      Q.    And field notes can contain sensitive

21  information?

22      A.    Sometimes.

23      Q.    About, for instance, the names and addresses of

24  minor victims?

25      A.    Yes.

1    Q.    And because they contain sensitive information, you

2    know it's important to keep close control over your own

3    notes, correct?

4    A.    Yes.

5    Q.    You've been a detective now for almost 10 years,

6    correct?

7    A.    Just started my 10th year.

8    Q.    And one of the things you're taught is to keep

9    accurate field notes during the course of your

10   investigations, correct?

11   A.    It depends on the case.

12   Q.    Can you elaborate on that?

13   A.    Well, if there's a lot to remember, if it's a very

14   complicated case and a lot of people you speak to, you keep a

15   running record.

16   Q.    How about an investigation that lasts six months?

17   A.    Well, of course.

18   Q.    And one of the purposes of taking field notes is to

19   ensure you remember important details of the investigation?

20   A.    Correct.

21   Q.    And to refresh your recollection, for instance, if

22   you're called to testify in a case?

23   A.    Yes.

24   Q.    Are you aware that Detective Morgan didn't keep any

25   field notes in this case?

1    A.    I'm not aware whether he took notes or didn't take

2    notes.

3    Q.    Let me ask you about Ms. Eastman's presence in the

4    apartment.  Would you agree that this was an important fact

5    that should have been noted in the police report?

6    A.    That his mother was in the apartment?

7    Q.    Yes.

8    A.    I guess so.  I don't know.

9    Q.    Would you have noted it in your police report had

10   you had the responsibility for writing the police report in

11   this case?

12   A.    Probably not.

13   Q.    No?  Even though you just testified that it

14   probably should have been included in the police report?

15   A.    Her presence in the room did not really affect the

16   case or why we were there.  So I probably wouldn't have put

17   it in the report.

18   Q.    Do you understand legally that a co-occupant's

19   refusal to consent could negate another occupant's consent,

20   correct?

21   A.    Say that again.  A co-occupant's what?

22   Q.    Refusal to consent could negate another occupant's

23   consent?

24   A.    Yes, I'm aware of that.

25   Q.    Detective Terni, I want to direct your attention to

1   Defense Exhibit 3 which is in your binder.

2       A.    Okay.

3       Q.    I believe you testified that you witnessed

4   Mr. Eastman sign this form?

5       A.    Yes.

6       Q.    And do you recall who wrote the date and time at

7   the bottom of the form?

8       A.    No.

9       Q.    Do you recall who wrote the location?

10      A.    No.  I know Detective Morgan signed it.  He may

11  have written the police address and stuff.

12      Q.    There's a box or line for witnesses or officers.

13  You didn't sign this form?

14      A.    No, sir.

15      Q.    And drawing your attention to the top of the form,

16  it says:  The Waterbury Police Department requests your

17  permission to search/obtain HP desktop computer which is

18  located at 157 Congress Avenue, 3rd Floor, Waterbury,

19  Connecticut.  That statement's false, correct?

20      A.    No.

21      Q.    So the computer was located at 157 Congress Avenue

22  at this time?

23      A.    The computer itself?

24      Q.    Yes.

25      A.    Was at 157 Congress Ave.

1    Q.    When this form was signed?

2    A.    No.  It was at the police department.  The evidence

3    that was going to be extracted from the computer was at the

4    police department.

5    Q.    So it's not true that the computer was located at

6    157 Congress Avenue when this form was signed?

7    A.    Yes.

8    Q.    In fact, this form was signed after Mr. Eastman had

9    already begun to give a statement to Detective Morgan,

10   correct?

11   A.    I'd have to check the times.

12   Q.    You don't recall exactly when this consent to

13   search form was presented to Mr. Eastman, do you?

14   A.    It was when he was -- it was after his statement, I

15   believe.  I don't remember.

16   Q.    You don't recall whether Mr. Eastman filled out the

17   date or the time, and you don't recall exactly when the

18   consent to search form was presented to him, correct?

19   A.    I wasn't standing over him watching him sign it.  I

20   could see him, but I was not like watching him sign it.

21   Q.    So you actually don't know whether he signed this

22   form or another form?

23   A.    No, I know he signed this one.  I could hear

24   Detective Morgan explaining it to him, walking him through

25   it.

1    Q.    And prior -- to go back to Mr. Eastman's apartment,

2    neither you nor Detective Morgan ever told Mr. Eastman that

3    he could refuse consent?

4    A.    I didn't speak to him at all.

5    Q.    You never heard Detective Morgan advice Mr. Eastman

6    at the apartment that he could refuse consent?

7    A.    I don't recall.

8    Q.    And prior to entering the apartment, you never

9    advised him that he could refuse to let you in?

10   A.    I'm not required to.

11   Q.    That wasn't my question.  My question was, did you

12   advise him that he had the right to refuse entry to the

13   apartment?

14   A.    No.

15   Q.    Do you recall if Detective Morgan had his firearm

16   on him as well?

17   A.    Yes.

18   Q.    And was that exposed?

19   A.    I don't recall.

20   Q.    Were you -- how did you identify yourself as police

21   officers?

22   A.    Detective Morgan actually introduced himself,

23   showed his badge, and my badge was visible on the outside of

24   what he was wearing and he introduced me as well.

25   Q.    So you had your police badges out, a gun was

1    visible?

2        A.    I'm not sure.  Like I said before, I don't remember

3    if our guns were visible or not.

4        Q.    I think you just testified Detective Morgan's gun

5    was visible unless I misheard.

6        A.    No, I said I didn't recall.

7        Q.    I apologize.  What is the purpose of a consent to

8    search form?

9        A.    Just that, it's a consent given by whoever we

10   present it to, to either voluntarily give us permission in

11   lieu of a search warrant to collect evidence or take

12   photographs of a scene, process a vehicle, for instance.

13   Anything.  Anything that we want to look at or investigate.

14       Q.    And the form advises the person signing it that

15   they have the right to refuse consent, correct?

16       A.    Yes.

17       Q.    And I think this is getting at what you just

18   testified to, but the primary purpose is to document when

19   someone is giving you voluntary consent to search or seize an

20   item, correct?

21       A.    Correct.

22       Q.    And to be effective, the form has to be signed

23   before you actually physically seize the item, correct?

24       A.    Correct.

25       Q.    The form in this case wasn't signed before you

1    seized the computer?

2        A.    Correct.

3        Q.    So when you went to Mr. Eastman's residence, he was

4    already a criminal suspect?

5        A.    He was suspected of something.

6        Q.    Soliciting minors to engage in sex acts?

7        A.    I'm not a hundred percent, to be honest about

8    that.

9        Q.    Let me ask you this.  Did Detective Morgan tell you

10   why you were going to Mr. Eastman's residence?

11       A.    Yes, I knew I was going.  I'm not familiar with the

12   actual statute that he was eventually charged with.

13       Q.    But the reason you went to the mother's apartment

14   was to see if he would talk to you, correct?

15       A.    Yes, sir.

16       Q.    Detective Morgan wanted to seize his computer?

17       A.    Detective Morgan wanted to initiate an

18   investigation.  He didn't specify whether or not he was going

19   to be seizing anything.

20       Q.    So he didn't tell you before he was going whether

21   he was interested in the computer or not?

22       A.    No.

23       Q.    Prior to entering the apartment --

24       A.    Can I back up?  When he explained the situation to

25   me, he did mention that, because he does all computer crime

1   stuff so I assumed naturally that was a computer issue.  He

2   didn't even know there were computers in the house.  So he

3   didn't really elaborate.

4        Q.    You advised Mr. Eastman prior to entering the

5   apartment that you were with the Waterbury Police Department,

6   correct?

7        A.    Yes.

8        Q.    But you didn't advise him of the nature of the

9   investigation?

10       A.    No.

11       Q.    So he didn't know why you were there?

12       A.    All I remember is Detective Morgan saying was that

13   we were there for an investigation that his name had come up

14   in and would he be willing to speak with us, and he invited

15   us in.

16       Q.    And the police report indicates that Detective

17   Morgan advised Mr. Eastman of the investigation once you were

18   already inside the apartment.  Is that consistent with your

19   recollection?

20       A.    Yes.

21       Q.    He indicated, Detective Morgan, that is, indicated

22   he was interested in Mr. Eastman's computer?

23       A.    Say that again.

24       Q.    Detective Morgan indicated he was interested in

25   Mr. Eastman's computer once you were inside the apartment,

1    correct?

2        A.    Once he did some initial questioning, yes.

3        Q.    And Mr. Eastman was the subject of an investigation

4    into criminal wrongdoing?

5        A.    Possibly.

6        Q.    But neither you nor Detective Morgan advised

7    Mr. Eastman of his Miranda rights at that time?

8        A.    No.

9        Q.    You didn't tell Mr. Eastman at that time that he

10    had the right to a lawyer?

