UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| vs. | :   CRIMINAL NO. 3:16-CR-6 (MPS) |
| JOHN EASTMAN | :   June 27, 2016 |

<u>DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

    This briefing arises out of the warrantless search and seizure conducted by two Waterbury Police detectives on November 10, 2012 at the Eastman home at 157 Congress Avenue, 3rd floor, Waterbury, Connecticut.  This is an important case, because it implicates the right to be free from unreasonable searches and seizures in our homes, which is the "chief evil" against which the Fourth Amendment is directed.  <u>See</u> <u>United States v. United States District Court</u>, 407 U.S. 297, 313 (1972).

    On May 14, 2013, Mr. Eastman was arrested on Connecticut state child pornography and related charges[1] and he has been detained in state custody ever since.  Def. Ex. 40.  On February 12, 2015, by criminal complaint, the federal government charged Mr. Eastman with child pornography and coercion and enticement offenses arising out of the same alleged conduct.  Doc. No. 19.  Thereafter, on January 7, 2016, the federal government indicted Mr. Eastman on the same charges.  Doc. No. 28.  On January 22, 2016, the defendant, Mr. John Eastman, through undersigned counsel, filed a motion to suppress physical evidence (an HP desktop computer and its contents) and a written statement, both taken by the Waterbury police on November 10, 2012.  Doc. No. 30.  On March 28, 2016, the government filed a memorandum in opposition to the defendant's motion.

--------

[1] These charges included illegal possession of child pornography, 1st degree (53a-196d); enticing a minor by computer (53a-90a(b)(1)); misrepresentation of age to entice a minor (53a-90b); employing a minor in an obscene performance( 53a-196a); promoting a minor in an obscene performance (53a-196b); risk of injury to a child (53-21).

Doc. No. 46.  On May 17, 2016, Mr. Eastman filed a reply.  Doc. No. 50.  That pre-hearing memoranda included affidavits as well as two competing expert reports on handwriting analysis. By agreement, the parties agreed not to present testimony by their respective handwriting experts. Transcript of May 31, 2016 Suppression Hearing (hereinafter, "Tr.") at 2-5.

On May 31, 2016, the Court held an evidentiary hearing, at which three law enforcement witnesses testified on behalf of the government, and one witness testified on behalf of Mr. Eastman. At the conclusion of the hearing, the Court ordered the parties to submit post-hearing briefings in the form of proposed findings of fact and conclusions of law.

This suppression briefing raises six principal issues:  (1) whether the detectives conducted an illegal search of the Eastman home when they entered it on November 10, 2012 without a warrant or whether they had a valid exception to the warrant requirement (e.g., voluntary consent); (2) if there was an illegal search into the Eastman home, whether everything that follows is fruit of the poisonous tree that must be suppressed; (3) whether Mr. Eastman was in custody in his home and subjected to custodial interrogation for which he was not Mirandized; (4) whether as a result he was unable to provide voluntary consent; (5) whether Ms. Eastman, as a third-party leaseholder of the home and owner of the computer, retracted any purported consent; and (6) whether everything that followed at the police station was fruit of the poisonous tree.

**Proposed Findings of Fact**

1)  John Eastman was born on October 2, 1967.  Def. Ex. 40.  In the fall of 2012 he was 45 years old.  Id.

2)  He has a lengthy criminal history.  Id.  His rap sheet is 37 pages long.  Id.  See also Tr. 60:4-7.

3)  In 1998, Mr. Eastman was convicted of Sexual Assault 4 and Risk of Injury of a Minor; in 1999, he was convicted of Harassment in the First Degree; and in 2008, he was convicted of Risk of Injury to a Minor.  Def. Ex. 1 at 7.  In 1999, Mr. Eastman was placed on the Connecticut Sex Offender Registry for 10 years.  Id.  See also Def. Ex. 40.  He also has multiple convictions for public indecency.  Def. Ex. 40.

4) In 2003, Mr. Eastman was charged with Assault on a Public Safety Personnel in violation of Conn. Gen. Stat. 53a-167c, however, he ultimately pled guilty to Assault 3d.  Def. Ex. 40.  He has been convicted of Interfering/Resisting Arrest.  Id.  He has been convicted of numerous counts of Disorderly Conduct and/or Breach of Peace.  Id.  He has been convicted of at least three violations of probation.  Def. Ex. 1 at 7; but see Def. Ex. 40 (revealing potentially more than three violations of probation).  Mr. Eastman has also been charged with Failure to Comply with Fingerprint Requests, but that charge was later nolled, when he pled guilty to Risk of Injury of a Child and Breach of Peace in 2008.  See Exhibit E to Defendant's Reply Memorandum.

5) Ms. Linda Eastman is John Eastman's mother.  Tr. 209:8-9.

6) Before 2004, Ms. Eastman had little to no contact with Mr. Eastman.  Tr.: 219:25-220:1.

7) In 2008, Ms. Eastman moved to 157 Congress Avenue, 3rd Floor, Waterbury, Connecticut.  Tr. 209:15-16.

8) Ms. Eastman leased the apartment in her name.  Tr. 209:17-18; Def. Ex. 37.

9) Prior to November 10, 2012, John Eastman moved in with Ms. Eastman.  Tr. 209:21-23.

10) John Eastman's name has never been on the lease.  Tr. 210:1-4.

11) On July 11, 2012, Ms. Linda Eastman purchased an HP Pavilion desktop computer (serial number 088611238022) from Walmart.  Tr. 217:4-9; Def. Ex. 38.  She owns that computer.  Id.  She used the computer approximately once per week "to see what was on there."  Tr. 225:25-226:1-3.  Mr. Eastman used the computer and it was kept in his bedroom.  Tr. 225.

12) On September 13, 2012, Vermont State Police Trooper Eric Jollymore spoke with a mother, who complained that her 11 year old daughter had a sleep over with three other girls, ages 11 and 12 at their residence on September 8-9, 2012.  The mother stated that during the party, the girls were using the computer program "Skype" to communicate with people over the internet.  Def. Ex. 1 at 2; Tr. 12:22-13:7.

13) The mother further complained that the girls began speaking to an individual with the user name Harry.Styles888 (resembling the name of a singer in the group One Direction), who requested that the girls pose in front of the camera in the sexual position doggie style.  Tr. 13:9-22.

14) On October 13, 2012, Trooper Jollymore applied for and was granted a court order to Skype to provide the account activation information for the user name Harry.Styles888.  Tr. 14:7-10; Def. Ex. 1 at 2.

15) On October 24, 2012, Trooper Jollymore received the results of the court order from Skype. The information indicated that the "Harry.Styles888" user name was activated on 7/27/12 from IP address 76.23.191.201.  Def. Ex. 1 at 2.

16) Trooper Jollymore traced that IP address (and the sexually explicit Skype activity associated with it) to an IP address in Waterbury, Connecticut.  Tr. 58, Lines 12-14.

