UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-CR-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | June 27, 2016 |

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**<u>REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>**

# **TABLE OF CONTENTS**

I.      PROCEDURAL BACKGROUND..................................................................................3

II.     PROPOSED FINDINGS OF FACT ..............................................................................4

      A.      Background of the Investigation..............................................................................4

      B.      The Detectives' Entry into the Defendant's Residence .........................................7

      C.      Events Inside the Defendant's Residence ............................................................10

      D.      The Defendant's Voluntary Statement at the Police Station ................................17

      E.      The Parties' Handwriting Experts.........................................................................22

III.    PROPOSED CONCLUSIONS OF LAW .....................................................................26

      A.      Law enforcement did not violate the defendant's Fourth Amendment
           rights when they entered the defendant's apartment..............................................26

      B.      Law enforcement did not violate the defendant's Fourth Amendment
           rights when they took the defendant's computer. ..................................................31

      C.      The defendant's written consent at the police station authorized the
           detectives to search the computer. ........................................................................34

      D.      Law enforcement would have inevitably obtained the computer evidence,
           and therefore, suppression is not warranted...........................................................36

      E.      Law enforcement did not violate the defendant's Fifth Amendment rights
           when they interviewed him....................................................................................38

CONCLUSION..............................................................................................................41

The Government respectfully submits the following proposed findings of fact and conclusions of law in connection with the defendant's motion to suppress evidence and the suppression hearing that was held on May 31, 2016.

## I.   PROCEDURAL BACKGROUND

On January 7, 2016, a federal grand jury returned a two-count indictment charging the defendant with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  (*See* Indictment [Doc. # 28].)[1]  The indictment alleges that between June and November 2012, the defendant engaged in video chats with minors over the internet using online video chatting services such as Skype, and that during these video chats, he enticed the minors to engage in sexually explicit conduct, which he then recorded and/or photographed and then saved on his computer.  (*Id*. ¶¶ 2, 5.)   The indictment further alleges that in order to deceive and entice the minors, the defendant posed as famous singers and musicians that are popular to teenagers.  (*Id*. ¶ 2.)

On January 22, 2016, the defendant filed a motion to suppress a computer that detectives from the Waterbury Police Department obtained from the defendant's residence on the evening of November 10, 2012, and the results of any subsequent forensic examination of that computer.  (*See* Def.'s Mot. to Suppress [Doc. # 30] and Mem. of Law [Doc. # 31].)  The defendant also seeks to suppress statements he allegedly made to the detectives at the police station later that evening.  (*See* Def.'s Mot. to Suppress and Mem. of Law.)

---

[1] The case docket entries are cited as "Doc. # ___."  The transcript of the May 31, 2016 suppression hearing [Doc. # 52] is cited as "Tr. ___."  Exhibits admitted into evidence at the suppression hearing are cited as "Gov't Ex. ___" and "Def. Ex. ___."

The Court held a suppression hearing on May 31, 2016. (Doc. # 51; Tr. 1.) The Government presented the following three witnesses, all members of the Waterbury Police Department: Detective Peter Morgan, Detective David Terni, and Acting Captain William Fox. (*See* Gov't's Marked Witness List [Doc. # 56]; Tr. 9, 133, 190.) The defendant presented just one witness, Linda Eastman, who is the defendant's mother. (*See* Def.'s Marked Witness List [Doc. # 55]; Tr. 208). The defendant did not testify at the suppression hearing but submitted an affidavit. (Def. Ex. 7.)

At the conclusion of the hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law. (Tr. 237.)

## II.   PROPOSED FINDINGS OF FACT

### A.   <u>Background of the Investigation</u>

1.     The investigation of this case began in the fall of 2012. (Tr. 12; Def. Ex. 1 at DISC-000029.) Detective Peter Morgan of the Waterbury Police Department in Waterbury, Connecticut, was the lead detective assigned to the case. (Tr. 57.) Detective Morgan has been a member of the Waterbury Police Department since 1995, and he has been a detective for 12 years, since 2004. (Tr. 11.) He is currently assigned to the Computer Crimes Unit, and the majority of cases he investigates involve child pornography and the online sexual enticement of minors. (Tr. 11.) He has received hundreds of hours of training to investigate those types of cases, and he is also a certified computer forensic examiner. (Tr. 12; Def. Ex. 1 at DISC-000031.)

2.     On October 25, 2012, Detective Morgan received a complaint from a trooper with the Vermont State Police that an individual with the user name Harry.Styles888 had

communicated with three female minors in Vermont via Skype.[2] (Tr. 13; Def. Ex. 1 at DISC-000029.)  The minors believed they were speaking with Harry Styles, who is a well-known performer with the singing group One Direction. (Tr. 13-14 Def. Ex. 1 at DISC-000029.)  The individual turned on his webcam, and the minors could see a still photo of Harry Styles on their screen.  (Tr. 13; Def. Ex. 1 at DISC-000029.)   At one point, the individual asked the minors to pose in front of the camera in a sexual position.  (Tr. 13; Def. Ex. 1 at DISC-000029.)  The minors did not comply and terminated the conversation.  (Tr. 13; Def. Ex. 1 at DISC-000029.)  The trooper initiated an investigation and received information from Skype that the Harry.Styles888 account on Skype was created from an internet protocol address[3] that he subsequently determined belonged to Comcast Cable ("Comcast") and was assigned to someone in Waterbury, Connecticut.  (Tr. 14; Def. Ex. 1 at DISC-000029.)

　　　3.　　　Detective Morgan reviewed the trooper's investigative reports and then obtained an *ex parte* order from a Connecticut Superior Court Judge in Waterbury requiring Comcast to disclose the subscriber information associated with the internet protocol address disclosed by Skype.  (Tr. 15; Def. Ex. 1 at DISC-000029.)   Comcast responded via letter dated November 8,

---

[2] "Skype is a voiceover Internet protocol program through which individuals can communicate with each other via webcam (video), microphone (audio), and/or instant messaging, by way of the Internet." *United States v. Naim*, No. 13-cr-660 NGG, 2015 WL 3440253, at *3 (E.D.N.Y. May 20, 2015); *see Ramirez v. Buyauskas*, No. CIV.A. 11-6411, 2012 WL 606746, at *22 (E.D. Pa. Feb. 24, 2012) ("Skype is a computer program that allows users to communicate over the Internet by instant message, video chat, and voice chat.") *amended*, 2012 WL 699458 (E.D. Pa. Mar. 2, 2012).

[3] Internet protocol addresses, also called IP addresses, "are numbers that are automatically assigned when a person signs onto the internet via an 'ISP' (Internet Service Provider). Thus when a person uses an internet service provider to access the internet, that person is assigned an IP address unique to the 'session' in which he is signed on to the internet." *United States v. Hair*, 178 F. App'x 879, 883 n.4 (11th Cir. 2006); *see United States v. Bershchansky*, 788 F.3d 102, 105 n.2 (2d Cir. 2015) ("[a]n internet protocol ('IP') address is a numerical label consisting of four numbers, separated by periods. Every computer that communicates with an internet network is assigned a unique IP address").

2012, reporting that the internet protocol address was assigned to the account of John Eastman at
████████████████████, Waterbury, Connecticut.  (Tr. 15-16; Gov't Ex. 17; Def. Ex. 1
at DISC-000029.)

      4.      On the evening of Saturday, November 10, 2012, two days after receiving the
response from Comcast, Detective Morgan was working a weekend rotation at the Waterbury
Police Department.  (Tr. 16.)  Detective David Terni was the only other detective working at the
Waterbury Police Department that evening.  (Tr. 17, 133-35.)

      5.      Detective Terni has been a member of the Waterbury Police Department for
nineteen years, and he has been a detective for the last nine years.  (Tr. 133.)

      6.      Detective Morgan asked Detective Terni to accompany him to the defendant's
residence to try and speak with the defendant about the complaint from the Vermont State Police.
(Tr. 16-17, 135-36.)

