# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:16-CR-00006 (MPS) |
| v. | |
| JOHN EASTMAN | |

## RULING ON MOTION TO SUPPRESS

### I.      Introduction

The Government accuses John Eastman of posing online as a teenage pop star to induce young girls to expose themselves to him in violation 18 U.S.C. § 2422(b). He is also accused of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). In 2012, a young girl told her mother that a person online posing as the pop star Harry Styles told her and other girls at a sleep-over to pose sexually for him. The mother reported the incident to the police. Later, the police traced the report to an internet protocol address assigned to John Eastman. The police went to Mr. Eastman's home. Mr. Eastman spoke with the police and gave his desktop computer to them. The police did not obtain a warrant before entering Mr. Eastman's home and seizing his computer. Mr. Eastman allegedly gave a detailed confession the same day.

Mr. Eastman now moves to suppress the physical evidence and incriminating statements. The defendant seeks to suppress "all physical evidence seized from [his apartment] as well as certain statements he allegedly made that day to law enforcement officers." (ECF No. 30 at 1.) He argues that the search and seizure is constitutionally infirm because it was conducted without a warrant and without consent. He also argues that his confession must be suppressed because he did not receive *Miranda* warnings. More specifically, he argues that the police forged his signatures on documents purporting to show his consent to the seizure of his computer, his acknowledgment of having received and understood *Miranda* warnings, and his confession.

I held an evidentiary hearing on the motion to suppress on May 31, 2016. The Government presented three witnesses, including Peter Morgan, David Terni, and William Fox. The defense presented a single witness: the defendant's mother, Linda Eastman. The Court also considered the exhibits and affidavits submitted by the parties as well as the parties' pre-hearing submissions and post-hearing briefing. For the reasons discussed below, I deny the motion to suppress because I find that Mr. Eastman consented to the search and seizure and received adequate *Miranda* warnings when they were required.

## II.     Legal Standard

Before trial, a criminal defendant may move to suppress evidence that was obtained illegally. *See* Fed. R. Crim. P. 12(b). "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *U.S. v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citations omitted). *See also United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). The government also bears the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

### A.     Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). The police do not violate the Fourth Amendment if a defendant consents to a search or seizure. *See id.* at 250–51 ("Thus, we

2

have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973))).  The question "is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334 (8th Cir.1994)).

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Id.* at 422 (citing *Schneckloth*, 412 U.S. at 228). "The test of voluntariness is whether[, under the totality of the circumstances,] the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64 (2d Cir. 2012) (internal citations and quotations omitted); *United States v. Perez*, 72 Fed. App'x 857, 859 (2d Cir. 2003); *see also Schneckloth*, 412 U.S. at 227. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. "The scope of the suspect's consent is a question of fact, and '[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.'" *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (quoting *United States v. Isiofia*, 370 F.3d 226, 230–31 (2d Cir. 2004)).

"Factors the court should consider in assessing the voluntariness of a consent include the defendant's age, intelligence and educational background, the length and nature of his or her interaction with the police, and whether the officers engaged in coercive behavior." *United States v. Zaleski,* 559 F. Supp. 2d 178, 185 (D. Conn. 2008); *see Schneckloth,* 412 U.S. at 226–27. The Court should also consider "whether the alleged consenting person was advised of his

3

constitutional rights . . . ." *United States v. Puglisi,* 790 F.2d 240, 243 (2d Cir.1986).  *See also Garcia*, 56 F.3d at 422–23.

### B.     Fifth Amendment

"The Fifth Amendment protects against compelled self-incrimination. It is well settled that before a suspect may properly be subjected to custodial interrogation, he must be informed that he has the right to remain silent, that any statement he makes may be used in evidence against him, and that he has the right to have counsel present." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (citing *Miranda v. Arizona*, 384 U.S. 436, 467–71 (1966)). "'Failure to administer *Miranda* warnings creates a presumption of compulsion,' and that 'presumption . . . [is] irrebuttable for purposes of the prosecution's case in chief.'" *Mathurin*, 148 F.3d at 69 (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). "Thus, 'unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.'" *Id.* (quoting *Elstad*, 470 U.S. at 307.)

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Faux*, —F.3d—, No. 15-1282-CR, 2016 WL 3648331, at *4 (2d Cir. July 8, 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). A seizure is necessary, but not sufficient, for finding that a person is in custody. *Id.* "An individual's subjective belief about his or her status generally does not bear on the custody analysis." *Id.* An officer's subjective belief about the status of an individual, "if conveyed . . . to the individual being questioned," "'may bear upon the custody issue . . .' but 'only to the extent [it] would affect how a reasonable person in the position of the individual being questioned would

4

gauge the breadth of his or freedom of action.'" *See id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

"Relevant considerations include: (1) 'the interrogation's duration'; (2) 'its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)'; (3) 'whether the suspect volunteered for the interview'; (4) 'whether the officers used restraints'; (5) 'whether weapons were present and especially whether they were drawn'; and (6) 'whether officers told the suspect he was free to leave or under suspicion.'" *Id.* (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)).

