```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3
     UNITED STATES OF AMERICA,   )
 4                 Plaintiff,    )          NO: 3:16CR6(MPS)
                                 )
 5   vs.                         )
                                 )          November 28, 2017
 6   JOHN EASTMAN,               )
                   Defendant.    )          Sentencing
 7   _____

 8
                            450 Main Street
 9                       Hartford, Connecticut

10   B E F O R E:
             THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
11

12   A P P E A R A N C E S:

13   For the Plaintiff :        NEERAJ N. PATEL, AUSA
                                 United States Attorney's Office
14                               157 Church Street, 25th Floor
                                 New Haven, CT 06510
15
     For the Defendant:         WILLIAM M. BLOSS, ESQUIRE
16                               Koskoff, Koskoff & Bieder, P.C.
                                 350 Fairfield Avenue
17                               Bridgeport, CT 06604

18

19

20

21

22

23
     Court Reporter:            Martha C. Marshall, RMR, CRR
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

1          THE COURT:  Good afternoon, everyone.  Please be

2     seated.  We're here for sentencing in United States versus

3     John Eastman.  The case is 16CR6.

4          Let's have counsel identify themselves for the

5     record, please.

6          MR. PATEL:  Thank you, Your Honor.  Neeraj Patel on

7     behalf of the United States.  And with me at counsel table is

8     Special Agents Allison Haimila (ph) and Ryan Mahar (ph) from

9     the Department of Homeland Security.

10          THE COURT:  Good afternoon.

11          MR. BLOSS:  William Bloss, Your Honor, by

12     appointment of the Court.  With me is Mr. Eastman.

13          THE COURT:  Attorney Bloss, Mr. Eastman.

14          Just by way of -- first, for the record, January

15     Welks, the Probation Officer, who prepared the Presentence

16     Investigation Report, is also with us today in the courtroom.

17          By way of procedural background, Mr. Eastman

18     appeared before me on March 2nd of this year and entered a

19     plea of guilty to Count One of the Indictment which charges

20     him with use of an interstate facility to persuade a minor to

21     engage in unlawful sexual activity, in violation of Title 18,

22     United States Code, Section 2422(b).  Mr. Eastman later

23     sought to withdraw his plea.  I denied his motion to withdraw

24     his plea.

25          Thereafter, a Presentence Report was prepared for

1    the Court by the U.S. Probation Office.  The initial report

2    was filed on January 28th, 2017; the final report on October

3    17th, 2017.

4            I have reviewed these materials.  I have consulted

5    with Officer Welks who prepared the report.  I have reviewed

6    her sentencing recommendation dated October 17, 2017.  I've

7    reviewed the sentencing memoranda prepared and filed by the

8    parties, including a brief the Government filed yesterday.

9    I've also reviewed a report by a psychiatrist retained by

10   Attorney Bloss which itself includes the results of

11   psychological testing as well as other information.  I have

12   reviewed law enforcement affidavits concerning the forensic

13   analysis of Mr. Eastman's computer.  I've also reviewed

14   documents underlying Mr. Eastman's criminal record.

15           Before we get into the Presentence Report, let me

16   just verify the Government -- whether the Government has

17   given notice to any victims under Section 3771.

18           MR. PATEL:  We have, Your Honor.

19           THE COURT:  And I take it there are no victims here?

20           MR. PATEL:  No victims chose to appear today.

21           THE COURT:  None have expressed a desire to speak or

22   anything like that?

23           MR. PATEL:  No, Your Honor.

24           THE COURT:  Thank you.

25           Turning now to the Presentence Report.  Attorney

1    Bloss, have you had a chance to read the Presentence Report,

2    sir?

3            MR. BLOSS:  I have, Your Honor.

4            THE COURT:  Did you have a chance to discuss it with

5    your client?

6            MR. BLOSS:  I did.

7            THE COURT:  Mr. Eastman, have you had a chance to

8    read the Presentence Report, sir?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  And have you had a chance to discuss it

11   with your lawyer?

12           THE DEFENDANT:   Yes, Your Honor.

13           THE COURT:   And did you understand the Presentence

14   Report?

15           THE DEFENDANT:   Yes, I understood it.

16           THE COURT:   Attorney Bloss, do you have any

17   objections to any of the factual statements in the

18   Presentence Report?

19           MR. BLOSS:  Factual statements, no, your Honor.

20           THE COURT:  Very well.  And then, Attorney Patel, do

21   you have any objections to any of the factual statements in

22   the Presentence Report?

23           MR. PATEL:  No, Your Honor.

24           THE COURT:  There being no objections to the factual

25   statements in the Presentence Report, I adopt those factual

1    statements as my findings of fact in this case.

2         I do have one item that I wanted to bring to the

3    parties attention and I think may need correction.  I did

4    bring this to Officer Welks' attention earlier today.

5         I'm referring, in particular, to paragraph 135.

6    There's a sentence that appears on page 34, and it's towards

7    the bottom of the paragraph, which says Mr. Eastman detailed

8    that his 13 year old cousin was residing at his aunt's house

9    as well and one night he came home drunk and his cousin's

10   step-daughter who was nine years old at the time, et cetera.

11   I believe that should be his aunt's step-daughter.  Do

12   counsel have thoughts on that?

13        MR. BLOSS:  Just give me a moment?

14        THE COURT:  Sure.

15        MR. BLOSS:  It's a different cousin, Your Honor.

16   There's a 13 year old cousin and there's a different cousin.

17        THE DEFENDANT:  He's a boy, a male.  That was his

18   bedroom.

19        THE COURT:  I got it.  Thank you, Mr. Eastman.  So

20   what we'll do is we'll say instead of his, we'll say another

21   cousin's step-daughter.  I'll order that change to paragraph

22   135.  Thank you, Mr. Easton.

23        THE DEFENDANT:  His older sister's step-daughter.

24        THE COURT:  Understood, sir.  Thank you.

25        I accept the Plea Agreement that was signed and

1    filed on March 2nd of this year.  I'm satisfied that the

2    agreement adequately reflects the seriousness of the actual

3    offense behavior and that accepting the agreement will not

4    undermine the purposes of sentencing.

5           Mr. Eastman, when you appeared before me for your

6    guilty plea, I explained to you the maximum and minimum

7    penalties you face.  They are as follows:

8           You face a term of imprisonment of up to life.

9           You face a minimum term of 10 years.

10          You face a minimum term of supervised release of

11   five years and a maximum of life.

12          You are not eligible for probation.

13          You face a fine of up to $250,000.

14          I'm required to impose a special assessment of $100.

15          You will be required to register as a sex offender

16   upon release.

17          I'm required to order the forfeiture of any property

18   that was used to commit the offense or that constitutes any

19   proceeds from the offense.

20          In your Plea Agreement you agreed to forfeit the

21   interest or your interest in a computer that's described in

22   the Plea Agreement.  The Government filed a motion for

23   preliminary order of forfeiture yesterday with respect to

24   that computer, which I granted, and that forfeiture of that

25   property will become part of the judgment in this case.

1          I'm required to order restitution under Section

2    3663(a), the mandatory Victims Restitution Act.  I

3    understand, however, from the Government's filings that the

4    Government has not received information that it believed

5    would provide a basis for restitution in this case.  Is that

6    right, Mr. Patel?

7          MR. PATEL:  That's correct, Your Honor.  I believe I

8    attached to my memo this one letter we received from an

9    attorney of a victim in Norway.  I do not believe -- the

10   Government's position is that is not a basis for restitution

11   in this case because there's no bodily injury which is a

12   prerequisite under 3663(a).

13         THE COURT:  I agree with that, although for a

14   different reason, which I'll explain in a moment.  I was

15   curious.  This has nothing to do with your case, Mr. Eastman.

16   But just because I imagine you and I will have other cases

17   together.  So if the only basis in say a child pornography

18   case for restitution is either bodily injury or damage to

19   property, what is the basis for restitution in all those

20   cases?

21         MR. PATEL:  Most of those cases are charged under a

22   different chapter of the United States Code which has its own

23   restitution provision that does not require bodily injury.

24   The enticement statute, 2422, is in a different chapter that

25   does not have its own restitution provision.

1          THE COURT:  I should have known that.  Thank you.

2          I do agree that there's no basis for restitution

3     that at least I've been provided with in this case.  I think

4     my reasoning on that is a little bit different, though.  And

5     I'll get into more detail on this later.

6          First, as Mr. Patel points out, the relevant statute

7     offers restitution only for bodily injury or for damage to

8     property.  There's been no evidence of either submitted to

9     me.  I also note, however, that the statute does provide for

10    expenses for participating in an investigation or

11    prosecution.  So, in theory, someone who hires a lawyer might

12    have such expenses.  However, the Second Circuit has held

13    that under the mandatory Victim Restitution Act, the relevant

14    question is whether the loss is caused by the specific

15    conduct that is the basis of the offense of conviction.  As I

16    will discuss later in our discussions of the Guidelines, the

17    conduct directed against the victim on whose behalf the

18    lawyer's letter was submitted, in my view, was not part of

19    the offense of conviction in this case.  So I do concur that

20    there's not a basis for restitution.

21         In any event, does either counsel object to my

22    statement of the maximum and minimum penalties?

23         MR. PATEL:  No, Your Honor.

24         MR. BLOSS:  No, your Honor.

25         THE COURT:  Turning now to the Sentencing

1    Guidelines, Mr. Eastman.  I mentioned the Sentencing

2    Guidelines when you were here for the guilty plea.  The

3    Guidelines are a body of advice -- this is the current

4    version of the Guidelines manual that I'm holding up now.

5    They are issued by the United States Sentencing Commission.

6    They provide me, as the sentencing judge, with guidance or

7    recommendations on what would be a fair and just sentence in

8    your case.  The way they do that is to examine the type of

9    offense involved, here, use of an interstate to persuade a

10   minor to engage in unlawful sexual activity.  They direct the

11   Court to consider certain characteristics that sometimes

12   accompany that type of an offense in a case like this, for

13   example, the number of victims, things likes that.  They also

14   direct the Court to consider whether and to what extent the

15   defendant has a criminal record.

16          The end result of the process of applying the

17   Sentencing Guidelines in a particular case results in

18   pointing the Court to a range of months of imprisonment that

19   the Sentencing Commission has decided would be appropriate in

20   a case like your case.  I am not bound to sentence you within

21   that range, but I do have to calculate the range accurately

22   and I have to consider it, along with other advice that the

23   Commission gives me, as well as other factors which I will

24   discuss later in sentencing you.