11        A.    No.

12        Q.    You didn't tell him he had the right to remain

13    silent?

14        A.    He wasn't in custody.

15        Q.    That anything he said could be used against him?

16        A.    He wasn't in custody.  Miranda rights weren't

17    necessary.

18        Q.    And you didn't provide him with an advice of rights

19    form at that time?

20        A.    No, sir.

21        Q.    When he was presented with an advice of rights

22    form, was he in custody at that time?

23        A.    No.

24        Q.    You didn't have him read an advice of rights form

25    in the apartment?

1    A.    No.

2    Q.    Or initial that he understood his rights?

3    A.    No.

4    Q.    Or signed to indicate that he was freely waiving

5    those rights?

6    A.    No.

7    Q.    And you never advised Mr. Eastman that if he

8    refused to consent, you'd need to obtain a search want for

9    his computer?

10    A.    No.

11    Q.    Direct your attention now to Defendant's Exhibit 2

12    in your binder.  You testified on direct that you witnessed

13    Mr. Eastman initial and sign this form.

14    A.    Yes, sir.

15    Q.    And that took place at approximately 6:55, p.m.?

16    A.    Yes, sir.

17    Q.    Do you recall whether Mr. Eastman or Detective

18    Morgan filled in the date and time?

19    A.    I don't.  I don't recall, no.

20    Q.    You didn't actually see Mr. Eastman sign the

21    form?

22    A.    I could see him while he was signing the form.

23    Q.    You didn't actually witness his signature on the

24    signature line, did you?

25    A.    No.  No, I saw him signing, but I didn't go and

1   look at it while he was doing it.  You know what I'm saying?

2   He was sitting maybe 15 feet away from me.

3       Q.    And Detective Morgan read the advice of rights form

4   out loud to Mr. Eastman?

5       A.    Yes.

6       Q.    And Mr. Eastman initialed next to each right?

7       A.    Yes.

8       Q.    How did it occur, did he initial all at once or did

9   he initial each one?

10      A.    One at a time, after each one, yes.

11      Q.    I want to direct your attention now to Defense

12  Exhibit 4.   So this is the Statement of Rights form that I

13  think you testified to was printed out by Detective Morgan at

14  the beginning of his -- Mr. Eastman's voluntary statement?

15      A.    Yes.

16      Q.    And you testified I believe on direct that

17  Detective Morgan read each one of these rights out loud to

18  Mr. Eastman as well?

19      A.    Yes.  Yes.

20      Q.    And Mr. Eastman initialed next to each one?

21      A.    Yes.

22      Q.    And did he initial all at once or did he initial as

23  Detective Morgan went through the rights one by one?

24      A.    I'm not really sure about this one.  I don't

25  recall.

1     Q.    So this one you don't recall?

2     A.    No.

3     Q.    The one that was signed 37 minutes earlier you

4   recall clearly?

5     A.    Well, I was right behind him listening to him, but

6   I don't remember if he did it one at a time or if he did it

7   all at once.

8           THE COURT:  I'm sorry, you're referring to which

9   form now?

10          THE WITNESS:  The long form, sir.

11    Q.    And do you see this line that -- the fourth line

12   that says if you cannot afford a lawyer one will be appointed

13   for you if you wish before any questioning?

14    A.    Yes.

15    Q.    Did Detective Morgan read that line to

16   Mr. Eastman?

17    A.    I believe so.

18    Q.    Mr. Eastman didn't initial next to that line?

19    A.    That's correct.

20    Q.    And then the line below that says if you wish to

21   answer questions, you have the right to stop -- you have the

22   right to stop answering at any time.  Did Detective Morgan

23   read that line to Mr. Eastman?

24    A.    Yes, sir.  He read them all.

25    Q.    Your memory on that point is clear?

1     A.    Say it again.

2     Q.    Your memory on that point is clear?

3     A.    Yes.

4     Q.    But Mr. Eastman didn't initial next to that one?

5     A.    I guess not.

6     Q.    And it's your testimony that Mr. Eastman signed

7  this form as well?

8     A.    Yes.

9     Q.    Are you just assuming that he signed the form or

10 did you actually physically witness him sign the form?

11    A.    I witnessed it.  Right after Detective Morgan

12 finished reading them all, he asked him the last two

13 questions and he handed it to him and I saw him sign it.

14    Q.    And then Mr. Eastman dated and time stamped the

15 form?

16    A.    I assume so.

17    Q.    You assume so, but you didn't witness that?

18    A.    When I say witness, like, once again, I was not

19 standing over him looking.  I could see him signing the

20 form.

21    Q.    Well, he could have been initialing?

22    A.    I don't know if he wrote -- I don't know if he

23 wrote the date and time or not.

24    Q.    Let's take a look at Defense Exhibit 5.

25    A.    Okay.

1     Q.    This is Mr. Eastman's voluntary statement?

2     A.    Yes.

3     Q.    I think you testified on direct that this is

4  basically a verbatim transcription of what Mr. Eastman was

5  telling Detective Morgan?

6     A.    Yes, sir.

7     Q.    And the start time's 7:34, p.m.?

8     A.    Yes.

9     Q.    And the end time's 8:43, p.m.?

10    A.    Yes.

11    Q.    And you were present during that entire time?

12    A.    Yes.

13    Q.    You never left the station?

14    A.    No.

15    Q.    Never left to get lunch?

16    A.    No, sir.

17    Q.    And let's just read the second paragraph.  The

18  second -- the first line:

19        I, John Eastman, of 157 Congress Avenue, Third

20  Floor, date of birth, which we'll redact for the purposes of

21  the public record, am giving this statement under my own free

22  will.

23        That was Mr. Eastman's statement to Detective

24  Morgan?

25    A.    Yes.  I didn't take the statement so I guess so.

1    Q.    Those were Mr. Eastman's words?

2    A.    Yes.  These are his words.

3    Q.    And the next line:  I can read and write English

4    and have completed 10 years of schooling and have a GED.

5    A.    Yes.

6    Q.    Those were Mr. Eastman's words?

7    A.    Yes.  After Detective Morgan asked him.

8    Q.    And then the next sentence:  Detective Morgan has

9    advised me of my Constitutional rights and I signed and

10   initialed a card and form agreeing to waive those rights and

11   speak to him and give this statement.

12         Those are Mr. Eastman's words?

13   A.    Yes.

14   Q.    I have not been threatened to give this statement,

15   nor have I been promised anything in return for it.  I know

16   the contents of the statement can be used in court.

17         Again, those were Mr. Eastman's words, not

18   Detective Morgan's?

19   A.    Yes.

20   Q.    So Mr. Eastman in the statement gives what amounts

21   to a confession, correct?

22   A.    Yes.

23   Q.    He told you and detective -- he told Detective

24   Morgan, and you overheard, that he had been chatting with

25   underage girls?

1    A.    Yes.  Online, yes.

2    Q.    And your response after obtaining this confession

3  was to let Mr. Eastman walk out of the station?

4    A.    My response or Detective Morgan's response?

5    Q.    Either one.

6    A.    Well, Detective Morgan was conducting the

7  investigation so it wasn't up to me whether or not to place

8  him under arrest or do an arrest warrant.

9    Q.    So it was Detective Morgan's decision to let

10  Mr. Eastman go?

11    A.    Yes, sir.

12    Q.    And you transported Mr. Eastman back to the

13  residence?

14    A.    Myself and Detective Morgan, yes.

15    Q.    Your testimony is Detective Morgan is with you?

16    A.    That's how we do it.

17    Q.    He wasn't interviewing another complainant at that

18  time?

19    A.    No.

20    Q.    A Hispanic female?

21    A.    No.

22    Q.    So both of you transport Mr. Eastman back to the

23  residence?

24    A.    Yes.

25    Q.    And let him go?

1    A.    Yes.

2    Q.    And he wasn't handcuffed at that time either?

3    A.    No, sir.

4          MR. KEENAN:  Just a moment, your Honor.  That's all

5    I have, Your Honor.

6          THE COURT:  Redirect, Attorney King.

7          MS. KING:  Very brief, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MS. KING:

10   Q.    Detective Terni, you indicated earlier on

11   cross-examination that you did not remember the exact words

12   that Mr. Eastman said when you entered the apartment, is that

13   right?

14   A.    Yes.

15   Q.    And you indicated that he provided consent to enter

16   the apartment, is that right?

17   A.    Yes.

18   Q.    Although you don't remember the exact words, did

19   you hear him say something?

20   A.    Yes.

21   Q.    And what was your understanding based on the words

22   that he said?

23   A.    That we were invited to go into his apartment.

24   Q.    And then you indicated earlier in your testimony

25   that there was a discussion with him about the computer, the

1    desktop computer in the apartment?