17) On October 25, 2012, Trooper Jollymore contacted the Waterbury Police Department ("WPD") about his investigation.  Tr. 57:22-25.  He faxed his investigative reports to the WPD for further investigation.  Tr. 14:5-7.

18) The WPD assigned the case to Detective Peter Morgan for further investigation.  Tr. 57:20-21; 12:18-21.

19) Detective Morgan is assigned to the Computer Crimes Unit, where he investigates all crimes that involve any kind of computers or digital media evidence.  Tr. 11:16-19.  The majority of the cases to which he is assigned focus on possessing and sharing of child pornography and the online enticement of minors to engage in sexual activity.  Tr. 11:22-25.

20) Detective Morgan claims to have specialized training in digital forensics examinations and computer investigations, including an EnCase certification.  Tr. 12:3-17.

21) As of the fall of 2012, Detective Morgan had been working at the WPD for 17 years (since 1995) and had been a detective for eight years (since 2004).  Tr. 10:17-23.

22) He has worked on all major crimes, including homicides, serious assaults, robberies, and sexual assaults.  Tr. 11:8-14.

23) On November 1, 2012, Detective Morgan applied for an *ex parte* court order to Comcast to obtain the subscriber information (IP address, date/time of creation) for the "Harry.Styles888" user account.  Tr. 15:2-6; 58:15-20.

24) The court granted that *ex parte* order.  Tr. 58:21-22.

25) By letter dated November 6, 2012, Comcast responded to the court order.  <u>See</u> Gov't Ex. 17.

26) On Thursday, November 8, 2012, Detective Morgan received the response from Comcast stating that the IP address 76.23.191.201 (which was in turn associated with the "Harry.Styles888" user account) was assigned on July 27, 2012 to John Eastman at 157 Congress Avenue, 3rd Floor, Waterbury, Connecticut 06708.  Tr. 15:8-11; 59:3-10.

27) The Comcast response received by Detective Morgan also stated that the subscriber account was "Active."  Gov't Ex. 17.  The response also indicated that the "Method of Payment" on the account was by "Statement sent to the above address" (the "above address" being John Eastman, 157 Congress Ave Fl 3, Waterbury, CT 06708).  <u>Id.</u>  The active nature of the account, in combination with the current IP history, <u>see</u> Gov't Ex. 17 at 2-3, suggests that the account was up to date and that payment was being made by statements sent to John Eastman at 157 Congress Avenue.  <u>See id.</u>

28) The Comcast response received by Detective Morgan also provided a telephone number (203-527-7591) and two email addresses (leastman9826 and Eastman.john) associated with John Eastman at 157 Congress Avenue, 3d Floor, Waterbury, Connecticut.  Gov't Ex. 17.

29) Upon receiving the response from Comcast, Detective Morgan did not believe that time was of the essence.  Tr. 59:15-16.

30) Yet, in the two-day period following his receipt of the Comcast response, he failed to perform the following due diligence:

   a)  Detective Morgan did not determine John Eastman's date of birth.  Tr. 64:16-18.

   b)  Detective Morgan did not run John Eastman's rap sheet.  Tr. 59:17-19.

c)  Detective Morgan did not determine that John Eastman was a former registered sex offender and had a variety of prior convictions relevant to the current investigation.  Tr. 60:8-25-61:1-3.

d)  Detective Morgan did not check the property records for 157 Congress Avenue.  Tr. 62:4-6.

e)  Detective Morgan did not determine who was the leaseholder for the property at 157 Congress Avenue.  Tr. 62:7-9.

f)  Detective Morgan did not attempt to call the telephone number listed on the Comcast response to determine if there was a John Eastman at that number.  See Gov't Ex. 17.

g)  Detective Morgan did not attempt to email the email addresses listed on the Comcast response to determine if those accounts were active.  See Gov't Ex. 17.

h)  Detective Morgan did not request the billing records for the Comcast account that Comcast had indicated was "Active."  See Gov't Ex. 17.

31) In light of ¶ 29, the failure to perform the steps set forth in ¶ 30(a)-(h) was sloppy police work.

a)  Detective Morgan claimed that he needed more information to determine whether John Eastman was living in the residence at the time.  Tr. 17:23-24.  Yet, that claim is belied by the fact that the response Detective Morgan received from Comcast on November 8, 2012 stated that the account was "active" and payments were being made by "John Eastman" at 157 Congress Avenue.  See ¶ 27, supra.  Moreover, the steps set forth in ¶ 30(a)-(h) would have further confirmed the same.

32) Based upon the information he knew or should have known by November 8, 2012, Detective Morgan had sufficient information to seek and obtain a search warrant.  See, supra ¶¶ 1-30.

33) Detective Morgan *chose* not to apply for a search warrant.  Tr. 61:17.

34) Detective Morgan *chose* not to apply for an arrest warrant.  Tr. 61:20.

35) In light of ¶¶ 29-30(a)-(h), Detective Morgan's claim that he did not try to apply for a search warrant, because he "felt he needed additional information" is not credible.  Tr. 62:17-19.  His contention on direct examination that he "felt that a judge may question not doing my own investigative research prior to obtaining a search warrant," Tr. 17:20-21, is belied by the fact that he nevertheless did not do any investigative research.  See supra 29-30(a)-(h).

a) If he felt he needed "additional information" an experienced and seasoned detective (see ¶¶ 19-22) would have performed the steps, or at least the most basic steps, such as running a date of birth and rap sheet, outlined in ¶¶ 30(a)-(h).

b) The fact that Detective Morgan did not state in his police report that he felt he needed more information to apply for a warrant, see Def. Ex. 1, further supports the conclusion that his claim is not credible.  Tr. 62:20-22.

c) Detective Morgan's demeanor and manner on cross-examination regarding the topic of why he did not at least try to obtain a warrant suggest that his claimed justification is not credible.  For example, he stated that he "did not feel that at the time that there was a definite crime" because John Eastman could have been 13 years old, and therefore his chats with 11 and 12 year old girls would have been "age appropriate" talk.  Tr. 64:1-15.  Yet, Detective Morgan did not perform the exceedingly simple step of determining Mr. Eastman's age.  Tr. 64:16-18.  More importantly, even without taking any additional action, he already had information in his possession to suggest that John Eastman was an adult, not a minor, and that therefore the chats were not "age appropriate."  The letter that Detective Morgan received from Comcast, dated November 6, 2012, see Gov't Ex. 17, stated that John Eastman was the responsible party for payment of bills.  A minor would never be listed as the obligor on a utility bill.

d) In addition, Detective Morgan's demeanor and manner of response on cross-examination regarding why he did not try to obtain a search warrant was argumentative, evasive, and defensive.  See, e.g., Tr. 65:1-23.

   i) For example, when asked by defense counsel whether Detective Morgan **now** knows that Linda Eastman is John Eastman's mother, Detective Morgan said he did not know.  Tr. 62:16.  Yet, on direct examination, Detective Morgan claimed to have been aware that John Eastman's mother had filed a complaint against him, suggesting he did know who John Eastman's mother was.  Tr. 56:13.