      7.      Detective Morgan did not obtain a search warrant prior to going to the
residence.  (Tr. 17.)  Detective Morgan testified that he felt he did not have enough probable
cause for a warrant and believed a judge may question him for not conducting addition
investigation before obtaining a warrant.  (Tr. 17, 68.)  Detective Morgan was unsure if John
Eastman was necessarily living at the residence, if someone else was in that residence using the
internet account, or if there was an open wireless network where someone else was using the
account.  (Tr. 17-18.)  In addition, Detective Morgan testified that in his years of experience,
trying to talk to people first, without a search warrant, yields more cooperation. (Tr. 18.)
Detective Morgan referred to this strategy as a widely used law enforcement tactic known as
"knock and talk" and he has employed this tactic on numerous occasions.  (Tr. 18, 125.)  In his
experience, suspects often voluntarily agree to let him examine their computers.  (Tr. 18.)

8.      That evening, sometime between 6:00pm and 6:15pm, Detectives Morgan and Terni drove in an unmarked police vehicle to ████████ Avenue.  (Tr. 17, 19, 135-36; Def. Ex. 7 ¶ 2 (noting the time was approximately 6:00pm.).)  They were armed, but only because they were required to be armed while on duty.  (Tr. 19, 161-62.)  Otherwise, the detectives were dressed in plain clothes.  (Tr. 19, 136-37.)

**B.      The Detectives' Entry into the Defendant's Residence**

9.      The defendant lived on the third floor of ████████ Avenue with his mother, Linda Eastman.  (Tr. 209, 221.)  Although the lease is in Mrs. Eastman's name, the defendant has resided there for a few years.  (Tr. 210, 222.)  The defendant had his own bedroom and his mother had her own bedroom.  (Tr. 221.)  The defendant also had the authority to allow third parties such as Comcast to provide services to the apartment even though his name was not on the lease—a fact that Mrs. Eastman readily admitted in her testimony. (Tr. 221-22.)

10.     When the detectives arrived at ████████ Avenue, they walked up to the third floor and knocked on the door.  (Tr. 19-20, 136-37.)  A man who identified himself as John Eastman answered the door.  (Tr. 20, 136-37.)  Detective Morgan identified himself and displayed his badge to the defendant.  (Tr. 20, 136, 174.)  Detective Morgan also introduced Detective Terni, whose badge was visible as he wore it around his neck.  (Tr. 20, 136, 174.)

11.     Detective Morgan informed the defendant that they were investigating a case involving his residence and asked if the detectives could come inside to speak to the defendant. (Tr. 20-21, 137, 177)  The defendant consented and invited them to enter the apartment.  (Tr. 21, 137, 163-64, 186.)

12.     Detective Morgan testified that he believed the defendant had the authority to let the detectives into the apartment.  At that moment, the detectives were unaware that anyone else was inside or living in the apartment.  (Tr. 21, 168; *see* Tr. 137 (Detective Terni testified that no

one else came to the door when they knocked.).)  The defendant's mother, who the detectives later learned was in the apartment, was in her bedroom, asleep, with the door closed, when the detectives first arrived.  (Tr. 223-225.)  Nothing in the record indicates that the defendant told the detectives when they first arrived that anyone else was inside or resided in the apartment.  While the detectives did not attempt to determine whose name was on the lease prior to driving to the residence, Detective Morgan had received information from Comcast indicating that John Eastman was the subscriber for the internet service at that address (Tr. 21; 61-62; Gov't Ex. 17.)

13.     In the defendant's affidavit to the Court, he admits the detectives identified themselves as police officers, but he claims that they did not display identification or provide their names.  (Def. Ex. 7 ¶ 3.)  The defendant further claims the detectives did not ask to enter the apartment and he did not invite them in.  (*Id.* ¶ 4.)  Rather, the defendant claims that when he opened the door, the detectives stepped inside forcing the defendant to stumble backwards.  (*Id.*)

14.     Because the defendant did not testify and could not be cross-examined, the assertions in his affidavit should be given little to no weight.  *See, e.g, United States v. Rivera*, 89 F. Supp. 3d 376, 389 (E.D.N.Y. 2015) ("the court declines to give significant weight to [defendant's] affirmations.  Because Mr. Garrett exercised his right not to testify, his testimony by affirmation was not subject to cross-examination"); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n. 13 (S.D.N.Y.2014) (giving less weight to defendant's affidavit because "[a]s a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination") (collecting cases); *DiMattina v. United States*, 949 F. Supp. 2d 387, 410–11 (E.D.N.Y. 2013) ( "DiMattina has chosen not to testify in his own defense. That is his constitutional right. Yet, he cannot use that right as shield to protect him from potential criminal liability while concomitantly wielding his affidavits as a

sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight"); *United States v. Munoz*, 987 F. Supp. 2d 438, 440 (S.D.N.Y. 2013) ("The Court considers [the defendant's] affidavits, but affords them less weight than credible testimony offered at the hearing"); *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 518 (S.D.N.Y. 2013) ("The Court credits the agents' testimony and gives diminished weight to the [defendant's] affidavit, which was not supported by other evidence or subject to cross examination"); *United States v. Al–Marri*, 230 F.Supp.2d 535, 539 (S.D.N.Y. 2002) ( "[t]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [defendant's] version of the facts"); *United States v. Juliano*, No. 99-cr-1197 (AGS), 2000 WL 1206745, at *3 (S.D.N.Y. Aug. 24, 2000) ("[T]he Court finds that, because defendant did not testify at the hearing and was not subject to cross-examination, the Court is unable to form an opinion as to his credibility or as to the truthfulness of his allegation. . . . Consequently, the Court concludes that defendant's conclusory statement that he "did not consent" carries little weight"); *United States v. Frank*, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998) (crediting officers hearing testimony and giving "little weight" to defendant's affidavit because the affidavit was not subject to cross examination and the testifying witnesses were credible); *see also United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) ("Although defendant submitted an affidavit . . . it was not clearly erroneous for the District Court to credit the officers' testimony over defendant's affidavit").

15.     The defendant did not present any other witness to corroborate his statement about the detectives' entry into the apartment.  The only witness to testify on his behalf was the defendant's mother.  However, she was in her bedroom, asleep, with the door closed, when the

detectives first arrived.  (Tr. 223-225.)  She did not observe the detectives enter the apartment.  (Tr. 223.)  She had no firsthand knowledge if the detectives identified themselves or displayed their badges to the defendant.  (Tr. 224.)  She had no firsthand knowledge if the detectives asked the defendant for permission to enter the apartment, and she had no firsthand knowledge if the defendant gave the detectives permission to enter the apartment.  (Tr. 224-225.)

16.     Accordingly, the Court should credit the detectives' testimony and find that the detectives identified themselves to the defendant and displayed their badges.  The Court should further find that the detectives requested permission to enter the apartment before entering, and that the defendant consented to their entry into the apartment.

C.     **Events Inside the Defendant's Residence**

17.     Once inside the apartment, the defendant sat on a couch in the front living room while the detectives stood in front of him.  (Tr. 22, 137-38.)  Detective Morgan informed the defendant about the investigation and began asking the defendant some questions.  (Tr. 22-23, 138, 177-78; *see* Def. Ex. 7 ¶ 5.)  Although the detectives did not inform the defendant of his *Miranda* rights at that point (Tr. 104, 178), the detectives did not consider him to be in custody (Tr. 130, 178) and the detectives told the defendant he was not under arrest—a fact that the defendant himself admits in his affidavit.  (Tr. 22; Def. Ex. 7 ¶ 6; *see also* Tr. 216 (testimony of Linda Eastman stating the officers told her that the defendant was not going to be arrested).)  The defendant was calm and cooperative while they were in the apartment.  (Tr. 22, 27, 30, 127; *see* Tr. 139 (Detective Terni described the defendant as being "very cooperative[,] [v]ery cordial, [and] "polite.").)