## III.   Findings of Fact

The defendant contends that the officers lacked a warrant to enter his apartment and that he did not consent to the entry of his apartment or the seizure of his computer. He also contends that his mother revoked any consent that may have been given. Finally, he asserts that his signatures on the consent-to-search and acknowledgment-of-rights forms were forged. (ECF No. 31 at 1.) After considering all of the evidence presented at the evidentiary hearing and the evidence the parties included in their written submissions, I make the following findings of fact, rejecting the defendant's contentions (other than that the police lacked a warrant) and concluding that the Government satisfied its burden of proving by a preponderance of the evidence that the defendant voluntarily consented to the searches, was not in custody when he made statements in his house, and voluntarily waived his *Miranda* rights before signing a confession at the police station.[1]

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice-versa.

### A.     The Alleged Crime

Prior to 2012, John Eastman moved in with his mother, Linda Eastman. Tr. 209. His mother leased the apartment where they lived and bought a computer that Mr. Eastman kept in his bedroom. *Id.* at 209, 217. His mother would go into his bedroom once a week "to see what was on there," *i.e.*, the computer. *Id.* at 225–26.

In 2012, a group of eleven and twelve year-old girls in Vermont were playing with Skype, an online video chat program, during a sleep-over. *See id.* at 12–13. Mr. Eastman was allegedly also using Skype that night and began chatting with the girls. *Id.* at 13. His username, "Harry.Styles888," resembled the name of a member of a popular boy band. *Id.* To trick children into thinking that he was Harry Styles, he would allegedly project video images of Harry Styles via his webcam. Def.'s Ex. 5. The night of the sleep-over, he allegedly asked the eleven and twelve year-old girls to pose sexually in front of their webcam. Tr. 13. One of the girls told her mother, who reported the incident to the Vermont State Police. *Id.* at 12–13.

### B.     The Preliminary Investigation

The Vermont State Police interviewed the child, who confirmed what her mother had reported. (Decl. of Peter Morgan, ECF No. 46-1 at ¶ 3.) The police then obtained a court order to obtain the Skype account information and the IP address associated with the username "Harry.Styles888," which allowed the police to trace the account to Waterbury, Connecticut. Tr. 14, 58. The Vermont State Police contacted the Waterbury Police Department, who assigned the investigation to Detective Peter Morgan. *Id.* at 12, 57. Detective Morgan specializes in digital forensic examination and focuses on the investigation of child pornography and similar crimes. *Id.* at 12.

Detective Morgan obtained a court order to acquire from Comcast Cable ("Comcast") the account information on the IP address associated with Harry.Styles888. *Id.* at 15, 58–59. Comcast reported that the IP address was assigned to John Eastman, 157 Congress Avenue, Third Floor, Waterbury, CT. *Id.* at 15, 59. Armed with that information, Detective Morgan went to that address with Detective David Terni, hoping that Mr. Eastman would cooperate with the investigation and that obtaining a warrant would not be necessary. *Id.* at 66–69.

### C.   The Defendant Consents to the Police Entering His Home, Allows the Police to Take His Computer, and Admits to Sex Chatting as Harry Styles

The detectives arrived in the dark around 6:00 p.m. on November 10, 2012. *Id.* at 70–71, 92. The two were in plain clothes but visibly wearing police badges and firearms. *Id.* at 73–74. The detectives identified themselves when Mr. Eastman answered the door to the apartment on the third floor of 157 Congress Avenue. *Id.* at 74. Detective Morgan asked Mr. Eastman if the detectives could "come in and talk to him." *Id.* at 75. Mr. Eastman said "yes, okay." *Id.* at 21, 75.

Once inside, the detectives asked Mr. Eastman about his computer and the investigation. *Id.* at 78. The detectives told Mr. Eastman that he was not under arrest and Mr. Eastman was calm and cooperative throughout the discussion. *Id.* at 22. Detective Morgan told Mr. Eastman about the information that he had received from the Vermont police, which included that the incident under investigation had occurred on Skype with a Harry Styles username. *Id.* at 22–23.

At some point, Mr. Eastman's mother came out of her room, but as soon as Detective Morgan identified himself and told her that he was investigating a case, Mr. Eastman told his mother to return to her room and she walked away. *Id.* at 23–24. The detectives asked about a laptop computer that was in the living room. *Id.* at 25. Mr. Eastman explained that he did not use the laptop, but that he did use a desktop computer in his bedroom. *Id.* at 25–26. Mr. Eastman led

7

the detectives to his bedroom where the desktop computer was located and told the detectives that he had used the Harry Styles username for video sex chatting. *Id.* at 25–26, 30, 81–82.