25          So here the parties disagree with each other and the

1     Defendant disagrees with the Probation Office concerning the

2     calculation of the Guidelines range.  And that calculation is

3     not straightforward in this case.

4           I have reviewed the Presentence Report.  I've

5     reviewed the parties submissions, including the submission

6     the Government filed yesterday in response to the notice that

7     I posted concerning a Guidelines issue not mentioned in the

8     parties' briefs.  I'm happy to have the parties speak

9     further.

10           I will start with the issue, just in case it will

11    save you time, with the issue at which I posted the notice as

12    to which the Government responded.  I concur with the

13    Government.  The question was whether the enhancement under

14    Section 4B1.5(a) should apply.  I concur with the Government

15    that it should not, for the reasons pretty much set forth in

16    the Government's brief.  So I'm not going to discuss that

17    issue further unless anybody wants to.  And I'm not going to

18    apply that enhancement.

19           There were two other issues the parties were

20    debating in their briefs.  One was whether conduct described

21    in the Presentence Report at paragraphs 26 through 33

22    directed at persons identified in the Presentence Report as

23    minor victims 2 through 5 constituted relevant conduct within

24    the meaning of the Guidelines and, thus, was conduct the

25    Court should use to calculate the Guidelines range.

1          The second issue is whether the Court should deny

2    Mr. Eastman a 2 point reduction for acceptance of

3    responsibility under Section 3E1.1(a) in light of the fact

4    that he sought to withdraw his guilty plea.

5          I have considered the parties briefs on that issue.

6    I'm happy to hear further argument if the parties wish to

7    present it.  I'm also happy to give you my ruling.

8          MR. PATEL:  The Government has nothing further to

9    add aside what's in our brief.

10         THE COURT:  Okay.  Attorney Bloss.

11         MR. BLOSS:  I think it has been adequately briefed,

12   Your Honor.  I think the only issue on the acceptance point,

13   today Mr. Eastman advised me that he wanted to express to the

14   Court his regrets at filing the motion to withdraw his guilty

15   plea.

16         THE COURT:  All right.  Thank you.

17         So I'm now going to turn to my own calculation of

18   the offense level under the Sentencing Guidelines.  I'm going

19   to start with what I take to be common ground between the

20   parties, the probation officer and myself.  I find that the

21   applicable base offense level for this matter is set forth in

22   Section 2G2.1 of the Guidelines manual effective November 1,

23   2016, which is the manual in effect on the date of

24   Mr. Eastman's sentencing and the one that the Court will use.

25   Section 2G2.1(a) determines that the base offense level is

1  32.   I note that Section 2G2.1 applies instead of Section

2  2G1.3 which would otherwise apply to this offense because the

3  offense in this case involved causing a minor to engage in

4  sexually explicit conduct for the purpose of producing a

5  visual depiction of that conduct.

6        Under Section 2G2.1 the base offense level will be

7  adjusted as follows:

8        An adjustment of plus 2 points applies under Section

9  2G2.1(b((6)(B) due to the Defendant's use of a computer in

10 the commission of the offense and, also, separately due to

11 his misrepresentation of his identity, that is, using the

12 screen name Justin Bieber to induce the minor to engage in

13 sexually explicit conduct for the purpose of producing a

14 visually depiction of that conduct.  This leads to an offense

15 level of 34.

16       As I said, the parties appear to agree with the

17 analysis thus far.  But as I said, they do disagree with

18 respect to two issues.  First, is Mr. Eastman's conduct

19 described in paragraphs 26 through 33 of the Presentence

20 Report with respect to minor victims 2 through 5.  Relevant

21 conduct, within the meaning of the Guidelines and, thus,

22 conduct the Court should use to calculate the Guidelines

23 range.  And second, should the Court deny Mr. Eastman a 2

24 point reduction for acceptance of responsibility under

25 Section 3E1.1(a) of the Guidelines in light of the fact that

1    he sought to withdraw his guilty plea.

2         I conclude after considering the parties' arguments

3    and reviewing the case law, that the answer to the first

4    question, the relevant conduct question is, no, that the

5    conduct described in paragraphs 26 through 33 is not relevant

6    conduct and should not be used to determine the Guidelines

7    range.  And that the answer to the second question whether

8    the Court should deny Mr. Eastman credit for acceptance of

9    responsibility is yes, and I will explain now.

10         With regard to the relevant conduct issue, the

11   parties first disagree over what Mr. Eastman admitted by

12   virtue of his guilty plea.  Strictly speaking, this part of a

13   dispute is not about whether his conduct with regard to the

14   four other victims is relevant conduct but, instead, about

15   whether it comprises part of the offense to which he pled

16   guilty.  By virtue of his guilty plea, Mr. Eastman admitted

17   only the elements of the offense to which he pled guilty,

18   that is, the elements of Title 18, United States Code,

19   Section 2422(b).  He did not, by pleading guilty to that

20   offense, admit every allegation set forth in the indictment,

21   nor did he admit anything other than facts that support the

22   elements of that offense with respect to a single victim,

23   minor victim 1, by signing the Stipulation of Offense Conduct

24   or by answering my questions about the factual basis for his

25   plea during the Change of Plea proceeding.  Those questions,

1    as Mr. Bloss points out in his brief, focused on the facts in

2    the Stipulation of Offense Conduct.  That stipulation

3    describes Mr. Eastman's conduct only with respect to minor

4    victim 1.  Mr. Eastman's conduct with respect to minor

5    victims 2 through 5 is not part of his offense of conviction.

6    It is also not part of the relevant conduct under Section

7    1B1.3(a)(1)(A) of the Guidelines in my view.  The reason for

8    that is that Mr. Eastman's conduct with respect to the other

9    four victims mentioned in the Presentence Report did not

10   occur during the commission of the offense of conviction,

11   that is, during his conduct on November 6, 2012 towards minor

12   victim 1 in preparation for that offense or in the course of

13   attempting to avoid detection or responsibility for that

14   offense.

15        My conclusion in this regard is based largely on the

16   2nd Circuit's decisions in the *Wernick* and *Ahders* cases --

17   ahders is A H D E R S, *Wernick is* W E R N I C K. -- on those

18   cases cited in the parties' briefs.  Those cases and similar

19   cases make clear that relevant conduct under Section

20   1B1.3(a)(1)(A) requires more than temporal overlap which we

21   don't really even have here, and more than similarity between

22   the other conduct and the offense of conviction.

23        First, it is plain, and no one here suggests

24   otherwise, that Mr. Eastman's conduct with respect to the

25   other four victims did not occur in the course of attempting

1    to avoid detection or responsibility for his conduct with

2    respect to minor victim 1.

3          Second, his other conduct, with respect to the other

4    four victims, did not occur during his offense conduct

5    either.  The conduct directed at minor victims 2 through 5

6    occurred on different dates and, in particular, before the

7    conduct directed at minor victim 1.  Further, the fact that

8    Mr. Eastman may have possessed on his computer child

9    pornography, even child pornography that he may have produced

10   during interactions with the five different victims, at the

11   time he committed the offense against minor victim 1 does not

12   suffice to make the other conduct relevant conduct.  *Wernick*

13   and *Ahders* both make clear that mere temporal overlap is

14   insufficient.  And in the *Ahders* case, the Second Circuit

15   rejected the Government's argument that mere possession of

16   sadomasochistic images of children involving a different

17   victim was enough to render it relevant conduct.

18         Third, there is no evidence in the Presentence

19   Report suggesting that Mr. Eastman's conduct with respect to

20   the four others was "in preparation for" his conduct with

21   respect to minor victim 1.  The mere fact that he may have

22   used the same computer equipment, the same screen name and

23   Skype account, and the same general modus operandi does not

24   mean the earlier conduct was in preparation for the offense

25   conduct.  Again, *Wernick* and *Ahders* both support this

1    interpretation of "in preparation for."  *Wernick's* example of

2    an elaborate bank robbery being planned and an opportunistic

3    bank robbery being committed, and *Ahders* discussion of the

4    possibility that the Defendant used sadomasochistic images to

5    induce the minor to engage in sexual activity both show that

6    "in preparation for" means that there has to be some link

7    beyond similarity of conduct tying the two crimes together.

8    There is no evidence in the PSR in this case that

9    Mr. Eastman's conduct with respect to minor victims 2 through

10   5 was, for example, practice for his conduct with respect to

11   minor victim 1.

12         Finally, the text of the relevant conduct section of

13   the Guidelines makes clear that Section 1B1.3(a)(2), which

14   sweeps into the notion of relevant conduct all acts that are

15   part of the "same course of conduct or common scheme or plan"

16   as the offense of conviction does not apply here.  By its

17   term, that provision applies "solely with respect to offenses

18   of a character for which Section 3D1.2(d) would require

19   grouping of multiple counts."  Section 3D1.2(d) does not

20   apply to this case and it is clear from the Guidelines that

21   because different victims were involved on different

22   occasions, grouping under chapter 3 would not be appropriate

23   here.

24         Therefore, I conclude that Mr. Eastman's conduct

25   with respect to minor victims 2 through 5 is not relevant

1    conduct.

2         As the Defendant concedes in his brief, however, I

3    still may consider that conduct under the Section 3553(a)

4    factors, for example, as part of the Defendant's history and

5    characteristics.  I may consider the conduct as long as it is

6    supported by reliable evidence and has been established by a

7    preponderance of that evidence.  I find that it is and that

8    it has been.  Specifically, I have reviewed the sworn

9    incident report and sworn arrest warrant relating to the

10   Waterbury police's investigation of Mr. Eastman and, in

11   particular, relating to the forensic analysis of his

12   computer.  I posted those documents on the docket yesterday

13   under seal because they contain details about minor victims.

14   Those documents support the facts set forth in paragraphs 26

15   through 33 in the Presentence Report.  And as noted earlier,

16   I have adopted those paragraphs as part of my factual

17   findings in this case.  Therefore, I may consider those facts

18   as part of the Section 3553(a) factors, but not as part of

19   the Guidelines calculation.

20        With respect to the second issue I find, after

21   considering all of the actions of Mr. Eastman, including his

22   statement today, that he has not clearly demonstrated

23   acceptance of responsibility for his offense.  Although he

24   did plead guilty and admit to the facts in the Stipulation of

25   Offense Conduct, he moved to withdraw his plea only four

1    weeks later and shortly after meeting with the probation

2    officer for purposes of preparing a Presentence Report.