2         A.    Yes.

3         Q.    And you also indicated that he agreed to having the

4    computer brought to the station, is that right?

5         A.    Yes.

6         Q.    You also testified that you don't remember the

7    exact words that he used when he agreed to that, is that

8    right?

9         A.    That's correct.

10        Q.    But based on what you heard him say, what did you

11   understand?

12        A.    That he was voluntarily giving us his computer to

13   help his cooperation with this investigation.

14        Q.    You also testified earlier that you met with the

15   prosecutors prior to your testimony here today, is that

16   right?

17        A.    Yes.

18        Q.    And you indicated that that may have been in the

19   last week to three weeks, is that right?

20        A.    I think so.

21        Q.    And you indicated that with the prosecutors and

22   Agent Haimila?

23        A.    Yes.

24        Q.    Was there another -- any other time where you may

25   have met with maybe not all the prosecutors?

1    A.    Yes.  I believe so.  One more time.

2    Q.    Did you recall who you met with at that time?

3    A.    I have a hard time saying his name.

4    Q.    The other prosecutor at the table, Mr. Patel?

5    A.    Yes.

6    Q.    And was he the only one you met with at that

7  time?

8    A.    Agent Haimila was there, too.

9    Q.    So there was one time where you met with AUSA Patel

10  and Ms. Haimila, and then another time more recently where

11  you met with Mr. Patel, Ms. Haimila, and myself, correct?

12    A.    That's correct.

13    Q.    You testified a moment ago that the voluntary

14  statement that is Defendant's Exhibit 5 that you were looking

15  at a moment ago, that these were the words of Mr. Eastman,

16  correct?

17    A.    Yes.

18    Q.    Did Mr. Eastman -- did you observe whether or not

19  Mr. Eastman was given an opportunity to read this voluntary

20  statement?

21    A.    Yes.

22    Q.    Was that before he was given the opportunity to

23  sign it?

24    A.    Oh, yes.

25    Q.    Was it before Lieutenant Fox witnessed his

1   signature on the form?

2       A.    Yes.

3       Q.    Was that before you signed the form?

4       A.    Yes.

5       Q.    And so he had an opportunity to read it before all

6   that happened, correct?

7       A.    Yes.

8       Q.    Was that also before Mr. Eastman signed and

9   initialed the form?

10      A.    Yes.

11      Q.    Did Mr. Eastman have an opportunity to change

12  anything he wasn't comfortable with in this voluntary

13  statement?

14      A.    Yes.

15          MS. KING:  That's all I have, your Honor.

16          THE COURT:  You may step down.

17          THE WITNESS:  Thank you, sir.

18          MR. PATEL:  Your Honor, the Government calls Captain

19  William Fox.

20          THE COURT:  Good afternoon, sir.  If you would step

21  forward, please.

22          Sir, if you would please stand, raise your right

23  hand, face our courtroom deputy.

24              W I L L I A M   F O X,

25  called as a witness by the Government, having been duly sworn

1  by the Clerk, was examined and testified on his oath as

2  follows:

3          THE CLERK:  Please be seated.  State your name, city

4  and state, spell your last name.

5          THE WITNESS:  I'm sorry.  You said your name?

6          THE COURT:  And city and state where you work,

7  sir.

8          THE WITNESS:  My name is William Fox.  I work for

9  Waterbury in Connecticut.  My last name is spelled F O X.

10         THE COURT:  Attorney Patel.

11         MR. PATEL:  Thank you, Your Honor.

12                 DIRECT EXAMINATION

13 BY MR. PATEL:

14     Q.    Good afternoon.

15     A.    Good afternoon, sir.

16     Q.    Can you tell the Court where you currently work?

17     A.    I work for the Waterbury Police Department.

18     Q.    And when did you begin working for the Waterbury

19 Police Department?

20     A.    Be 21 years this August.  So, approximately,

21 1995.

22     Q.    And what is your current rank or position?

23     A.    I'm an Acting Captain in the Patrol Division.

24     Q.    I couldn't hear the last part.

25     A.    In the Patrol Division.

1    Q.    And can you walk us through the various positions

2  you've held at the Waterbury Police Department over the

3  years?

4    A.    I've worked as a patrolman.  I've worked as a

5  tactical narcotics officer.  I worked as a field training

6  officer and I ran the field training program.  I've worked as

7  a patrol sergeant and now the acting captain of the afternoon

8  shift.

9    Q.    And how long have you been the acting captain of

10  the afternoon patrol shift?

11    A.    I was appointed to the acting captain on 10-2-2014.

12    Q.    November 2, 2014?

13    A.    That's correct.

14    Q.    And back in the November 2012 time period, what was

15  your position?

16    A.    That would have been a Lieutenant.

17    Q.    In the Patrol Division?

18    A.    That's correct.

19    Q.    As an Acting Captain, what are your

20  responsibilities?

21    A.    They have a wide range of duties, up and including

22  responding to any kind of critical incidents on the roadway,

23  taking care of a number of clerical incidents on any given

24  day, up and including training issues, personnel issues,

25  complaints, these kind of nature.  Anything that goes on on

1    your afternoon shift basically you handle it.  It's your

2    responsibility.

3        Q.    And November 2012, when you were a Lieutenant, what

4    were your responsibilities back then?

5        A.    I was a Lieutenant which is divided in the Patrol

6    Division is into two distinct positions which is on any

7    particular day you could either be the outside Lieutenant or

8    the inside Lieutenant.  The outside Lieutenant would take

9    care of anything that occurred on the roadway, supervision of

10   officers, responding to scenes.  If you're the inside

11   individual you take care of the lockup, the hiring for the

12   next day, any kind of issues that arise from individuals

13   coming into the police station, complaints, issues within the

14   lobby, things of that nature.  Some kind of security breach

15   potentially within the building.  Anything that happens

16   within the building.

17       Q.    And you worked for primarily the Patrol Division?

18       A.    That is correct.

19       Q.    Did you have any regular responsibilities with the

20   Detective Bureau?

21       A.    Regular responsibilities?

22       Q.    Other than maybe one off interactions.  Did you

23   have, on a daily basis, did you have any duties in connection

24   with the Detective Bureau?

25       A.    You would very frequently interact with them,

1    depending -- it could be on any number of issues, but as far

2    as an assigned assignment, no.

3        Q.    Say that last part again.

4        A.    As far as an assigned daily assignment, no.

5        Q.    Are you familiar with a Waterbury Police Department

6    form called a Voluntary Statement?

7        A.    Yes, I am.

8        Q.    What is the purpose of that form?

9        A.    It's -- there's any number of reasons.  It's to get

10   somebody's story on a particular incident in their words.

11       Q.    And as part of your responsibilities as a Captain

12   and previously as Lieutenant, part of your duty is to

13   notarize statements made on that form?

14       A.    Yes, that's true.  That's accurate.

15       Q.    How many times did you have to notarize a Voluntary

16   Statement form?

17       A.    I couldn't give you an exact number, but I could

18   approximate probably 40 to 50.

19       Q.    Can you walk us through the process, how do you go

20   about notarizing a voluntary statement form?

21       A.    Me personally, usually what you do is you go to the

22   individual that's made the statement.  I personally -- this

23   is the way do I it.  I ask them raise your right hand.  Do

24   you solemnly swear that this is accurate, it's the truth,

25   it's your statement.  That no one's coerced or forced you to

1    give this statement.  And I've never had a time when somebody

2    said that that wasn't their statement.  And at that time I

3    have them initial the beginning left and the right on every

4    page, and then I have them sign it.

5        Q.    And that's the process you personally follow every

6    time?

7        A.    Yes.  There's -- there could be sometimes -- well,

8    there's different aspects of it, up and including if I didn't

9    know the individual, if I had no one there, sometimes you

10   might have to take a look at their I.D. to confirm that

11   they're who they say they are.  That's another aspect of it.

12   Like if somebody came in the desk and they wanted to make an

13   internal complaint.  Now, if I didn't know that individual

14   usually I ask for an I.D. if this is a cold person that I

15   have no interaction with or no other police officer that I'm

16   with has interaction with.

17       Q.    Have you ever notarized a blank form, just signed

18   your name and given to another detective?

19       A.    Absolutely not.

20       Q.    Have you ever notarized a form that had already

21   been signed by the person making a statement where you did

22   not observe that statement sign the form?