36) Detective Morgan's claim that he did not run John Eastman's rap sheet between November 8 and November 10, 2012 because he "didn't have a suspect at that time" is not credible.  Tr. 59:17-22.

a) That testimony is contradicted by Detective Terni, who testified that at the time [he] became involved (November 10, 2012 at the WPD prior to going to the Eastman home), Mr. Eastman was already a suspect.  Tr. 161:3-5.

b) No reasonable police officer, especially one with as much experience as Detective Morgan, would have gone into the home of a suspect without at least trying to run a rap sheet, particularly not knowing whether the individual was a firearm owner.  Tr. 168:11.

c) Detective Morgan's claim that he did not do so suggests either a lack of candor or extreme sloppiness.

37) Even if Detective Morgan truly believed that he did not have enough information to apply for a search warrant, he nevertheless decided to go to the Eastman home anyway without a warrant to attempt to get the same information to which he would have had access if he had obtained a warrant.  Tr. 66:13-25; 67:1-8.

38) In approaching the Eastman home, Detective Morgan was hoping that Mr. Eastman would be cooperative and speak to Detective Morgan without a lawyer present.  Tr. 69:7-13.

39) Saturday, November 10, 2012 was the Veteran's Day holiday weekend.  Detective Morgan was working "a short-staffed weekend shift."  Detective Morgan decided to go to the Eastman home.  Tr. 16:13.

40) He asked Detective David Terni to accompany him for officer safety.  Tr. 72:4.

41) At least from the moment that Detective Terni became involved in the case onward, he and Detective Morgan considered Mr. Eastman to be a suspect.  Tr. 161:3-5.

42) Detective Terni is junior to Detective Morgan.  Tr. 73:5.

43) Detectives Morgan and Terni did not have a search warrant for the Eastman home at 157 Congress Avenue, 3rd Floor, Waterbury, CT on November 10, 2012.  Tr. 17:15 -18:9; 61: 13-24.

44) Detectives Morgan and Terni went to the Eastman home between 6:00 and 6:15 p.m.  Tr. 71:12-13.

45) It was dark.  Tr. 71:15.

46) Detectives Morgan and Terni were armed with firearms.  Tr. 73:11-12.

47) Their firearms were visible.  Tr. 73:13-14.

48) Detectives Morgan and Terni were visibly wearing police badges.  Tr. 74: 1-2.

49) Detectives Morgan and Terni were carrying handcuffs, which are part of the standard police uniform.  Tr. 161:25 – 162:1-4.

8

50) Detective Morgan's testimony that neither he nor Detective Terni were carrying handcuffs is not credible.  Tr. 73:17-25.

    a) It is contradicted by Detective Terni's testimony.  Tr. 161:25 – 162:1-4.

    b) It defies logic and common sense.  No (on-duty) police officer in his right mind, let alone a seasoned officer such as Detective Morgan would go anywhere, let alone the home of a potential suspect, without carrying his handcuffs with him.  Even if Detective Morgan had no reason to think anyone in the Eastman home was dangerous, anything could happen either in the home or on his way to and from the home.  What would he have done if he needed to restrain someone either in the Eastman home or upon passing an emergency scene along the way?

    c) In the affidavit submitted at Exhibit A of the Government's Memorandum in Response to Defendant's Motion to Suppress, Detective Morgan states that he never placed Mr. Eastman in handcuffs, but he does not state that he did not have his handcuffs on him when he went to the Eastman home.  Gov't Memorandum, Ex. A at ¶ 11.

    d) When asked on direct examination whether he placed Mr. Eastman in handcuffs, Detective Morgan testified "No . . . because he wasn't under arrest."  Tr. 22:11-15.  If, in fact, he did not have handcuffs on him at all, it would have been natural to offer up the additional explanation, "Oh, and I did not even have my cuffs on me at the time."  But he did not say that.

    e) It is a point that a police officer would be unlikely to forget or misremember and therefore suggests a willful attempt to deceive as opposed to a memory failure.

51) Detective Morgan's apparent willful lack of credibility on a point - that itself is not particularly important but is related to a very important point - suggests that the Court should treat his testimony as a whole with caution and skepticism, and when confronted with conflicted evidence on any particular point, the Court should not find in favor of Detective Morgan.  See, supra ¶¶ 48- 50; see also ¶¶ 35(a)-(d)-36.

52) Detectives Morgan and Terni identified themselves as police officers when Mr. Eastman answered the door.  Tr. 74:23-25.

53) Their ID badges and guns were visible.  Tr. 73:13-14; 136:20-23.

9

54) It is undisputed that Mr. Eastman did not provide written consent for Detectives Morgan and Terni to enter the home.  Tr. 106:11.

55) Mr. Eastman did not provide oral consent for Detectives Morgan and Terni to enter the home.  The detectives did not ask for permission to enter the home, nor did Mr. Eastman invite them in.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 4.  They stepped inside and Mr. Eastman backed away.  He did not physically oppose them.  Id.

a) Detective Terni does not recall the words exchanged between the detectives and Mr. Eastman.  Tr. 164:3-12.  Therefore, the Court should not credit any testimony by Detective Terni to the contrary on direct examination.  Detective Terni's failure to recollect on this point and others more generally is supported by other known facts:

i) Detective Terni's entire involvement with the Eastman case began and ended on November 10, 2012.  Tr. 158:20-23.

ii) Since November 10, 2012, Detective Terni has definitely investigated more than 50 cases and possibly more than 100 other cases.  Tr. 156:1-4.

iii) Detective Terni did not take notes of what occurred on November 10, 2012.  Tr. 157:1.

iv) Detective Terni never read Detective Morgan's Police Report (Def. Ex. 1).  Tr. 158:10-11.

v) Although he was reluctant to admit it, Detective Terni admitted that he could not recall all of the details of what happened on November 10, 2012, such as whether or not he searched Mr. Eastman prior to putting him in the police vehicle.  Tr. 156:18-23.  He also could not recall whether or not Detective Morgan brought a written consent form to the Eastman home.  Tr. 163:15.

vi) Although Detective Terni testified that he reviewed "paperwork" about what transpired on November 10, 2012, see Tr. 157:4, the "paperwork" was limited to the voluntary statement form, the rights card, and the consent form.  Tr. 157:11-25.  The "paperwork" did not include notes or the police report, see above, and both Detective Terni and Detective Morgan testified that there was no verbatim record taken of what

10

was actually said or done at the Eastman home.  Tr. 165:5; Tr. 91:16 (Q: Did you have any documents from the Eastman home on November 10, 2012?  A:  No.).

b) It is undisputed that Detectives Morgan and Terni did not discuss informed consent with Mr. Eastman prior to entering the home.  Tr. 75:15-18.

c) It is undisputed that neither the Detectives nor Mr. Eastman ever uttered the word "consent." Tr. 75: 19-21.

d) Detective Morgan's testimony that Mr. Eastman "allowed" the Detectives to come in and/or that Detective Morgan asked to come in and Mr. Eastman said, "Yes, okay," is not credible either due to lack of memory and/or due to lack of candor or sloppiness.  Tr. 75: 1-25.