18.     The detectives did not place the defendant in handcuffs at any point.  (Tr. 22, 26, 30, 138, 154-55, 166.)  Nor did they conduct a protective sweep of the apartment.  (Tr. 78-79, 81-82, 167.)  The detectives did not feel they were in any danger.  (Tr. 83-84, 126-27, 168.)  The

detectives were unaware he had a criminal history. (Tr. 83.)  Although the detectives had different recollections as to whether or not they were carrying handcuffs on them at the time, the detectives were definite in their testimony that they did not place the defendant in handcuffs. (Tr. 22, 26, 30, 73, 138, 166.)  The detectives did not feel handcuffs or a protective sweep were necessary because he was not in custody or under arrest and because he was very cooperative. (Tr. 26-27.)  Detective Terni testified, "[the defendant's] demeanor was very pleasant and cooperative and he gave us no indication that he was going to be violent in any way. We weren't there for a violent crime. So we weren't concerned with doing a protective sweep of the house." (Tr. 168.)  Detective Morgan similarly testified, "[t]here was absolutely no reason for that. I didn't feel a protective sweep was necessary in any way."  (Tr. 127.)  Detective Morgan has often times talked to individuals in their homes about a case without placing them in handcuffs or conducting a protective sweep.  (Tr. 127.)  As the Court observed during the hearing, Detective Morgan has a large physical build.  (*See* Tr. 214 (testimony of Linda Eastman describing Detective Morgan as "tall" and "big.").)

19.     During Detective Morgan's conversation with the defendant, the defendant stated he used the Harry Styles user name to speak to people via the Skype program (Tr. 24, 30.) Detective Morgan asked the defendant if he would be willing to come to the police station to provide a statement.  (Tr. 24, 139; Def. Ex. 7 ¶ 5.)  The defendant agreed to go with the detectives to the station for an interview.  (Tr. 24-25, 139; Def. Ex. 7 ¶¶ 5-6.)  The defendant concedes "the request to go to the station was phrased as a request, not an order." (Def. Ex. 7 ¶ 6.)

20.     As Detective Morgan was speaking with the defendant in the living room, the defendant's mother came into the room.  (Tr. 23, 138-39.)  Detective Morgan proceeded to

identify himself and explain why he was there, but before he could say much, the defendant cut him off. (Tr. 23, 138-39.) The defendant told his mother everything was all right and to go back in her room. (Tr. 23, 138-39.) She then walked away. (Tr. 23-24, 138-39.)

21.     Detective Morgan continued to speak with the defendant. During the conversation, Detective Morgan asked the defendant about computers in the residence. (Tr. 24-25, 139.) Detective Morgan noticed a laptop computer in the living room, but the defendant stated he did not use that laptop. (Tr. 25; *see* Tr. 226 (testimony of Linda Eastman stating there was a laptop in the living room).) The defendant stated the computer he used was in his bedroom. (Tr. 25, 139.) Detective Morgan asked if he could see the computer, at which point the defendant led the detectives into his bedroom. (Tr. 25-2, 139.) The detectives observed a desktop computer, which the defendant identified as the computer he used. (Tr. 25-26, 139.) Detective Morgan did not have a consent to search form with him, but he asked the defendant if the defendant would agree to let the detective take the computer back to the police station, and the defendant verbally agreed. (Tr. 25-26, 28-29, 139, 164-65, 187.)

22.     Detective Morgan testified that based on the defendant's statements, he believed the defendant had the authority to let him take the computer. (Tr. 25-26, 29.)  If the defendant had not consented to take the computer, Detective Morgan testified he would have secured the apartment if necessary and obtained a search warrant to seize the computer.  (Tr. 30.) While Detective Morgan had stated earlier in his testimony that he did not believe he had enough probable cause for a search warrant before he entered the apartment, he stated the defendant had now admitted that he had been using the Harry Styles username to speak with people over Skype. (Tr. 30.)

23.     The detectives did not take anything else from the residence aside from the one computer.  (Tr. 28, 226 (testimony of Linda Eastman stating the detectives only took one computer and nothing else).)  They left the other computers in the apartment.  (Tr. 28, 226.)  They did not enter the mother's bedroom or search through any drawers or cabinets. (Tr. 24, 28, 79, 154.)  Detective Morgan did not recall entering the kitchen, but he testified he walked through a hallway to get to the bedroom. (Tr. 28, 80.)  In looking at the floor plan, this hallway was likely the kitchen.  (Def. Ex. 21.)  Similarly, Detective Terni did not recall entering the kitchen, although he stated he may have a one point (Tr. 154.)  However, both detectives denied going through drawers or cabinets or searching the kitchen.  (Tr. 24, 28, 79, 154.)

24.     The detectives and the defendant then departed the residence.  (Tr. 26-27, 139-40.)  Prior to leaving the residence, the defendant used the bathroom.  (Tr. 26-27, 140.)  The detectives also informed Mrs. Eastman that they were going to the police station with the defendant, and they also told her that the defendant was not under arrest.  (Tr. 27, 140, 216 (testimony of Linda Eastman confirming the same).  The detectives and the defendant then left the apartment to go to the Waterbury Police Station.  (Tr. 27, 30-32, 140.)

25.     The period of time that the detectives were in the apartment did not last more than 15 or 20 minutes.  (Tr. 30.)   During the entire time, the defendant was calm and cooperative.  (Tr. 19, 27, 139.)

26.     In the defendant's affidavit to the Court, he makes a number of claims which the Court should not credit.  He states that when he observed Detective Morgan in his bedroom disconnecting the computer, he informed the detective he had no right to conduct a search and not to touch it.  (Def. Ex. 7 ¶ 11.)  There is no testimony his mother heard her son make such a statement.  The defendant further states the detectives took four cell phones, even though his

mother testified the detectives did not take anything except the computer. (Def. Ex. 7 ¶ 18; Tr. 226.)

27.     The defendant also claims that Detective Morgan entered the kitchen and began looking through counter drawers and into the pantry area.  (Tr. 231; Def. Ex. 7 ¶ 8.)  At the same time, however he claims he was sitting on a couch, which his mother confirmed was on the right side of the floor plan in the front living room in front of a window. (Tr. 231; Def. Ex. 7 ¶ 7; Def. Ex. 21.)  In looking at the floor plan of the apartment, it appears unlikely that the defendant would have been able to see the kitchen and most of the pantry area from that vantage point. (*See* Def. Ex. 21.)  He also claims Detective Morgan entered his mother's bedroom (Def. Ex. 7 ¶¶ 8-9), which he would not have been able to see from his location. (*See* Def. Ex. 21.)

28.     As discussed above, because the defendant did not testify and could not be cross-examined, and because his statements uncorroborated, the defendant's claims should be given little to no weight.  (*See* case law, *supra* ¶ 20.)

29.     At the suppression hearing, Mrs. Eastman claimed that earlier that evening, while she was asleep in her bedroom, Detective Morgan banged on her door, opened her door, and stood inside for a few minutes.  (Tr. 213-14.)  She claimed that after he exited her bedroom, she observed him opening drawers and looking through stuff.  (Tr. 213.)  She claimed that she then went and stood in the doorway between the kitchen and the living room, where she saw the defendant sitting on a couch across the way, past the living room, at the far end of the other front living room next to the window, with handcuffs behind his back. (Tr. 214, 231-33; Def. Ex. 21.) She claimed she observed him handcuffed later when he passed by her to use the bathroom.  (Tr. 235.)

30.     The Court should not credit her testimony either.  Seeing her son in jail has been tough for her, and she wants him to come home as soon as possible. (Tr. 219.)  There are also inconsistencies between her testimony and the statements in her affidavit.  For example, in her affidavit, she states that after seeing her son in the living room, she sat down at the kitchen table. (Def. Ex. 8 ¶ 4.)  However, at the hearing, she testified that after seeing her son sitting in the living room, she went to her bedroom and stood "in the doorway between [her] room and the bathroom." (Tr. 234-35.)  She testified she did not go anywhere else while the police were in the apartment. (Tr. 234.)  In addition, the Court should find it hard to believe she was able to observe the defendant wearing handcuffs in the living room, considering there was quite a distance between them and the handcuffs were purportedly behind his back.  (Tr. 214, 231-33; Def. Ex. 21.)

31.     The defendant's mother also testified the detectives did not ask for her permission to take the computer. (Tr. 215.)  She testified that she owned the desktop computer that was in her son's bedroom, claiming she was the one who purchased it.  (Tr. 217.)  She recognized a receipt for the purchase of the computer, although the receipt itself does not list her name or otherwise indicate who purchased the computer. (Tr. 217; Def. Ex. 38.)