At the hearing and in the briefs, the defendant contested that he was a lessee of the apartment and that he owned the computer. Although the lease of the apartment was in Mr. Eastman's mother's name, Mr. Eastman had resided at the apartment for a few years. *Id.* at 210, 221–22. According to Mr. Eastman's mother, the defendant had authority to set up services such as Comcast internet for the apartment. *Id.* at 222–23. At the apartment, he had his own room where he kept a desktop computer. *Id.* at 29 ("He identified the bedroom as his and identified the computer as one that he had purchased.").

I find that at the time of the seizure the computer belonged to Mr. Eastman, either because his mother gave it to him as a gift or because he purchased it. The computer was located in his bedroom and Ms. Eastman used two other computers, one in her bedroom and one in the living room. *See id.* at 29, 139, 187, 217, 225–26. Although Ms. Eastman testified that she purchased the computer, there is no testimony that Ms. Eastman told the detectives that she owned the computer, or that she expressly objected to the presence of the police in the apartment. *See id.* at 217. Further, Mr. Eastman suggests in his affidavit that he was the computer's owner, Def.'s Ex. 7 at ¶¶ 13, 17 ("I . . . demanded the return of my computer.").

Mr. Eastman agreed to go to the police station and to let the detectives take the computer, but asked to use the restroom before leaving, which he did. Tr. at 24–29. The officers repeated that the defendant was not under arrest. *Id.* at 140. Mr. Eastman, Detective Morgan, and Detective Terni then left for the police station with the computer. *Id.* at 30–32. Although Mr. Eastman was not placed in handcuffs, Detective Terni performed a pat-down of Mr. Eastman before he entered

the unmarked police vehicle to ensure that Mr. Eastman did not possess any weapons. *Id.* at 19,
31. On the way to the station, they did not discuss the investigation. *Id.* at 31.

###     D.      The Police Mirandize the Defendant, Who Gives a Full Confession

Once they reached the police station, they sat at one of the many desks in a large room. *Id.*
32. Detective Morgan gave *Miranda* warnings to the defendant around 6:55 p.m. *See id.* at 34–35.
Mr. Eastman signed a card acknowledging that he had been advised of his rights. *Id.* at 35–38;
Gov't Ex. 1. Detective Morgan then interrogated the defendant, who gave an oral confession. Tr.
at 37.

Next, Mr. Eastman agreed to give a written statement. *Id.* at 37–38. The computer program
that Detective Morgan used to type the statement gives the option of printing out an advisement
of rights form. *Id.* at 38. Detective Morgan chose to print the form that explained the defendant's
constitutional rights. *Id.* Mr. Eastman signed the form around 7:32 p.m. *Id.* at 39; *see* Gov't Ex. 2.
As Detective Morgan began to type Mr. Eastman's statement at 7:34 p.m., he asked whether Mr.
Eastman would be willing to sign a consent form to search Mr. Eastman's computer. Tr. at 41–42.
Mr. Eastman agreed and at 7:40 p.m. signed the form, which listed the location of the computer as
having been at Mr. Eastman's apartment, although by that time it had already been brought to the
police station with Mr. Eastman's permission. *Id.* at 25–26, 41, 43–44; Gov't Ex. 3. Detective
Morgan completed typing the statement at 8:43 p.m. Tr. at 42–43. Mr. Eastman reviewed the
document and requested that Detective Morgan change certain portions of the statement, which
Detective Morgan did. *Id.* at 48. The statement describes in graphic detail Mr. Eastman's use of
his computer to lure underage girls into performing sexually explicit activity. *See* Gov't Ex. 4
(Waterbury Police Department Voluntary Statement). The statement also acknowledges that Mr.
Eastman was repeatedly advised of his constitutional rights and consented to the search of his

computer. *Id.*; Tr. 49–50. Mr. Eastman swore an oath before William Fox, then a lieutenant and supervisor, affirming that the statement was true and accurate.[2] Gov't Ex. 4; Tr. 49–52. Mr. Eastman then signed and initialed the document. Gov't Ex. 4; Tr. 52–53. Captain Fox and Detective Terni signed the statement as well. Gov't Ex. 4; Tr. 53. Finally, the detectives drove Mr. Eastman home. Tr. 54–55.

### E.     The Defendant's Version of Events Is Not Credible

The defendant asks me to accept a contrary version of these events. According to him, the police shoved their way into his apartment and physically restrained him with handcuffs; his mother strenuously objected to the police presence; the police never gave him any *Miranda* warnings and he was interrogated despite his request for an attorney; and the police repeatedly forged his signature on documents that purport to show that his confession was lawful. For the reasons that follow, I do not credit the defendant's version of events.