3    Under the Guidelines, a defendant is not entitled as a matter

4    of right to credit for acceptance of responsibility merely

5    because he has pled guilty.  That's application note 3 to

6    Section 3E1.1.

7            Mr. Eastman's motion to withdraw his plea did not

8    challenge the constitutionality of the statute or contend

9    that the statute did not apply to his conduct.  Circumstances

10   that the Second Circuit has suggested might want credit for

11   acceptance of responsibility even in the event of a motion to

12   withdraw a plea.  Instead, Mr. Eastman in his motion

13   complained about his lawyer, saying she had pressured him

14   into pleading guilty.  That she was acting improperly by not

15   serving as an extension of himself in the courtroom, and had

16   failed to challenge, among other things, alleged chain of

17   custody failures by the Waterbury police.  The motion added

18   that Mr. Eastman would not "tacitly accept debasing of his

19   character especially when rendered by his own defense counsel

20   in the form of a plea arrangement."

21           I denied his motion to withdraw his plea in a

22   separate ruling, but the point for present purposes is that

23   his arguments in that motion and the filing of the motion

24   itself are not consistent with acceptance of responsibility.

25   To the contrary, Mr. Eastman in that motion clearly blamed

1    everyone but himself, including his lawyer, the Waterbury

2    police, and me for the situation in which he finds himself.

3    Therefore, I deny him credit for acceptance of

4    responsibility.

5           As noted, although I had raised another issue about

6    Section 4B1.5, I concur with the Government for the reasons

7    set forth in its response to my notice yesterday that no

8    enhancement should be applied under that provision.

9    Therefore, the offense level is 34.

10          Turning to criminal history, there did not appear to

11   be a dispute about this issue.  But, in any event, I concur

12   with the probation officer that Mr. Eastman falls into

13   Criminal History Category VI.

14          Mr. Eastman, a defendant's criminal history category

15   is determined largely by the nature and extent of his prior

16   criminal record.  In your case, the available information

17   places you in Criminal History Category VI.  That makes the

18   Guidelines range as follows:

19          262 to 327 months imprisonment;

20          A term of supervised release of five years to life;

21          A fine of $250,000, or twice the gross gain or loss

22   resulting from the offense, whichever is the highest; and

23          A special assessment of $100.

24          Apart from objections that have already been

25   preserved in the papers, are there further objections to my

1    calculation of the Guidelines range?

2          MR. PATEL:  Just for the record, to the extent it's

3    not reflected in our papers, we do object to the Court's view

4    not to include the other victims as relevant conduct or as

5    part of the offense of conviction, just in the event that

6    Mr. Eastman appeals, to preserve our right to cross appeal on

7    that issue.

8          THE COURT:  That's fine.

9          Mr. Bloss.

10         MR. BLOSS:  No, I don't have any other comments on

11   that, Your Honor.

12         THE COURT:  All right.  Thank you.

13         All right.  So we've now reached what I consider to

14   be the heart of the sentencing proceeding.  I'm going to ask

15   Attorney Bloss to speak on behalf of Mr. Eastman.  And I'm

16   also going to, after when Attorney Bloss is done, ask if

17   Mr. Eastman would like to speak.  He certainly can and I'd be

18   interested in anything he might wish to say, but he's not

19   required to speak.  After the defense has finished with their

20   presentation, I'll hear from the Government.  After that, I

21   will take a short recess to reflect on everything that's been

22   said.  And after that I will return to impose sentence.

23         Attorney Bloss.

24         MR. BLOSS:  Thank you, your Honor.

25         Your Honor, I think I cited an article in my

1   memorandum written by Judge Chen that I think makes some very
2   interesting points and very valid points about how there's no
3   such thing as an easy sentencing.  And you're the only person
4   in the courtroom, Your Honor, whose ever done it and ordered
5   somebody committed to the custody of the Attorney General.  I
6   don't think anybody here imagines that it's an easy activity
7   or that it is not an activity that should be done without a
8   great deal of thought and without a great deal of
9   understanding about both the conduct that causes us to be
10  here.  Not surprisingly, I'm not going to spend a lot of time
11  on the conduct that leads us here because we've stipulated to
12  what's in the Presentence Report.  There is not going to be
13  any attempt to minimize the conduct.  There's not going to be
14  any attempt to justify the conduct.  What I would like to try
15  to do, though, a little bit today is to try to maybe explain
16  why we're here, why Mr. Eastman has made the decisions that
17  cause us to be here and maybe, as importantly, or perhaps
18  more importantly, what are the implications of that for the
19  future.  I am sure there are a couple of different currents
20  crossing here in this case in this courtroom, right?

21          One is Mr. Eastman has a long record.  And while
22  it's not a particularly violent record compared to some
23  defendants, there's no use of force or weapons or things like
24  that.  On the other hand, it's pretty long.  And it is
25  pretty -- it is indicative of somebody who has had a hard

1    time meeting societal norms, if I can phrase it that way.

2           I think when I read the, very ably put, discussed in

3    the Presentence Report, but it's also I think fleshed out a

4    little bit more in Dr. Heil's report which I'm sure Your

5    Honor has read.  If you think about what happened to

6    Mr. Eastman in the years between his fifth or sixth birthday

7    and his, say, 18th birthday, just to cut it off, when I think

8    much of the misbehavior that forms the foundation of what

9    leads us to be here started to take place, the phone calls,

10   things like that, if you just take off or catalog what

11   happened to Mr. Eastman from the time he was in kindergarden

12   until the time he was 18 years old it's, frankly,

13   unimaginable.

14          His mother and father break up.  Mr. Eastman catches

15   his mother with another man.  She reacts angrily, winds up

16   breaking his leg.  He's in a body cast for a period of

17   months.  That leads to DCF taking him out of the home.  Which

18   was probably a good thing.  The problem is then he was put

19   into a foster home where he was sexually abused.  And the DCF

20   records, the contemporaneous DCF records establish that.

21   That's not something that Dr. Heil discussed for the first

22   time.  The DCF records establish that.  The records show that

23   Mrs. Eastman was told by Mr. Eastman about that abuse and she

24   didn't do anything about it, which I'm going to touch on a

25   little bit later, Your Honor, in terms of some abandonment

1    issues.

2             In any event, he then goes and eventually winds up

3    going back into the mother's home and the mother has a new

4    boyfriend.  The father and the mother are separated by this

5    time or divorced.  And the boyfriend fractures his nose.

6    Hits him in the face because of some disagreement and

7    fractures his nose.

8             He is then -- I think the Dr. Heil's report talks

9    about how the family is really living day-to-day.  There's

10   food shortages.  There is, nonetheless, plenty of alcohol and

11   marijuana in the house.  By the time he's 12, he's basically

12   living in an apartment where the only thing to eat is rice

13   and the activity is alcohol and drugs.  This is by 12 years

14   old, Your Honor.

15            So he's been physically assaulted with a broken leg,

16   sexually assaulted, physically assaulted with a broken nose,

17   effectively abandoned, and living basically day-to-day.  This

18   is 12 years old.  Then when he's 15, his mother just leaves.

19   Goes to the store.  Doesn't come back.  Now, what she told

20   Dr. Heil, I think what she told DCF, was that she thought

21   that John, Mr. Eastman, was capable, mature enough to take

22   care of raising, helping to raise his sisters.  That's

23   madness.  That's just absolute madness.

24            He then goes to live with the father.  The father

25   had been in and out of alcohol treatment and been in and out

```
1    of Rushford Hall in Middletown for many years.  And part of I
2    guess his activities in terms of helping his father, taking
3    care of his father, was to drive his father back and forth to
4    Waterbury for sexual liaisons.
5          Now this is about when the misconduct starts.  I
6    think really based on both the Presentence Report records and
7    also the records that Dr. Heil reviewed and are summarized in
8    his report.  But then there's something that I know Dr. Heil
9    talked about and --
10          THE COURT:  You said his report.  Dr. Heil's report?
11          MR. BLOSS:  Yes, Dr. Heil's report.
12          THE COURT:  Dr. Heil's a woman.
13          MR. BLOSS:  No, Your Honor.
14          THE COURT:  Wasn't the name Katherine.
15          MR. BLOSS:  Karsten.  He's German, Your Honor.
16          THE COURT:  I'm glad you pointed that out to me.
17    You kept saying his report and I'm glad you pointed that out.
18    Thank you.
19          MR. BLOSS:  Karston Heil, Your Honor, he's German
20    and works at Yale obviously.
21          Now there's an event that takes place.
22    Mr. Eastman's in high school.  This has been a bad childhood
23    up to now, but it's about to get worse.  Because he starts to
24    lose his hearing.  And I know Dr. Heil talked about that in
25    some depth, and I've talked about it with Mr. Eastman myself,
```

1   Your Honor.  I think -- I'm not the psychiatrist, Dr. Heil is

2   the psychiatrist and he's done a good job putting this

3   together I think and trying to explain what series of events

4   and what series of circumstances bring us here.  But what

5   happened when Mr. Eastman was in high school, Your Honor, is

6   that his hearing wound up alienating him, separating him from

7   friends.  People made fun of him.  People teased him pretty

8   mercilessly.  And so by the time he's 16, he's in 10th grade,

9   he drops out of school.  That's it.  And largely because of

10  the hearing issues.  Now why didn't -- his father had

11  insurance.  John thinks his father had insurance.  Why didn't

12  John's father bring him to get help?  The best explanation,

13  as Mr. Eastman has it, is that his father was too focused on

14  himself and too focused -- too worried that he was going to

15  hit maximums on his own medical insurance.  If Mr. Eastman

16  had surgery, then the father wouldn't be able to check into

17  facilities as he needed to.  Apparently he checked into

18  either mental health or alcohol related facilities regularly

19  during this time period.  So I don't think it's a good

20  explanation, but that's at least the explanation that the

21  father gave the son.  And that never really got taken care

22  of, Your Honor.  So if you think about, what is that, half a

23  dozen, eight decisions, conscious decisions that adults in

24  Mr. Eastman's life made that wound up alienating him from

25  friends, not giving him medical care, not giving him food,

1    having him physically abused, having him physically abused

2    again, having him sexually abused, and dropping out of school

3    with basically no prospects.

4         Now, that's a long time ago.  That's a long time ago

5    and I accept that.  That's 32 years before today.  But,

6    nonetheless, the pattern of behavior that I think is a

7    straight line from the time he was 16 until the time he was

8    46 or 45, at the time of his offense, runs straight through

9    all of those events.