23       A.    Absolutely not.

24       Q.    I want to show you --

25            MR. PATEL:  May I approach the witness, Your Honor?

```
 1              THE COURT:  Yes.
 2        Q.    If you could just turn to tab 4, and you'll see
 3   what's marked on the sticker as Government Exhibit 4.
 4        A.    I'm glad I brought this.  Excuse me.  It's,
 5   unfortunately, a necessary thing for me now adays.
 6              All right.
 7        Q.    Do you have the document in front of you?
 8        A.    Yes, I do, sir.
 9        Q.    Do you recognize this document?
10        A.    I recognize it as a Waterbury Police Department
11   Voluntary Statement form, yes.
12        Q.    And look at the bottom of the page.  Do you see a
13   signature -- do you see the word supervisor and a signature
14   next to it?
15        A.    I do.
16        Q.    Whose signature is that?
17        A.    That is my signature.
18        Q.    If you look at the very top, do you see a date next
19   to start date?
20        A.    Yes, I do.
21        Q.    What does it say?
22        A.    11-10-2012.
23        Q.    And underneath, it says place statement taken.  Do
24   you see 255 East Main Street, Waterbury, Connecticut?
25        A.    Yes, I do.
```

 1      Q.      Do you know what's at that location?

 2      A.      That's the Waterbury Police Department.

 3      Q.      And underneath that do you see it says:  I, the

 4  undersigned, John Eastman, of 157 Congress Avenue, and it

 5  goes on?

 6      A.      I do see that.

 7      Q.      Now, earlier -- you testified a moment ago you

 8  signed this.  You see this signature at the bottom of this

 9  document, correct?

10      A.      Yes.

11      Q.      Do you recall signing this document?

12      A.      This specific document, no, I do not.  I do

13  recognize that is, in fact, my signature.

14      Q.      Do you recall having to notarize a statement for

15  John Eastman?

16      A.      Involving this case, I specifically don't recall

17  all the aspects.  I do remember being called upstairs.  I do

18  remember for Detective Terni and Detective Morgan signing a

19  statement for them or with the defendant or defendant or

20  suspect but -- and I believe I've never signed a statement

21  for them in the past.  So it would only be one.  So I do

22  attribute my signature to that time.

23      Q.      Just to back up.  You don't specifically recall the

24  circumstances around you signing this particular document, is

25  that right?

1    A.    That is correct.

2    Q.    But I think you just testified there's only been

3  one occasion where you can recall where you've had to

4  notarize a document when you've been called up by Detectives

5  Terni and Morgan?

6    A.    That is correct.

7    Q.    So to your recollection, would this be that

8  document?

9    A.    Yes, it would.

10   Q.    And earlier you testified that the process that you

11 go through to have -- to notarize a document, correct?

12   A.    Correct.

13   Q.    To your recollection, have you ever deviated from

14 that process?

15   A.    No.

16   Q.    And do you believe you would have deviated from

17 that process on this occasion?

18   A.    Absolutely not.

19   Q.    So you would have had a witness raise -- a person

20 making the statement raise their right hand and place them

21 under oath?

22   A.    That's correct.

23   Q.    And then you would have -- would you ask them the

24 questions you just went through a moment ago?

25   A.    Yes.

1     Q.     And when would you have them initial the body of

2     the text, the beginning and end of the text?

3     A.     Usually right after they've acknowledged that this

4     is, in fact, their statement, that they haven't been coerced.

5     Then I ask them to initial it, and then I ask them to sign it

6     in front of me, and then I sign it.

7     Q.     And have you ever signed a document before the

8     witness signs the document?

9     A.     No.  No, I haven't.

10           MR. PATEL:  One moment, Your Honor?

11           THE COURT:  Yes.

12           MR. PATEL:  No further questions.

13           THE COURT:  Okay.  Cross-examination.

14                  CROSS-EXAMINATION

15    BY MS. BARRETT:

16    Q.     Good afternoon, Captain Fox.

17    A.     Good afternoon, ma'am.

18    Q.     You joined the Waterbury Police Department in 1995,

19    correct?

20    A.     What's your name, ma'am?  I'm sorry.

21    Q.     Kelly Barrett.  You joined the Police Department in

22    1995, correct?

23    A.     That's correct, ma'am.

24    Q.     Prior to that you completed your high school

25    diploma?

1      A.     Yes, ma'am.

2      Q.     You completed your college degree as well?

3      A.     That's correct, ma'am.

4      Q.     And that was in finance?

5      A.     That's correct.

6      Q.     You graduated from the Connecticut Police

7  Academy?

8      A.     That's correct.

9      Q.     And you also graduated from the FBI National

10 Academy, correct?

11     A.     That is correct.

12     Q.     You're a certified field training officer,

13 correct?

14     A.     Yes, ma'am.

15     Q.     You have responsibilities for training new

16 officers?

17     A.     Yes, I did, ma'am.  I still do, but not in the same

18 capacity.

19     Q.     And you've actually received numerous commendations

20 for your police work, correct?

21     A.     A few, yes, ma'am.

22     Q.     Currently you are a shift commander, is that

23 correct?

24     A.     That is correct.

25     Q.     You're familiar with the term field notes,

1    correct?

2         A.    Yes, ma'am.

3         Q.    Field notes --

4              MR. PATEL:  Objection, Your Honor.  I think this is

5    beyond the scope of direct.

6              THE COURT:  I'll allow it.  She indicated she'd

7    reserve her right to call, but let's get to it.

8         Q.    You would agree that field notes play an important

9    role in criminal investigations, correct?

10        A.    Certainly they can, yes, ma'am.

11        Q.    Officers in the Waterbury Police Department receive

12   training about how to keep field notes, correct?

13        A.    There are often -- training, I'm not sure.  But

14   generally speaking, most officers take field notes.

15        Q.    Are officers in the Waterbury Police Department, do

16   they also receive training on how to write police reports?

17        A.    Yes, ma'am.

18        Q.    And it's important that police reports be accurate,

19   correct?

20        A.    Yes, ma'am.

21        Q.    Because they're often used as a permanent record in

22   a case, correct?

23        A.    Yes, ma'am.

24        Q.    Did you review the police report that Detective

25   Morgan prepared in this case?

1      A.    The police report?  I don't believe I have looked

2   at it.

3      Q.    In front of you is a binder marked Defense

4   Exhibits.  I would direct your attention to Defense Exhibit

5   1.

6          MR. PATEL:  Attorney Barrett, he's looking at the

7   wrong binder.

8      Q.    Defense Exhibit 1 has been previously December

9   filed as Detective Morgan's police report.  Could you take a

10  look at that and let us know if you've ever reviewed that

11  document?

12         THE COURT:  You want him to read the whole thing?

13         MS. BARRETT:  You don't need to read the whole

14  thing.  If you can refresh your recollection if you've ever

15  reviewed it before.

16     A.    I don't believe I have, ma'am.

17     Q.    Now, all the officers in the Waterbury Police

18  Department receive training on the Fourth Amendment,

19  correct?

20     A.    Yes, they do.

21     Q.    They receive training on how to conduct consent

22  searches as well, correct?

23     A.    Yes, they do.

24     Q.    Waterbury Police Department has a standard written

25  consent form, correct?

1    A.    Yes, they do.

2    Q.    And are officers taught to use that standard

3  written consent form whenever possible?

4    A.    Yes.

5    Q.    And that's to protect the officer, correct?

6    A.    That's to protect everybody.

7    Q.    Everybody meaning the suspect and the officer?

8    A.    Absolutely.

9    Q.    And the officers are taught not to rely merely on

10  oral consent, correct?

11   A.    My opinion -- my statement on that would be if they

12  can get a written consent it would be better.

13   Q.    Waterbury Police Department also trains officers on

14  how to transport suspects in police vehicles, correct?

15   A.    Absolutely.

16   Q.    Officers are trained that prior to transporting a

17  suspect, the suspect should be searched and handcuffed,

18  correct?

19   A.    No, that's not accurate.

20   Q.    What is the policy, Captain?

21   A.    Well, you're saying a suspect.  I'm not sure what

22  you -- a prisoner?

23   Q.    I'm talking about a criminal suspect in a police

24  vehicle.

25   A.    A suspect.  My general -- it should be that you

1   should search anybody prior to putting them or pat them down

2   prior to putting them in your car.  But as far as securing

3   them, handcuff them, that's not always necessary.

4       Q.    You testified that a pat down is done.  Is that to

5   protect officer safety?

6       A.    Yes.

7       Q.    You're aware that Detective Peter Morgan and

8   Detective David Terni went to the Eastman home on November

9   10, 2012, correct?

10      A.    I'm not sure what the date is, but I believe I'm

11  aware they went to a residence regarding this case at some

12  point.

13      Q.    But you were not present?

14      A.    No, I was not, ma'am.

15      Q.    And you were not consulted prior to them going to

16  the home?

17      A.    Absolutely not, ma'am.

18      Q.    You did not personally observe anything the

19  officers did at the home?

20      A.    That is correct.

21      Q.    You did not participate in the transport of

22  Mr. Eastman?

23      A.    I did not, ma'am.

24      Q.    You did not sign off on Detective Morgan's

25  report?