   (1) Lack of Memory

      (a) Detective Morgan did not keep any notes during the Eastman investigation.  Tr. 91:23.  This is another example of sloppy police work.

         (i) Captain William Fox testified that field notes play an important role in criminal investigations and that "most officers take field notes."  Tr. 200:10-14.

         (ii) Captain Fox is a training officer, supervisor, shift commander, graduate of the FBI academy, and recipient of numerous commendations for his work. Tr. 199:1-23.[2]

         (iii) Detective Terni testified that in an investigation lasting six months, "of course" an officer should take field notes, so as to remember important details about the investigation.  Tr. 170:13-23.

         (iv) Detective Morgan agreed that the decision not to keep notes was not necessarily keeping with best police practices but rather was in keeping with **his own** police practices. [emphasis added] Tr. 92:4-10.

   ────────────────────

[2] See also http://www.wtbypd.org.dnnmax.com/Divisions/Operations/Patrol/ShiftCommanders/tabid/134/Default.aspx

(b) It is undisputed that there are no contemporaneous documents (or recordings) memorializing what occurred in the Eastman home.  Tr. 92:18; 91:14-16.

(c) It is undisputed that Detective Morgan's police report is dated May 7, 2013, more than six months after November 10, 2012.  Tr. 90:17-25.

(d) Detective Morgan relied on his memory in typing up the section of the police report pertaining to the time spent at the Eastman home.  Tr. 91:10.

(e) Even though Detective Morgan knew the issue of whether Mr. Eastman consented to the Detectives entering the home was important, the police report does not quote the words used by Detective Morgan or Mr. Eastman.  Its description concerning the issue of consent is vague.  Def. Ex. 1.

(f) Since November 10, 2012, Detective Morgan investigated over 50 cases.  Tr. 93:5.

(2) Lack of Candor or Sloppiness

(a) Detective Morgan was dishonest about the fact that both he and Detective Terni carried handcuffs as part of their standard police uniform on November 10, 2012. See supra, ¶¶ 48-50.

(b) Detective Morgan's police report contains numerous material omissions, most notably of which are all the aspects of the investigation that were less helpful to law enforcement, e.g., the presence of Ms. Eastman in the home, the fact that Detective Morgan did not believe he had enough information to get a search warrant, the time the detectives went to the Eastman home, the time and place where the written consent form were signed, the fact that Detective Terni patted down or searched Mr. Eastman, the fact that Detective Morgan called Mr. Eastman's former probation officer, and the fact that Mr. Eastman used the bathroom while the Detectives were at his home.  Tr. 97:1-25-99:1-25.

(c) Detective Morgan's demeanor and manner of answering questions on cross-examination regarding his note-taking policy, the omissions from his police report, and the presence and importance of Ms. Eastman was argumentative, evasive and defensive, thus further suggesting a lack of candor or extreme sloppiness.  For example, when asked "You know the issue of whether Mrs. Eastman was present in the home is important, correct?", Detective Morgan

12

answered "No" even though he acknowledged that the presence of a third-party in the home could invalidate consent.  Tr. 97:8-16.

(d) Detective Morgan's testimony about not knowing that Mr. Eastman was ultimately arrested in May 2013 is not credible in light of the fact that it was Detective Morgan who sought the arrest warrant and then closed the case in May 2013 with Mr. Eastman's arrest.  Tr. 117:17-25; 118:1-8.

(e) Detective Morgan was dishonest about his entering of the computer into evidence.  He testified that he entered the computer into evidence on November 10, 2012, Tr. 121:8-22, however, the Property Record Report and Property Inventory demonstrate that the computer was not logged into evidence until May 10, 2013.  See Exhibit F (attached hereto).[3]

(f) In addition, Detective Morgan failed to give Mr. or Ms. Eastman a property receipt for the computer that was seized.  Tr. 118:23.

   (i) It is undisputed that the computer was evidence.  Tr. 119:1.

   (ii) The failure to provide a receipt was both sloppy and against police procedure.  Tr. 119:2-13.  Def. Ex. 39-1.

(g) The fact that Detective Morgan relied on oral consent (rather than written consent) is in itself evidence of sloppy and/or dishonest work.

   (i) Captain Fox testified that WPD officers are taught to use the standard written consent form whenever possible.  Tr. 202:2-4.

   (ii) The purpose of using the standard written consent form is to protect everybody, meaning the officers and the suspect.  Tr. 202:5-8.

   (iii) Captain Fox testified that if officers can get written consent, that is better than oral consent.  Tr. 202:9-12.

---

[3] The Property Record was not disclosed to the defense in the discovery received prior to the May 31, 2016 hearing.  Following Detective Morgan's testimony, defense counsel specifically requested the Property Form, and it was provided by the government to the defense on June 13, 2016.

       (iv) The written consent form advises suspects that they have a right to refuse consent.  Tr. 175:14-16.

       (v) Detective Morgan did not advise Mr. Eastman that he had a right to refuse consent.  Tr. 103:11.

       (vi) In light of the above, the fact that Detective Morgan did not even bring a written consent form with him is evidence of bad faith and/or extreme sloppiness.  Tr. 29:7; Tr. 163:24.

    (h) Numerous other examples of Detective Morgan's sloppiness have already been cited.  See, supra ¶¶ 30, 35, 36, 49, 50, 54(d)(1)(i).

56) The written consent to search form was not signed until 7:40 at the WPD.  The form states that the property was located at 157 Congress Avenue, but at the time it was executed, that was not an accurate statement.  Tr. 102.

   a) The police report, Def. Ex. 1, does not state that the written consent was signed at 7:40 at the WPD.  In fact, it is misleading in that it is written in such a way as to suggest it was signed at the Eastman residence.  Tr. 99:5-11.

   b) The fact that the consent form itself states the location of the property was Congress Avenue, when in fact it was the WPD, and the fact that the police report is misleading, both suggest that Detective Morgan's testimony regarding oral consent is not credible.

57) If the Court indeed finds the above suggested findings of fact, it is not necessary to proceed any further.

58) Once inside the Eastman home, Detective Morgan told Mr. Eastman that he was investigating sex chats from Vermont and asked questions about the same.  Tr. 77:20-22.

59) At that point, even Detective Morgan agrees, and thus it is undisputed, that Mr. Eastman was considered a suspect, and in fact was the only suspect.  Tr. 161:5.[4]

---

[4] Mr. Eastman urges the Court to find that he was actually considered a suspect earlier, at least as of the point in time when Detective Terni became involved in the case.  Tr. 161:3-5.

60) The detectives put handcuffs on Mr. Eastman, and had him sit on the couch in the living room. Tr. 214:22-23.

    a)  Ms. Eastman had a clear line of sight from where she was standing, because Mr. Eastman is a large man, so he was sitting on the edge of the couch far enough forward where Ms. Eastman could see his hands behind his back. Tr. 233:22-23. She was able to see him through the open sliding doors. Tr. 231.