32.     Notwithstanding her statements, in the defendant's affidavit, he twice refers to the computer as "my computer."  (Def. Ex. 7 ¶ 17.)  He does not refer to the computer as his mother's computer.  (*Id*.)  In addition, Mrs. Eastman agreed that computer was the one he used and "[f]or the most part, that [computer] was his computer for his use in his bedroom."  (Tr. 225-26.)  She only used that computer "[m]aybe once a week.  Just to see what was on there."  (Tr. 226.)  She had two other computers in the apartment that were for her use: one in her bedroom and one in the living room.  (Tr. 226.)

15

33.     Mrs. Eastman further testified the detectives never asked for her permission to enter the apartment or take the computer.  (Tr. 215.)  In her testimony and in her affidavit, Mrs. Eastman states she asked the detectives why they were in her apartment and what they were looking for, and she claims she was never shown a warrant.  (Tr. 214; Def. Ex. 8 ¶¶ 2, 8.)  She also testified she would not have allowed the police to enter her apartment or take the computer without a warrant. (Tr. 217.)

34.     However, there is no testimony that Mrs. Eastman ever told the detectives she owned the computer.  There is no testimony she ever expressly objected and told them not to take the computer.  There is no testimony she ever expressly objected to them being in the apartment nor is there any testimony she ever asked them to show her a warrant. And there is no testimony she ever expressly asked the detectives to leave the apartment.

35.     Similarly, nothing in the record indicates that Mrs. Eastman or the defendant ever informed the detectives of the fact that only her name was on the lease.  (Tr. 165.)

36.     After weighing the evidence, the Court should find that the defendant verbally agreed to let the detectives enter the apartment and to take the computer from his bedroom.  (Tr. 25-26, 28-29, 136-37.)  The Court should also find that neither the defendant nor Mrs. Eastman told the detectives she was the owner of the computer or that she was the only person named on the lease.  The Court should further find that neither the defendant nor Mrs. Eastman expressly objected to the detectives being in the apartment, neither of them asked the detectives to leave the apartment (Tr. 28.), neither of them asked to see a warrant (Tr. 28.), and neither of them told the detectives they could not take the computer (Tr. 29.)  In addition, the Court should find that the detectives did not take anything else from the residence.  (Tr. 28, 226.)

16

### D.     The Defendant's Voluntary Statement at the Police Station

37.     After leaving the apartment, the detectives drove the defendant to the Waterbury

Police Station.  (Tr. 30-32, 139-40, 142.)  They did not place the defendant in handcuffs during

the drive.  (Tr. 31, 85, 154-55.)  They did a pat down before he entered the car and did not locate

any weapons.  (Tr. 31.)  Police department policy did not require them to place him in handcuffs

as he was not a prisoner or under arrest.  (Tr. 84-87, 167, 202.)

38.     After they arrived at the police station, they proceeded into an area known as the

Detective Bureau. (Tr. 31-32, 142.)  The Detective Bureau as a large room, about the size of the

courtroom where the suppression hearing was conducted, with numerous desks and other rooms

within.  (Tr. 3, 142-43.)  Detective Morgan sat at a desk with a computer, and the defendant sat

next to him.  (Tr. 32-33, 143.)  Detective Terni sat at a desk behind Detective Morgan, but he

was facing across from the front of the defendant and the computer screen.  (Tr. 33, 143.)

39.     The defendant was not placed in handcuffs while he was at the police station. (Tr.

34, 154-55.)

40.     Detective Morgan then began interrogating the defendant.  (Tr. 34.)  Before

asking any questions, Detective Morgan provided the defendant with an "Advisement of Rights"

card, which lists what is commonly referred to as a person's *Miranda* rights (Tr. 34, 144-45;

Gov't Ex. 1.)  Detective Morgan first read each of the rights out loud to the defendant, after

which he provided the card to the defendant and had him read the rights to himself.  (Tr. 34.)

Detective Morgan had the defendant read the first right out loud as well so he could be sure the

defendant could read and understand English.  (Tr. 35, 145.)  The defendant then initialed each

of the rights and signed the card, indicating he understood and was agreeing to waive those

rights.  (T. 34-35; Gov't Ex. 1.)   Detective Morgan observed the defendant sign and initial the

card, and then Detective Morgan signed the form and noted the date and time, which was November 10, 2012 at 6:55 p.m. (Tr. 35-37.) Detective Terni did not sign the card, but he testified he could hear Detective Morgan read the rights to the defendant and he observed the defendant signing the form, although he could not see the words on the form itself from where he was sitting. (Tr. 144, 148, 179-80.)

41.     Detective Morgan then questioned the defendant about his use of Skype to speak to other individuals. (Tr. 37, 145-46.) This conversation lasted about 37 minutes. (Tr. 40.) At that point, Detective Morgan asked the defendant if he was willing to provide a written statement, and the defendant agreed. (Tr. 37-38.)

42.     Detective Morgan started a computer program in order to type the defendant's statement into a "Voluntary Statement" form, but he first provided the defendant with a "Voluntary Statement Rights Form" which is another form that lists an individual's *Miranda* rights. (Tr. 38; Gov't Ex. 2.) Detective Morgan had the defendant read the form to himself. (Tr. 39-40.)[4] The defendant placed his initials next to several (but not all) of the rights and then signed the form agreeing that he understood and wished to waive those rights. (Tr. 39-40; Gov't Ex. 2.) Detective Morgan observed the defendant sign and initial the form, and then Detective Morgan signed the form and noted the date and time, which November 10, 2012 at 7:32 p.m. (Tr. 39-40; Gov't Ex. 2.) Detective Terni did not sign the form, but he testified he could hear Detective Morgan discussing the form with the defendant and he observed the defendant signing the form, although he could not see the words on the form itself from where he was sitting. (Tr.

---

[4] Detective Terni testified that Detective Morgan verbally advised the defendant of the rights (Tr. 146, 180), although he later stated he could not recall the details about this particular form. (Tr. 180.) He stated the events took place four years ago and he does not recall all of the "details" of what transpired. (Tr. 156.)

147-48.)  After signing the "Voluntary Statement Rights Form," Detective Morgan began to type up a "Voluntary Statement" based on the information the defendant provided.  (Tr. 41.)

43.     During this conversation, Detective Morgan had the defendant sign a "Consent to Search" form to memorialize the verbal consent he previously gave to search his computer.  (Tr. 41, 43-47, 147-48; Gov't Ex. 3.)   The defendant signed and initialed the form.  (Tr. 43-47; Gov't Ex. 4.)  Detective Morgan observed the defendant sign and initial the form, and then Detective Morgan signed the form and noted the date and time, which was November 10, 2012 at 7:40 p.m..  (Tr. 43-47; Gov't Ex. 3.)    Detective Terni did not sign the form, but he testified he could hear Detective Morgan discuss the form and he observed the defendant signing the form, although he could not see what the words on the from where he was sitting.  (Tr. 147-48, 173.)

44.     The form indicates that the computer is located at ███Redacted███ Avenue, which is the defendant's residence.  (Tr. 45; Gov't Ex. 4.)  At the time the form was signed, however, the computer was already physically at the Waterbury Police Station.  (Tr. 45.)  Detective Morgan testified that he wrote the defendant's address on the form, but he was not trying mislead anyone by listing the defendant's address rather than the police station as the location of the computer. (Tr. 45-46.)  Rather, Detective Morgan wanted it to be known where the computer was taken from originally.  (Tr. 45-46.)

45.     After the defendant signed the Consent to Search form, Detective Morgan finished typing up the "Voluntary Statement" based on the information that the defendant providing.  (Tr. 48, 148-49.)  Detective Morgan printed the "Voluntary Statement" form and gave it to the defendant to read and review.  (Tr. 48, 149.)  The defendant reviewed it and requested a change.  (Tr. 48, 188-89.)   Detective Morgan made the requested change, reprinted the form, and provided it to the defendant.  (Tr. 48-49; Gov't Ex. 4.)