Captain William Fox was a highly credible witness with little incentive to fabricate: He was not assigned to the case, did not work frequently with Detectives Morgan and Terni, and was considerably more senior in rank. Further, his testimony closely matched the documents—even before he was shown those documents on the stand. Although Captain Fox did not specifically remember actually notarizing the defendant's signature on the voluntary statement, his testimony that he has only performed one such notarization for Detectives Morgan and Terni was credible, and he identified his signature on the notarization spaces on Mr. Eastman's confession. Tr. at 195– 96; *see* Gov't Ex. 4. At the hearing, before the exhibit was shown to him, he described his practice of obtaining initials on the left and right of each page, which closely reflects what is on the

---

[2] Fox, who had been promoted to captain by the time of the hearing, testified that he was a lieutenant when he notarized Mr. Eastman's signature on the statement in 2012. Tr. at 191.

document. *See* Tr. at 193–98; Gov't Ex. 4. Further, because he testified that his practice is to ask each person signing such a statement whether or not the statement is his, whether or not it is accurate, and whether or not it was voluntary, his notarization of the signature not only provides me with confidence that Mr. Eastman did, in fact sign it, but that it was, in fact, his voluntary statement and one he believed to be accurate at the time. Tr. 193–98. I further credit Captain Fox's testimony that he has never, in notarizing voluntary statements such as the one signed by Mr. Eastman, notarized a blank form or a form that had been previously signed in his absence. *Id.* at 194. Captain Fox's testimony was corroborated by the detailed testimony of Detectives Morgan and Terni.

Against this evidence showing that Mr. Eastman did in fact sign the forms in question, the defendant presented no credible evidence. The defendant's only witness at the hearing—his mother—testified only as to what she observed after Mr. Eastman gave his consent for the officers to enter the apartment, and had no personal knowledge of what took place during the initial entry or later at the police station. The only other evidence on whether the signatures were forged was two-fold: (1) the defendant's own affidavit, in which he swore that the signatures on the forms at issue were not his, and (2) the report of the defendant's handwriting expert, which concluded that the defendant did not sign the consent forms.

With regard to the defendant's affidavit, I find that it is not credible. First, the defendant's definitive statements that he did not sign the police forms are directly contradicted by the substantial evidence that he did, which is discussed above. Second, the defendant himself did not testify, and while I draw no adverse inference from his decision not do so, the fact remains that his statements have not been subjected to cross-examination and therefore carry less weight compared to the credible testimony of the government witnesses, which was subject to cross-examination at

the hearing. *E.g.*, *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) ("As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination."). Third, portions of the defendant's versions of events—as set forth in his affidavit—make little sense. For example, he avers that Officer Terni drove him home alone, *i.e.*, without the accompaniment of another officer. (ECF No. 31-2 at ¶ 17.) This is neither consistent with the credible testimony of the officers, nor plausible as an account of police practice in this context. Tr. 55 ("Q: Who took him home? A: Myself and Detective Terni.") While it is true that he was not formally under arrest at the time, it is simply implausible that Detective Morgan—the lead detective—would have allowed Detective Terni, who was assisting him, to drive someone who was then definitely a suspect home alone. The car involved was an unmarked vehicle with no security screen between the front and back seats and with no other particular security features. *Id.* at 85, 140.

Mr. Eastman's affidavit also states that "[w]hen Officer Terni dropped me at my home, he gave back to me four cell phones" the officers had taken from his house. (ECF No. 31-2 at ¶ 18.) This was not covered at all at the hearing, but it is implausible that the officers would have seized the phones and then returned them without examining them forensically, especially in light of their plans to examine the computer forensically. In short, I find that the defendant's affidavit is not credible in several respects—and especially on the crucial point about whether he signed the police forms—and do not credit any of it. *See Hinton v. Patnaude*, No. 92–CV–405, 1997 WL 727529, at *2 & n.3 (N.D.N.Y. Oct. 21, 1997) (noting that "*[f]alsus in uno, falsus in omnibus* has particular applicability to an assessment of plaintiff's credibility" (citation and internal quotation marks omitted)).

### F.        Conflicting Testimony Surrounding Handcuffs

The defendant urges me not to credit the Government's witnesses because of inconsistent testimony surrounding handcuffs. Admittedly, the evidence about handcuffing was muddled. The defendant's affidavit states that he was cuffed while in the apartment and that the officers removed the cuffs when he asked to go to the bathroom. Def.'s Ex. 7 at ¶¶ 7, 10. The defendant's mother testified that she observed him in cuffs while he sat on a couch in the apartment. Tr. 214. On direct examination, she testified in a way that suggested that she could not see whether or not he had cuffs on when he went to the bathroom, although this testimony is ambiguous, *id.* at 216 ("Q: And did they remove the handcuffs so he could use the restroom? A: I didn't see that because I moved back."); in response to the Court's questions, however, she testified that he did have cuffs on when he went to the bathroom, contradicting her son's affidavit, *id.* at 235 ("The Court: He did have cuffs on at that time? The Witness: Yes, he did, correct."). She also testified, in response to the Court's questions, that she was standing at a location from which she could—according to the diagram of the apartment introduced by the defendant—have clearly seen whether or not he was cuffed when he went to the bathroom. *Id.* at 235; Def.'s Ex. 21.