10         Now, the next question may be so what?  Because that

11   still is the foundation that his life has been built on.  And

12   how -- I would expect, Your Honor, that one of the major

13   concerns you have would be if I let him out after a period,

14   how do I know that it's not going to happen again, right?  Of

15   course that's a significant concern.  Safety of the community

16   is one of the factors you have to take into account under

17   3553(a).

18         The best I can say -- I think I can say two things.

19   One is I rely on what Dr. Heil and Dr. Brown, for that

20   matter, the psychologists did the testing have written in

21   their report.  And I know that Your Honor has read it but I

22   do want to refer to a couple of parts of it.

23         Specifically, Dr. Brown, the psychologists at page

24   16 of the report.  Mr. Eastman is a -- Mr. Eastman has a

25   history of a chaotic childhood, including exposure to sex at

1    an early age, physical and sexual abuse as a child and

2    emotional neglect.  As an adult he struggled to make

3    meaningful connections with others and often spent time out

4    on the street using drugs, drinking alcohol excessively, and

5    getting into legal trouble.  Although he exhibits poor

6    insight on the severity of his childhood events and its

7    influence on his current functioning, is is my opinion that

8    Mr. Eastman's chaotic development did impede his social and

9    emotional maturation, he has not successfully achieved adult

10   independence, nor normal and intimate adult social

11   connections.  His sexual social deviant behavior has

12   demonstrated a desire for closeness and intimacy, but he is

13   ill-equipped emotionally to engage in a mature responsible

14   give and take of an adult relationship.  Then a little later.

15   Mr. Eastman will benefit from supervision as well as

16   treatment that can help him gain insight on his personality

17   structures, specifically how he understands himself and it

18   relates to others, and behaviors that have contributed to his

19   current legal issues.

20          Dr. Heil, your Honor, has the same conclusion at

21   page 17.  Mr. Eastman would benefit from psychosocial

22   treatment that focuses on improving his insight into his

23   social immaturity as well as building a set of skills that

24   would help him to navigate in personal and social

25   relationships in a more appropriate way.  He would most

1    benefit from sex offenders specific treatment.  There are

2    many such treatment programs throughout the country.  I'm

3    going to actually have a request as it relates to designation

4    on that in a moment, Your Honor.  Here Mr. Eastman could

5    learn strategies and skills to better control his maladaptive

6    behaviors.  Research has shown that participation in such

7    specialized programs significantly reduces the risk of

8    recidivism in sex offenders.

9            THE COURT:  Let me ask you a question about that.

10   If you look at the Presentence Report, Officer Welks was

11   apparently able to obtain records from a previous sex

12   offender program set forth in her report, in which he didn't

13   follow the rules on two different occasions separated by

14   years.

15           I note that in the final paragraph Dr. Heil talks

16   about his defensiveness and says it's unlikely he would

17   adhere to such treatments without being mandated to do so.  I

18   assumed that the earlier treatment was also a court ordered

19   condition and twice it didn't work out.  To be more blunt, he

20   was ejected for failing to follow the rules, at least

21   according to the information in the Presentence Report.  So

22   why should I, addressing the very question that you raised,

23   have confidence that this time will be different with regard

24   to sex offender treatment?

25           MR. BLOSS:  I think for two reasons, Your Honor.

1   One is the sex offender treatment has come a long way since

2   then.  This was a long time ago.  I think we provided those

3   records actually to Probation.  The records are from The

4   Connection, as I recall it, the program.  It was a program in

5   Middletown.  I don't know whether those were court mandated.

6   I think it would not be unreasonable to speculate that they

7   were court mandated and that they were conditions of

8   probation.  I have a little bit of experience with The

9   Connection.  It is not a higher level sex offender treatment

10   for whatever reason.  I think, as I look back on it, I think

11   that that treatment program was probably as a result of the

12   sexual assault on the fourth degree and risk of injury charge

13   that Mr. Eastman was convicted of in 1999 approximately, and

14   that was at the very, very, very beginning of when the

15   Connecticut Probation Department started to really get into a

16   much more energetic, robust interventional sex offender

17   program.  It was actually a little bit later when they

18   started to get into something, the Connecticut -- CATSO,

19   Connecticut Association for the Treatment of Sex Offenders.

20   That program, I think, was in its very early days at the

21   time.

22          What we don't have, Your Honor, is we don't

23   have -- I provided I think the Probation Office with all the

24   records we were able to obtain and the records are terribly

25   incomplete.  But I agree that it is not hard to imagine that

1    Mr. Eastman would not do this voluntarily, would not do a

2    program voluntarily.  He would need to do it first during his

3    incarceration.  So there's going to be a program that he

4    -- and he's going to want to take advantage of it, Your

5    Honor.  I will tell you that this has been a little bit of a

6    struggle, because it is a hard thing to say I need help.  It

7    is.  And today actually, for the first time, Mr. Eastman said

8    to me I'd like to do it.  I'd like to make a go of it.  I

9    think you said I'm going to try my best.  That's progress,

10   Your Honor.  Is it a guarantee of success?  No.  But that's

11   more than I've heard.  I don't know when I was appointed in

12   this case, over the summer, I think.  I heard that today.  I

13   think that's a positive step.

14          The other thing, though, I can say about that, Your

15   Honor -- no matter what you do, Your Honor, he's going to get

16   some kind of treatment on the inside, assuming he takes

17   advantage of it.  Second, assuming that he's released and he

18   gets out on supervised release, I have a much higher degree

19   of confidence in the ability of the Federal Probation Office

20   to supervise sex offender treatment than I do the Connecticut

21   Probation Department.  I'm sorry to say that, but that's just

22   a fact.

23          Third, I would note, Your Honor, he's 50 years old.

24   So let's say he gets out whenever he gets out.  He has some

25   treatment on the inside and my guess is his records of that

1    treatment will follow him to Probation and Probation will

2    look at that and say, hum, this guy really doesn't get it and

3    so we're going to have him on an extraordinarily short leash.

4    The next time he's here, Your Honor, is the end.  I think.

5    He's 50 years old.  The next time it's -- no matter what you

6    do or somebody else, it's effectively a life sentence.

7            So that's the best -- I think that's the best

8    assurance I can give you under the present record, your

9    Honor.  I understand what Your Honor's concern is.  It is

10   completely valid.  All I can tell you is that Mr. Eastman

11   tells me, in addition to the systemic issues, the kind of

12   structural issues I talked about, he tells me he's willing to

13   do it.  I hope that happens.  I hope Your Honor gives him an

14   opportunity to make it happen and I hope he takes advantage

15   of it if Your Honor gives him that opportunity.  If he

16   doesn't, there's not much anybody can do.  Right?

17           So, Your Honor, I do -- let me maybe just talk about

18   that for just a second, I think on the designation issue.  I

19   don't think Danbury has the program.  I know Devens does.

20   His mother, Mr. Eastman's mother, lives in Waterbury.  I

21   think Devens would be relatively convenient.  Mr. Patel said

22   that maybe Fort Dix does, although I could only find Devens

23   in the Northeast.

24           THE COURT:  They're well-known programs outside the

25   northeast, Butner, there's a place in Ohio, there's a place

1    in Colorado but, obviously, that's no where near where his

2    mother is.  I don't know.  Devens has a medical -- well-known

3    medical facility.  I don't know about their sex offender

4    treatment program.  But you've done some research on this?

5          MR. BLOSS:  I have, Your Honor, to the extent that I

6    could.  Just looking at BOP, some BOP guidelines.  And the

7    fact is, the PSR is obviously going to be available to

8    whoever does the designation, as is Dr. Heil's report I

9    assume.  They have a very structured program.

10         THE COURT:  I'm happy to recommend Devens if that's

11   what you're asking.

12         MR. BLOSS;  That is what I'm asking, Your Honor.

13         THE COURT:  And that's in terms of classification,

14   that's either low or medium?

15         MR. BLOSS:  I think their medical unit is

16   technically an administrative, because it's a medical unit.

17   And so I think would he qualify for Devens.

18         THE COURT:  That's fine.  I'm going to include it.

19         MR. BLOSS:  And, obviously, it's up to the BOP.

20         THE COURT:  That's right.  And I'll explain that

21   later.

22         MR. BLOSS:  So, anyway, I'm not going to keep going

23   through Dr. Heil's report.  You read it.  Again, I don't

24   offer it as an excuse.  I don't offer it as a justification.

25   Maybe of an explanation and with some hope, or maybe more

1     than a hope that there is something positive that can come

2     out of this in terms of avoiding any kind of future

3     misconduct.

4            There's just a couple of other issues I want to talk

5     about, Your Honor, briefly.  One is -- and I think Government

6     and I actually agree on this, although our scale of agreement

7     may not completely overlap.  I think we agreed that there is

8     a rather broad spectrum of cases of this nature.  None of

9     them are -- they're all bad.  They're all bad period.  There

10    are some, though, that are worse.  And I think the 2nd

11    Circuit has made this point, the 7th Circuit has made this

12    point, where there is conduct such as the images are

13    distributed, where there is -- where the perpetrator -- where

14    the defendant is present with the victims.  Where the

15    defendant actually physically touches or molests or assaults

16    the victims.  Where the victims are photographed in some of

17    the more graphic circumstances where there is contact with

18    others during the photography, threats of violence, threats

19    of weapons involved, and so forth.  All of those factors are

20    aggregating, I guess, in the type of conduct.  There are none

21    of those factors here.  I understand there is deception that

22    was involved.  That was already taken into account in the

23    Guidelines.  And, again, I'm not trying to minimize what

24    Mr. Eastman did, but I do want to put it in the greater

25    context of the types of cases that bring us here, that I

1    think we've cited some of the cases and the Government cited

2    some of the cases too.  And I appreciate the Government's

3    candor, frankly, with trying to put this case into a context

4    of similar cases to avoid disparity.

5           THE COURT:  There is one issue with regard to that,

6    one issue you have a chance to address.  Of course there's

7    the conduct in the offense but, as you know, I can consider

8    the conduct in paragraphs 26 through 33, and I will, in

9    connection with his history and characteristics.  Surely some

10   of that conduct could have been charged as the production of

11   child pornography.  I don't think there's really any basis to

12   dispute that.  And the production of child pornography

13   carries a 15 year minimum.  Now, I'm not sure why the

14   Government chose to charge the case the way it did.  I'm not

15   criticizing the Government for that.  But there are other

16   cases, including cases where I sentenced, where the defendant

17   did something that was not all that different, but faced the

18   15 year minimum.  So that I think also plays into the

19   disparity analysis here.  Just because one person faces a

20   different charge isn't really a reason not to treat them

21   alike with another if the conduct is pretty similar.