1    A.    No, I did not.

2    Q.    You did not personally observe whether or not

3  Mr. Eastman signed a consent form?

4    A.    No, I not, ma'am.

5    Q.    You did not personally observe whether or not

6  Mr. Eastman signed an Advisement of Rights form?

7    A.    No, I did not.

8    Q.    You did not personally observe whether Mr. Eastman

9  signed a Voluntary Statement form?

10    A.    The voluntary statement?

11    Q.    Not the voluntary statement itself.  I'm referring

12  to -- if you turn to Defense Exhibit 4.

13    A.    In this same book?

14    Q.    Yes.

15    A.    The Voluntary Statement Rights form?

16    Q.    Correct.

17    A.    I did not witness this.

18    Q.    In the time that's passed since November 2012, can

19  you estimate approximately how many cases you've been

20  involved with?

21    A.    How many cases?

22    Q.    Yes.

23    A.    Since 2012?  You're talking four years.  I really

24  would have a -- directly involved, indirectly.  My cases

25  personally, probably a very small number.  I would say maybe

1    three or four.  But indirectly, I would say more than a

2    hundred.

3         Q.    Because you're a supervisor, correct?

4         A.    That is correct.

5         Q.    So as a supervisor you may touch a number of cases

6    that you were not personally involved with?

7         A.    Well, I wasn't directly -- I wasn't the initiator

8    of it.  I wasn't the officer that responded to the scene.

9    But at some point I may have responded to the scene, I may

10   have given advice or counsel regarding any number of

11   things.

12        Q.    Now, you have reviewed the voluntary statement in

13   this case, correct?

14        A.    The voluntary statement?  Yes, I have.

15        Q.    Now, you were not present at the time that

16   Detective Morgan took that statement, correct?

17        A.    No, I was not.

18        Q.    You were called in after the statement was taken?

19        A.    That's correct, ma'am.

20        Q.    Do you recall how many times you have -- scratch

21   that.

22              Have you spoken with the federal prosecutors in

23   advance of your testimony today?

24        A.    Yes, I have, ma'am.

25        Q.    Do you recall how many times?

1       A.      I believe it was twice.

2       Q.      Do you recall approximately when that was?

3       A.      I believe one was last week and I'm not sure when

4   the other one was.  Probably several months prior to last

5   week.

6       Q.      Do you recall who was present at those meetings?

7       A.      Yes.

8       Q.      Could you please identify who was present?

9       A.      I'm not going to be able to get their names

10  accurate.  The last meeting last week was the three

11  individuals at the prosecutor's table at this time.  And

12  prior to that, it was the prosecutor and the young lady on

13  the far left, my left.

14      Q.      Thank you, Captain.

15              And during those meetings, did anybody take any

16  notes?

17      A.      I believe they did.

18      Q.      Do you recall who?

19      A.      I'm not sure.

20      Q.      Aside from those two meetings, did you discuss your

21  testimony with anyone else prior to coming to court today?

22      A.      No.

23      Q.      Is it fair to say that prior to reviewing the

24  voluntary statement, you had little independent recollection

25  of what happened on November 10, 2012?

1     A.     I would say that's a fair statement.

2     Q.     Do you recall what time you signed the form?

3     A.     I believe it was -- I know it's on there but,

4  without looking, I believe it was in the evening.

5     Q.     Were you aware that Mr. Eastman was not arrested on

6  November 10, 2012?

7     A.     I believe what I recall is that, no, he was not

8  being arrested that evening.

9     Q.     Were you involved in the decision not to arrest

10  Mr. Eastman?

11    A.     No, I was not.

12    Q.     Do you know who did make that decision?

13    A.     It would be a guess on my part if I were to say.  I

14  believe the detectives involved would make that decision.

15    Q.     Would you be surprised to hear that Mr. Eastman was

16  not arrested until May of 2013?

17    A.     That wouldn't surprise me, ma'am.

18    Q.     But you were not involved with the decision about

19  when to arrest Mr. Eastman?

20    A.     No, I was not.

21         MS. BARRETT:  Could I have one moment, Your Honor?

22         THE COURT:  Yes.

23         MS. BARRETT:  No further questions.

24         THE COURT:  Redirect.

25         MR. PATEL:  The Government has no further questions.

 1          THE COURT:  You may step down.  Thank you, sir.

 2          MR. PATEL:  The Government has no further witnesses

 3  at this time.

 4          THE COURT:  The Government rests?

 5          MR. PATEL:  Yes, Your Honor.

 6          MS. BARRETT:  Your Honor, at this time the defense

 7  calls Linda Eastman to the stand.

 8          THE COURT:  Welcome, ma'am.  If you could step right

 9  up to the witness box for us, please.

10          Ma'am, if I could trouble you to raise your right

11  hand and face our courtroom deputy.

12                  L I N D A   E A S T M A N,

13  called as a witness by the Defendant, having been duly sworn

14  by the Clerk, was examined and testified on her oath as

15  follows:

16          THE CLERK:  For the record, would you please state

17  your city and state of your residence.

18          THE COURT:  The town where you live.

19          THE WITNESS:  Waterbury, Connecticut.

20          THE COURT:   Have a seat, ma'am.

21          Ma'am, just make sure that microphone is nice and

22  close.  That's perfect.

23          THE WITNESS:  Like this?

24          THE COURT:  Yes.

25          Attorney Keenan, go ahead.

```
1                      DIRECT EXAMINATION

2    BY MR. KEENAN:

3         Q.    Good afternoon, Mrs. Eastman.

4         A.    Good afternoon, sir.

5         Q.    I'm going to begin by asking you some background

6    questions.

7         A.    Okay.

8         Q.    What is your relationship to John Eastman?

9         A.    I'm his mother.

10        Q.    And where do you live?

11        A.    I live at 157 Congress Avenue in Waterbury,

12   Connecticut.

13        Q.    On what floor?

14        A.    Third floor.

15        Q.    And how long have you lived there?

16        A.    Since 2008.

17        Q.    Do you rent or own?

18        A.    I rent.

19        Q.    And does anyone else live there with you now?

20        A.    No.

21        Q.    And was anyone living there with you on November

22   10, 2012?

23        A.    My son was staying there.

24        Q.    And was John Eastman's name on the lease on

25   November 10, 2012?
```

```
 1      A.     No, he was not.  No, his name was not on the

 2   lease.

 3      Q.     Has his name ever been on the lease?

 4      A.     No.

 5      Q.     Mrs. Eastman, do you work outside the home?

 6      A.     Pardon me?

 7      Q.     Do you work outside the home?

 8      A.     Yes, I do.

 9      Q.     Where is that?

10      A.     I do cleaning at night, residential, commercial

11   properties.

12      Q.     And how long have you --

13      A.     Been there?

14      Q.     Yes.

15      A.     Since 2005.

16             THE COURT:  I'm sorry, how long have you been where?

17      Q.     At the place where you currently work?

18      A.     It's RKM Images, it's a cleaning service.

19             THE COURT:  And you've been working there since

20   2005?

21             THE WITNESS:  Yes, correct.

22             THE COURT:  I'm sorry.  Go ahead.

23      Q.     So you were working for that company as of November

24   10, 2012?

25      A.     Yes, I was.
```

1        Q.     You testified your apartment's on the third

2    floor?

3        A.     Correct.

4        Q.     How many units are in the building?

5        A.     Three.

6        Q.     Do you know if those units were occupied on

7    November 10, 2012?

8        A.     Yes, they were.

9        Q.     And is there an elevator or just stairs?

10       A.     There's stairs.

11       Q.     How many bedrooms are in your apartment?

12       A.     Two.

13       Q.     Do you know approximately how large the apartment

14   is in terms of square feet?

15       A.     No, I don't.

16       Q.     You have a binder up there that says Defense

17   Exhibits?

18       A.     These two?

19       Q.     Yes, the one that says Defendant's Exhibits.

20       A.     Just a second.

21       Q.     Can you turn to the 21st tab?

22       A.     Okay.

23       Q.     Is that an accurate depiction of the layout of your

24   apartment?

25       A.     Yes, correct.

1    Q.    So you enter the apartment, and you enter into the

2  front living room, is that correct?

3    A.    Correct.

4    Q.    And your bedroom's located at the rear of the

5  apartment?

6    A.    Yes, it is.

7    Q.    Next to the kitchen?

8    A.    Yes, correct.

9    Q.    And your son's bedroom is located next to the

10  living room, is that correct?

11    A.    It's on the other side of the bedroom -- I mean,

12  the bathroom.  Excuse me.  I'm sorry.  You have to come

13  through the living room here, the kitchen, to get to two

14  bedrooms.