61) As Mr. Eastman sat on the couch, Detective Terni remained with him, standing to the side of him. Tr. 214:24-25.

62) Neither Detective Morgan nor Detective Terni advised Mr. Eastman of his <u>Miranda</u> rights. Tr. 104:2.

63) They did not tell him he had a right to a lawyer. Tr. 104:5.

64) They did not tell him he had a right to remain silent. Tr. 104:8.

65) They did not tell him that anything he said could be used against him. Tr. 104:11.

66) In fact, they did not even have an Advice of Rights card with them at the time. Tr. 104:14.

67) They did not tell him he had a right to leave. Tr. 104.

68) Detective Morgan conducted a protective sweep of the home. Given that officer safety is paramount, Tr. 78:21, and given that Detective Morgan did not ask whether anybody else was in the home at the time he entered, Tr. 75:14, it is not credible that he would not have conducted a protective sweep. In addition, as discussed below, Mrs. Eastman observed Detective Morgan checking her bedroom and conducting a protective sweep of other areas of the home.

69) Detective Morgan knocked on the bedroom door of Ms. Linda Eastman, and she answered the bedroom door in her pajamas. Tr. 213:10-15.

70) Ms. Eastman did not consent to the Detectives searching her home. Tr. 79:25.

71) Ms. Eastman questioned who he was and what he was doing in her home. Tr. 213:23-24; Tr. 80:4-6. Ms. Eastman did not and would not have allowed the police to enter her home without a warrant and did not allow them to take the computer without a warrant. Tr. 217.

72) Detective Morgan exited the bedroom, and Ms. Eastman observed him opening up drawers and going through them.  Tr. 214:16-18.

73) It is undisputed that Detective Morgan did not advise Mr. Eastman that he could refuse consent to take the computer.  Tr. 103:11.

74)  Mr. Eastman did not orally consent to Detective Morgan taking the HP Pavilion Desktop computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 11.

   a)  Detective Terni's testimony regarding the seizure of the computer is not credible, because he did not recall what was said between Detective Morgan and Mr. Eastman, and he did not take notes, so he did not know what was said.  Tr. 164:15- 165:5.

   b)  Detective Morgan's testimony regarding the seizure of the computer is not credible for the reasons already discussed above (failing to discuss Ms. Eastman in the police report, wrongly stating that he did not have handcuffs with him, making other material omissions in the police report, etc).

   c)  Moreover, Detective Morgan's testimony regarding the seizure of the computer is not credible because no reasonable police officer would have permitted a suspect to lead the detective around his own house unrestrained.  Mr. Eastman was a suspect at this time.  Tr. 81:18-25; 82:1-7.

   d)  Detective Morgan's testimony regarding the seizure of the computer is not credible for the additional reason that he wrongly testified that he never went into the kitchen at the Eastman home, when in fact he did go into the kitchen.  Tr. 80:14-16; 215:3.

   e)  In fact, it is impossible to get to either Mr. or Ms. Eastman's bedrooms without going through the kitchen.  Tr. 215:3-4.  That is because in November 2012, there were furniture, including a heavy antique Victrola and boxes completely blocking the door between the living room and the bedroom on the living room side.  Tr. 228:18-25.  See also Def. Exs. 18-21.  In addition, the door between the living room and John Eastman's bedroom was also blocked on the bedroom side with furniture, a computer table and the computer itself.  See Def. Exs. 13-17 (depicting the computer stand where the computer was located, and furniture blocking the door from inside Mr. Eastman's bedroom).  Thus, the only way for Detective Morgan to have accessed Mr. Eastman's bedroom to seize the computer was to go through the kitchen and into the other bedroom door from the hallway.  See Def. Ex. 21.

75) Ms. Eastman did not orally consent to Detective Morgan taking the HP Pavilion Desktop computer.  Tr. 215:21.

76) While the detectives were in his home, Mr. Eastman requested permission to use the bathroom. Tr. 81:1.

77) When Mr. Eastman requested the use of the bathroom, the handcuffs were removed but he was told he would have to keep the door partially open so one of the detectives could observe him, which he did.  Tr. 216:1-5.

78) Mr. Eastman was then placed back in handcuffs, <u>see supra</u>, had his person searched by Detective Terni, <u>see</u> Tr. 84:12-22, and was transported by the detectives to the Waterbury Police Department, along with the HP computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 12.  No reasonable officer would have transported Mr. Eastman, now a criminal suspect, in the backseat of an unmarked police vehicle without a screen, and although we can argue over semantics (prisoner versus suspect), the WPD policy suggests that such a practice would be impermissible.  Def. Ex. 39-2.

79) Detectives Morgan and Terni did not advise Mr. Eastman that he had the right to refuse the search of his person and that they had no authority to pat him down if he did not agree.  Tr. 85:1-5.

80) At the police station, Mr. Eastman was read a copy of a police report from Vermont, which he denied.  He also asked for the return of his computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 13.

81) At that point, he was threatened by Detective Morgan with detention over the long holiday weekend if he refused to cooperate.  <u>Id.</u> ¶ 14.  Detective Morgan called Mr. Eastman's prior probation officer, another fact omitted from the police report, to intimidate Mr. Eastman.

82) Mr. Eastman, feeling that he was under arrest instead of being a party to a consensual interview, asked what charges were being made against him and requested a lawyer.  <u>Id.</u> ¶ 15.

83) Detective Morgan ignored the question and request, instead typing up and printing the "voluntary statement."  Mr. Eastman did not agree with or admit to the statements on the form. ¶ Id. 16.

84) Mr. Eastman did not sign the "Advisement of Rights" form.  Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

85) Mr. Eastman did not sign the "Consent to Search" form for the HP computer.  Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

86) Mr. Eastman did not sign the "Voluntary Statement Rights Form."  Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

87) Mr. Eastman did not sign the "Voluntary Statement."  Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

88) As between the defense expert, John Reznikoff, and the prosecution expert, Joan DiMartino, the Court should find that the opinions are even, and therefore because the government has the burden of proof, in favor of the defense.

   a)  Mr. Reznikoff is highly qualified and has served as an expert in many cases in favor of the government.  Def. Ex. 22. ███████████████████████████████ ██████████████████████████████  Thus, the government cannot critique Mr. Reznikoff's experience, skills, or expertise with any credibility.

   b)  Mr. Reznikoff uses the standard tools of the trade, including a Video Spectral Comparator.

   c)  Mr. Reznikoff considered 14 known samples of Mr. Eastman's handwriting, of which all were originals, and of which four arose long before any litigation in this case (K1, K12, K13, and K14).  Def. Ex. 22.

   d)  Ms. DiMartino made a significant mistake in her report.  She states that Exhibits 1.9 through 1.17 known signatures were provided by the defense, which is false.  Exhibits 1.11 through 1.17 were provided by the government.

   e)  Ms. DiMartino's report effectively "talks over" Mr. Reznikoff's report, in that Ms. DiMartino reviewed a set of known samples to which Mr. Reznikoff did not have access at

18

the time he performed his examination (government documents to which the government had access).  Accordingly, those samples were not part of Mr. Reznikoff's report.

f)  Conversely, Ms. DiMartino did not review or opine on the set of known samples that Mr. Reznikoff considered.

g)  Thus, each expert's conclusion is like a ship passing the other in the night, and neither addresses the other's findings and conclusions.

h)  Both experts considered different sets of documents spanning over 15 years.

i)  Handwriting can change over time depending on circumstances, including depending upon stressors and whether someone is handcuffed or not at the time.

j)  Considering all of the above, the Court should find that the expert findings are at best unclear and thus the government cannot meet its burden of proof.

k)

89) Detective Terni did not actually witness Mr. Eastman sign the "advice of rights" form.  Tr. 179:23-25.