46.     The "Voluntary Statement" states that Detective Morgan advised the defendant of his constitutional rights and that he signed and initialed a card and form agreeing to waive those rights.  (Tr. 49; Gov't Ex. 4 at 1).  The referenced card and form are the "Advisement of Rights Card" and the "Voluntary Statement Rights Form" that the defendant signed earlier.  (Tr. 49; Gov't Exs. 1, 2.)  The "Voluntary Statement" then described in detail the defendant's alleged use of Skype to entice minors to engage in sexually explicit conduct.  (Gov't Ex. 4).  Finally, the "Voluntary Statement" states that the defendant signed a consent to search form allowing Detective Morgan to take the desktop computer from his bedroom and conduct a forensic examination. (Tr. 49-50; Gov't Ex. 4 at 2).

47.     At that point, Detective Morgan called for a supervisor to observe and notarize the defendant's signature.  (Tr. 50, 149.)  Lieutenant William Fox then came up to notarize the statement.  (Tr. 51-52, 149.)

48.     Lieutenant Fox, who is now an Acting Captain in the Patrol Division, has been a member of the Waterbury Police Department since 1995.  (Tr. 190.)  In November 2012, he was a Lieutenant in the Patrol Division.  (Tr. 191.)  Part of his responsibilities includes notarizing statements made on the Voluntary Statement form.  (Tr. 193.)  He has had to notarize the form on approximately 40 to 50 occasions.  (Tr. 193.)

49.     After Lieutenant Fox came up, he administered an oath to the defendant.  (Tr. 51, 193, 197.)  He asked the defendant if the statement was his statement and if it was the truth and the defendant indicated it was.  (Tr. 52, 193-94, 197-98.)  He then asked the defendant if anyone coerced or forced him to make the statement (Tr. 193-94, 198.)

50.     Lieutenant Fox then asked the defendant initial the beginning and end of the statement on each of the two pages, and the defendant did so.  (Tr. 52-53, 149, 194, 198; Gov't

Ex. 4.)  Detective Morgan, Detective Terni, and Lieutenant Fox all observed the defendant places his initials on the statement.  (Tr. 52-53, 151-52.)

51.     Lieutenant Fox then asked the defendant to sign the bottom of each page.  (Tr. 53-54, 198.)  The defendant signed the bottom of each page.  (Tr. 53-54; Gov't Ex. 4.)  Detective Morgan, Detective Terni, and Lieutenant Fox all observed the defendant sign the statement.  (Tr. 53-54, 151-52.)

52.     After the defendant signed the statement, Lieutenant Fox signed the statement as a supervisor and Detective Terni signed the statement as a witness.  (Tr. 54, 149-50, 196-97; Gov't Ex. 4)  Detective Morgan and Detective Terni both observed Lieutenant Fox sign the statement, and Detective Morgan and Lieutenant Fox both observed Detective Terni sign the statement. (Tr. 54, 151-52.)

53.     Although Lieutenant Fox could not recall notarizing the Voluntary Statement for this particular defendant, Lieutenant Fox confirmed his signature on this statement and indicated he has only notarized a statement for Detectives Morgan and Terni on one occasion.  (Tr. 195, 197.)  He indicated that the process described above is the one he follows every time and he has never deviated from the process.  (Tr. 194, 197.)  He has never signed a blank Voluntary Statement form, and he has never notarized a form that had been already signed by an individual without having observed that person sign it. (Tr. 194, 198.)

54.     After the statement was signed, Detective Morgan and Detective Terni drove the defendant back to his residence.  (Tr. 54-56, 153.)  The defendant was not arrested at that time. (Tr. 55-56.)  Detective Morgan testified he first needed to perform a forensic examination of the defendant's computer to obtain evidence to confirm that the information in his statement was accurate and to link the defendant to the minors in Vermont.  (Tr. 55, 116-17.)

55.     After they arrived at the residence, the defendant exited the car and the detectives left. (Tr. 56, 155.)

56.     In the defendant's affidavit to the Court, he denies making any statement to the detectives and claims he was handcuffed.  (Def. Ex. 7 ¶¶ 13, 15, 16.)  He claims he did not sign or initial the "Advisement of Rights," the "Voluntary Statement of Rights," the "Consent to Search," or the "Voluntary Statement" (collectively, the "Questioned Documents").  (Def. Ex. 7 ¶ 19.)  The defendant's mother was not present at the police station and did not witness anything that happened there.  (Tr. 210.)

57.     As before, because the defendant did not testify and could not be cross-examined, and because his mother cannot corroborate his claims about what happened at the police station, the Court should give those claims little to no weight.  (*See* case law, *supra* ¶ 20.)

**E.     The Parties' Handwriting Experts**

58.     To support the defendant's claim that he did not sign the Questioned Documents, the defendant submitted a report by John Reznikoff, who purports to be an expert in questioned documents and handwriting.  (Def. Ex. 22 at 5.)  In his report, Mr. Reznikoff claims to have examined photocopies of the Questioned Documents.  (Def. Ex. 22 at 3.)  He then compared the signatures on those photocopies to signatures on photocopies and originals of fourteen other documents that he states represent the defendant's known signatures.  (Def. Ex. 22 at 3.)  He concluded that the signatures and initials on the Questioned Documents do not share authorship with the fourteen other documents. (Def. Ex. 22 at 3.)

59.     After preparing the report, Mr. Reznikoff was given the opportunity to review the originals of the Questioned Documents that bear the original ink signatures, as opposed to

photocopies. (*See* Stipulation Regarding Evidence Related to Defendant's Motion to Suppress [Doc. 49].) Mr. Reznikoff did not supplement his report after reviewing the original documents.

60.     Mr. Reznikoff did not testify at the hearing and was not subject to cross-examination.[5]

61.     The Court should give little weight to Mr. Reznikoff's report and conclusions. First, he did not testify, and his methodology and qualifications could not be explored. There is no testimony as to how he examined the documents or for how long, whether he used any special equipment, or whether he simply eyeballed the documents for five seconds. The Court has no way of understanding the methodology and procedures he used, whether they are reliable and generally accepted, and whether they would satisfy *Daubert*.

62.     Second, his report is not based on a review of the originals of the Questioned Documents, only photocopies. As he readily admits, "photocopies provide a sub-par example of handwriting . . . . Lost for examination are pen speed, pressure, rhythm, as well as a number of other factors." (Def. Ex. 22 at 3-4.) In addition, because Mr. Reznikoff did not prepare a supplemental report after reviewing the originals, the Court does not know if his examination of the originals confirmed or changed his conclusions.

63.     Third, of the fourteen documents that Mr. Reznikoff examined that he claims represent the defendant's known signatures, all but four are documents the defendant appears to have signed after he was arrested and had a motive to manipulate or alter his signature. (Def. Ex. 22 at 3 (stating Exhibits K1, K12 to K14 attached to his report predate the defendant's arrest).) Almost all of them appear to have been signed on one of two days: either February 23, 2015 or

---

[5] At the start of the hearing, the parties agreed that their respective handwriting experts would not testify but that their reports would be admitted as full exhibits. (Tr. 3-5.) The parties reserved their rights to contest the weight that the Court should attribute to the reports. (Tr. 3-5.)

March 19, 2015.  (Def. Ex. 22, Exhibits K2 to K8, K11).  Significantly, of the four known signatures he examined that pre-date the disputed documents, none of them remotely resemble the defendant's 2015 signatures, further supporting the view that the defendant may have altered his signature after his arrest.  Mr. Reznikoff's report offers no explanation for this discrepancy.

64.     In addition, there was no testimony or evidence describing the conditions under which the defendant signed these documents bearing his known signatures and handwriting exemplars, whether he was supervised and given instructions, or whether he was simply left alone and allowed to take all the time in the world to carefully manipulate his signature.

65.     Fourth, there are numerous other documents in evidence containing the defendant's signatures and initials, including a Waiver of Extradition form that he signed before a judge in Norfolk, Virginia, various forms the defendant signed in 2011 with the State Probation Office, a fingerprint card the defendant signed in 1997, and other forms he signed and initialed while he was being held in Virginia in May 2013.  (Gov't Exs. 5 to 15.)  Mr. Reznikoff did not factor these documents into his report.