For their part, the officers both testified—definitively and repeatedly—that the defendant at no time was cuffed, either in the apartment, at the police station, or in the vehicle. *E.g.*, Tr. at 22. Both detectives—and Captain Fox—testified that cuffing someone who is not under arrest was not standard practice and was not always necessary. *E.g.*, *id.* at 167. The two detectives contradicted each other, however, on whether they had cuffs in their possession that day—with Detective Morgan saying that he did not and that detectives did not ordinarily carry cuffs and Detective Terni saying the opposite. *Id.* at 73, 161–62, 166.

13

Overall, while it is not clear to me why the two detectives contradicted each other on whether they were carrying handcuffs on November 10, 2012, I found that the detectives were more credible than the defendant's mother and, as noted, I do not credit anything in Mr. Eastman's affidavit. The detectives were on the stand for considerably longer than the mother, their testimony was substantially more detailed, and her testimony, which was closer to the version in her son's affidavit, is suspect because that affidavit is not credible.[3]

Further, the mother's version of at least some of the events was implausible and may have been colored by her affection for her son or by the fact that, as she testified, she was not feeling well that day, was sleeping when the officers came into the apartment, and was roused suddenly while they were there—or both. *Id.* at 212–13. For example, she testified that she was awakened when there was a banging on her bedroom door and that a detective, who she later learned was Detective Morgan, entered her room without her permission, "stood there for a few minutes," and then exited her room and began rifling through drawers and cabinets. *Id.* at 213–14. According to her testimony, she protested and demanded that he identify himself and explain why he was in her home but he said not a word in response, not even identifying himself or telling her to get out of his way. *Id.* at 213–14. It is unclear what motive the detectives would have had to refuse to speak

---

[3] The defendant argues that I should discredit the officers' account because of a "lack of candor or sloppiness." (ECF No. 59 at 11–14.) The defendant points out what he considers to be material omissions in Detective Morgan's police report, that Detective Morgan did not make or keep notes of the investigation, that Detective Morgan argued with defense counsel on cross-examination, that Detective Morgan did not provide a property receipt when he took the computer, and other instances of alleged "dishonesty" or "sloppiness." (*Id.*) As discussed above, I find Detective Morgan's testimony to be credible because it is corroborated by the other credible evidence in this case. Even if I were to conclude that Detective Morgan conducted a sloppy investigation and did not follow certain best practices, for example, giving Mr. Eastman a receipt for his computer, it would not follow that Detective Morgan lied in his testimony or that Mr. Eastman did not consent to the search of the apartment and the seizure of the computer.

to or even identify themselves to a complaining resident whose room they had just entered. I do not find her account to be credible.

In addition, at points Ms. Eastman's memory was faulty or she was not forthright, or both. In addition to the potentially contradictory testimony about whether she could see whether the defendant was handcuffed when he entered the bathroom, the defendant's mother offered conflicting facts about her location within the apartment during the police visit. At the hearing, she testified that she was standing in two locations during the police visit (other than when she was in her room): (1) in the doorway between the kitchen and the living room, from which she observed her son on a couch with cuffs on, and (2) in the doorway between her bedroom and the bathroom, from which she could look into her son's bedroom (the door of which faced her bedroom door) and see Detective Morgan. *See id.* at 226–33. In her affidavit, however, she stated that at one point, she sat down at the kitchen table (from which, according to the diagram, she could not have observed either of these events) in response to a directive from Detective Morgan; there was no mention of sitting at the kitchen table during her hearing testimony. *See* Def.'s Ex. 8 at ¶ 4; Def.'s Ex. 21.  For all these reasons, I credit the officers' version that Mr. Eastman was not cuffed at any time on November 10, 2012.

### G.    Handwriting Analysis

The parties submitted reports from two handwriting experts. Neither expert was called as a witness at the hearing. Because the defendant's handwriting expert learned of a conflict of interest a few days before the evidentiary hearing but after he drafted his report, the parties agreed to submit the expert reports as evidence without subjecting either expert to cross-examination. Tr. at 2–5. The experts disagree about whether Mr. Eastman is the person who signed the Government's exhibits purporting to show that Mr. Eastman was informed of his rights and

voluntarily gave a full confession. Before considering the experts' reports, I first consider the role of handwriting experts.

### 1.    Applicability of Rules of Evidence

The admissibility of expert testimony in general is controlled by Federal Rule of Evidence 702.[4] "[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *U.S. v. Matlock*, 415 U.S. 164, 172–73 (1974) (discussing hearsay); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). *See also* Fed. R. Evid. 1101(d)(1) ("These rules—except for those on privilege do not apply to . . . the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility."). Thus, at least arguably, I may consider the handwriting experts' opinions even if they do not satisfy Rule 702. Nonetheless, because the purpose of any expert opinion offered in court is to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), it will be helpful to consider how the Second Circuit and other courts have treated the field of handwriting analysis.