22          MR. BLOSS:  I guess I can't comment on those cases,

23   Your Honor, without knowing, again, were the images

24   distributed in those cases, were there other factual -- I

25   think that's a big issue.

1          THE COURT:  You're right that that is a

2     significant -- it's distribution, as you say, physical

3     contact.  And I think I also agree that physical presence

4     makes a difference.  I agree that those are to some extent

5     differentiators in this case.  But, anyway, if you wanted to

6     comment on that further you can.

7          MR. BLOSS:  I think I've said what I can say, Your

8     Honor.  I don't know what the charging decision was and why

9     it was charged the way it was.  My guess is that the

10    Government takes into account some of these aggravating

11    factors and mitigating factors, I guess the absence of

12    aggravating factors, if you will, even if it's technically

13    within.  But I don't know the answer to that, Your Honor.

14         I think this is a sad and difficult case all around.

15    All around.  For the victims certainly, I think it's sad

16    because what I think led us to be here.  And it's just I

17    think a frustrating, difficult and sad situation.

18         The only other issue that I want to mention, Your

19    Honor, is the issue of jail credit for Mr. Eastman's

20    detention for four and a half years.  I'm not suggesting

21    anybody did wrong here by the way.  I just want that to be

22    very, very clear.  Mr. Eastman was arrested on state charges.

23    He was held for two years on bond in the Bridgeport jail

24    before he was indicted in this case.  Then, of course, Your

25    Honor is familiar with what happened here.  The bottom line

1    is that he has been held on bond on the state charges for

2    four and a half years.  That is under any analysis a long

3    time.

4              THE COURT:  I agree with you.

5              MR. BLOSS:  Again, I'm not suggesting the Government

6    did something wrong.

7              THE COURT:  I understand.

8              MR. BLOSS:  But I'm just making a point.  It

9    happened the way it happened.  And it happens sometimes that

10   way.  That's fine.  But he has been held in protective

11   custody for four and a half years.  And what protective

12   custody means, Your Honor, is that he's out of his cell for

13   seven and a half hours a day, three and a half hours part of

14   the day and four hours during the day.  However, he can only

15   go into the day room.  He takes meals in the day room.  The

16   day room is a room maybe about half the size of the jury box,

17   something along those lines.  The people that are there are

18   all there for not this specifically, but they're there

19   because they're either witnesses in a case or they're

20   something else.  They're not in general population.  He can't

21   see me when there's anybody else around.  I tried to go see

22   him on Friday, Your Honor, and as long as there were general

23   population inmates in the room, in the visiting area, he

24   couldn't go in there.  So it has not only been an

25   extraordinarily long period of time, but it's an

1    extraordinarily difficult period of time.  As a pretrial

2    detainer, which he's been for four and a half years, he gets

3    no programming at all.  There's no schooling, there's no

4    rehabilitative function because he's not convicted.  There's

5    nothing to rehabilitate.  They don't spend any time on

6    programming.  So do I think that's the controlling factor?

7    No.  But I think it's an important fact and something that I

8    think Your Honor can take into account.

9         So I think, Your Honor, between the papers and my

10   comments here today, I don't really have any other comments.

11   I think Mr. Eastman does want to address the Court briefly.

12        THE COURT:  Sure.

13        THE DEFENDANT:  I'd just like to say I'm sorry for

14   what I've done and I wish I could take it back.  I look

15   forward to doing programs, if I can.  If you let me do this

16   so I can function, you know, in society again, you know, one

17   day.  But I really, you know, the bottom line is I'm really

18   sorry.  I wish this never happened.  I've embarrassed my

19   family.  I've embarrassed the victims.  That's all I want to

20   say.

21        THE COURT:  Thank you, Mr. Eastman.

22        Mr. Patel.

23        MR. PATEL:  Thank you, Your Honor.  Before I begin

24   my remarks on what's an appropriate sentence, I just want to

25   go back a little bit and talk about -- I should have raised

1    it a little while ago.  The Court noted that it reviewed the

2    Waterbury police affidavit and police report and posted it on

3    the docket.  I just want to be clear that was not the only

4    source of evidence in this case.  After the Waterbury police

5    did their forensics, Agent Mahar here did his own forensic

6    analysis in the computer and recovered additional

7    information.  For example, in the PSR there is a paragraph on

8    some of the chats between Mr. Eastman and the minor victim

9    number 1.  That was all recovered in the subsequent forensic

10   analysis that Agent Mahar did.  The pictures and the videos,

11   that was all recovered.  And the Skype user names and what

12   they were when they were created, that was all done in the

13   Waterbury police forensic analysis.  But then we did our own

14   forensic analysis.  We also obtained records from various

15   email providers and Facebook.  When someone creates a Skype

16   user name they have to register an email address with that.

17   And so for each one of those Skype users names that's in the

18   PSR there was an email address, a Gmail account, a Yahoo

19   account, a Microsoft account in the name of those celebrities

20   as well, and we obtained records and saw the IP addresses

21   that were used to create those email addresses, and that all

22   corroborated the forensic report from the Waterbury Police

23   that tied this all back to Mr. Eastman.  I just want to make

24   sure the record is clear it's more than just the evidence on

25   his computer.  We also searched the minor victim 1 and minor

39

1    victim 3's computers and did a forensic analysis which also

2    showed some chats with these specific user names.

3         THE COURT:  Thank you for pointing that out.  I

4    think I asked you this the very first appearance but I don't

5    remember what you told me.  Is that why it took a long time

6    for the government to adopt -- the federal government to

7    adopt the case?

8         MR. PATEL:  Partly the reason.  I will say that

9    we -- this case was brought to our attention by the State

10   Attorney's Office and that didn't happy I think until more

11   than a year after he was extradited back from Virginia.  And

12   then after that we did our own investigation and that took

13   almost a year.  And then he was charged by complaint and with

14   his previous counsel we were working with them on discovery

15   and that took continuing the case for a year, hoping that it

16   could be resolved.  And then at a point it came we were told

17   it was not going to be resolved and so we had to indict the

18   case.

19        THE COURT:  Okay.

20        MR. PATEL:  I also believe -- my understanding from

21   the State's Attorney is there was a couple of instances of a

22   change of counsel in the state case before it was adopted

23   federally.  So that added to the delay in the state case

24   before it was brought to our attention.

25        So turning to the appropriate sentence.  The parties

1    agree that in this particular case a non-guideline sentence

2    is appropriate.  We're not seeking a Guideline sentence.  The

3    question is what is the right sentence.  I don't think

4    counsel explicitly stated it a few minutes ago, but in his

5    Plea Agreement -- in his sentencing memorandum he argues for

6    10 years which is mandatory minimum.  And the Government's

7    arguing for something in the middle of the range, between 10

8    and 20 years.

9         We agree with certain things that counsel raised his

10   remarks.  There's no evidence Mr. Eastman distributed these

11   pictures or videos that he created.

12        THE COURT:  I did want to ask about that.  I'm not

13   suggesting there is such evidence just to be clear.  But

14   there was a line in the Presentence Report that concerned me

15   along those lines.  I'm expecting you're going to tell me,

16   Judge, we checked and nothing happened.  But let me just tell

17   you what I'm referring to.

18        Yes, it's paragraph 34.  There's a discussion of a

19   chat on Skype between justin.bieber727 and someone called

20   other user.  And then the -- there's a line there that says

21   from the other user to justin.bieber, you should record some

22   more to me.  And I didn't know what, if anything, the

23   Government made of that.

24        MR. PATEL:  We saw that, too, and we just don't have

25   any evidence that that was ever done.  We did go through the

1    Facebook records.  We did see that message.  That showed up

2    in the emails because his Facebook profile was set to that,

3    any time someone posted a message it was went to his email

4    account.  But we didn't see any evidence of distribution.

5            THE COURT:  Okay.

6            MR. PATEL:  So there's no evidence he distributed

7    and we agree that he did not have any physical contact with

8    any of the people he enticed via Skype.  And there's no

9    evidence he did this for commercial gain or benefited

10   financially.  Ten years is a long time but, even still, the

11   Government does not believe that the mandatory minimum of 10

12   years is appropriate in this case.  So I'd like to start by

13   putting that mandatory minimum into context.

14           If we take, for example, a defendant who enticed one

15   or two minors who are 16 or 17 years old over a short period

16   of time, a few weeks, or maybe a month, the defendant did not

17   misrepresent himself or use trickery or deceit, where the

18   victim knew exactly who they were communicating with and the

19   defendant asked that victim to take pictures of herself and

20   send them to him and the defendant and the victim complied,

21   and a defendant with no criminal history and no prior

22   offenses involving a minor, that person is a person whose

23   request for a mandatory minimum sentence of 10 years in the

24   Government's view would be credible.  But that person is not

25   Mr. Eastman.  He did not entice just one or two minors who

1    were in their mid to late teens.  And taking the Court's

2    ruling that the victims 2 through 5 are not part of the

3    Guidelines calculation, they did agree -- the defense did

4    agree that those facts were accurate in the PSR.

5            THE COURT:  And I've adopted them.

6            MR. PATEL:  Right.  And that the Court acknowledged

7    that it could consider that as part of the characteristics.

8            THE COURT:  Absolutely.

9            MR. PATEL:  And so by our account he enticed at

10   least five young girls, some as young as 12 years old.  He

11   didn't do this over a short period of time.  He did this over

12   the course of several months.  He also deceived these minors.

13   He went to great length to impersonate celebrities that he

14   knew and hoped that would cause these young girls to contact

15   him.  He used screen names and videos of these celebrities as

16   bait to lure these young girls into Skype conversations with

17   him.  And then once he lured them into these Skype calls he

18   preyed on them.  He preyed on the admiration these girls had

19   for these singers, these celebrities.  And he also preyed on

20   their emotions and their self-esteem.  For example, I noted

21   this in this my memo.  The chats with minor victim number 1

22   are in the Presentence Report, where she's talking about how

23   she's lonely at school and no one likes her.  There's also

24   another girl, minor victim number 2.  This is not in the

25   Presentence Report, but she was interviewed by law

1    enforcement and during that interview she talked about this

2    period of time in her life when this conduct occurred.  She

3    talked about how right around this time there was stuff going

4    on at school and she felt like her friends had turned on her

5    and they didn't like her anymore and so she started chatting

6    on Skype.  And that's when she encountered a screen name of

7    someone with -- a screen name with Harry Styles in it.  And

8    Harry Styles was the singer in her favorite music group at

9    the time, One Direction.