15    Q.    So you have to go through the living room and

16  through the kitchen to get to the two bedrooms?

17    A.    Yes, correct.

18    Q.    I want to ask you some questions now about

19  specifically what happened on November 10, 2012.  Do you

20  recall whether you worked that evening?

21    A.    Yes, I did.

22    Q.    And what time, approximately, did you return home

23  on the night of November 10th?

24    A.    All I know is I did the bank and it was dark out.

25  I really didn't look at the time or anything, because I

 1   wasn't feeling well that day.  So I just went to my room and

 2   laid down for a while.

 3        Q.    Did you see anyone else in the apartment before

 4   going to your bedroom?

 5        A.    John was there.  He was in his room.

 6        Q.    And did you fall asleep?

 7        A.    Yes, I did.

 8        Q.    And what's the next thing you remember after

 9   falling asleep?

10        A.    Someone banging on my bedroom door.

11        Q.    And what did you do in response?

12        A.    I jumped up because the person went to turn the

13   knob, and I jumped up out of a deep sleep and I grabbed the

14   door knob.

15        Q.    And then what happened?

16        A.    And the door opened and I asked the person, I says,

17   you know, who are you?  And there was no respond.  He didn't

18   say anything.  He just kind of opened the door.

19        Q.    Do you recall what you were wearing at the time?

20        A.    Yes, I was wearing like a pajama type thing.

21        Q.    And what, if anything, did you say to the

22   officer?

23        A.    I just wanted to know who he was and why was he in

24   my home.

25        Q.    And do you recall what he looked like?

1   A.   Tall, big.  Kind of a, you know, short haircut.

2   Q.   Do you recall his race?

3   A.   White.

4   Q.   And was he wearing a uniform?

5   A.   No, he wasn't.  He was plain clothes.

6   Q.   So did the officer then -- he never entered your

7   bedroom?

8   A.   Yes, he did.  He stood there for a few minutes.

9   Q.   And then he exited the bedroom at that point?

10   A.   Yes, he did.

11   Q.   After he exited the bedroom, what did you do?

12   A.   I asked him what was he doing.  And he was just

13   looking around.  I mean, you know, touching stuff, looking

14   through stuff.  And I kind of stood in the doorway to my

15   bedroom.

16   Q.   And what did you observe?

17   A.   I observed him opening up the drawers and going

18   through stuff.

19   Q.   Did you see your son?

20   A.   He -- well, kind of right after that I was watching

21   what he was doing, and I went to the kitchen and looked into

22   the living room area and I saw my son sitting on the couch

23   with his handcuffs --  he was handcuffed behind his back.

24   And I guess Detective Terni was with him, standing on the

25   side of him.

1    Q.    So the officer who tried to enter your bedroom

2   walked through the kitchen?

3    A.    Yes, he did.  That's the only way to get to the

4   back bedrooms.

5    Q.    Was there another officer present?

6    A.    It was just the two.

7    Q.    There were two officers present?

8    A.    Yes.  Detective Morgan and Terni.  Detective

9   Terni.

10    Q.    They didn't tell you their names at the time?

11    A.    No, I did not know their names until I read them in

12   the paper.

13    Q.    Did either officer ever ask you for permission to

14   search the apartment?

15    A.    No, they did not.

16    Q.    Did either officer ever ask you for consent to

17   enter the apartment?

18    A.    No.

19    Q.    Did either officer ever ask you for permission to

20   take the computer that was located in the apartment?

21    A.    No, he did not.  He just took it.

22    Q.    Do you recall whether your son ever asked to use

23   the bathroom?

24    A.    Yes.  Because when I was standing in my doorway, he

25   came in front of me and entered the bathroom.

1     Q.    And what, if anything, do you recall about your son

2  using the bathroom?

3     A.    I kind of stepped back because they didn't shut the

4  door.  I mean, you know, I mean, he's an adult.  I just kind

5  of stood back.

6     Q.    And did they remove the handcuffs so he could use

7  the restroom?

8     A.    I didn't see that because I moved back.

9     Q.    Do you recall approximately how long the police

10  officers were in your home?

11     A.    It wasn't that long.

12     Q.    And did they eventually remove John?

13     A.    Yes.  They said they were taking him downtown to

14  interview him.  And I asked the officer was he going to be

15  arrested and he said, no, it was just to question him.

16     Q.    And at some point that evening did John return

17  home?

18     A.    Yes, he did.

19     Q.    Do you recall what time approximately that was?

20     A.    I'm not sure.  I mean, everything happened so

21  quick.

22     Q.    I want to turn your attention in that binder.

23     A.    The same one?

24     Q.    Yes, the same one.  To Exhibit 38.

25     A.    38.  Okay.

1    Q.    Do you recognize that document?

2    A.    Yes.  It's the Wal-Mart receipt where I bought the

3  computer.

4    Q.    So you purchased the computer?

5    A.    Yes, I did.

6    Q.    And when that was?

7    A.    It was on July 11th, 2012.

8    Q.    So you were the computer's owner?

9    A.    Yes, I was.  I'm the owner.

10    Q.    Would you have allowed -- if the police had asked

11  you -- strike that.

12          Would you have allowed the police to enter your

13  apartment without a search warrant?

14    A.    No, I would not.

15    Q.    And would you have allowed the police to seize your

16  computer without a search warrant?

17    A.    No, I would not.

18    Q.    And why is that?

19    A.    Because I know the law.  I mean, you just can't

20  come into someone's home and take something without a search

21  warrant.

22          MR. KEENAN:  If I could just have a moment, Your

23  Honor?

24          THE COURT:  Yes.

25          MR. KEENAN:  That's all I have, Your Honor.

1            THE COURT:  Cross-examination.

2                 CROSS-EXAMINATION

3   BY MR. PATEL:

4       Q.    Good afternoon, Ms. Eastman.

5       A.    Good afternoon.

6       Q.    My name is Neeraj Patel and I'm a federal

7   prosecutor and represent the United States.  I have some

8   questions for you.

9       A.    Okay.

10      Q.    If you don't understand my questions --

11      A.    I'll ask you to repeat it.

12      Q.    Or you can ask me to rephrase it.

13      A.    Rephrase it, okay.

14            THE COURT:  One thing, ma'am.  Just because the

15  court reporter's taking down what's said, let the lawyer

16  finish the question and then start your answer.

17            THE WITNESS:   Okay.

18            THE COURT:  Thank you.

19            THE WITNESS:  Sorry.

20      Q.    Now, you testified John Eastman is your son, is

21  that right?

22      A.    Correct.

23      Q.    And you love him dearly, don't you?

24      A.    Yes, I do.

25      Q.    And you don't want anything bad to happen to you,

1    do you?

2         A.    No.

3         Q.    And you don't want to see him in jail, do you?

4         A.    No.

5         Q.    In fact, he's been in jail before, hasn't he?

6         A.    Yes.

7         Q.    And as his mom, that must have been tough for you,

8    right?

9         A.    Pardon me?

10        Q.    That must have been tough for you to see him in

11   jail?

12        A.    Of course, because I'm a parent.

13        Q.    And you don't want that to happen again, right?

14        A.    No.

15        Q.    And just to be clear, he is in jail now?

16        A.    Yes.

17        Q.    And you visit him there?

18        A.    Yes, I do, once a month.

19        Q.    And you would like to see him come home as soon as

20   possible, isn't that right?

21        A.    Correct.

22        Q.    Now, many years ago, isn't it true that

23   Mr. Eastman's father put Mr. Eastman into a sex rehab

24   program?

25        A.    See, I'm not sure.  See, before 2004, I had no

1    contact with my son.  So I'm not -- I don't know what went on

2    between him and his father.

3         Q.    Well, did there come a time where you signed him

4    out of a sex rehab program?

5         A.    No.

6         Q.    Are you aware that one of your daughter's has

7    provided a statement to the police in this case?

8         A.    No.

9         Q.    And so if she indicated that you signed Mr. Eastman

10   out of a sex rehab program that would be incorrect?

11        A.    Incorrect.  I never signed my son out of any kind

12   of facility.

13        Q.    I'm going to switch topics.  I want to make sure

14   the record is clear about something.

15              You were not present at the Waterbury Police

16   Station on the evening of November 10, 2012, were you?

17        A.    No.

18        Q.    So aside from what your son may have told you, you

19   have no idea, you have no firsthand knowledge what took place

20   at that police station, do you?

21        A.    No.

22        Q.    And so aside from what your son may have told you,

23   you have no idea whether or not your son made any statements

24   to the police, do you?

25        A.    No.

1    Q.    And aside from what your son may have told you, you

2    have no firsthand knowledge of whether or not your son signed

3    any forms at the police station, do you?

4    A.    No.

5    Q.    So it's entirely possible he signed a consent form

6    to search, to have his computer examined, isn't that right?