90) Detective Terni did not recall witnessing Mr. Eastman sign the "statement of rights" form.  Tr. 180:24-25.

91) Detective Terni did not witness Mr. Eastman sign the written "consent to search" form.  Tr. 172:14; 173:19.

92) Detective Terni was sitting 15 feet away from Detective Morgan and Mr. Eastman at the police station and therefore could not have accurately heard and/or witnessed the contents of the Voluntary Statement form.  Tr. 180:2.

93) There is no video-recording of the encounter with Mr. Eastman at the police station, and no contemporaneous notes or other recordings of what transpired.  Tr. 110:25; Tr. 111:3.

94) Detective Morgan's testimony regarding Mr. Eastman's signature on all four questioned documents is not credible for the reasons already discussed above.  In addition, it is not credible that he would have released Mr. Eastman from custody if, in fact, Mr. Eastman had signed the documents and given a full confession to such serious crimes.  Tr. 184:20-22; 185:2-11.

95) Detective Morgan and Detective Terni gave contradicting testimony about the mechanics of how Mr. Eastman's alleged statement was taken.  According to Detective Morgan, Mr. Eastman did not give a word-for-word statement, but rather, Detective Morgan generated the words in the written statement and then showed them to Mr. Eastman.  Tr. 112:24-25; Tr. 113:1-2.  According to Detective Terni, the words taken down in the Voluntary Statement were "basically a verbatim transcription of what Mr. Eastman was telling Detective Morgan."  Tr. 183:6; 184:13; 184:19.  This is a major difference that undercuts the credibility of both Detective Morgan and Detective Terni.

96) Mr. Eastman did not make the statement in the Voluntary Statement.  Those words are Detective Morgan's words.  Tr. 113:2; Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 16.

97) Captain Fox had no independent recollection of the events of November 10, 2012 and no independent recollection of witnessing the Voluntary Statement form.  Tr. 196:11-12.

98) In spite of having supposedly obtained a full confession, the physical evidence at issue in the case, forensic evidence from Comcast verified by the detectives' visit to the Eastman home, and confirming Mr. Eastman's sex offender status with his former probation officer, Detective Morgan decided to let Mr. Eastman leave without seeking to charge him with any crime and without seeking to detain him even on a temporary basis.  One or both of the detectives drove him home.  The Court should find that Detective Morgan's position is not credible.

a) Detective Morgan's testimony that Mr. Eastman did not "necessarily" give what amounts to a full confession is not credible, and again, is suggestive of an overall lack of candor.  Tr. 114:17.  The statement speaks for itself.  Def. Ex. 5 (e.g., "I have chatted with some girls who were like between 12 and 15 years old.  We chatted about sex and they posed in a sexual manner or performed a sex act so I could watch them on the web cam.").

b) Detective Morgan's testimony that "there was nothing that linked [Mr. Eastman] to the conversations with the girls in Vermont" is not credible and blatantly wrong.  See, supra, 26-

28 (delineating information received from Skype and Comcast linking Mr. Eastman to the conversations with the girls in Vermont).

c) Detective Morgan's testimony that "he had no evidence of what he was saying was accurate" is similarly not credible and blatantly wrong for the same reasons. Moreover, it has never been the standard that an officer must have all of the information in any given case in order to detain a suspect.

99) Detective Morgan did not write a report of the night's activities for over six months. Tr. 127:20.

100)   Mr. Eastman was arrested on May 14, 2013. He has been detained in custody ever since.

101)   Detective Morgan did not properly log the HP Pavilion computer into evidence until May 10, 2013 – over six months after it was seized. Exhibit F, attached. The Court – and all of us – are left to wonder where exactly the computer was for those six months, and what exactly took Detective Morgan so long.

## Proposed Conclusions of Law

A. The government bears the burden of proof. "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. . . . Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence . . . that the search or seizure did not violate the Fourth Amendment." United States v. Herron, 18 F. Supp.3d 214, 221 (E.D.N.Y. 2014) (citations omitted). There is no dispute that the police seized a computer from Mr. Eastman's home and subjected it to a search. Nor is there any dispute that no warrant was issued for the seizure or the search. The government therefore has the burden of proving that its actions were legal. United States v. Vasquez, 638 F.2d 507, 524 (2d Cir. 1980) (citing cases).

B. The detectives' entrance into the Eastman home and seizure of the computer is *per se* unreasonable unless the government can prove otherwise. "[I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal

citations and quotation marks omitted); <u>see</u> <u>also</u> <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 474 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is <u>per se</u> unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions").

C. The government cannot prove that Mr. Eastman provided voluntary consent for the detectives to enter the home.  "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."  <u>United States v. Isiofia</u>, 370 F.3d 226, 230 (2d Cir. 2004).  In seeking to admit evidence obtained during a warrantless search on the basis of consent, the Government must demonstrate by a preponderance that such consent was (1) provided (2) voluntary (3) by someone with actual or apparent authority over the premises.  The Government must further demonstrate (4) that the consent remained effective (i.e., was not retracted) at the time the evidence was seized, and (5) was not countermanded by a co-inhabitant's express refusal to consent.  In holding the Government to its burden, it should be remembered that the right to be free from warrantless searches is "fundamental" and "cannot be eroded simply because the government seeks to take the path of least resistance by obtaining consent from an individual whose interest in the premises searched is obviously vague and attenuated." <u>United States v. Gonzalez Athehorta</u>, 729 F. Supp. 248, 258 (E.D.N.Y. 1990).

D.  Because the government cannot prove that Mr. Eastman provided voluntary consent to enter the home, the detectives' entrance into the home is an unlawful search.  <u>United States v. Isiofia</u>, 370 F.3d 226, 230 (2d Cir. 2004) ("The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.").  Absent valid, voluntary consent, at the moment the Waterbury detectives entered the Eastman home, they were conducting a search.  <u>See</u>, <u>e.g.</u>, <u>Miller v. United States</u>, 357 U.S. 301 (1958) (police entry into home began when they broke down the door of apartment in multi-unit building); <u>Johnson v. United States</u>, 333 U.S. 10 (1948) (search began when police entered "living quarters – hotel room of defendant).