66.     The Court should find that the defendant's signature and initials on these documents are strikingly similar to the initials and signatures on the Questions Documents. *See, e.g.*, *United States v. Marshall*, No. 3:10-CR-14-JCH, 2011 WL 2842497, at *6 (D. Conn. July 14, 2011) ("The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents" (quoting *United States v. Alvarez–Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003)).

67.     The Government submitted a report by its own forensic document examiner, Joan DiMartino, to refute the conclusions in Mr. Reznikoff's report.  (Gov't Ex. 16.) She is employed

by the United Stated Department of Homeland Security. (Gov't Ex. 16 at 1.) She compared the originals of the Questioned Documents to other original documents that bear the defendant's signatures and initials, including the Waiver of Extradition signed before a judge in Virginia on May 15, 2013, and a Uniform Arrest Report, a Booking Card, and a Questionnaire, all of which the defendant signed on May 29, 2013 after he was brought back to Waterbury and which are signed by officers other than Detectives Morgan and Terni. (Gov't Exs. 5-8, 16 at 1-2.) After performing a comparative and microscopic handwriting examination, she determined that the writer of John Eastman's signature on the Questioned Documents is the same as the writer of John Eastman's signature on the other documents she examined.

68.     Ms. DiMartino did not testify and therefore, like Mr. Reznikoff, her methodology and qualifications could not be explored. Nonetheless, her findings call Mr. Reznikoff's conclusions into question.

69.     In light of these shortcomings in Mr. Reznikoff's analysis and conclusions, the Court's own review of the various exhibits bearing the defendant's signatures, and the conclusions of Ms. DiMartino, the Court should not credit Mr. Reznikoff's conclusions. To find otherwise, the Court would have to believe that the defendant's signature on the waiver of extradition form witnessed by a judge in Virginia was also forged, his signature on other forms from the Norfolk Sherriff's office were forged, the signature on the 2011 probation forms was forged, his signature on a 1997 fingerprint card was also forged, and his signature on the Uniform Arrest Report, Booking Card, and Questionnaire in 2013 were forged. Such a vast conspiracy to forge his signature on multiple documents witnessed by multiple people in multiple jurisdictions over a span of 20 years defies credulity.

70.     Thus, the Court should find that the defendant signed the Questioned Documents.

### III.     PROPOSED CONCLUSIONS OF LAW

#### A.     Law enforcement did not violate the defendant's Fourth Amendment rights when they entered the defendant's apartment.

1.      The Waterbury Police detectives did not violate the defendant's Fourth Amendment rights when they entered the apartment because the defendant voluntarily consented to their entry.

2.      "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181.  "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Id.* (internal citations omitted); *see United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (a warrantless search or seizure without probable cause does not violate the Fourth Amendment if "the authorities have obtained the voluntary consent of a person authorized to grant such consent"); *Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007) ("Such consent may be given by a third party").

3.       A third party has authority to consent to a search "'if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access.'" *United States v. McGee*, 564 F.3d 136, 139-40 (2d Cir. 2009) (quoting *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)).  Additionally, "even if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." *Andreno*, 505 F.3d at 209.  A third party has apparent authority when "the facts available to the officer[s] at the moment. . .  warrant a man of reasonable caution in the belief that the consenting

26

party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (internal quotation marks omitted).

4.      If two people with common authority over a property are present and one consents to a search, but the other objects, the search is unreasonable as to the objecting co-inhabitant.  *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006) ("a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident").

5.      However, the objecting co-inhabitant party must affirmatively make an objection. *See Randolph*, 547 U.S. at 120 (noting that there must be an "*express* refusal of consent" (emphasis added)); *United States v. Lopez*, 547 F.3d 397, 399 (2d Cir. 2008) (noting there must be an "*express objection*" (emphasis is original)).

6.      Law enforcement officers "are under no affirmative obligation to request consent from a potentially objecting co-occupant before acting on permission they received from another occupant." *Id.* at 400 (citing *Randolph*, 547 U.S. at 122).  If one co-tenant consents to a search, officers have "no duty to ask [the other co-tenant] if he consented to the search, no matter how easy or convenient it might have been to do so." *Lopez*, 547 F.3d at 400.  Rather, the onus is on the co-occupant to affirmatively object to the search.  *See id.* ("[t]he onus was on Lopez to object to the search").

7.      Even if a co-occupant expressly objects to a search, "any further search would be unreasonable *as to the objecting co-occupant*." *Id.* at 397 (citing *Randolph*, 547 U.S. at 121-122) (emphasis added).  In *Randolph*, the Supreme Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable

and invalid *as to him*" (emphasis added)).  *Id.* at 106.  Significantly, the Supreme Court did not

hold that the search would be invalid as to anyone else in the apartment, including the person

who consented.  *See id.* at 120 n.8 (stating it was not deciding such an issue).

8.     In determining whether or not a person has expressed his or her consent, courts

have held that consent "need not be expressed in any particular form[.]" *United States v.*

*Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). "[I]t is well settled that consent may be inferred from

an individual's words, gestures, or conduct. Thus a search may be lawful even if the person

giving consent does not recite the talismanic phrase: 'You have my permission to search.'"

*United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).

9.     Moreover, in determining whether consent is voluntary, courts look to the totality

of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v.*

*Wilson*, 11 F.3d 346, 351 (2d Cir. 1993). A number of factors are relevant to the voluntariness of

a consent to search, including age, education, background, physical and mental condition, the

setting in which the consent is obtained, and the defendant's prior interactions with law

enforcement. *See Schneckloth*, 412 U.S. at 226; *United States v. Calvente*, 722 F.2d 1019, 1023

(2d Cir. 1983) (consent voluntary where 40-year-old defendant was calm, conversation with

police was conversational in tone, and defendant had prior convictions and was "thus no

newcomer to the law").

10.    Significantly, a defendant's knowledge of the right to refuse consent is not a

requirement to a finding of voluntariness.  *See Schneckloth*, 412 U.S. at 231-33; *United States v.*

*Drayton*, 536 U.S. 194, 206 (2002) ("The [Supreme] Court has rejected in specific terms the

suggestion that police officers must always inform citizens of their right to refuse when seeking

permission to conduct a warrantless consent search").

11.     In this case, there is no Fourth Amendment violation because the detectives asked for permission to enter the apartment and the defendant verbally agreed.  The defendant had the actual authority to allow them to enter the apartment.  Even though the defendant's name was not on the lease, he had been living in the apartment for a few years and had his own bedroom.  He also had the authority to allow third party utilities, such as Comcast, to provide services to the apartment in his name.  The defendant had access to the apartment and had common authority over the apartment.  Therefore, the defendant had the actual authority to allow the detectives to enter the apartment.  *See McGee*, 564 F.3d at 139–40 (a third party has authority if he has access to the area searched, and either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access).

12.     Even if the Court were to find that the defendant lacked the actual authority to allow the detectives inside, the record demonstrates that the detectives reasonably believed the defendant had the authority to let them in.  Although the detectives did not perform a property records search to see who owned or leased the apartment, they had the information from Comcast indicating that the defendant subscribed to internet service at that address.  When the detectives asked if they could come inside, the defendant agreed.   At the time, the defendant did not inform them that someone else was inside the apartment, let alone that the lease to the apartment was in his mother's name.  Under these circumstances, the defendant had the apparent authority to allow the detectives into the apartment.  *See Rodriguez*, 497 U.S. at 188 (warrantless entry based upon the consent of a third party is valid when, at the time of entry, the facts available to the officers would cause them to reasonably believe the party had authority over the premises).