---

[4] Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

2.      *The Second Circuit's Treatment of Handwriting Experts*

"Handwriting analysis, or 'forensic document examination' as its practitioners prefer to call it, involves the 'asserted ability to determine the authorship vel non of a piece of handwriting by examining the way in which the letters are inscribed, shaped and joined, and comparing it to exemplars of a putative author's concededly authentic handwriting.'" *Almeciga v. Ctr. for Investigative Reporting, Inc.*, No. 15-CV-4319 (JSR), 2016 WL 2621131, at *8 (S.D.N.Y. May 6, 2016) (citation omitted).

The Second Circuit "has not authoritatively decided whether a handwriting expert may offer his opinion as to the authorship of a handwriting sample, based on a comparison with a known sample." *United States v. Adeyi*, 165 F. App'x 944, 945 (2d Cir. 2006). Nonetheless, expert testimony on handwriting analysis has been admitted in this Circuit, and the court in *Adeyi* concluded: "Because expert opinion as to handwriting authorship is not clearly inadmissible in this circuit, we cannot say the district court committed plain error" in allowing the expert's opinion. *Id.* at 946 & n.1. *Accord United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) ("The combined proffered testimony of: (1) Tin Yat Chin's wife (that she had not made the purchases), (2) the store managers (regarding their transaction practices), and (3) a handwriting expert (identifying Tin Yat Chin's signature) was sufficient to satisfy Rule 901's authentication requirements."); *United States v. Green*, 523 F.2d 229, 236–37 (2d Cir. 1975) (handwriting expert may testify as an expert witness in criminal trial); *United States v. Wilson*, 441 F.2d 655, 656 (2d Cir. 1971) (handwriting expert's uncertainty about his ability conclusively to identify a specific writer goes to weight, not admissibility).

### 3.  *A Recent District Court Decision Criticized Handwriting Experts*

A district court in this Circuit recently excluded the opinions of a handwriting expert after "finding that handwriting analysis in general is unlikely to meet the admissibility requirements of Federal Rule of Evidence 702 . . . ." *Almeciga*, 2016 WL 2621131, at *1. Judge Rakoff concluded that the expert's testimony in that case "[bore] none of the indicia of science and suggest[ed], at best, a form of subjective expertise." *Id.* at *10. He found that "to the extent the field has been subject to any 'peer' review and publication, the review has not been sufficiently robust or objective to lend credence to the proposition that handwriting comparison is a scientific discipline." *Id.* at *11. He noted a "2001 study in which forensic document examiners were asked to compare (among other things) the 'known' signature of an individual in his natural hand to the 'questioned' signature of the same individual in a disguised hand, examiners were only able to identify the association 30% of the time. Twenty-four percent of the time they were wrong, and 46% of the time they were unable to reach a result." *Id.* at *12. He said: "For decades, the forensic document examiner community has essentially said to courts, 'Trust us.' And many courts have. But that does not make what the examiners do science." *Id.* at *14.

While Judge Rakoff's opinion does not address the use of handwriting experts at a suppression hearing, which is not governed by Fed. R. Evid. 702, it does raise doubt about the extent to which a court should rely on the conclusions of handwriting experts.

### 4.  *The Handwriting Experts in This Case Did Not Testify*

Further, in this case, the handwriting experts have not testified, as the parties decided by agreement not to call their experts as witnesses at the suppression hearing. Tr. at 2–5. I thus have not been able to observe these witnesses or evaluate their demeanor—which is a significant part of any credibility assessment. The reports of the experts do not adequately answer questions I

would have posed had they appeared and testified, such as (1) how the experts verified that the "known" handwriting exemplars are accurate representations of the defendant's handwriting; (2) how differences among the signatures examined show a difference in authorship, as opposed to the mere passage of time or different conditions under which the signatures were made; and (3) whether the experts were told that the signatures were forged or authentic prior to beginning their analysis. *See Almeciga*, 2016 WL 2621131, at *15 ("All of this is contrary to the well-established principle that experts must, to the maximum extent possible, proceed 'blindly,' that is, without knowledge of the result sought by the party seeking to retain them."). Further, neither expert submitted a sworn affidavit. Accordingly, I do not give significant weight to either report. All that I can conclude is that some of the signatures are written with varying qualities of penmanship. Because there is other strong evidence that the defendant did sign the crucial documents, I attribute the differences in handwriting either to the conditions under which the signatures were made or to the defendant's decision to change his signature. I base my finding that the defendant did in fact sign the documents in question primarily on the credible testimony of Captain Fox, which was corroborated by other officers and the documents themselves.

## IV.     Legal Analysis

### A.     The Defendant Consented to the Search and Seizure

As to the issue of entry, the only evidence introduced at the hearing was that of the detectives, who said that Mr. Eastman agreed to let them enter the apartment and take his computer. The mother had no personal knowledge of the entry because she was sleeping at the time. And, as noted, Mr. Eastman did not testify at the hearing. Although his affidavit suggests that the officers "stepped inside, forcing [him] to stumble backwards," I do not credit that statement for the reasons set forth above. (ECF No. 31-2 at ¶ 4.) Therefore, I find that Mr. Eastman consented to the entry.