10         And so, like I said, Mr. Eastman was counting on

11   these young girls falling for his deception and he took

12   advantage of these naive girls and enticed them and

13   instructed them to get naked and pose in a sexual manner for

14   him.  And as he watched them he masturbated and secretly

15   recorded them.

16         Now, this isn't Mr. Eastman's first brush with the

17   law.  We've talked about this, that he has 31 prior

18   convictions, including a prior conviction involving a minor.

19   He was on the sex offender registry for 10 years.  And he did

20   participate in sex offender treatment before.  That was court

21   mandated.  If we look at the order of probation that was part

22   of his prior conviction.

23         THE COURT:  If I'm not mistaken, there are two prior

24   convictions involving a minor.  There's one involving the

25   paragraph that I read earlier about the step-daughter of the

1    cousin, and then there's another -- I believe it was a risk

2    of injury conviction or grabbing the arm.

3          MR. PATEL:  Yes, that's right.  After that

4    conviction where he did grab the arm of somebody.  There's no

5    indication that this was sexual in nature.  But from the

6    first one involving the step-daughter of the cousin, I think

7    the order of probation lists sex offender treatment as part

8    of the order at the bottom of that page.  So I do believe it

9    was court ordered.  And he was ejected from that program.

10         Now, we heard today from his counsel that, for the

11   first time, that he wants to obtain treatment and it's a goal

12   of his.  I will note that we just heard that for the first

13   time today just moments before Your Honor's about to sentence

14   him.  I also note we've heard him say things before only to

15   change his mind.  For example, on March 2nd he pled guilty,

16   and then a few weeks later he had a change of heart and

17   decided to withdraw his guilty plea.  So I don't know how

18   much credit we can give his statement today that he really

19   wants to participate in this program and get better.  And

20   those prior convictions, the sex offender treatment, being on

21   the sex offender registry, none of that deterred him from

22   victimizing these young girls in this case.

23         So the Government believes that the defendant is a

24   very real danger to the community, especially minors.  And

25   just because he hid behind the internet and did not

1    physically touch any of these young girls does not make him

2    any less of a danger.  He had direct contact with and

3    communicated with these girls in a sexually explicit manner.

4    He directed and instructed them in how to engage in sexually

5    explicit conduct, how to pose in front of the camera.  And he

6    recorded their sexual acts for his own or their sexually

7    explicit conduct for his own sexual pleasure.  And the

8    Government believes this conduct would have continued if he

9    wasn't arrested.  Minor victim number 1, the date of that

10   offense was November 6, 2012, and Waterbury police visited

11   him only four days later.

12              THE COURT:  That's the report from Vermont?

13              MR. PATEL:  The report from Vermont actually was in

14   September 2012, before the incident with minor victim

15   number 1.  The incident from Vermont happened and after --

16              THE COURT:  It took a while to --

17              MR. PATEL:  It took a while to get the IP address,

18   to figure out which residence that resolved to.  And by the

19   time they got that information and Detective Morgan and

20   Detective Terni went to the house, it wasn't until November

21   10th, 2012.

22              THE COURT:  Okay.

23              MR. PATEL:  So in the Government's view,

24   Mr. Eastman's conduct makes him a real danger to the

25   community, not only this conduct but his past conduct.  And

1    his conduct and history, as the Government set forth in its

2    memo, are a far cry from the type of conduct that might merit

3    the mandatory minimum sentence.

4         Your Honor noted about the production charge versus

5    the enticement charge.  You know, in other districts, being

6    the coordinator in our office for these types of cases I'm on

7    a list serve where we discuss these type of cases with other

8    AUSAs in other districts.  I have no doubt in some other

9    districts that this would definitely have been charged as a

10   production of child pornography.

11        THE COURT:  I had a case in this district, United

12   States versus Michael Crawford, 13CR6, where there were

13   differences, there was contact, it was a person in his care.

14   The case agent is here.  On the other hand, there were many

15   more extenuating circumstances as well and one could have

16   argued about the wisdom of charging it that way, but it was

17   charged that way.  So I think -- I mean, there's no question,

18   at least in that case that was, one could say, a reasonably

19   aggressive use of a production charge.  I'm not being

20   critical, to be clear.  I'm just saying I don't think it's

21   correct to say that in this district no one ever gets charged

22   for production unless they're the Charles Manson of sex abuse

23   crimes.  It's just not true.

24        MR. PATEL:  I just had a sentencing earlier this

25   year which I handled and I did not put it in my memo because

47

1    it was a production charge, but it was a defendant who

2    enticed three young girls under the age of 16 over Skype and

3    Kik, but he had physical contact with one of them.  And in

4    that instance we decided to charge that one with production.

5    This one there was no physical contact or not in person with

6    these victims, and those cases our office tends to review

7    those more on a case by case basis.  If it was an in person

8    contact we more likely would have charged that as a

9    production case.

10            The last thing I want to mention, Your Honor, is the

11   harm of this conduct on the victims.  And while we've not

12   received any impact statements from victims directly, there

13   is a statement from the attorney, what's listed in the PSR as

14   minor victim number 4.  But we know from past experience the

15   harmful effects these cases have on minors.  And while the

16   effects might not manifest themselves right away so that

17   there could be a victim impact statement, they sometimes

18   occur years down the road.

19            I don't think there is a doubt that whatever

20   sentence this Court imposes, the victims will be dealing with

21   this conduct for some time to go, if not for the rest of

22   their lives.  And so while the Government is not seeking a

23   Guideline sentence in this case, the Government does not

24   believe that the mandatory minimum is appropriate.  And so we

25   would ask the Court to impose somewhere in the middle of the

```
 1    range between 10 and 20 years, followed by a lengthy term, if
 2    not a life term, of supervised release.
 3              THE COURT:  Thank you, Attorney Patel.
 4              Mr. Bloss, did you want to say anything before we
 5    recess?
 6              MR. BLOSS:  Very briefly, your Honor, just as to the
 7    last point.  I think the supervised release should be a long
 8    time.  I don't think there's any question about that.  I
 9    would expect that to be the case.  I think any marginal
10    credibility I might have might disappear if I suggested that
11    anything different should take place.
12              On the harm to the victims, I don't want to minimize
13    that, but in those Second Circuit cases that I cited there
14    was evidence of specific -- now, a lot of those were contact
15    cases, to be fair, and there was much more detailed evidence
16    of harm to the victims.  Having said that, I don't dispute
17    generally the circumstances here.  Other than that, no, Your
18    Honor, I don't have any comments.
19              THE COURT:  Thank you.  All right.  We're going to
20    take a short recess.  I'll be back to impose sentence at
21    about 3:30.
22              (Recess.)
23              THE COURT:  Please be seated.
24              First, just as a preliminary matter, I'm going to
25    order that the psychiatric evaluation be attached to the
```

1  Presentence Report in this case for purposes of the Bureau of

2  Prisons.

3       Let me now turn to sentencing.

4       So, Mr. Eastman, the law requires me to consider a

5  series of factors in deciding on a sentence in your case.

6  The factors are listed in Section 3553(a) of Title 18 of the

7  United States Code.  They include the following things:

8       Your background and characteristics.

9       The nature and circumstances of this crime.

10      The purposes of a criminal sentence.  And the

11  purposes of a criminal sentence recognized in the law are

12  punishment.  Punishment itself includes the need to reflect

13  the seriousness of the offense behavior and the need to

14  promote respect for the law, among other things.

15      Another purpose of a criminal sentence is

16  deterrence.  Deterrence includes deterring you from

17  committing crimes in the future and deterring other people

18  from committing this type of a crime.

19      Rehabilitation, which means addressing treatment and

20  vocational needs you might have.

21      And protecting the public from further crimes by

22  you.

23      Those are the purposes of a criminal sentence.

24      Another factor I'm required to consider is the

25  Sentencing Guidelines and the advice that the Guidelines give

1    me about how to sentence you.  As I've said before, I've

2    calculated the Guidelines range as 262 to 327 months of

3    imprisonment.

4         I also have to consider the need to avoid

5    unwarranted sentence disparities among defendants with

6    similar records who have been found guilty of similar

7    conduct.  There are other factors as well, such as

8    restitution which doesn't ultimately apply here.  But in

9    short, these factors require me to consider everything that I

10   have learned today, everything that's good and everything

11   that's not good, and to weigh all that information and

12   determine a sentence that is fair, just, and reasonable in

13   your case, and also a sentence that is sufficient but no

14   greater than necessary to serve the purposes of sentencing.

15   Now, I've considered all of these factors, but every case is

16   different and there are some factors here that weigh more

17   heavily than others.  I now want to talk to you more

18   specifically about how I reached a decision as to the

19   sentence by walking through these factors.

20        First, as a preliminary matter, I note that the law

21   gives me discretion to depart from the Guidelines range.  I'm

22   not going to exercise that discretion in this case because I

23   don't believe there's a basis to do so.  However, second, the

24   law also gives me discretion to impose what's called a

25   non-guidelines sentence, which is a sentence outside the

1    Guidelines regime.  I am going to exercise my discretion to

2    do that for reasons that will become apparent as I walk

3    through the factors and how they apply in this case in my

4    assessment.

5         I'm going to begin with your background and

6    characteristics.  Your lawyer did a very good job laying out

7    the information that's in the Presentence Report and in the

8    psychiatric report that I've received in a cogent way.  It's

9    clear you had a very challenging childhood.  And I see a lot

10   of defendants who have -- I would say actually most

11   defendants have challenging childhoods.  Yours was worst than

12   most that I see.  Alcoholic parents, a father who served

13   time, really abandonment by parents, in and out of foster

14   case, physical and sexual abuse, hearing loss, early on

15   dropping out of school, beginning to abuse alcohol.

16        So let me just begin by saying that Mr. Bloss is

17   right, this is sad for any child.  It's sad for you and it's

18   sad for any child.  Nobody deserves to begin life like that.

19   That said, after a time or actually quite early on, you began

20   following the pattern of your father and to some extent your

21   mother by engaging in alcohol abuse.  You began committing

22   crimes, including sex related crimes.  You've compiled a very

23   long criminal record, well over three decades, much of which

24   is too old to even count under the Sentencing Guidelines.

25   And unfortunately, that record, though not involving what

1    some people would consider to be violence, guns, knives,

2    beatings, things like that, the record does document

3    increasingly serious conduct.