7    A.    But that should have came to me.  I understand what

8    you're saying.

9    Q.    The question is it's entirely possible he signed a

10   form like that?

11   A.    I don't know.

12   Q.    That's because you weren't there?

13   A.    I wasn't there.

14   Q.    Now, let's go back to when the detectives and your

15   son were in your apartment on November 10, 2012.

16   A.    Okay.

17   Q.    On November 10, 2012, your son was living at 157

18   Congress Avenue on the third floor in that same apartment?

19   A.    Yes, correct.

20   Q.    That was his residence?

21   A.    Yes.

22   Q.    And he had his own bedroom there?

23   A.    Yes, he did.

24   Q.    And you had your own bedroom?

25   A.    Yes, I did.

1      Q.     And he had been living there for a few years, isn't
2    that right?

3      A.     Correct.

4      Q.     And the -- your apartment had Internet service back
5    at that time?

6      A.     Yes.

7      Q.     And that was through Comcast Cable, is that
8    right?

9      A.     Correct.

10     Q.     And that Internet service was in your son's name,
11    right?

12     A.     Correct.

13     Q.     That account with Comcast was in John Eastman's
14    name?

15     A.     Yes.

16     Q.     He set it up, right?  He set up the account with
17    Comcast?

18     A.     Yes.

19     Q.     And he had the authority to have Comcast provide
20    Internet service into your apartment, is that right?

21     A.     Yes.

22     Q.     And you don't believe Comcast was illegally
23    providing service into your home just because your son set it
24    up, do you?  You don't think Comcast was doing anything
25    illegal because he was the one that set up Internet

1    service?

2        A.    No.

3        Q.    Because he had the authority to set up service for

4    your apartment even though you're the lease holder, is that

5    right?

6             THE COURT:  You have to say yes or no, or I don't

7    recall.

8             THE WITNESS:  Okay.  All right.

9             THE COURT:  So the last question was because he had

10   the authority to set up surface for your apartment even

11   though you're the lease holder, is that right?  That was the

12   question.

13            THE WITNESS:  Correct.

14       Q.    Now, if I understand your testimony on direct, you

15   stated that on the evening of November 10, 2012, you were in

16   your bedroom when you heard -- was it the door knob

17   opening?

18       A.    No, there was a banging on my door.

19       Q.    And then you heard the door knob?

20       A.    The door knob, yes.

21       Q.    And when you opened the door, you saw one of the

22   detective who you later learned was Detective Morgan?

23       A.    Correct, yes.

24       Q.    So to be clear, you did not observe Detectives

25   Morgan and Terni actually enter the apartment, is that

1    right?

2         A.    No.

3         Q.    You would have been in your room at that time?

4         A.    Yes, I was in my room at that time.

5         Q.    And so you have no firsthand knowledge of what the

6    detectives and your son said to each other before you opened

7    your bedroom door and came out of your bedroom?

8         A.    No.

9         Q.    And you have no firsthand knowledge if the

10   detectives identified themselves to your son and showed their

11   badges to him, do you?

12        A.    I don't know that.  I know that they didn't show

13   them to me.

14        Q.    You don't know whether they showed them to your

15   son?

16        A.    No.

17        Q.    And if they did identify themselves to your son,

18   you wouldn't have seen that when you were in your bedroom?

19        A.    No, I wouldn't have saw that, no.

20        Q.    And you have no firsthand knowledge if they, when

21   you were in your bedroom, if they asked your son for

22   permission to enter the apartment, do you?

23        A.    No.

24        Q.    And you have no firsthand knowledge of when you

25   were in your bedroom if your son gave them permission to

 1   enter the apartment, do you?

 2        A.     No.

 3        Q.     And when you came out of your bedroom, as you

 4   testified, you saw these two officers.  At that time you knew

 5   they were the police, though, isn't that right?

 6        A.     Well, by the time I figured it out.

 7        Q.     So at some point you came to realize that they were

 8   police?

 9        A.     Yes.

10        Q.     I believe you testified that one of the detectives

11   or -- which detective took the computer?

12        A.     Detective Morgan.

13        Q.     And that was your son's computer, is that right?

14        A.     Well, it was mine, but I just -- it was in his

15   room.

16        Q.     It was in his bedroom?

17        A.     Yes, it was.

18        Q.     It wasn't in the living room or in the kitchen?

19        A.     No.

20        Q.     And it was in your son's bedroom?

21        A.     Yes.

22        Q.     Because that was the computer he used, right?

23        A.     Yes.

24        Q.     You didn't use that computer?

25        A.     Well, once in a while I would go on.

1    Q.    How frequently?

2    A.    Maybe once a week.  Just to see what was on

3   there.

4    Q.    For the most part, that was his computer for his

5   use in his bedroom?

6    A.    Yes.

7    Q.    Other than that computer, which you testified they

8   took, you didn't see them take anything else from the

9   apartment, did you?

10    A.    No.

11    Q.    Were there other computers in the apartment?

12    A.    Yes.  I have two laptops.

13    Q.    And did you have those two laptops in 2012?

14    A.    Yes, I did.

15    Q.    And they didn't take those, did they?

16    A.    No, they did not.  There was one in the living room

17   and one in my bedroom.  Just to let you know where they were

18   located.

19    Q.    And did you use those computers?

20    A.    Yes, I did.

21          MR. PATEL:  One moment, Your Honor?

22          THE COURT:  Yes.

23          MR. PATEL:  No further questions.

24          THE COURT:  I have a few.

25          Ma'am, would you please get Defendant's Exhibit 21,

1    that's the layout, in front of you.

2              All right, ma'am.  Is this an accurate depiction of

3    the way your apartment looked in November of 2012, if you

4    know?

5              THE WITNESS:  Yes.

6              THE COURT:  And the entrance, the front entrance for

7    somebody coming in from the outside, can you just tell me

8    where that would be?

9              THE WITNESS:  It's right there where -- it's like a

10   cone type thing where they have in the corner, the door's

11   right there.

12             THE COURT:  Can you tell me which words you see near

13   it?

14             THE WITNESS:  It says front living room.

15             THE COURT:  So that's the entrance coming in from

16   the outside?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  And your bedroom where you were

19   that evening when the officer knocked on your door is the

20   room that says Linda Eastman bedroom, is that right?

21             THE WITNESS:  Yes, that's my bedroom.

22             THE COURT:  And your son's bedroom where the

23   computer was taken from, that's the one that says John

24   Eastman bedroom, right?

25             THE WITNESS:  That's his bedroom, because there's a

1    bathroom in between.

2              THE COURT:  Now, am I correct that at least on the

3    layout it shows that there is a door from the living room

4    leading to John Eastman's bedroom?

5              THE WITNESS:  Yes.

6              THE COURT:  Is that an accurate depiction?  Is

7    there, in fact, such a door?

8              THE WITNESS:  There is a door.

9              THE COURT:  And was there, in fact, such a door in

10   November of 2012?

11             THE WITNESS:  Yes.

12             THE COURT:  Maybe I misheard you, but I thought you

13   said that the only way to access that bedroom was through the

14   kitchen.

15             THE WITNESS:  I had boxes and furniture and stuff up

16   against that door.  So there's no access.  You can't get

17   through that door.

18             THE COURT:  So in November of 2012, the doorway from

19   the living room to John Eastman's bedroom was blocked?

20             THE WITNESS:  It was blocked.  You couldn't get

21   through it.

22             THE COURT:  And you couldn't move those boxes?

23             THE WITNESS:  No, because there's furniture there.

24             THE COURT:  You couldn't move the furniture?

25             THE WITNESS:  I mean, if you want to take some time

1    to move it.

2              THE COURT:  What you're saying is the much easier

3    way to get to that bedroom would be to go through the

4    kitchen, is that accurate?

5              THE WITNESS:  Yes.

6              THE COURT:  And then at some point I think you said

7    that you observed your son in handcuffs, is that right?

8              THE WITNESS:  Correct, yes.

9              THE COURT:  Where were you standing when you saw

10   that?  Can you show me on this?

11             THE WITNESS:  Right here.

12             THE COURT:  Tell me what word you're pointing to.

13             THE WITNESS:  Right here.  It says stove.  And then

14   on the other side the stove there's an entrance right

15   there.

16             THE COURT:  And that's where you were standing?

17             THE WITNESS:  That's where I was standing.

18             THE COURT:  And so you came out of your bedroom at

19   some point?

20             THE WITNESS:  Yes.

21             THE COURT:  And then what did you do after that?

22   After you came out of your bedroom, did you walk into the

23   living room?

24             THE WITNESS:  Yes.  I walked to that -- there.

25             THE COURT:  To that entrance between --

1            THE WITNESS:  That entrance right there.

2            THE COURT:  I'm sorry.  Just for the record, were

3  you saying the doorway between the kitchen and the living

4  room right now?