E. Accordingly, everything that follows, including the seizure of the computer and purported statements, must be suppressed as fruit of the poisonous tree.  "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation - whether such evidence be tangible,

physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention.'" United States v. Crews, 445 U.S. 463, 470 (1980) (internal citations omitted).  This is true even if Mr. Eastman had later signed the written consent forms and other questioned documents, which he did not, because the taint of illegality had not dissipated by that time.

F. The government cannot prove that Ms. Eastman consented to the search of her home (and by extension that she did not negate any alleged consent given by Mr. Eastman).  Even if Mr. Eastman consented to the detectives entering the home, that consent was negated by Ms. Eastman's retracting of that purported consent when she questioned the detectives' presence in her home.  An individual who possesses actual or apparent authority may withdraw his or her consent at any time prior to or during the search.  See Walter v. United States, 447 U.S. 649, 656 (1980) ("When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of its authorization."); United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004) (noting that an individual has a "constitutional right to revoke or limit the scope of a search to which he has consented").  See Georgia v. Randolph, 547 U.S. at 103, 120 (2006) ("[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

G. Mr. Eastman was in custody at his home, and was subjected to custodial interrogation for which he was not Mirandized.  United States v. Faux, 94 F. Supp. 3d 258, 273-75 (2015) (Underhill, J.).  The test for determining "custody" is an objective inquiry that asks:  (1) "whether a reasonable person would have thought [she] was free to leave" the police encounter; and (2) if not, "whether [her] freedom of action has been curtailed to a degree associated with formal arrest."  Id.  Both elements are required, but the second is the "ultimate inquiry" of the custody analysis.  Id.  An individual's beliefs about his status and the officers' perceptions of the same do not bear on the analysis.  Id.  Relevant factors include:  (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the

interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect [she] was free to leave or under suspicion." Id. at 274.  Judge Underhill's analysis in Faux is instructive here:

> An interrogation that occurs in an individual's home uniquely affects the custody analysis.  The home is "the most constitutionally protected place on earth"; thus, the right to terminate the interrogation and be "free to leave" is "hollow" if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home. *United States v. Craighead,* 539 F.3d 1073, 1082-83 (9th Cir.2008).  Nevertheless, being questioned in a private, constitutionally-protected place is viewed as a far cry from the typical custodial setting—the police station or the back of a cruiser. *See id.*  Absent a formal arrest, courts rarely conclude that a suspect interrogated in her own home is "in custody." *See, e.g., United States v. Badmus,* 325 F.3d 133, 139 (2d Cir.2003); *United States v. Mitchell,* 966 F.2d 92, 99 (2d Cir.1992); *Falso,* 293 Fed.Appx. at 839; *United States v. Schaefer,* 859 F.Supp.2d 397, 411-12 (E.D.N.Y.2012), *aff'd,* 519 Fed.Appx. 71 (2d Cir.2013); *United States v. Bershchansky,* 958 F.Supp.2d 354, 382-83 (E.D.N.Y.2013); *United States v. Groezinger,* 625 F.Supp.2d 145, 158 (S.D.N.Y.2009).

> Under certain circumstances, however, the home may be transformed into a custodial setting. *See, e.g., Orozco v. Texas,* 394 U.S. 324, 325, 89 S. Ct. 1095, 22 L.Ed.2d 311 (1969) (defendant in custody where four officers entered his bedroom at 4:00 a.m. and questioned him without providing warnings) *Newton,* 369 F.3d at 676-77 (defendant in custody where questioned at home in handcuffs); *United States v. Ortiz,* 943 F. Supp.2d 447, 455-56 (S.D.N.Y.2013) (defendant in custody where officers threatened to arrest everyone in apartment unless information was provided); *Craighead,* 539 F.3d at 1084-89 (defendant in custody where questioned in closed-door room, in police-dominated home, with armed law enforcement blocking exit).

> All factors should be weighed and no one factor is dispositive, but certain circumstances tend to make an individual reasonably feel that she is "completely at the mercy of the police" and, thus, significantly impact the custody analysis. *Newton,* 369 F.3d at 675 (citing *Berkemer,* 468 U.S. at 440, 104 S. Ct. 3138); *United States v. Griffin,* 922 F.2d 1343, 1354-55 (8th Cir.1990) ("Questioning which occurs in the suspect's own home may

provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting."). Handcuffs, "a hallmark of a formal arrest," are strongly suggestive of custody where the individual lacks reason to believe that she will be handcuffed only for the duration of a search. *See Newton,* 369 F.3d at 676-77. Drawn weapons, raised voices and verbal threats likewise are indicia of custody. *See id.* Restricting the individual's movements in her home may also indicate custody if the individual is not informed that the rationale for doing so is officer safety and/or preservation of evidence. *See Craighead,* 539 F.3d at 1085-86; *Griffin,* 922 F.2d at 1354. Isolating the individual from her family or others who might provide emotional support points toward custody as well. *See id.; United States v. Montalvo*, No. 11-CR-00366-RJA-JJM, 2014 WL 3894374, at *6 (W.D.N.Y. Apr. 16, 2014), *report and recommendation adopted,* No. 11-CR-366-A, 2014 WL 3894383 (W.D.N.Y. Aug. 8, 2014); *United States v. Revels,* 510 F.3d 1269, 1276 (10th Cir. 2007); *United States v. Mittel-Carey,* 493 F.3d 36, 40 (1st Cir. 2007); *cf. United States v. Pollaro,* 733 F. Supp.2d 364, 371 (E.D.N.Y.2010) (defendant not in custody where he and his wife were permitted to go about their morning routine and were not kept apart during interrogation). Finally, the mere fact that the individual's home is overrun with law enforcement officials may also bear on custody, particularly where the individual would not reasonably comprehend why so many officers were present. *Compare, e.g., Craighead,* 539 F.3d at 1085-86 (presence of eight law enforcement officers from three different agencies in defendant's home increased custodial nature of interview), *with Newton,* 369 F.3d at 675 (six officers not surprising where defendant was parolee used to answering questions and knew some of the officers).

Conversely, informing the individual from the outset that she is not required to answer questions, that she is not under arrest or suspicion, and/or that she is free to leave or will be after the search are mitigating statements that carry significant weight in the custody analysis. *See Bershchansky,* 958 F. Supp.2d at 382-83; *Groezinger,* 625 F. Supp.2d at 158; *United States v. Pattee,* No. 12-CR-6183-PFG, 2013 WL 6579066, at *3 (W.D.N.Y. Dec. 13, 2013); *United States v. Lifshitz,* No. 03 CR. 572(LAP), 2004 WL 2072468, at *6-7 (S.D.N.Y. Sept. 15, 2004). The individual's decision to voluntarily permit law enforcement into her home and willingness to engage in conversation also weigh against a finding of custody. *See id.; Badmus,* 325 F.3d at 139.

Id. at 274-75.