13.     In addition, looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  The defendant invited the detectives into his apartment, and later showed the detectives to his bedroom.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. *See United States v. Cardona*, 545 F. App'x 76, 80 (2d Cir. 2013) (finding that wife's consent was voluntary where wife was fluent in English, had the authority to consent, was at all times calm and cooperative, and was told she was not in any trouble); *see also United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) ("absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial"); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (noting that interrogation in the familiar surroundings of one's own home is generally not deemed custodial). In fact, the defendant admits that the request to go to the police station for an interview "was phrased as a request, not an order."  The defendant also has prior dealings with law enforcement and is no newcomer to the law.  *See Calvente*, 722 F.2d at 1023 (consent voluntary where 40-year-old defendant was calm, conversation with police was conversational in tone, and defendant had prior convictions and was "thus no newcomer to the law").  That the detectives did not expressly inform the defendant that he could refuse consent does not impact the voluntariness of his consent.  *See Schneckloth*, 412 U.S. at 231-33 (a defendant's knowledge of the right to refuse consent is not a requirement to a finding of voluntariness); *Drayton*, 536 U.S. 194, 206 (2002) ("The [Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search").

30

14.     The fact that the officers did not ask Mrs. Eastman, as the tenant whose name was on the lease, for consent to enter the apartment does not change the analysis.  As discussed, the law allows a third party with actual or apparent authority to consent, which the defendant had in this case.  In addition, the detectives were under no obligation to ask for Mrs. Eastman's consent once they had the defendant's consent.  *See Lopez*, 547 F.3d at 400.  Rather, the onus was on Mrs. Eastman to expressly object to their entry or tell them to leave.  *See id.*  As discussed, there is no testimony that she did so.  While she asked Detective Morgan what he was doing and looking for and while she testified they never asked for her permission, she never testified she expressly objected to their presence or asked them to leave.

15.     Even if she had objected, the search would have only been unreasonable as to her, not as to the defendant.  *See Randolph*, 547 U.S. at 106; *Lopez*, 547 F.3d at 397.

16.     Accordingly, because the defendant verbally consented to the detectives entering the apartment, and because he had the actual and apparent authority to give that consent, the detectives did not violate the defendant's Fourth Amendment rights when they entered the apartment.

**B.     Law enforcement did not violate the defendant's Fourth Amendment rights when they took the defendant's computer.**

17.     For substantially similar reasons, the Waterbury Police detectives did not violate the defendant's Fourth Amendment rights when they took the computer from his bedroom because, again, the defendant voluntarily consented to let them take the computer.

18.      First, the defendant had the actual authority to allow them to take the computer because he had access to the computer and he had common authority over the computer. *See McGee*, 564 F.3d at 139–40 (a third party has authority if he has access to the area searched, and either: (a) common authority over the area; or (b) a substantial interest in the area; or (c)

permission to gain access). Even though Mrs. Eastman purchased the computer and claims she is the owner, the defendant was the primary user of the computer. As she testified, "[f]or the most part, that [computer] was his computer for his use in his bedroom." (Tr. 226.) She only used that computer "[m]aybe once a week. Just to see what was on there." (Tr. 226.) She had two other computers in the apartment that were for her use: one in her bedroom and one in the living room. (Tr. 226.) Even the defendant, to this day, continues to refer to the computer as "my computer." (Def. Ex. 7 ¶ 17.) He does not refer to the computer as his mother's computer. (*Id.*)

19.     Second, even if the Court were to find that the defendant lacked the actual authority to allow the detectives to take the computer, the record demonstrates that the detectives reasonably believed the defendant had the authority to let them in. At the time, the defendant identified the computer as the computer he uses, and the computer was located in his bedroom. Detectives had no reason to believe she owned, or even used, the computer. Neither the defendant nor Mrs. Eastman informed the detectives that she was purportedly the true owner of the computer. Under these circumstances, the defendant had the apparent authority to allow the detectives to take the computer. *See Rodriguez*, 497 U.S. at 188 (warrantless entry based upon the consent of a third party is valid when, at the time of entry, the facts available to the officers would cause them to reasonably believe the party had authority over the premises).

20.     Moreover, the detectives were under no obligation to ask for Mrs. Eastman's consent once they had the defendant's consent. *See Lopez*, 547 F.3d at 400. If she had an objection or was refusing consent, the onus was on her to expressly object and tell the detectives they could not take the computer. *See id.* There is no evidence that she did so. Even if she had

objected, the seizure would have only been unreasonable as to her, not as to the defendant.  *See Randolph*, 547 U.S. at 106; *Lopez*, 547 F.3d at 397.

21.     Finally, in looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  As discussed earlier, the defendant invited the detectives into his apartment, and later showed the detectives to his bedroom.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. The request to go to the police station for an interview "was phrased as a request, not an order." The defendant also has prior dealings with law enforcement and is no newcomer to the law.

22.     Further demonstrating the voluntariness of his consent, when the defendant was at police station, he initialed and signed a "Consent to Search" form, memorializing his prior consent to have the detectives examine his computer.  The form expressly disclosed that he had the right to refuse consent, and he initialed the form indicating he read and understood that right. He also initialed the form to indicate his consent was being given freely and voluntarily without coercion.

23.     Accordingly, because the defendant verbally consented to letting the detectives take the computer, and because he had the actual and apparent authority to give that consent, the detectives did not violate the defendant's Fourth Amendment rights when they took the computer.

C.      **The defendant's written consent at the police station authorized the**
        **detectives to search the computer.**

24.     Even if the Court were to conclude that the defendant did not give verbal consent

for the detectives to enter the apartment and take the computer, the defendant's written consent

later at the police station permitted the detectives to maintain and forensically examine the

computer.

25.     When consent to search is preceded by an unlawful seizure, the evidence obtained

from the search does not warrant suppression if the Government shows both that the consent was

voluntary and that "'the taint of the initial [seizure] has been dissipated.'"  *United States v.*

*Snype*, 441 F.3d 119, 132 (2d Cir. 2006) (quoting *United States v. Oguns*, 921 F.2d 442, 447 (2d

Cir. 1990)).  Courts consider four factors to determine whether the taint has been dissipated:  "(1)

the giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the alleged

consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the

official misconduct." *Id.* (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).

26.     Applying this standard here, suppression is not warranted.

27.     First, Detective Morgan advised the defendant of his *Miranda* rights, not once,

but twice, before the defendant signed the consent to search form.  The first time, the defendant

read the rights out loud, and then provided the rights card to the defendant to read to himself.

Detective Morgan even had the defendant read the first right out loud so he could be sure the

defendant could read them.  The defendant initialed each right and signed the card.  Before

signing the consent form, the detective provided the defendant with another form listing his

*Miranda* rights.  Again, the defendant signed the form acknowledging he understood them.

28.     Second, in terms of temporal proximity, almost an hour passed from when the

detectives left the apartment and when the defendant signed the consent to search form.

34

"[I]ntervening event, even within a brief time, can sometimes sever the causal connection between an illegal entry and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will." *Snype*, 441 F.3d at 135 (finding period of 20 minutes was sufficient).

29.     Third, the intervening events show that the defendant voluntarily agreed to go to the police station where he signed the form.  As he states, the request to go to the police station was phrased as a request, not an order.  He was not in handcuffs and he was calm and cooperative.  And the consent to search form made clear that he had the right to require the detectives to obtain a search warrant first.  The defendant also initialed the statements that he was giving consent freely and voluntarily without coercion.

30.     Finally, the detectives conduct was not flagrant or purposeful.  Although the detectives did not get a warrant before going to the apartment, Detective Morgan did not believe he had enough probable cause at the time.  He thought using a "knock and talk" strategy would be more fruitful.  Courts have repeatedly recognized that this "knock and talk" strategy is a legitimate law enforcement option. *See United States v. Chambers*, 395 F.3d 563, 568 n. 2 (6th Cir. 2005) ("Courts generally have upheld [the 'knock and talk'] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (noting that the "knock and talk" is "generally upheld as a legitimate method of investigation, designed to obtain a suspect's consent to search").  In addition, when

they entered the apartment, they believed the defendant had the authority to let them in.  They also believed the defendant had the authority to let them take the computer.

31.     In sum, the four factors weigh in favor of a finding that the taint from any illegal entry into the apartment and taking of the computer was sufficiently dissipated by the time the defendant signed the consent to search form.  Even if the Court finds the fourth factor weighs in favor of the defendant, the other three weigh in favor of the Government.