I likewise find that he consented to the search and seizure of his computer because the preponderance of the evidence shows that Mr. Eastman gave the officers permission to seize his computer. Tr. 25; (ECF No. 46-1 at ¶ 13 (declaration of Detective Morgan stating "I asked Eastman if we could take the desktop to the police station to be examined for further investigation. Eastman verbally consented for us to take the computer.")). Also the fact that Mr. Eastman signed the consent to search form at the police station suggests that he consented to the earlier seizure of his computer.

Additional factors weigh in favor of finding that Mr. Eastman's consent to the search and seizure was voluntary. *Zaleski,* 559 F.Supp.2d at 185 (listing factors including age, length and nature of interactions with the police, and whether the officers engaged in coercive behavior). During the time in question, Mr. Eastman was an adult. (*See* ECF No. 59 at 2.) As Mr. Eastman points out, he is no stranger to police interactions. Indeed, his rap sheet is thirty-seven pages long. (*See id.* at 2–3.) Given Mr. Eastman's extensive interactions with the police from 1998 until 2012, Mr. Eastman likely would have been exposed to police questioning multiple times and would almost certainly have had his rights explained to him either by the officers involved or by his attorneys.[5] Finally, Captain Fox specifically questioned Mr. Eastman about whether his signature on the voluntary statement—which includes a statement that he consented to the seizure of the

---

[5] Mr. Eastman argues that "it does not make sense that Mr. Eastman would consent to a search" because "Mr. Eastman has a history of past interactions with law enforcement and is an inherently distrustful man," including an assault charge and a charge of refusing to provide fingerprints. (ECF No. 31 at 9.) Much of Mr. Eastman's extensive criminal history, however, dates from when he was a younger man, and thus does not necessarily suggest that his apparent actions of cooperation with the police in this case were out of character. It is equally plausible that when two officers arrived at his door asking about his Internet conversations with a twelve-year-old, he believed that he had been apprehended and that it would be in his interest to cooperate.

computer—was voluntary. Tr. at 193–94. I thus find that Mr. Eastman voluntarily gave the officers permission to enter the apartment and seize his computer.

The defendant suggests that the seizure of the computer was not reasonable because Mr. Eastman was not the lessee of the apartment, because it was not Mr. Eastman's computer, and because Ms. Eastman did not provide her consent. (*See* ECF No. 31 at 11.) The defendant points out that Ms. Eastman testified that she purchased the computer. Tr. at 217; Def.'s Ex. 38. When asked "Did either officer ever ask you for permission to take the computer that was located in the apartment?" Ms. Eastman replied "No, he did not. He just took it." Tr. at 215.

"It is well established that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that common authority is shared." *United States v. Gonzalez Athehorta*, 729 F. Supp. 248, 256 (E.D.N.Y. 1990) (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974)). "The consenting party need not have actual authority; apparent authority to consent is sufficient." *Id.* (citations omitted). "[A] person (described as a 'third party') validates a search by giving the authorities consent to search 'if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. McGee*, 564 F.3d 136, 139–40 (2d Cir. 2009) (citing *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)). Whether a person had apparent authority "must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief'' that the consenting party had authority over the premises?" *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)).

Even assuming that Mr. Eastman did not have actual authority to consent to the entry of the apartment or the seizure of the computer, the facts available to the officers would warrant a person of reasonable caution in the belief that Mr. Eastman could consent to the search and seizure at issue. *Id.* A utility company, Comcast, reported to the police that the IP address for Harry.Styles888 was assigned to John Eastman at the address of the apartment. When the police arrived at the apartment, Mr. Eastman, who ordered internet service for the apartment, answered the door. When Mr. Eastman allowed the officers to enter, there was no indication that Ms. Eastman was also present. Mr. Eastman told the officers that he had a bedroom at the apartment and that he had purchased the computer in the bedroom. Tr. at 29 ("He identified the bedroom as his and identified the computer as one that he had purchased.").

Although the police learned after the entry that there was another occupant in the apartment, she had a separate bedroom, there were other computers in the apartment that she likely used, and she did not protest the officers' presence in the apartment. *Id.* at 22–26. The police certainly could have asked Ms. Eastman whether she owned the computer that was in her adult son's separate bedroom, but even a person of reasonable caution would not think that doing so was necessary to confirm that Mr. Eastman had authority to allow the police to take the computer that was in his bedroom at the apartment where he arranged for internet service and that he claimed to have purchased.

> **B.  There Was No Custodial Interrogation in the Defendant's Home,
> and the Defendant Was Mirandized Before He Voluntarily Confessed**

Mr. Eastman contends that his statements to the police must be suppressed because the police did not give him *Miranda* warnings before subjecting him to custodial interrogation. He does not contend that the police otherwise violated his Fifth Amendment rights.