4         While this offense, which I'm going to talk about in

5    a minute, did not involve physical conduct, two of the

6    earlier offenses did.  The two that I discussed with

7    Mr. Patel.  One of which was a risk of injury conviction from

8    just 10 years ago.  We're not talking about ancient history

9    here.

10        Perhaps even more disturbingly, your criminal record

11   also further documents that you committed several of these

12   offenses while you were on probation and while you were not

13   supposed to possess or use a computer.

14        As I discussed earlier, the Presentence Report

15   documents reliable evidence of uncharged criminal conduct in

16   this case, conduct that I found not to be a basis for

17   calculating the Guidelines.  And I''m talking now about the

18   conduct described in paragraphs 26 through 33 of the

19   Presentence Report against minor victims 2 through 5.  That

20   conduct was very similar to the conduct involved in the

21   offense of conviction except that some of the victims were

22   even younger, as young as 12.  Some of the conduct involved,

23   clearly involved the production of child pornography,

24   including encouraging minors to perform sex acts.

25        Other reliable evidence in the Presentence Report

1    shows that you independently possessed child pornography

2    downloaded from the internet.  That's a crime that causes its

3    own unique harm by inflicting pain on victims repeatedly

4    through the years each time an image is accessed.

5          Taken together, I find that your background shows

6    whatever the explanation for it and whatever the causes for

7    it, that you are a habitual and, I'm sorry to say, dangerous

8    sex offender, regardless of whether you qualify for

9    particular labels in that regard under the Sentencing

10   Guidelines.

11         First, you have not aged out of criminal conduct.

12   Even in your mid 40's, your crimes continue to occur and, if

13   anything, became more serious.  Worse, I would say, you

14   apparently failed to recognize this, at least before anything

15   that you said today.  And I'll be frank with you, I always

16   take what's said on the day of sentencing with a grain of

17   salt.  It's normal for a judge to do that.  Because I know

18   that you are aware that you're facing sentencing.

19         I read the motion that you filed to withdraw your

20   plea, and in that motion you described your crime against

21   minor victim 1 as a crime of technicality.  You made the

22   point earlier that you didn't want to be portrayed as a

23   monster or a sexual predator, and that somehow you seemed to

24   suggest that the world saw you in a much worst light than you

25   really were or that you really presented.

1           The problem with all that from my perspective is

2    that it doesn't fit with the actual conduct.  In spite of

3    repeatedly deceiving young girls into displaying themselves

4    in sexual positions and into performing sex acts, in spite of

5    grabbing one and spanking another, in spite of refusing to

6    comply with the rules of an earlier sex offender program, in

7    spite of repeatedly violating strict conditions of probation,

8    you think that you're not a sexual predator.  Your failure to

9    take responsibility for your actions and to recognize your

10   flaws by itself poses a danger, because it suggests that you

11   will be resistant to efforts to curb your behavior.  And I

12   think that, frankly, the psychiatric report to some extent

13   concurs with that.

14           Turning now to the nature and circumstances of this

15   crime.  Causing a child, even one as old as 16, to display

16   herself over the internet for your sexual gratification and

17   taking a picture of it is a serious crime.  The law has long

18   recognized that children suffer serious harm when they're

19   made the sexual play things of adults.  And there are many,

20   many studies that show that children who are sexually abused

21   are much more likely to abuse substances, suffer from

22   depression, and engage in other antisocial behaviors as

23   compared to those who are not sexually abused.  Your own life

24   is evidence of that.  I'm aware of that.

25           This crime was exacerbated by the deception used and

1    by your creating a visual image.  Conduct that, as I

2    mentioned, could have been charged as production of child

3    pornography which would have subjected you to a 15 year

4    minimum.  With regard to the seriousness of the offense, make

5    no mistake, apart from violent crime, sex crimes against

6    children are probably the most serious crimes that are

7    prosecuted in this court, at least in my assessment.

8          Turning now to the purposes of a criminal sentence.

9    One purpose here, of course, is the need to reflect the

10   seriousness of the crime which I just described.  There's

11   also a need to promote respect for the law.  In light of the

12   attitude you expressed in your motion to withdraw your plea

13   about a crime of technicality, and in light of your pattern

14   of reoffending while under court supervision such as

15   probation.  But far and away from my perspective the purpose

16   of a criminal sentence that is most salient, most urgent here

17   is the need to protect the public.  Previous sentences,

18   including a term of as long as 40 months, and previously

19   lengthy terms of probation with strict conditions, including

20   computer monitoring and sex offender treatment were not

21   adequate to protect the public.  Nor, as I mentioned, has

22   your age slowed down your criminal conduct which is, frankly,

23   unusual.

24         Further, I'm taking comfort in the fact that this

25   particular offense did not involve contact.  As I said,

1  earlier offenses did, including one you committed in your
2  late 30's.  In light of all this, it would not be
3  unreasonable to make an argument, which the Government has
4  not made, that the protection of the public alone calls for a
5  sentence so lengthy that you would be decrepit and physically
6  incapable of committing further crimes when you were
7  released.  I'm not going to impose a sentence that that's
8  long, but I do think I reasonably could.  And the sentence is
9  going to be long in this case.

10      Specific deterrence is also a salient purpose here
11  for pretty much the same reasons I've already said.  A longer
12  prison sentence -- a substantially longer prison sentence is
13  necessary here than any one you previously served, because
14  previous sentences were unsuccessful in deterring from
15  criminal conduct.

16      I agree with Mr. Bloss about the need to take into
17  account where you've been for the past four and a half years.
18  That is unusual, too, in my experience.  And though I haven't
19  been to Bridgeport, I have been to other holding facilities
20  like Whalley Avenue in the state, I've certainly been to
21  Wyatt, but I can imagine that Bridgeport not only doesn't
22  have programming but, frankly, is a place where you had to do
23  much harder time than most federal prisoners would have to
24  serve.  And you're going to get a year's worth of credit for
25  that for me.  And I would say that, just so you understand

1    why it's only a year, it's not unusual in this court for

2    someone to be at Wyatt for two, two and a half years.  There

3    are circumstances, some of which occurred in this case,

4    changing counsel and the like, that sometimes delay things.

5    But in this case most of the delay or at least a substantial

6    part of it was not due to anything that you did.  And I'm not

7    faulting the Government.  As Mr. Bloss said, this happened.

8    But you are going to receive some credit for it.

9          Lastly, in terms of -- and the reason I mention that

10   in connection with the purposes of sentencing is that the

11   fact that you did harder time does go part of the way towards

12   the need to address the seriousness of the offense and to

13   provide for just punishment.

14         Turning to the Sentencing Guidelines and how I see

15   them fitting into the picture here.  As I said, the range is

16   262 to 327 months.  I note that that is over six times more

17   than any amount of time that Mr. Eastman has previously

18   served.  That fact, combined with the fact that I expect to

19   impose very restrictive conditions of supervised release,

20   leads me to conclude that a sentence within the Guidelines

21   range would be greater than what is please to protect the

22   public and even to reflect the seriousness of the offense.

23   Although, I'll be honest, it's a close call in my

24   assessment.  And I think one could reasonably argue otherwise

25   with regard to the need to protect the public.

1          The sentence I impose will be substantially below

2    the Guidelines range.  Indeed, after taking account of the

3    one year reduction, I will be imposing as a result of the

4    fact that you were at Bridgeport for four and a half years,

5    the sentence will be below the range that would apply even if

6    I had granted acceptance of responsibility.  The sentence I

7    will impose is the minimum that I find to be necessary to

8    protect the public and fulfill the other purposes of

9    sentencing that are most salient in the case as I have

10   described them.  I note that I would impose that same

11   sentence, the sentence I'm going to impose, regardless of

12   whether Mr. Eastman had qualified for acceptance of

13   responsibility

14         Lastly, I want to touch on the issue of disparities

15   which is another issue that I've thought about and the

16   parties have discussed.  I do appreciate the Government's

17   bringing some of those cases to my attention.  I wasn't aware

18   of all of them.  I was aware of some of them.  I've

19   considered those cases.  I've also, as I said, considered the

20   fact that Mr. Eastman easily could have been charged here

21   with the production of child pornography which would have

22   carried a 15 year minimum.  There's no evidence here that

23   Mr. Eastman traded images.  There's no evidence that he had

24   contact with either minor victim 1 or minor victims 2 through

25   5.  And I agree that those are -- those factors make this

1  less serious than some cases. That said, the harm he

2  perpetrated on these victims is still serious. And I

3  mentioned the Crawford case. In that case there were some

4  different circumstances, starting with the fact that the

5  victim was the defendant's relative, and that the defendant

6  traded images and was physically present with the victim. By

7  the same token, the defendant in that case, who I sentenced

8  to 210 months in prison, posed much less of a danger of

9  recidivism. He had zero criminal history points. He was in

10  his 30's at the time of the offense, and he did not have

11  nearly as troubling history and characteristics as

12  Mr. Eastman does. Were it not for the fact that I'm going to

13  give Mr. Eastman a year's credit for serving his time in

14  Bridgeport, I would impose a sentence on him that was

15  slightly higher than the one that Mr. Crawford received. In

16  the end it will be slightly lower, and it will be three years

17  lower than what I understand Mr. Hazley received. Mr. Hazley

18  was discussed in the Government's brief. He was sentenced,

19  as I understand it, by Judge Bolden. His offense was

20  considerably more serious than Mr. Eastman's. It involved

21  not only trading, but a great deal more victims. On the

22  other hand, he had a substantially lower criminal history.

23         So those are the comparisons that I've run in my

24  mind. The Government also mentioned the Smith case. And in

25  my view that case bears zero resemblance to this case. There

1    were very different circumstance in that case, including the

2    fact that the defendant suffered from a rare disease which

3    affected his mind.

4         Finally, with regard to restitution, as I said, I

5    don't believe I have a basis to impose restitution in this

6    case.

7         All right.  Mr. Eastman, for the reasons I've

8    explained, I find that the following sentence is the minimum

9    that is necessary to serve the purposes of sentencing that

10   I've described, including the need to protect the public.

11   And, again, I note that I would impose this sentence

12   regardless of my Guidelines determinations.

13        Please stand.

14        I sentence you to 204 months, which is 17 years, of

15   imprisonment with credit for time served.

16        I impose a lifetime term of supervised release.  In

17   addition to the standard conditions of supervised release,

18   the following mandatory conditions are imposed:

19        First, the Defendant shall not commit another

20   federal, state, or local offense.