5            THE WITNESS:  Yes.

6            THE COURT:  You walked to that doorway?

7            THE WITNESS:  That doorway right there.

8            THE COURT:  And what did you observe?

9            THE WITNESS:  I observed Detective Terni, and my son

10  was sitting on the couch that's right here.

11            THE COURT:  So the couch is sort of facing that

12  doorway?

13            THE WITNESS:  Right here, yes.

14            THE COURT:  In the front living room?

15            THE WITNESS:  The front living room, the couch is

16  right here.

17            THE COURT:  So now I'm a little confused.  On the

18  layout it seems to suggest there's a wall between --

19            THE WITNESS:  No, there's an entrance here too.

20  There's sliding doors.  It's an old-fashioned apartment that

21  has sliding doors.  They were both open.

22            THE COURT:  All right.  Maybe just for the record

23  if I could just ask the questions.  I'm just trying to

24  understand.

25            THE WITNESS:  I understand.

1          THE COURT:  So right now I have you standing at the

2    doorway between the kitchen and the living room, is that

3    where you were standing?

4          THE WITNESS:  Yes, I was.

5          THE COURT:  Okay.  And then if -- let's imagine that

6    you're standing there now.  According to this diagram, you

7    would be staring at a wall that runs between the two -- the

8    area indicated living room and front living room, is that

9    accurate?

10          THE WITNESS:  No.  There's sliding doors right

11    here.

12          THE COURT:  And --

13          THE WITNESS:   They were open.

14          THE COURT:  They were open?

15          THE WITNESS:  Yes.

16          THE COURT:  So you're saying you could see through

17    there and you could see your son on the couch, is that right?

18          THE WITNESS:  Because, see, here's those two doors

19    that slide.  And the couch is right here.  There's a bay

20    window right here and the couch was right in front of the

21    window.

22          THE COURT:  When you're saying there's a bay window,

23    you're pointing to what is the right side of the front living

24    room, am I right?

25          THE WITNESS:  This is the the front.  Front of the

1    house.  This is the front of the house.

2           THE COURT:  Now you're pointing to the right side of

3    the page, am I right?

4           THE WITNESS:  Right here.

5           THE COURT:  Ma'am, you have to say if you're

6    pointing to the right side of the page.

7           THE WITNESS:  Yes.  I'm sorry, your Honor.

8           THE COURT:  The right side of the page?

9           THE WITNESS:  Yes.

10          THE COURT:  Because the lawyers can't see what

11   you're holding up.  I can see it, but they can't.  So that's

12   why I have to ask those questions.

13          So let me ask you this.  What I hear you saying now

14   is from where you were standing, which we've already

15   established was at that doorway, you could see through the

16   doors which were open and which were where what appears to be

17   a wall is located, am I right?

18          THE WITNESS:  Yes.

19          THE COURT:  And then you could see that your son was

20   sitting on a couch, is that right?

21          THE WITNESS:  Yes.

22          THE COURT:  And you said I think Detective Terni

23   was there?

24          THE WITNESS:  Yes.

25          THE COURT:  Was he standing or sitting?

1          THE WITNESS:  He was standing on the side of him.

2          THE COURT:  Where was the other person, Detective

3    Morgan, at this time, if you recall?

4          THE WITNESS:  He was in my son's room.

5          THE COURT:  He was in your son's room.  Okay.

6          And how do you know that?  How are you able to say

7    that?

8          THE WITNESS:  Because when I came out of my room

9    when he was -- he was in there.  And he was in there and then

10   I went through the kitchen to see where my son was.  I was

11   wanting to see if there was anyone else in the apartment

12   besides this detective.

13         THE COURT:  Okay.  And, in fact, you confirmed there

14   was?

15         THE WITNESS:  Yes.

16         THE COURT:  And how was your son cuffed?

17         THE WITNESS:  Behind his back.

18         THE COURT:  So let me ask you this.  He was facing

19   you.  You didn't actually see the cuffs or you did see the

20   cuffs?

21         THE WITNESS:  Because my son's a big person, he was

22   like on the edge, like this.  And I could see that there

23   were, you know, cuffs behind his back.  Because where he was

24   sitting, it was kind of awkward for him to sit because he's a

25   big person.  And so he was sitting on the edge of the couch

1    kind of crossways.

2            THE COURT:  Did you stay at that location throughout

3    the rest of the time the police were in the apartment?  When

4    I say that location, I mean the doorway between the living

5    room and the kitchen, or did you go elsewhere?

6            THE WITNESS:  No, I went back to see what Detective

7    Morgan was doing.

8            THE COURT:  So you went back where?

9            THE WITNESS:  To my son's room.  And I saw him --

10           THE COURT:  I'm sorry.  Did you go through the

11   kitchen to get there?

12           THE WITNESS:  Yes, correct.

13           THE COURT:  And did you remain at that location for

14   the rest of the visit?

15           THE WITNESS:  Because I was watching to see if he

16   was taking the computer apart.

17           THE COURT:  So you remained in your son's bedroom

18   for the rest of the visit?  Don't let me put words in your

19   mouth.

20           THE WITNESS:  No.

21           THE COURT:  You tell me where you went after that.

22           THE WITNESS:  I was standing in front of my room

23   right there, because you can see in my son's room from my

24   room.

25           THE COURT:  Let me get this straight.  After you

1    were standing at the doorway between the living room and the

2    kitchen, you went to your room?

3              THE WITNESS:  Yes.

4              THE COURT:  And so you were in your room?

5              THE WITNESS:  I was in the doorway.

6              THE COURT:  In the doorway between your room and the

7    bathroom?

8              THE WITNESS:  Yes.

9              THE COURT:  And you could see into your son's room?

10             THE WITNESS:  Yes.

11             THE COURT:  And other than that location, did you go

12   anywhere else while the police were in the apartment?

13             THE WITNESS:  No.

14             THE COURT:  And at some point you said your son went

15   to the bathroom?

16             THE WITNESS:  Yes.

17             THE COURT:  And so he walked right in front of you

18   to do that?

19             THE WITNESS:  Yes.  Because I was standing right

20   there.

21             THE COURT:  And you couldn't -- could you tell

22   whether he had cuffs on at that time?

23             THE WITNESS:  Yes.

24             THE COURT:  He did have cuffs on at that time?

25             THE WITNESS:  Yes, he did, correct.

 1            THE COURT:  Thank you.

 2            Did you want to ask any other questions?

 3            MR. PATEL:  One moment, your Honor?

 4            No further questions, Your Honor.

 5            THE COURT:  Redirect?

 6            MR. KEENAN:  Nothing, Your Honor.

 7            THE COURT:  You can step down.  Thank you.

 8            THE WITNESS:  Because I just wanted to say

 9    something.

10            THE COURT:  No, no.  Ma'am, no further questions.

11            Thank you.

12            THE WITNESS:  Just give me a second.

13            THE COURT:  Sure.  Take your time.

14            Anything?

15            MS. BARRETT:  The defense rests, Your Honor.

16            THE COURT:  All right.  Okay.  So let's talk about

17    then post-hearing submissions.  I think I will need them.  I

18    think it probably makes sense -- well, I guess since they're

19    proposed findings, I think it probably makes sense to have

20    them submitted simultaneously.  And you should certainly cite

21    the transcript pages and the exhibits which I have.

22            How much time do you think is necessary?

23            MR. PATEL:  Your Honor, I guess the first one to

24    inquire from the court reporter when we can get a transcript.

25    But I'm fine with whatever the Court -- two weeks after that?

1          THE COURT:  Two weeks after the transcript?  That's

2     fine.  Is that all right?

3          MS. BARRETT:  Yes, Your Honor.

4          THE COURT:  So briefs will be due two weeks after

5     the transcript is filed, or I should say made available.  And

6     those should be in the form of proposed findings of fact and

7     conclusions of law.

8          Is there anything else we should discuss today?

9          MR. PATEL:  Perhaps it makes sense, Your Honor, I

10    know we did the colloquy at the beginning, that the defendant

11    is still comfortable with the arrangement he made earlier.

12         THE COURT:  I already did that.  I'm not inclined to

13    do that again.

14         Is there anything else we should cover?

15         MS. BARRETT:  No, Your Honor.

16         THE COURT:  We'll be in recess.

17         Thank you.

18         (Concluded.)

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Martha C. Marshall, RMR, CRR, hereby certify that the foregoing pages are a complete and accurate transcription of my original stenotype notes taken in the matter of UNITED STATES V. JOHN EASTMAN, which was held before the Honorable Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford, Connecticut, on May 31, 2016.

_/s/Martha C. Marshall_____
Martha C. Marshall, RMR,CRR
Official Court Reporter