Similarly, here, two officers entered the Eastman home at a relatively late hour in the darkness on a Saturday of a holiday weekend. Mr. Eastman believed they were armed, and they were armed. Mr. Eastman was placed in handcuffs and was kept on the couch in the living room, separated from his mother, who was kept in the other part of the house in the kitchen and hallway area leading to the bedrooms. Mr. Eastman was questioned about his internet and Skype activities in the context of a specific investigation into the Vermont sex chats for which he was not only considered a suspect at the time, but was in fact, the only suspect at the time. Finally, Mr. Eastman was never told that he was free to leave; that he could refuse consent; that he could refuse to talk to the officers; and that the officers had no authority to be there if he terminated the interaction. Accordingly, under the totality of the circumstances here, a reasonable person in Mr. Eastman's situation would have understood his freedom of action to be curtailed to a degree associated with formal arrest. Because Mr. Eastman did not receive Miranda warnings, any statements alleged to have been made during that encounter and all that follow must be suppressed. See id. at 276-77.

H. Because Mr. Eastman did not consent to the detectives entering the home, the detectives' seizure and search of the computer was fruit of the poisonous tree. In other words, the detectives' illegal entry into the Eastman home did not dissipate enough to avoid tainting the resulting seizure of the computer and supposed statements of Mr. Eastman. In United States v. Snype, the Second Circuit stated:

> When a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that "the taint of the initial entry has been dissipated" in order to admit evidence seized following the illegal entry. United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (internal quotation marks omitted). Oguns's identification of taint and voluntariness as distinct inquiries in evaluating the validity of certain consents derives from two Supreme Court decisions: Wong Sun v. United States, which held that evidence seized after an illegal search must be suppressed unless the government shows that it, in

26

> fact, resulted from "an intervening independent act of free will" sufficient "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963); and <u>Brown v. Illinois</u>, which held that, where an inculpatory statement follows an unlawful arrest, a finding of voluntariness under the Fifth Amendment (based on <u>Miranda</u> warnings) does not obviate the need to make a separate Fourth Amendment determination as to whether the statement was "'sufficiently an act of free will to purge the primary taint.'"  422 U.S. 590, 602, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting Wong Sun, <u>id.</u>).

441 F.3d 119, 132 (2d Cir. 2006).

The Supreme Court has prescribed three factors for determining whether the taint from a Fourth Amendment violation has dissipated:  (1) the time between the Fourth Amendment violation and the acquisition of evidence, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct.  <u>Brown v. Illinois</u>, 422 U.S. 590, 603–04 (1975).  Here, all three factors point to the need to apply the Exclusionary Rule.  The time between the illegal entry into the home and the seizure of the computer was quite brief – less than half an hour according to the detectives' own time line.  There were essentially no intervening circumstances – no change of venue, no substantive conversation between police and Mr. Eastman, and no opportunity for Mr. Eastman to speak to counsel or communicate with anyone outside the apartment – much less use the bathroom unsupervised.  Finally, the egregiousness of the violation cannot be overstated.

I.  The government has not met its burden of showing that Mr. Eastman signed any of the questioned documents.  The party proffering the evidence bears the burden of proving "a rational basis for concluding that an exhibit is what it is claimed to be." <u>United States v. Hon</u>, 904 F.2d 803, 809 (2d Cir.1990).   The Court does not even need to reach this issue, however, because everything that happened at the police station is fruit of the poisonous tree that must be suppressed.

J.  In the alternative, because Mr. Eastman was in custody in his home, <u>see supra</u> G, any purported consent he gave regarding the computer was not voluntary and thus not valid.  <u>See supra</u> C.

K.  The "good faith" doctrine does not apply here.  The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an

27

invalidated warrant.  United States v. Jacobson, 4 F. Supp.3d 515, 522 (E.D.N.Y. 2014) (citing United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. (citing Herring v. United States, 555 U.S. 135, 140 (2009)).  There is a distinction between inadvertent mistakes and willful conduct, and in the case of the latter, the good faith doctrine does not apply.  See Defendant's Reply Memorandum at 5-8.  To apply it would permit state actors to launder their egregious unconstitutional behavior through the federal government in order to resurrect what would have otherwise been a dead claim.  State v. Hicks, 707 P.2d 331, 333 (Ariz.Ct.App. 1985) (aff'd on other grounds sub nom.  Arizona v. Hicks, 480 U.S. 321 (1987).  This simply cannot be permitted, and the case law does not justify such a practice in a situation like this.  See United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985); see also United States v. Reilly, 76 F.3d 1271, 1281 (2d Cir. 1996), on reh'g, 91 F.3d 331 (2d Cir. 1996) (holding that "it is one thing to admit evidence innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error.  It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant.").

This case has been pending for over three years.  It began as a case in the State court system.  Mr. Eastman raised the issue of the illegal search and seizure with his first lawyer in the state system and each after that.  He went through three different lawyers.  Not one of them hired an expert, conducted any investigation, or filed any motions.  The reason why?  Because they were continually told the case was "going federal."  Meanwhile, Mr. Eastman sat in pre-trial detention while effectively nothing was being done on the case.  By the time the federal government charged Mr. Eastman nearly two years later, it knew or should have known that there was a claimed issue with regard to an illegal search and seizure, and if they did not, the only reason is because the state process was stymied by the federal government's involvement.  Neither the letter nor the spirit of the good faith doctrine applies.

**<u>Conclusion</u>**

It is undisputed that the police did not have a warrant to search the Eastman home or to search the computer in question.  It is undisputed that at the time they entered the home they did not have written consent to enter the home or to take the computer.  The only way the search of the home and resulting interrogation of Mr. Eastman and search and seizure of the computer could have been lawful is if Mr. Eastman provided voluntary consent that was not retracted by Ms. Eastman. In order for that to have happened, the Court must believe the detectives' version of events, which hinges on a series of decisions and behaviors by Mr. Eastman that require complete cooperation. Mr. Eastman has a long history of refusing to cooperate with law enforcement – from assaults on safety personnel to resisting arrest to violations of probation to refusing to be fingerprinted to firing lawyer upon lawyer.  There is simply no way that on the one day of his life that he encountered Detective Peter Morgan, John Eastman decided to change the entire essence of who he is in favor of being absolutely and totally submissive to the Waterbury police.  And then, having done so, it is equally unbelievable that the police just let him walk out of the door and run free for seven months. It just did not happen.  There are many, many defendants who do cooperate on all different levels with law enforcement.  John Eastman is just not one of them.

For the reasons discussed in the Defendant's briefing, exhibits, and testimony evidenced at the May 31 hearing as analyzed above, Mr. Eastman respectfully requests that the Court suppress the HP Pavilion computer, its contents, and all purported statements.

Respectfully Submitted,

THE DEFENDANT,
John Eastman

FEDERAL DEFENDER OFFICE

Date: June 27, 2016                      /s/ Kelly Barrett
                                         Assistant Federal Defender
                                         265 Church Street, 7th FL
                                         New Haven, CT 06510
                                         Phone: (860) 498-4200
                                         Bar No.: ct27410
                                         Email: kelly_barrett@fd.org


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2016, a copy of the foregoing Proposed Findings of Fact and Conclusions of Law was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                         /s/ Kelly Barrett
                         Kelly Barrett