32.     Accordingly, suppression of the computer evidence is not warranted.

**D.     Law enforcement would have inevitably obtained the computer evidence, and therefore, suppression is not warranted.**

33.     The inevitable discovery exception to the exclusionary rule also applies in this case, and therefore suppression is not warranted.  If the defendant had not consented to let the detectives take and later forensically examine the computer from his bedroom, Detective Morgan stated he would have sought a search warrant, and there would have been sufficient probable cause for him to obtain such a warrant.

34.     Evidence obtained by law enforcement during an otherwise unreasonable search and seizure is nonetheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  "[I]llegally–obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).  This analysis "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have

happened had the unlawful search never occurred."  *United States v. Eng*, 997 F.2d 987, 990 (2d

Cir. 1993).

35.     Under this standard, in order for the computer evidence to be admissible under the

inevitable discovery doctrine, the Court must be able to conclude "with sufficient confidence"

that Detective Morgan would, in fact, have obtained a warrant to search and seize these tapes and

DVDs if they had applied for one.  *See Heath,* 455 F.3d at 60–61.  That standard is satisfied in

this case.

36.     When Detective Morgan went to the defendant's residence on the evening of

November 10, 2012, he was aware, based on information provided by the Vermont State Police,

that someone was using a computer to communicate with minors in a sexually explicit manner

over Skype.  He also had information that the Skype communications were associated with a

Skype username that was created from an internet protocol address assigned to the defendant's

address.  However, Detective Morgan felt he needed additional probable cause and believed,

based on his experience, that a judge might question the probable cause since Detective Morgan

did not conduct any of his own independent investigation.  For example, Detective Morgan

stated there could have been other people outside the residence who were using that internet

protocol address, if, for instance, there was an unsecured wireless router in the home.

37.     After the detectives went to the apartment, and after the defendant invited them

inside and began talking to the detectives, Detective Morgan obtained the additional information

he needed to establish probable cause to seize the computer.   The defendant was not in custody

and he admitted that he had been using the Harry Styles username to speak with people over

Skype, and that information was consistent with the information provided by the Vermont State

Police.  Based on this information, Detective Morgan testified that if the defendant had not

consented to letting the detectives take the computer, he would have at that point secured the apartment if necessary and obtained a search warrant to seize the computer.

38.     In light of the information provided by the Vermont State Police, the information provided by the defendant about his Skype activity, and Detective Morgan's training and experience in investigating online child enticement cases, this Court should find, "with a high level of confidence" that had the detective secured the apartment while obtaining a warrant for the search and seizure of the computer, such a warrant application would have been granted.

39.     Therefore, even the detectives improperly took the computer from the home without a warrant, it properly falls under an exception to the warrant clause and should not be excluded.

     **E.**    **Law enforcement did not violate the defendant's Fifth Amendment rights <u>when they interviewed him.</u>**

40.     The detectives did not violate the defendant's Fifth Amendment when they interviewed him in his home and at the police station.  Therefore, suppression of his statements is not warranted.

41.     A defendant's voluntary confessions are admissible under the Fifth Amendment. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000).  The Government must demonstrate that a defendant's statements were voluntary by a preponderance of the evidence. *See Missouri v. Seibert*, 542 U.S. 600, 610, n. 1 (2004).  To protect a defendant's Fifth Amendment right against self-incrimination, police are required to administer *Miranda* warnings when a suspect is subjected to "custodial interrogation." *Newton*, 369 F.3d at 669 (quoting *Miranda v. Arizona*, 384 U.S. 444, 447 (1966)).  Thus, if a suspect is not in custody, then *Miranda* warnings are not required.  *See United States v. FNU LNU*, 653 F.3d 144, 155 (2d Cir. 2011).   The test for determining whether a person is in "custody is an objective one: whether a reasonable person in

defend-ant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *Newton*, 369 F.3d at 671 (internal quotation marks omitted).  "[O]nce *Miranda's* requirements have been met, a defendant is hard pressed to argue that his confession has been coerced." *United States v. McFarland*, 424 F. Supp. 2d 427, 434 (N.D.N.Y. 2006) (citing *Dickerson*, 530 U.S. at 444 (citing *Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984))).

42.    Under this standard, the defendant's statements were voluntary and should not be suppressed.

43.    First, any discussion that took place in the defendant's home was not the subject of a custodial interrogation.  The Second Circuit has determined that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675; *see Mitchell*, 966 F.2d at 99 (noting that interrogation in one's own home is generally not deemed custodial).  The defendant invited the detectives into the home, he was not in handcuffs, and he was calm and cooperative throughout the short time period of time—15 to 20 minutes—that the detectives were in the home.  Indeed, the defendant concedes he was told he was not under arrest and the detectives' request for him to go to the station "was phrased as a request, not an order."  These circumstances weigh in favor of finding the interview at the home was voluntary and non-custodial. *See Newton*, 369 F.3d at 677 ("[A] reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing the degree to which one is at 'the mercy' of the authorities."); *Mitchell*, 966 F.2d at 98 ("Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave.");

*FNU LNU*, 653 F.3d at 153 (pertinent "circumstances include" the "interrogation's duration"); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) ("The relatively short duration of the interview, which lasted roughly ninety minutes" is "consistent with the finding that the interview was not custodial.")

44.     Second, the statements the defendant made at the police station were made after he was advised of and waived his *Miranda* rights.  Indeed, the defendant was advised of and waived his rights two times, once when he signed the "Advisement of Rights" card and then again when he signed the "Voluntary Statement Rights" form.  (Gov't Exs. 1 and 2.)  Also, in the "Voluntary Statement," the defendant again acknowledged that he was advised of his rights and agreed to waive them.  (Gov't Ex. 4.)  All three forms were signed by both the defendant in the presence of Detectives Morgan and Terni.  In addition, a supervisor, Lieutenant Fox observed and notarized the defendant's signature on the Voluntary Statement.  The defendant was not in handcuffs when he was at the police, and he was not arrested afterwards.  These circumstances weigh in favor of finding that his statements were voluntary.  *See McFarland*, 424 F. Supp. 2d at 434 ("[O]nce *Miranda's* requirements have been met, a defendant is hard pressed to argue that his confession has been coerced" (citations omitted)).

45.     Even if the Court were to determine that the detective's entry into the home was illegal, the statements he made at the police station in the "Voluntary Statement" were sufficiently attenuated from the unlawful entry, and therefore suppression is unwarranted.  *See United States v. Guzman*, 724 F.Supp.2d at 444 (government bears burden of demonstrating "the statements were sufficiently attenuated to remove the taint from the unlawful search").  The factors to be considered are identical to the factors outlined above with respect to consent: "(1) the administration of the *Miranda* warnings, (2) the temporal proximity between the Fourth

Amendment violation and the statements, (3) the presence of intervening circumstances, and (4)

the purpose and flagrancy of the official misconduct." *Id.* at 444 (citing *Mosby v. Senkowski*, 470

F.3d 515, 521 (2d Cir. 2006).  As discussed above, these factors weigh in favor of a finding that

the taint from any illegal entry into the apartment was sufficiently dissipated by the time the

defendant made his statements at the police station and signed the Voluntary Statement.  *See*

discussion of the four factors, *supra* ¶¶ 27-31.

      46.     Accordingly, suppression of the defendant's statements is not warranted.

**<u>CONCLUSION</u>**

     For the foregoing reasons, the Government respectfully requests that the Court deny the

defendant's motion to suppress.

                Respectfully submitted,

                DEIRDRE M. DALY
                UNITED STATES ATTORNEY

                */s/  Neeraj N. Patel*
                NEERAJ N. PATEL
                ASSISTANT UNITED STATES ATTORNEY
                Federal Bar No. phv04499
                157 Church Street, 25th Floor
                New Haven, CT  06510
                Tel.:    (203) 821-3700
                Fax:    (203) 773-5376
                Email: neeraj.patel@usdoj.gov

41

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on June 27, 2016, a copy of the foregoing Government's Proposed Findings of Fact and Conclusions of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/   Neeraj N. Patel* \
Neeraj N. Patel \
Assistant United States Attorney