22

There is credible evidence that Mr. Eastman received *Miranda* warnings before making his full confession at the police station. There is, therefore, no basis to suppress those statements. The best evidence that Mr. Eastman received *Miranda* warnings are the multiple signed statements affirming that he was advised of his constitutional rights, that he understood those rights, and that he wished to forego his rights and answer the detectives' questions. Def.'s Exs. 3–5; (ECF No. 46-1 at 11, 13, 15). As discussed above, there is also credible testimony that the officers gave these warnings. There is no credible evidence that Mr. Eastman did not understand the warning and did not waive his constitutional rights. Accordingly, as the detectives did not fail to administer *Miranda* warnings, there is no presumption of compulsion that would merit suppressing the statements made at the police station. *See Mathurin*, 148 F.3d at 69. Because the detectives gave *Miranda* warnings, I do not decide the issue of whether Mr. Eastman was in custody while he was at the police station.

As for the statements made at Mr. Eastman's apartment, I find that Mr. Eastman did not receive *Miranda* warnings before he admitted that he used the Harry Styles username for video sex chatting. Tr. 81. However, I also determine that *Miranda* warnings were not needed because Mr. Eastman was not subjected to custodial interrogation at that time.

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Faux*, —F.3d—, No. 15-1282-CR, 2016 WL 3648331, at *4 (2d Cir. July 8, 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). "Relevant considerations include: (1) 'the interrogation's duration'; (2) 'its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)'; (3) 'whether the suspect

23

volunteered for the interview'; (4) 'whether the officers used restraints'; (5) 'whether weapons were present and especially whether they were drawn'; and (6) 'whether officers told the suspect he was free to leave or under suspicion.'" *Id.* (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)).

Here, the questioning was relatively brief. The detectives arrived around 6:00 p.m. and had been questioning the defendant for less than an hour when he admitted to using the Harry Styles username. *See* Tr. 32–35, 71, 81–82 (showing that officers arrived around 6:00 p.m., that the defendant made incriminating admission at his apartment, and that the defendant was later Mirandized at the police station around 6:55 p.m.). This factor weighs in favor of finding that Mr. Eastman was not in custody.

The location of the interview was Mr. Eastman's home. "The home is 'the most constitutionally protected place on earth'; thus, the right to terminate the interrogation and be 'free to leave' is 'hollow' if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home." *Faux*, 2016 WL 3648331, at *4. However, "courts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Id.* (collecting cases). Although there was some evidence that Mr. Eastman was not the lessee of his apartment, and thus may have felt less able to exclude the officers from the apartment, he had been living there for some time. A reasonable person who lived in an apartment, even though not a leaseholder, would think that he was able to to terminate the police encounter in this context by telling the officers to leave. *See United States v. Mitchell*, 966 F.2d 92, 98–99 (2d Cir. 1992) (suspect who "welcomed" government agents into his home, who "was cooperative," and who "willingly divulged information" was not in custody when agent "engaged in no speech or actions

which reasonably could be taken as intimidating, coercive, or restricting" of the suspect's freedom").

The next factor, whether the suspect volunteered for the interview, weighs in favor of finding that Mr. Eastman was not in custody. Although he did not approach the police, Mr. Eastman responded affirmatively when asked whether the police could enter his apartment to speak with him. His voluntary statement also confirms that he "wanted to fully cooperate" with the investigation. (ECF No. 46-1 at 16.)

The fourth factor also weighs in favor of finding that Mr. Eastman was not in custody because, as discussed above, I find that the officers did not use any restraints or otherwise restrict Mr. Eastman's movement while at Mr. Eastman's home.

The fifth factor, by contrast, weighs in favor of finding that Mr. Eastman was in custody because the officers were visibly armed. However, this factor is only slightly in Mr. Eastman's favor and does not outweigh the other factors because there is no evidence that the weapons were ever drawn or that the detectives otherwise made a show of force. *See Faux*, 2016 WL 3648331, at *4 ("whether weapons were present and *especially whether they were drawn*") (emphasis added) (quoting *FNU LNU*, 653 F.3d at 153).

Finally, the sixth factor is neutral as to whether Mr. Eastman was in custody. It would have been clear to a reasonable person in Mr. Eastman's position, based on the nature and subject of the detectives' questioning, that he was "under suspicion" and Mr. Eastman was not explicitly told that he was free to leave. *Id.* However, Mr. Eastman was also informed that he was not under arrest and was not told that he had to continue to cooperate with the investigation, which a reasonable person would understand to mean that he was "free to leave the police encounter at issue." *Id.*; Tr. 130.

As discussed above, given the circumstances concerning the questioning in Mr. Eastman's apartment, I find that a reasonable person would have understood that he or she was not in custody. Accordingly, the failure to give *Miranda* warnings at the apartment does not merit the suppression of evidence.

Finally, as discussed above, the evidence at the hearing showed that the defendant knowingly and voluntarily signed two waivers of his *Miranda* rights at the police station before voluntarily signing the written confession.

## V.     Conclusion

For the reasons discussed above, the Motion to Suppress (ECF No. 30) is DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              August 15, 2016