21        Second, he shall not unlawfully possess a controlled

22   substance.

23        Next, the Defendant shall refrain from any unlawful

24   use of a controlled substance and submit to one drug test

25   within 15 days of release on supervised release and at least

1   two periodic drug tests thereafter for use of a controlled

2   substance.

3           The Defendant is required to pay the assessment

4   imposed in accordance with Title 18, United States code,

5   Section 3013.

6           The Defendant shall report the address where he will

7   reside and any subsequent change of residence to the

8   Probation Officer responsible for supervision and shall

9   register as a sex offender in any state where he may reside,

10  where he may be employed, or where he carries on location or

11  is a student.

12          The Defendant shall cooperate in the collection of a

13  DNA sample.

14          In addition, the following special conditions are

15  imposed.  Before I specify these conditions, I note that they

16  are based on my findings that I've detailed today, including

17  the findings about Mr. Eastman's history and characteristics,

18  his performance on probation, his performance in sex offender

19  treatment, and his performance under a condition requiring

20  checking his computer.  I find that these conditions are the

21  minimum necessary to protect the public when Mr. Eastman is

22  released from prison based on his history and characteristics

23  and the nature and circumstances of the offense.

24          First, you must not associate with children under

25  the age of 18 except in the presence of a responsible adult

1    who is aware of the nature of your background and the current

2    offense and who has been approved by the Probation Office.

3         Second, you must not loiter around playgrounds,

4    schools, youth oriented organizations, clubs, or any other

5    place where children under the age of 18 are known to

6    congregate.  You must not associated with or have contact

7    with convicted sex offenders or those considered

8    inappropriate by the Probation Office because of a connection

9    to sexual abuse of minors or sexually explicit material

10   involving minors unless as part of an approved counseling

11   program.

12        Next, you must submit to periodic polygraph testing

13   at the discretion of the Probation Office as a means to

14   ensure that you are in compliance with the requirements of

15   your supervision following the completion of a sex offender

16   treatment program. You must pay all or a portion of the costs

17   associated with testing based on your ability to pay as

18   determined by the Probation Office.

19        Next, you must not possess any materials including

20   pictures, photographs, books, writings, drawings, videos, or

21   video games depicting what is described as child pornography

22   as described in Title 18, United States Code, Section 2256.

23        Next, you must submit your person, residence, office

24   or vehicle to a search conducted by a U.S. Probation Officer

25   at a reasonable time and in a reasonable manner based upon

1    reasonable suspicion of contraband or evidence of a violation

2    of a condition of release.  Failure to submit to a search may

3    be grounds for revocation.  You must inform any other

4    residents that the premises may be subject to searches under

5    this condition.

6         Next, you must submit all photographic equipment,

7    personal computers, or other internet capable devices and

8    related equipment owned, controlled, or used by you, to a

9    review conducted by the U.S. Probation Office or its designee

10   at a reasonable time and in a reasonable manner without prior

11   notice or a search warrant.  You must also permit the

12   Probation Office to install and use monitoring programs on

13   all such equipment.  You must bear the cost of said

14   monitoring programs depending, however, on your ability to do

15   so.  Refusal to submit to a search will be a violation of

16   conditions of supervision.  This condition may be modified on

17   motion by the parties or the recommendation of the Probation

18   Office communicated to the parties based on changes in

19   technology.

20        Next, you must comply with the requirements of the

21   Sex Offender Registration Identification Act as directed by

22   the Probation Office, the Bureau of Prisons, or any state sex

23   offender registration agency in which you reside, work, are a

24   student, or were convicted of a qualified offense.

25        Next, you must not be employed in any position or

1  participate as a volunteer in any activity that involves

2  contact with children under the age of 18 except as approved

3  by the Probation Officer.

4         Next, you must participate in mental health

5  treatment with an emphasis on sex offender treatment as

6  recommended by the Probation Office and approved by the

7  Court, and must abide by the policies and procedures of the

8  program which may include polygraph testing.  You must pay

9  all or a portion of the costs associated with treatment based

10 on your ability to pay as determined by the Probation Office.

11        Next, you must participate in substance abuse,

12 evaluation and treatment in a program recommended by

13 Probation and approved by the Court.  You must comply with

14 the rules of the program.  You must pay all or a portion of

15 the costs associated with such treatment based on your

16 ability to pay as determined by the Probation Office.

17        Finally, you must provide the Probation Office with

18 access to any requested financial records including, but not

19 limited to telephone and cellular phone bills and credit card

20 statements.  That condition is based on your computer

21 purchases documented in the record.

22        I impose no fine.

23        I impose no restitution.

24        You're required to pay a special assessment of $100.

25        As I said, the forfeiture of your computer will be

1    part of the judgment.

2         Does either counsel know of any reason that the

3    sentence I have described cannot legally be imposed as the

4    sentence of the Court?

5         MR. PATEL:  No, Your Honor.

6         MR. BLOSS:  No, Your Honor.

7         THE COURT:  Mr. Eastman, the sentence I've described

8    is imposed as the sentence in your case.  The judgment will

9    be prepared for my signature by the Clerk's Office in

10   consultation with the Probation Office.  It will include a

11   recommendation for the Devens facility.

12        If you wish to appeal the judgment, you must file a

13   written Notice of Appeal within 14 days of the entry of

14   judgment.  Do you understand that time limit?

15        THE DEFENDANT:  Yeah.

16        THE COURT:  If you wish to appeal but you cannot

17   afford to, then you may apply for leave to appeal in forma

18   pauperis.  If the motion is granted, the Court will waive the

19   filing fee for your appeal and will appoint a lawyer to

20   represent you at no cost to you.  Do you understand, sir?

21        THE DEFENDANT:  Yeah.

22        THE COURT:  Mr. Bloss, I did grant your motion with

23   regard to withdrawing your appearance after the sentencing.

24   Mr. Eastman not only has a right to appeal the judgment, but

25   this was a conditional guilty plea.  Unless he directs you

1  otherwise, would it be all right if you actually filed the

2  Notice of Appeal for him?

3          MR. BLOSS:  I think there are two alternatives, Your

4  Honor.  The other time that I've been involved with this I

5  think what the Court did actually was to appoint a new

6  lawyer --

7          THE COURT:  It's just you've got 14 days.

8          MR. BLOSS:  I understand.  I can certainly do it.  I

9  don't mind doing it.  I think the problem is --

10         THE COURT:  Will the Circuit consider that an

11  appearance?

12         MR. BLOSS:  Exactly.  So if it is possible to have

13  somebody appointed who is on the panel.

14         THE COURT:  The only problem is I think -- you mean

15  the Circuit panel, right?

16         MR. BLOSS:  Correct.

17         THE COURT:  I don't believe I'm -- I may be

18  wrong -- to appoint people who are the Circuit panel to

19  represent him at the Circuit.

20         MR. BLOSS:  There are going to be people that are on

21  the District Court panel that are also on the Circuit panel.

22  I think that would be the cleanest way to do it is if

23  somebody from the District panel was on the Circuit panel.

24         THE COURT:  I mean, it might be better, though, if

25  he got somebody from New York just kind of a fresh eye as

1    your motion indicated.  Look, I hear you which is -- but

2    wouldn't you be able to say to the Circuit Judge Shea let me

3    out?

4         MR. BLOSS:  I would trust that somebody would

5    -- obviously I don't want to have Mr. Eastman prejudiced.

6         THE COURT:  Let's have you file the Notice of Appeal

7    for him.  I will put something on the docket with the

8    judgment noting, again, that I granted your order and you are

9    relieved from representing him on appeal.  I'll put that

10   somewhere.

11        MR. BLOSS:  That's fine.  It will work out, your

12   Honor.

13        THE COURT:  Thank you, Mr. Bloss.

14        Does the Government have a motion with respect to

15   the remaining count of the indictment?

16        MR. PATEL:  Yes, Your Honor.  In accordance with the

17   Plea Agreement, now that he's been sentenced we move to

18   dismiss Count Two of the indictment.

19        THE COURT:  And that motion is granted.

20        Officer Welks?

21        PROBATION OFFICER WELKS:  Your Honor, just to

22   clarify for the record, when the amended Presentence Report

23   comes out should it include the Court's finding with regard

24   to the Guidelines that were determined today?

25        THE COURT:  Yes.  Unless either counsel thinks this

1    doesn't work, what I'm going to do is direct the Probation

2    Office to change the reference in the discussion in

3    paragraphs 26 through 33 where the heading to I think

4    Mr. Bloss suggested other evidence.  And that would at least

5    correspond with my findings.  I understand the Government

6    disagrees.  But it would correspond with my findings that

7    it's not part of the relevant conduct in this case.  Is there

8    any reason not to do that?

9              MR. PATEL:  I don't think so, Your Honor.

10             MR. BLOSS:  No, Your Honor.  And on that issue,

11   though, Your Honor indicated that regardless of how the

12   Guidelines were calculated on the acceptance issue that the

13   Court would impose the same sentence.  And given that Your

14   Honor has taken into account the paragraph 26 through 33

15   conduct, albeit not under the Guidelines but as other

16   conduct, again, forgive me for asking this, would it also be

17   the case that Your Honor's sentence would be the same as what

18   Your Honor imposed?

19             THE COURT:  Absolutely, yes.  I should have said

20   that.  I did sort of encompass it, but my sentence would be

21   the same -- it's a good question -- even if I had included

22   the conduct described in paragraphs 26 through 33 as relevant

23   conduct.  In other words, even if I had gone the opposite way

24   on that Guidelines issue.  It's prudent of you to raise that.

25   So thank you.  Because I find for the reasons I've indicated.

1          Why don't we do that then.

2          PROBATION OFFICER WELKS:  Yes, your Honor.

3          THE COURT:  Anything else?

4          MR. PATEL:  No, Your Honor.

5          MR. BLOSS:  Not that I can think of, Your Honor.

6   Thank you.

7          THE COURT:  Thank you.  We'll be in recess.

8          (Concluded.)

C E R T I F I C A T E

        I, Martha C. Marshall, RMR, CRR, hereby certify that
the foregoing pages are a complete and accurate transcription
of my original stenotype notes taken in the matter of UNITED
STATES V. JOHN EASTMAN, which was held before the Honorable
Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,
Connecticut, on November 28, 2017.


                                    /s/Martha C. Marshall
                                   Martha C. Marshall, RMR,CRR
                                   Official Court Reporter

        .